## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| ——————————————— x | |
| RUSSELL HOFF, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. _____ |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| vs. | DEMAND FOR JURY TRIAL |
| POPULAR INC., RICHARD CARRIÓN AND JORGE A. JUNQUERA, | |
| Defendants. | |
| ——————————————— x | |

## CLASS ACTION COMPLAINT

**TO THE HONORABLE COURT**:

**NOW COMES THE PLAINTIFF** Russell Hoff, on his own behalf and on behalf of all others similarly situated, through his undersigned counsel, and respectfully submits the following Class Action Complaint for violations of the Federal Securities Laws.

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Popular Inc. ("Popular" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the securities of Popular between January 23, 2008 and January 22, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Russell Hoff, as set forth in the accompanying certification and incorporated by reference herein, purchased the securities of Popular during the Class Period and has been damaged thereby.

7.      Defendant Popular, through its subsidiaries, offers a range of retail and commercial banking products and services in Puerto Rico and the United States.

8.      (a)      Defendant Richard Carrión ("Carrión") is, and was at all relevant times, Chairman and Chief Executive Officer of Popular.

- 2 -

(b)     Defendant Jorge A. Junquera ("Junquera") is, and was at all relevant times, the Company's Senior Executive Vice President and Chief Financial Officer.

(c)     Defendants Carrión and Junquera are collectively referred to herein as the "Individual Defendants."

9.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Popular, were privy to confidential and proprietary information concerning Popular, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Popular, as discussed in detail below. Because of their positions with Popular, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Popular's business.

11.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ Stock Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Popular's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Popular common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of Popular securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Popular's business, operations, management and the intrinsic value of Popular securities; and (ii) caused Plaintiff and members of the Class (defined below) to purchase Popular common stock at artificially inflated prices.

- 4 -

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the securities of Popular between January 23, 2008 and January 22, 2009, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Popular common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Popular or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Popular;

(c)     whether the price of Popular common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     Defendant Popular describes itself as a "full service financial institution based in Puerto Rico with operations in Puerto Rico, the United States, the Caribbean and Latin America."

21.     The Class Period begins on January 23, 2008.  On that date, Popular issued a press release announcing that it agreed to "sell certain assets of Equity One, the U.S. mainland consumer finance operations of Popular Financial Holdings, to American General Finance, Inc. , a member of American International Group" for approximately $1.5 billion in cash.

22.     On January 23, 2008, following the sale of a large part of Equity One's loan portfolio to American General Finance Inc., Fitch Ratings removed Popular from Rating Watch Negative and affirmed its long-term issuer default rating of A- for Popular.  Moreover, Moody's Investors Service changed its outlook on Popular to stable from negative. According to Moody's, the transaction will

"reduce Popular's exposure to US subprime mortgages and significantly strengthen its holding company liquidity position since Popular has largely financed its US consumer finance business with short- and medium-term wholesale borrowings at the parent company level."

23.    Upon this news, shares of the Company's stock rose $1.45 per share, or 17%, to close at $10.13 per share, on heavy trading volume.

24.    On January 24, 2008, Popular issued a press release announcing its financial results for the fourth quarter and year end of 2007, the period ended December 31, 2007.  For the quarter, the Company reported an estimated net loss of ($294.1) million and an estimated basic and diluted net loss per common share of ($1.06).  Defendant Carrión, commenting on the results, stated, in pertinent part, as follows:

> These are obviously disappointing results.  However, we continue to take the difficult steps to improve our performance moving forward.

With regard to the sale of Equity One, the press release stated:

> In January 2007, Popular's management announced that based on a comprehensive strategic and financial assessment of all of PFH's operations, the Corporation decided to adopt a Restructuring and Integration Plan at PFH, the holding company of Equity One (the "PFH Restructuring Plan"). The PFH Restructuring Plan called for PFH to exit the wholesale subprime mortgage loan origination business, to consolidate support functions with its sister U.S. banking entity, Banco Popular North America ("BPNA"), creating a single integrated North American financial services unit, and to focus on existing profitable businesses. At that time, Popular decided to continue the operations of Equity One and its subsidiaries ("Equity One"), with over 130 consumer services branches principally dedicated to direct subprime loan origination, consumer finance and mortgage servicing. However, given the unforeseen disruption in the capital markets since the summer of 2007 and its impact on funding, Popular's management now believes that it will be difficult to generate an adequate return on the capital invested at Equity One.
>
> As indicated in the press release dated January 23, 2008, Popular, Inc. announced the signing of an Asset Purchase Agreement (the "Agreement") to sell certain assets of Equity One, the U.S. mainland consumer finance operations of Popular Financial Holdings, to American General Finance, Inc., a member of American International Group. The Agreement contemplates the sale of a significant portion of Equity One's mortgage loan and consumer loan portfolio approximating $1.5 billion. This portfolio was reclassified by the Corporation from loans held-in-portfolio to loans held-for-

sale in December 2007. The Agreement also provides that American General Finance, Inc. will consider hiring an unspecified number of Equity One's consumer services employees and will consider retaining an unspecified number of branch locations. Equity One will close all remaining consumer branches. Workforce reductions at Equity One will result in the loss of employment for those employees at the consumer services branches not hired by American General Finance, Inc., as well as for other related support functions. The individuals whose jobs will be eliminated will receive from Equity One a transitional severance package, professional counseling, outplacement and support during this process.

It is anticipated that this restructuring plan (the "PFH Branch Network Restructuring Plan") will result in estimated combined charges for the Corporation of $19.5 million broken down as follows:

| (In millions) | Fourth Quarter 2007 | First Quarter 2008 | Total |
|---|---|---|---|
| Severance, retention bonuses and other benefits | -- | $8.1 | $8.1 |
| Lease terminations | -- | 5.6 | 5.6 |
| Other | -- | 2.1 | 2.1 |
| Total restructuring charges | -- | 15.8 | 15.8 |
| Impairment of long-lived assets | $1.9 | -- | 1.9 |
| Other costs | -- | 1.8 | 1.8 |
| Total combined estimated costs | $1.9 | $17.6 | $19.5 |

These estimates are preliminary and may vary as Popular's management implements the PFH Branch Network Restructuring Plan. The impairment of long- lived assets was taken in the fourth quarter of 2007 and is mainly related to leasehold improvements, furniture and equipment. The closing of the transaction is subject to the approval of state licensing agencies. It is anticipated that the transaction and the workforce reductions at Equity One will be accomplished in the first quarter of 2008.

25.     On January 25, 2008, Raymond James upgraded Popular and stated that the Company has "refitted itself to be less risky."

26.     Upon this news, on the next trading day, shares of the Company's stock rose $1.28 per share, or 12%, to close at $12.26 per share.

27.     On April 18, 2008, Popular issued a press release announcing its financial results for the first quarter of 2008, the period ended March 31, 2008.  For the quarter, the Company reported net income of $103.3 million and basic and diluted earnings per common share (EPS) of $0.36, per share.  Defendant Carrión, commenting on the results, stated, in pertinent part, as follows:

> Excluding non-recurrent items, the quarter was a difficult one as credit and markets continued to deteriorate.  We have reduced our U.S. mortgage exposure but we expect economic conditions to stay under stress.

With regard to what impacted the Company's financial results in the first quarter, the press release stated:

> * Higher provision for loan losses for the first quarter of 2008, which increased by $71.9 million as compared with the same period in 2007, driven principally by higher net charge-offs and additional reserves for certain specific commercial and construction loans considered impaired.

> * Higher non-interest income by $55.8 million, mostly driven by increases on the sale of loans, higher other service fees and other revenues that were impacted by certain major events, which are described subsequently in this press release.

> * The results for the first quarter of 2008 were favorably impacted by the gain on sale of VISA shares amounting to approximately $49.3 million, but on a comparative basis to the same quarter in 2007 the impact of this sale is diluted as there were also non-recurring gains on the sale of securities in 2007, primarily $118.7 million from the sale of the Corporation's interest in Telecomunicaciones de Puerto Rico, Inc. ("TELPRI"), as further described in the Non-interest Income section of this press release.

28.     On May 6, 2008, the Company issued a press release announcing that it is "planning to commence a public offering of $350 million of non-cumulative perpetual preferred stock pursuant to an existing effective Popular registration statement."

29.     On May 22, 2008, the Company issued a press release announcing that it "priced its previously announced public offering of non-cumulative perpetual preferred stock offering following an increase in the offering size by $50 million to $400 million. The resulting offering of 16,000,000 shares was priced at 8.25% with a purchase price of $25 per share."  The offering was completed on

May 28, 2008. The Registration Statement issued in connection with the preferred stock offering failed to disclose the material facts detailed herein.

30.     On July 17, 2008, Popular issued a press release announcing its financial results for the second quarter of 2008, the period ended June 30, 2008. For the quarter, the Company reported net income of $24.3 million and basic and diluted earnings per common share (EPS) of $0.06 per share. Defendant Carrión, commenting on the results, stated, in pertinent part, as follows:

> We continue to feel the pressure of the turmoil in the financial markets and deteriorating economic conditions. We are fully engaged in the process of evaluating various strategic alternatives to improve the profitability of our operations in the United States. Some of these alternatives may involve the sale of some of these operations. Our banking and processing businesses in Puerto Rico continue to perform well despite a weak economy. Banco Popular de Puerto Rico met our expectations for the first half of the year with that segment reporting net income amounting to $191.3 million even with significant increases in its provision for loan losses. In addition, we remain strongly capitalized with over $1 billion of Tier I capital in excess of the regulatory "well capitalized requirement."

With regard to what impacted the Company's financial results in the first quarter, the press release stated:

> Financial results for the quarter ended June 30, 2008 were principally impacted by the following items (on a pre-tax basis compared to the second quarter of 2007):
>
> -- Lower net interest income by $33.5 million due to the sale and reduction of various low margin assets.
>
> -- Higher provision for loan losses for the second quarter of 2008, which increased by $75.5 million as compared with the same period in 2007.
>
> -- Net losses attributable to changes in the fair value of Popular Financial Holdings' ("PFH") loans and bond certificates measured at fair value pursuant to SFAS No. 159 amounted to $35.9 million for the quarter ended June 30, 2008.
>
> -- Lower net gain on sale of loans and valuation adjustments on loans held-for-sale by $29.7 million for the second quarter of 2008, with PFH and E- LOAN showing a reduction of approximately $34 million.
>
> The above were partially offset by:

-- Higher combined net gains on sale and valuation adjustments of investment securities and trading account profits by $32.9 million, primarily resulting from sales of agency securities and a higher volume of mortgage loans pooled and sold as mortgage-backed securities in the secondary markets in the Banco Popular de Puerto Rico reportable segment. Refer to "Balance Sheet comments" for further information.

-- Higher other non-interest income by $22.9 million.

-- Lower operating expenses by $13.3 million.

-- Income tax benefit of $31.2 million for the second quarter of 2008, compared with income tax expense of $23.6 million for the same quarter in 2007.

31.     On August 29, 2008, the Company issued a press release announcing that it agreed to sell "loan and servicing assets of its U.S. mortgage subsidiary Popular Financial Holdings (PFH) to various Goldman Sachs affiliates. The sale includes approximately $1,170 million in loans and mortgage servicing assets. The transaction, expected to close in the fourth quarter of 2008, will provide more than $700 million in additional liquidity and significantly reduce Popular's U.S. subprime assets. Popular expects to report a loss of approximately $450 million in connection with the transaction." Defendant Carrión, commenting on the sale, stated, in pertinent part, as follows:

We are continuing to narrow the scope of our mainland U.S. operations are most exposed to the credit and mortgage markets, by leveraging on our core strengths in Puerto Rico, where we are the undisputed market leader. Indeed, our core retail banking franchise in Puerto Rico is strong and continues to perform well.

32.     On September 17, 2008, the Company issued a press release announcing that it "reached an agreement to purchase from R-G Mortgage Corp., a unit of R-G Financial, the third-party mortgage servicing rights to a mortgage loan portfolio of approximately $5.1 billion." Defendant Carrión, commenting on the acquisition, stated, in pertinent part, as follows:

This transaction will further fortify our leading position in Puerto Rico and it is immediately accretive.

33.     On September 18, 2008, the Company also announced the "sale of manufactured housing loan assets of its U.S. mortgage subsidiary Popular Financial Holdings, or PFH, to 21st

Mortgage Corp. and Vanderbilt Mortgage and Finance, Inc."  Moreover, according to the press release, the "transaction will provide approximately $194 million in cash and further reduce its assets at its PFH subsidiary, in conjunction with previously announced asset sales. Popular expects to report a pre-tax loss of approximately $70 million in connection with the sale announced today." Defendant Carrión, commenting on the sale, stated, in pertinent part, as follows:

> This agreement builds on previous actions we have taken to exit non-strategic markets and strengthen our balance sheet.  We still have work to do and will communicate future actions once completed.

34.     Upon this news, shares of the Company's stock rose $3.12 per share, or 40%, over the next two trading days.

35.     On October 22, 2008, Popular issued a press release announcing its financial results for the third quarter of 2008, the period ended September 30, 2008.  For the quarter, the Company reported a net loss of $668.5 million.  Defendant Carrión, commenting on the results, stated, in pertinent part, as follows:

> These results are directly related to the decision announced two months ago to sell the assets and discontinue the operations of PFH. We have also taken a partial valuation allowance on our deferred tax assets related to our U.S. operations. We remain well capitalized and have raised liquidity to meet obligations through 2009. We are focused on the profitability of our U.S. operations and we will be taking additional steps to further reduce expenses and to close or consolidate unproductive branches.

With regard to what impacted the Company's financial results in the first quarter, the press release stated:

> The following items principally impacted financial results:
>
> -- Losses of $457.3 million, net of tax, related to the discontinued operations of the U.S.-based reporting segment Popular Financial Holdings ("PFH"). The losses included writedowns of assets, losses on the sales of loans and restructuring charges recorded in connection with actual sales and scheduled disposition of PFH's assets. Sales of PFH's portfolios in connection with the discontinuance of PFH's operations are expected to result in over $900 million in additional liquidity, of which $198 million was received in September 2008. The loan sales completed in September

2008 and the expected asset sales to Goldman Sachs scheduled for the fourth quarter of 2008, reduce PFH's assets by more than $1.2 billion. The results for the quarter also include the recording of a valuation allowance on deferred tax assets of $171.2 million.

-- Losses from continuing operations of $211.2 million primarily resulting from a valuation allowance of $189.2 million against the Corporation's deferred tax assets related to U.S. operations and higher provision for loan losses of $165.8 million as a result of higher credit losses, particularly in real estate related loans.

36.     On November 3, 2008, the Company issued a press release announcing that it "completed the sale of the loan and servicing assets of its U.S. mortgage subsidiary Popular Financial Holdings, Inc. to various Goldman Sachs affiliates.  The sale would result in a reduction of approximately $900M in loans and mortgage servicing assets that are mainly accounted at fair value, providing Popular with more than $700 million in additional liquidity and significantly reducing Popular's U.S. subprime assets."  Defendant Carrión, commenting on the sale, stated, in pertinent part, as follows:

The closing of this transaction is a major step forward in our efforts to build capital and liquidity, and create a leaner and more efficient business. We continue to focus on reducing the size of our footprint in the mainland U.S. to a level better suited to present economic conditions while taking steps to improve profitability across our business.

37.     On November 18, 2008, the Company issued a press release announcing that it "received preliminary approval from the U.S. Department of the Treasury (the "Treasury") to participate in its Capital Purchase Program ("CPP") under the Troubled Assets Relief Program ("TARP"). As a result, the Corporation expects that Treasury will purchase $950 million newly issued shares of the Corporation's preferred equity stock."  Defendant Carrión, commenting on the infusion by the government, stated, in pertinent part, as follows:

This investment further improves the liquidity and capital position of Popular as we strive to meet the needs of our customers and communities in the current challenging economic environment.

38.    The statements referenced above in ¶¶21, 24, 27, 29, 30, 31, 32, 33, 35, 36, and 37 were materially false and misleading when made because they misrepresented and failed to disclose:

(a)    that the Company's deferred tax assets related to its U.S. operations were materially overstated;

(b)    that the Company was experiencing increasing loan losses in Puerto Rico and the U.S. construction sectors;

(c)    that the quality of the Company's remaining mortgage-related loans in its U.S. mainland portfolios and other assets were deteriorating and were materially overstated;

(d)    that the Company was experiencing a higher percentage of non-performing loans;

(e)    that the Company's new loan originations were declining; and

(f)    as a result of the foregoing, the Company would soon be facing liquidity concerns and would be forced to cut or eliminate paying a dividend to shareholders.

39.    Then, on January 22, 2009, Popular issued a press release announcing its financial results for the fourth quarter and year end of 2008, the period ended December 31, 2008.  For the quarter, the Company reported a net loss of $702.9 million.  Defendant Carrión, commenting on the results, stated, in pertinent part, as follows:

> Our disappointing results reflect deteriorating economic conditions both in the U.S. mainland and Puerto Rico, which resulted in substantial loss for the fourth quarter principally caused by a significant increase in the allowance for loan losses and the valuation allowance equal to 100% of the deferred tax asset related to our U.S. mainland operations. **The provision for loan losses increased particularly in the construction sector in Puerto Rico and in the U.S. mainland and the mortgage related loans in our U.S. mainland portfolios.** Notwithstanding these charges, our Puerto Rico operation produced over $200 million in profits. The $935 million TARP funds provided us with solid regulatory capital ratios, which will permit us to manage through what we expect to be another extremely challenging year.

- 14 -

The integration of the U.S. mainland franchise and our Puerto Rico operation is underway to provide a more nimble organization focused on core banking and achieving the necessary operational synergies.

With regard to what impacted the Company's financial results in the first quarter, the press release stated:

The following principal items impacted the Corporation's continuing operations financial results for the quarter ended December 31, 2008, when compared to the same quarter in the previous year:

   **-- higher provision for loan losses by $267.1 million as a result of higher credit losses and increased specific reserves for impaired loans;**

   **-- valuation allowance on the Corporation's deferred tax assets related to the U.S. operations of $462.8 million recorded during the fourth quarter of 2008**; and

   -- lower goodwill and trademark impairment losses by $199.3 million due to $211.8 million in impairment losses related to E-LOAN's goodwill and trademark recognized in the fourth quarter of 2007, compared to losses of $12.5 million in the fourth quarter of 2008, consisting principally of $10.9 million in losses related to E-LOAN's trademark. The trademark impairment losses recorded in 2008 resulted from E-LOAN ceasing to operate as a direct lender in the fourth quarter of 2008.

The press release continued in more detail as follows:

   -- Net income for the Banco Popular de Puerto Rico ("BPPR") reportable segment for the quarter ended December 31, 2008 amounted to $12.4 million, compared to $80.2 million in the same quarter of the previous year. **The financial results were principally impacted by an increase in the provision for loan losses of $112.7 million primarily related to the commercial and construction loan portfolios. During the fourth quarter of 2008, several commercial and construction loans in the BPPR reportable segment reported further deterioration due to current economic conditions requiring their classification as impaired loans under SFAS No. 114 or an increase in their specific reserves.** As of December 31, 2008, there were $639 million of SFAS No. 114 impaired loans in the BPPR reportable segment with a related specific allowance for loan losses of $137 million. During this fourth quarter, the Corporation recorded $101 million in provision for loan losses for loans classified as impaired under SFAS No. 114 in the BPPR reportable segment, of which $79 million pertained to residential construction loans.

   BPPR's reportable segment net interest income for the fourth quarter of 2008 declined $13.8 million, compared to the same quarter in the previous year. **This decrease was principally related to lower volume of investment securities and to lower yields in the loan and investment portfolios, partially offset by lower cost**

**of funds.** Despite the impact of the unprecedented market conditions and historical reductions in interest rates by the Federal Reserve ("FED"), the BPPR reportable segment maintained a healthy net interest margin that approximated 3.89% for the quarter ended December 31, 2008, compared to 3.91% in the same quarter of the previous year. Non-interest income increased for the quarter by $10.4 million, or 8%, principally in other service fees and service charges on deposits accounts. Operating expenses in this reportable segment decreased by $3.4 million when comparing quarterly periods. This decline was partly the result of successful control management efforts and reduced compensation tied to financial performance.

-- Banco Popular North America ("BPNA") reportable segment reported net losses of $349.5 million for the quarter ended December 31, 2008, compared to net losses of $218.3 million in the fourth quarter of 2007. **The quarterly financial results were principally impacted by an increase in the provision for loan losses of $156.4 million. The increase in the provision for loan losses considered higher loan net charge-offs, specific reserves for commercial, construction and mortgage loans, as well as the impact of the deterioration in the U.S. residential housing market that has also affected home equity lines of credit and second lien mortgage loans which are behaving as unsecured loans due to devaluation in real estate.** This reportable segment also recognized a valuation allowance on deferred tax assets of $200.1 million during the fourth quarter of 2008. These unfavorable variances were in part offset by the reduction in impairment losses on intangible assets of E-LOAN which was previously described.

During the quarter ended December 31, 2008, the BPNA reportable segment recorded approximately $33.8 million in charges such as severance costs, lease cancellations, and write-downs of intangibles and long-lived assets that were associated to the restructuring plans of its banking operations and E-LOAN. As indicated in the Form 10-Q filed on November 10, 2008, in October 2008, the Corporation's Board of Directors approved a restructuring plan for BPNA with the objective of reducing the size of its banking operations in the U.S. mainland to a level suited to present economic conditions, improve profitability in the short term, increase liquidity and lower credit costs and, over time, achieve a greater integration with corporate functions in Puerto Rico. Also, the Board of Directors approved a plan for E-LOAN to cease operating as a direct lender effective in the fourth quarter of 2008. Refer to the Corporation's Form 10-Q for the quarter ended September 30, 2008 for further information.

The integration of both banking subsidiaries, BPPR and BPNA, under one management continues to be implemented, as part of the previously announced restructuring plan for the U.S. operations. The business divisions of retail banking and commercial banking, in addition to administrative and operational personnel, at Banco Popular North America, are now reporting to management in Puerto Rico.

-- Losses of $75.2 million, net of tax, related to the discontinued operations of Popular Financial Holdings ("PFH") in the U.S. mainland for the fourth quarter of 2008. The net losses for the quarter ended December 31, 2008 corresponding to the

- 16 -

discontinued operations included $37.8 million in valuation allowances on the Corporation's deferred tax assets. Also, the net loss included non-interest losses of $24.3 million for the quarter ended December 31, 2008 consisting of additional write-downs in loans accounted at fair value as of year end and the final impact of the sale of assets to Goldman Sachs announced in the third quarter of 2008 and that closed in November 2008. Operating expenses for the discontinued operations amounted to $34.1 million for the fourth quarter of 2008, which primarily included charges related to the final settlement on the sale to Goldman Sachs, personnel costs and other restructuring charges related to the discontinuance of the operations. As of December 31, 2008, PFH holds only $13 million in assets, of which $7 million are loans measured at fair value.

Net Loss from Continuing Operations - Fourth Quarter 2008 compared to Fourth Quarter 2007:

This press release should be read in conjunction with the accompanying Financial Summary (Exhibit A), which is an integral part of this report. The Corporation retrospectively adjusted certain information to exclude results from discontinued operations from prior periods presented in this press release for comparability purposes. The discussions that follow pertain to Popular, Inc.'s continuing operations, unless otherwise indicated.

Net Interest Income

Net interest income for the fourth quarter of 2008 was $288.9 million, compared with $337.3 million for the fourth quarter of 2007. The decrease was due to a decline of $1.3 billion in average earning assets, together with a reduction of 40 basis points in the net interest margin.

*       *       *

**The decline in average earning assets was due mostly to the runoff of investment securities as part of a strategy of delevering the balance sheet.** The reduction in the average balance of investment securities was used to repay short-term borrowings, including repurchase agreements. In the loan portfolio, an increase in average commercial loans outstanding was offset in part by declines in mortgage and auto loans.

The decline in the net interest yield was driven by a reduction in the yield of earning assets. This was caused primarily by the decline in the yield of commercial loans, which have a significant amount of floating rate loans whose yield decreased as the Fed cut the funds rate in 2008. The Fed lowered the federal funds target rate between 400 and 425 basis points from December 31, 2007 to December 31, 2008. Also contributing to the reduction in the yield of commercial loans is the substantial increase in non-performing loans as described later in this press release. The Corporation's average cost of funds decreased driven by a reduction in the cost of deposits and short-term borrowings.

Offsetting partially the decline in the cost of deposits and short-term borrowings was an increase in the cost of long-term borrowings. During 2008, certain medium-term notes matured which had been issued in previous years at relatively low rates were some replaced with more expensive term funds whose cost reflects the current distressed conditions of the credit markets. Also contributing to the reduction in the net interest yield was the net loss for the year which reduced available funds obtained through capital.

Provision for Loan Losses and Credit Quality

The provision for loan losses in the continuing operations totaled $388.8 million, or 174% of net charge-offs, for the quarter ended December 31, 2008, compared with $121.7 million or 157%, respectively, for the same quarter in 2007, and $252.2 million, or 148%, respectively, for the quarter ended September 30, 2008. The provision for loan losses for the quarter ended December 31, 2008, when compared with the same quarter in 2007, reflects higher net charge-offs by $146.2 million, mainly in construction loans by $63.0 million, consumer loans by $28.8 million, commercial loans by $37.0 million, and mortgage loans by $15.1 million. Provision and net charge-off information for prior periods was retrospectively adjusted to exclude discontinued operations for comparative purposes.

The higher level of provision for the quarter ended December 31, 2008 was mainly attributable to the continuing deterioration in the commercial and construction loan portfolios due to current economic conditions in Puerto Rico and the U.S. mainland. Credit deterioration trends in the Corporation's commercial loan portfolio are reflected across all industry sectors. The allowance for loan losses for commercial and construction credits has increased, particularly the specific reserves for loans considered impaired. Also, deteriorating economic conditions in the U.S. mainland housing market have impacted the mortgage industry delinquency rates. The Corporation has recorded a higher provision for loan losses in the fourth quarter of 2008 to cover for inherent losses in the mortgage portfolio of the Corporation's U.S. mainland operations as a result of higher delinquencies and net charge-offs, and consideration of troubled debt restructurings in the mortgage portfolio, principally from the non-conventional business of Banco Popular North America. Furthermore, consumer loans net charge-offs rose principally due to higher losses on home equity lines of credit and second lien mortgage loans of the Corporation's U.S. mainland operations, which are categorized by the Corporation as consumer loans. The deterioration in the delinquency profile and the declines in property values have negatively impacted charge-offs.

Exhibit A provides credit quality data, including certain key credit quality metrics. The allowance for loan losses represented 3.43% of loans held-in-portfolio at December 31, 2008, compared with 2.76% at September 30, 2008 and 1.96% at December 31, 2007. As of December 31, 2008, there were $898 million of SFAS No. 114 impaired loans in the Corporation's continuing operations with a related specific allowance for loan losses of $195 million, compared with impaired loans of $291

million and a specific allowance of $53 million as of December 31, 2007, excluding PFH.

During the quarter ended December 31, 2008, the Corporation recorded $150 million in provision for loan losses for loans classified as impaired under SFAS No. 114. As of September 30, 2008, there were $753 million of SFAS No. 114 impaired loans in the Corporation's continuing operations with a related specific allowance for loan losses of $131 million.

Non-performing assets of the continuing operations totaled $1.3 billion at December 31, 2008. This represented an increase of $192 million since September 30, 2008 primarily related to increases in construction loans by $84 million, mortgage loans by $57 million, commercial loans by $24 million, consumer loans by $10 million and other real estate by $17 million. Non- performing assets from continuing operations increased by $672 million from December 31, 2007 to the same date in 2008. The increases were mostly reflected in commercial loans by $207 million, construction loans by $230 million, mortgage loans by $168 million, consumer loans by $26 million and other real estate by $40 million.

Non-interest Income

Non-interest income from continuing operations totaled $141.5 million for the quarter ended December 31, 2008, compared with $190.6 million for the same quarter in 2007. The unfavorable variance in non-interest income was principally as a result of an increase in lower of cost or fair value adjustments in loans reclassified to held-for-sale, primarily related to a lease portfolio from the U.S. mainland operations, lower gains on the sale of SBA commercial loans due to lower volume sold, and higher impairments on investments accounted under the equity method.

Operating Expenses

Operating expenses for the continuing operations totaled $360.2 million for the quarter ended December 31, 2008, a decrease of $211.9 million, or 37%, compared with $572.1 million for the same quarter of 2007.

As indicated earlier in this press release, E-LOAN and BPNA commenced to carry out further restructuring of its operations during the fourth quarter of 2008. For the quarter ended December 31, 2008, operating expenses for the continuing operations included approximately $33.8 million in costs associated to the restructuring plans in place at the subsidiaries, including impairments on E-LOAN's trademark and other long-lived assets, compared to approximately $231.9 million in 2007, which also included impairment losses associated to E- LOAN's goodwill. Isolating the impact of these restructuring related costs, operating expenses totaled $326.4 million for the quarter ended December 31, 2008, compared to $340.2 million for the quarter ended December 31, 2007. The decrease was principally due to lower business promotion expenses and personnel costs, including the impact of the downsizing of E-LOAN's operations in early 2008 as well as lower compensation tied to financial performance.

Income Taxes

Income tax expense from continuing operations amounted to $309.1 million for the quarter ended December 31, 2008, compared with an income tax benefit of $15.4 million for the same quarter of 2007. As previously indicated, the variance was primarily due to the establishment of a full valuation allowance on the deferred tax assets of the U.S. mainland operations, as well as the impact of higher operating losses.

The Corporation's net deferred tax assets (prior to deducting the valuation allowance) amounted to $1.2 billion as of December 31, 2008, of which $848 million pertains to the U.S. mainland operations. As of December 31, 2008, the Corporation recorded a total valuation allowance of $861 million on the deferred tax assets of the Corporation's U.S. operations. This full valuation allowance was recorded in consideration of the requirements of SFAS No. 109 "Accounting for Income Taxes" ("SFAS No. 109") which states that a deferred tax asset should be reduced by a valuation allowance if based on the weight of all available evidence, it is more likely than not (a likelihood of more than 50%) that some portion or all of the deferred tax asset will not be realized. The determination of whether a deferred tax asset is realizable is based on weighting all available evidence, including both positive and negative evidence. SFAS No. 109 provides that the realization of deferred tax assets, including carryforwards and deductible temporary differences, depends upon the existence of sufficient taxable income of the same character during the carryback or carryforward period. SFAS No. 109 requires the consideration of all sources of taxable income available to realize the deferred tax asset, including the future reversal of existing temporary differences, future taxable income exclusive of reversing temporary differences and carryforwards, taxable income in carryback years and tax planning strategies.

The Corporation's U.S. mainland operations are in a cumulative loss position for the three-year period ended December 31, 2008. For purposes of assessing the realizability of the deferred tax assets in the U.S. mainland, this cumulative taxable loss position, along with the evaluation of all sources of taxable income available to realize the deferred tax asset, as discussed above, is considered significant negative evidence and has caused management to conclude that the Corporation will not be able to fully realize the deferred tax assets in the future, considering solely the criteria of SFAS No. 109. Management will reassess the realizability of the deferred tax assets based on the criteria of SFAS No. 109 each reporting period. If future events differ from management's year-end 2008 assessment, a partial reversal of the valuation allowance may be required in future years. An important consideration, although not sufficient positive evidence to overcome the negative evidence under SFAS No. 109, is that the net operating loss carryforwards of the Corporation's U.S. operations have an expiration term of 20 years. To the extent that the financial results of the U.S. operations improve and the deferred tax asset becomes realizable, the Corporation will be able to reduce the valuation allowance through earnings.

Balance Sheet Comments:

- 20 -

The accompanying Exhibit A provides information on principal categories of the Corporation's balance sheet at December 31, 2008, September 30, 2008, and December 31, 2007 and the following sections provide more detailed information.

Investment securities

The Corporation's portfolio of investment securities available-for-sale and held-to-maturity totaled $8.2 billion at December 31, 2008, compared with $8.3 billion at September 30, 2008 and $9.0 billion at December 31, 2007. The Corporation holds investment securities primarily for liquidity, yield enhancement and interest rate risk management.

The portfolio primarily includes very liquid, high quality debt securities. The decline in the Corporation's available-for-sale and held-to-maturity investment portfolios from December 31, 2007 to the same date in 2008 was mainly associated with the maturities of securities.

40.     In response to this announcement, shares of the Company's common stock fell $2.52 per share, or 50%, to close at $ 2.46 per share, on heavy trading volume.

41.     The markets for Popular securities were open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Popular securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Popular securities relying upon the integrity of the market price of Popular securities and market information relating to Popular, and have been damaged thereby.

42.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Popular's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

43.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Popular's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Popular and its business, prospects and operations, thus causing Popular securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the inflation was removed from the prices of the securities.

### Additional Scienter Allegations

44.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Popular, their control over, and/or receipt and/or modification of Popular's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Popular, participated in the fraudulent scheme alleged herein.

**Loss Causation/Economic Loss**

45.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Popular securities and operated as a fraud or deceit on Class Period purchasers of Popular securities by failing to disclose the Company's true financial condition.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Popular securities fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Popular securities during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

46.     By failing to disclose the Company's true financial condition, Defendants presented a misleading picture of Popular's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Popular common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $14.07 per share on February 1, 2008.

47.     As a direct result of Defendants' disclosures on January 22, 2009, the price of Popular common stock fell precipitously, falling $2.52 per share, or approximately 50%.  This drop removed the inflation from the price of Popular common stock, causing real economic loss to investors who had purchased Popular common stock during the Class Period.

48.     The 50% decline in the price of Popular common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Popular common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate

- 23 -

the prices of Popular common stock and the subsequent significant decline in the value of Popular common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

<strong>Applicability of Presumption of Reliance:<br>Fraud on the Market Doctrine</strong>

49.     At all relevant times, the market for Popular common stock was an efficient market for the following reasons, among others:

(a)     Popular common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Popular filed periodic public reports with the SEC and the NASDAQ;

(c)     Popular regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Popular was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

50.     As a result of the foregoing, the market for Popular common stock promptly digested current information regarding Popular from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Popular common stock during the Class Period suffered similar injury through their purchase of Popular common stock at artificially inflated prices and a presumption of reliance applies.

- 24 -

**No Safe Harbor**

51.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Popular who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of
the Exchange Act Against and Rule 10b-5
Promulgated Thereunder Against All Defendants**

52.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

55.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Popular common stock.  Plaintiff and the Class would not have purchased Popular common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

56.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Popular common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     The Individual Defendants acted as controlling persons of Popular within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Popular, and their ownership of Popular stock, the Individual Defendants had the power and authority to cause Popular to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 14th day of May 2009.

I hereby certify that, on this date, I presented the foregoing *Class Action Complaint* to the Clerk of the Court for filing and uploading to the Court's CM/ECF system, which will send electronic notification of such filing to all counsel of record.

THE LAW OFFICES OF
ANDRÉS W. LÓPEZ, P.S.C.

**s/Andrés W. López**
ANDRÉS W. LÓPEZ
USDC No. 215311
207 Del Parque St., Third Floor
San Juan, PR 00912
*Telephone* (787) 641-4541
*Facsimile* (787) 641-4544

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone:  770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
682 Grant Street
Denver, Colorado 80203
Telephone: 303/861-1764
303/395-0393 (fax)

Attorneys for Plaintiff