UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---

|  |  |  |
|---|---|---|
| | x | |
| RUSSELL HOFF, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 3:09-cv-01428-GAG (Consolidated) |
| | : | |
| Plaintiff, | : | ECF Filed |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| POPULAR INC., RICHARD CARRIÓN, JORGE A. JUNQUERA, MANUEL MORALES, FRANCISCO M. REXACH, JUAN J. BERMÚDEZ, MARIA L. FERRÉ, WILLIAM J. TEUBER, JOSÉ R. VIZCARRONDO, FREDERIC V. SALERNO, MICHAEL J. MASIN, PRICEWATERHOUSE COOPERS LLP, UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO, POPULAR SECURITIES, INC., and CITIGROUP GLOBAL MARKETS, INC., | : : : : : : : : : | |
| | : | |
| Defendants. | x | |

---

## CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE ........................................................................... 5

PARTIES .............................................................................................................. 6

FACTUAL ALLEGATIONS PERTAINING TO THE EXCHANGE ACT CLAIMS ............... 13

    A.    BACKGROUND ................................................................... 13

    B.    THE EXCHANGE ACT DEFENDANTS FAILED TO RECORD A VALUATION ALLOWANCE FOR POPULAR'S U.S. MAINLAND DEFERRED TAX ASSETS IN VIOLATION OF GAAP .................................. 14

        1.    GAAP Standards Regarding Deferred Tax Assets And Valuation Allowances................................................................. 14

        2.    Popular's Failure To Record A Valuation Allowance Against Its Mainland U.S. Deferred Tax Assets Violated GAAP.............................. 18

        3.    Popular US Was Operating At A Three-Year Cumulative Loss From The Very Beginning Of The Class Period ..................................... 21

        4.    Popular Did Not Retain Any U.S. Mainland Operations During The Class Period That Were More Likely Than Not To Realize A Benefit From Its U.S. Mainland Deferred Tax Assets.............................. 24

        5.    Popular's Reliance On A Standard Expiration Term Of 20 Years Or Longer Was Insufficient Under GAAP To Justify Failing To Record A Valuation Allowance Against Up To $700 Million Of U.S. Mainland Deferred Tax Assets ........................................................ 36

        6.    Popular's Last-Minute "Tax Strategies" Were Improper Under GAAP To Justify Failing To Record A Valuation Allowance Against $323 Million Of U.S. Mainland Deferred Tax Assets................. 40

    C.    THE EXCHANGE ACT DEFENDANTS' IMPROPER ACCOUNTING ARTIFICIALLY INFLATED THE COMPANY'S REPORTED EARNINGS, LIQUIDITY AND REGULATORY CAPITAL RATIOS............. 45

    D.    THE TRUTH ABOUT THE EXCHANGE ACT DEFENDANTS' IMPROPER ACCOUNTING BEGINS TO EMERGE......................................... 53

E.    THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS .............................................. 59

F.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS WERE MATERIAL .................................................. 72

G.    THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER .............. 73

LOSS CAUSATION ................................................................................. 79

THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ....................................... 81

THE PRESUMPTION OF RELIANCE ............................................................. 82

CLASS ACTION ALLEGATIONS ................................................................. 83

CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................ 85

COUNT ONE ....................................................................................... 85

COUNT TWO ....................................................................................... 87

ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT ................................................................................ 89

A.    THE SECURITIES ACT DEFENDANTS' NEGLIGENCE .............................. 95

1.    The Underwriter Defendants .................................................. 96

2.    The Officer and Director Defendants ....................................... 97

3.    PwC ............................................................................... 97

B.    LOSS CAUSATION .................................................................. 101

CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ...................................... 102

COUNT THREE ................................................................................... 102

COUNT FOUR .................................................................................... 106

COUNT FIVE ..................................................................................... 108

JURY DEMAND .................................................................................. 110

PRAYER FOR RELIEF ........................................................................... 110

Lead Plaintiffs, the General Retirement System of the City of Detroit ("Detroit General"), Nilda Picó and José L. Puig-Rivera (collectively "Plaintiffs"), make the following allegations upon information and belief based upon all of the facts set forth below which were obtained through an investigation made by and through Plaintiffs' Lead Counsel. Lead Counsel's investigation has included, among other things, interviews with former employees of Popular, Inc. ("Popular" or the "Company"), a review of filings by Popular with the United States Securities and Exchange Commission ("SEC"), press releases and other public statements issued by Defendants, a review of media reports about Popular, reports by securities analysts who followed the Company and other sources as set forth below. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth below through discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this federal securities class action on behalf of themselves and all persons and entities other than Defendants and their affiliates as specified below, who purchased or acquired Popular common stock and/or 8.25% non-cumulative monthly income preferred stock Series B ("Series B preferred stock"), during the time period between January 24, 2008 and February 19, 2009, inclusive (the "Class Period"), and were injured thereby.

2.      In this Complaint, Plaintiffs assert two different sets of claims. The first set of claims (Counts One and Two), assert fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act") against those Defendants who are alleged to have directly participated in a fraudulent scheme during the Class Period and who acted with knowledge or reckless disregard of the true facts.

3.      The second set of claims (Counts Three through Five) assert strict liability and negligence claims based on the Securities Act of 1933 (the "Securities Act"). These claims are asserted against those Defendants who are statutorily responsible for material misstatements of

facts and omissions in the Offering Documents (defined below in ¶283) pursuant to which Popular Series B preferred shares were offered to the public in May 2008 (the "Series B Offering" or "Offering").  Plaintiffs specifically disclaim any allegations of fraud in connection with these non-fraud claims.

4.     Popular, a publicly-owned bank holding company based in Puerto Rico, is a financial services provider.  During the Class Period, Popular had two main operating segments, one in Puerto Rico and one in the mainland United States.  Popular's Puerto Rico operations ("Popular PR") primarily provided retail and commercial banking services through Banco Popular de Puerto Rico, the largest bank in Puerto Rico.  Popular's mainland United States operations ("Popular US") primarily consisted of Banco Popular North America, a commercial bank; Popular Financial Holdings, a consumer finance company; and E-LOAN, an online consumer lending company.

5.     Throughout the Class Period, Popular issued, and its senior executive officers certified, financial statements that were materially misstated and not presented in accordance with Generally Accepted Accounting Principles ("GAAP") by improperly accounting for up to $700 million of deferred tax assets – or losses, credits and other tax deductions, which may be used to offset taxable income in future years – from Popular US.  Despite the fact that the Company's financial statements repeatedly referred to and acknowledged the relevant and controlling GAAP standards for deferred tax assets, the Company's financial statements failed to comply with those same standards.

6.     Specifically, as set forth herein, the Exchange Act Defendants (defined in ¶23 below) artificially inflated Popular's reported earnings throughout the Class Period by failing to record a valuation allowance against hundreds of millions of dollars of deferred tax assets from

Popular US, as required under GAAP, even though it was "more likely than not" that Popular

US would not generate sufficient profit to realize the benefit of those deferred tax assets. In

particular, Popular was required to record a valuation allowance against its U.S. mainland

deferred tax assets because Popular US was in a three-year cumulative loss position at the

beginning of the Class Period. Under GAAP, a three-year cumulative loss is significant

negative evidence that a company is unlikely to realize the benefit of deferred tax assets, and

thus that a valuation allowance is required to be recorded against those assets. Further, Popular

US was "more likely than not" to be unable to recognize the benefit of its deferred tax assets

because Popular was dramatically downsizing its poorly performing U.S. operations, and its

remaining U.S. operations were operating at a significant loss, both before and during the Class

Period. Under the tax laws, Popular could not apply these deferred tax assets to its operations in

Puerto Rico or use them to reduce its taxes in Puerto Rico. Thus, a valuation allowance was

required from the beginning of the Class Period.

7.    Notwithstanding these GAAP requirements, the Exchange Act Defendants

initially tried to justify Popular's failure to record a full valuation allowance for its large and

growing U.S. mainland deferred tax assets by relying on a standard 20-year expiration term for

using deferred tax assets in the United States. But, the standard 20-year expiration term is not a

valid justification under GAAP for a failure to record a valuation allowance because it provides

no evidence of Popular US's ability to generate profit and realize deferred tax assets in the

future.

8.    Thereafter, the Exchange Act Defendants claimed at the last-minute to rely on

purported "tax strategies" to continue to violate GAAP and avoid taking a full valuation

allowance against its U.S. mainland deferred tax assets. Specifically, on October 22, 2008,

Popular announced that it was taking a <u>partial</u> valuation allowance for its mainland U.S. deferred tax assets, but that it would not write down those assets completely because of two purported tax strategies.  First, Popular announced a purported strategy to transfer debt from Popular US to Popular PR.  Second, Popular announced a purported strategy to transfer some unidentified profitable line of business from Popular PR to Popular US.  In announcing the strategies, Popular lacked any objectively verifiable details to support the tax strategies, including what debt or profitable lines of business were involved, what benefits they would provide, what the costs would be, or how Popular could possibly obtain regulatory approval for these changes.

9.     Neither of these "tax strategies" was prudent, feasible, or within Popular management's control, as required by GAAP to be a valid basis to avoid writing down Popular's U.S. mainland deferred tax assets.  Rather, the strategies were completely unrealistic. In fact, just two months after they announced these last-minute tax strategies, the Exchange Act Defendants abandoned them as a basis for avoiding a valuation allowance.  As Defendant Junquera, the Company's CFO, later publicly admitted, "we had to confront reality."

10.     By improperly accounting for its U.S. mainland deferred tax assets throughout the Class Period, Popular was able to artificially inflate both its reported earnings and liquidity. Specifically, Popular's failure to record a required valuation allowance for its U.S. mainland deferred tax assets during the Class Period artificially inflated its earnings each quarter by the full amount of its U.S. mainland deferred tax assets – ranging from $300 million at the start of the Class Period to as high as $700 million before the Company's partial valuation allowance in October 2008.  Popular then used its improperly recorded deferred tax assets to artificially inflate its liquidity, which concealed the fact that by the beginning of the second quarter of 2008

Popular US was no longer "well-capitalized" under regulations promulgated under the Federal Deposit Insurance Act ("FDIA").  Had Popular admitted that Popular US was not "well capitalized" beginning in the second quarter of 2008, Popular would have been prohibited from engaging in essential non-banking activities and from holding brokered deposits, thereby significantly threatening both the Company's revenue and liquidity.

11.    When the true facts about the Company's U.S. mainland deferred tax assets were finally revealed on January 22, 2009, including a full valuation allowance for Popular's $861 million U.S. mainland deferred tax assets, the price of Popular securities declined precipitously. Specifically, the price of Popular common stock declined in one trading day by approximately 50%, from $4.98 to $2.46.  The valuation allowance, in turn, then helped force the Company on February 19, 2009, to cut its dividend by 75% to preserve its dwindling liquidity.  As a result, Popular's common stock again fell an additional 11% in a single day, from $1.79 to $1.59, and Popular's Series B stock fell 43% in a single day, from $14 to $8.

<u>**JURISDICTION AND VENUE**</u>

12.    Non-fraud related claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Other claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

14.    Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this district.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## PARTIES

16.    On August 21, 2009, The Honorable Judge Gelpi of the U.S. District Court for the District of Puerto Rico appointed the General Retirement System of the City of Detroit ("Detroit General"), Nilda Picó and José L. Puig-Rivera (collectively, "Plaintiffs") to serve as Lead Plaintiffs in this consolidated class action.

17.    Lead Plaintiff Detroit General is a public pension fund organized for the benefit of the current and retired employees of the City of Detroit.  Detroit General is responsible for managing the benefits of approximately 20,000 members and has over $3.6 billion in assets under management (as of June 30, 2008).  As set forth in its previously filed certification attached hereto as Exhibit A, Lead Plaintiff Detroit General purchased shares of Popular common stock at artificially inflated prices during the Class Period and was injured as a result.

18.    Lead Plaintiff Nilda Picó is a resident and citizen of Puerto Rico.  As set forth in her previously filed certification attached hereto as Exhibit B, Lead Plaintiff Picó purchased 71,680 Series B preferred shares of Popular at artificially inflated prices during the Class Period and was injured as a result.

19.    Lead Plaintiff Dr. José L. Puig-Rivera is a resident and citizen of Puerto Rico.  As set forth in his previously filed certification attached hereto as Exhibit C, Lead Plaintiff Puig-Rivera purchased 7,100 Series B preferred shares of Popular at artificially inflated prices during the Class Period and was injured as a result.

20.    Defendant Popular, Inc. ("Popular" or the "Company") is a Puerto Rico corporation headquartered in San Juan, Puerto Rico.  Popular is a publicly traded bank holding company registered under Banco Popular Holding Company Act of 1956, as amended and, accordingly, subject to the supervision and regulation of the Board of Governors of the Federal Reserve System.  Popular operates in two main markets: Puerto Rico ("Popular PR") and the mainland United States ("Popular US").  Popular also operates in Venezuela and the Dominican Republic.  The Company has over 282 million shares of common stock issued and outstanding which trade on the NASDAQ under the ticker symbol "BPOP."

21.    Defendant Richard Carrión ("Carrión"), a resident and citizen of Puerto Rico, has been Chairman of the Board of Popular since 1993, CEO of Popular since 1994, and served as President of Popular from 1991 to January 2009.  Carrión served as President of Banco Popular Puerto Rico from 1985 to 2004.  Carrión also serves as Chairman and CEO of Popular North America, Inc. and other direct and indirect wholly-owned subsidiaries of the Company.  Carrión also has served as Chairman of the Board of Trustees of Fundación Banco Popular, Inc. since 1982 and as Chairman and Director of Banco Popular Foundation, Inc. since 2005.  Carrión prepared, authorized and/or issued the false and misleading statements Popular made during the relevant period and signed false and misleading Sarbanes-Oxley certifications in connection with all of Popular's relevant period financial filings with the SEC.  As set forth below, Defendant Carrión also signed the materially misstated Offering Documents pursuant to which

Popular Series B preferred shares were offered and sold to the public during the Class Period, and was a Popular officer and director at the time of the Series B Offering.

22.     Defendant Jorge A. Junquera ("Junquera"), a resident and citizen of Puerto Rico, has been as Popular's Senior Executive Vice President since 1997 and Chief Financial Officer since 1996.  Junquera also serves as Chief Financial Officer of Banco Popular Puerto Rico.  Previously, Junquera served as Supervisor of the Popular, Inc. U.S. Operations from January 1996 to December 2001, as President and Director of Popular International Bank, Inc. and Popular North America, Inc. since January 1996, and as a Director of Banco Popular until April 2000 and from 2001 to present.  Junquera also served as President of Banco Popular North America until December 2001, as President of Banco Popular, National Association, a Director of Popular Financial Holdings, Inc., Popular Cash Express, Inc., Popular ES, LLC, Popular Leasing USA, Inc. and of Banco Popular North America, indirectly wholly-owned subsidiaries of the Corporation and serves as a Director of Banco Hipotecario Dominicano and Consorcio de Tarjetas Dominicanas, S.A., where Popular has an indirect investment.  Junquera prepared, authorized and/or issued the false and misleading statements Popular made during the relevant period and signed false and misleading Sarbanes-Oxley certifications in connection with all of Popular's relevant period financial filings with the SEC.  As set forth below, Defendant Junquera also signed the Company's materially misstated Offering Documents pursuant to which Popular Series B preferred shares were offered and sold to the public during the Class Period, and was a Popular officer at the time of the Series B Offering.

23.     Defendants Carrión and Junquera are referred to herein collectively as the "Officer Defendants," and with Defendant Popular as the "Exchange Act Defendants."  Because of their senior executive positions with the Company, each of the Officer Defendants had access

at the time they held their positions to the adverse undisclosed information about Popular's financial statements as set forth below. It is appropriate to treat these two individuals as a "group" for pleading purposes and to presume the materially misstated information conveyed in the Company's press releases, SEC filings and other public statements quoted below were the collective actions of this narrowly defined group of individuals. Each of these individuals, by virtue of his high-level positions with the Company, directly participated in the management of the Company, including its financial reporting. These individuals were each involved in drafting, producing, reviewing and/or disseminating the statements at issue in this case during his tenure with the Company.

24.    As officers of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act, traded on NASDAQ, and governed by the Federal securities laws, the Officer Defendants each had a duty to disseminate promptly, accurate information with respect to the Company's business, operations, and financial statements, and to correct any previously-issued statements that had become materially misstated or untrue, so that the market price of the Company's publicly-traded securities would be based upon accurate information. The Officer Defendants violated these requirements and obligations during the Class Period.

25.    The Officer Defendants, because of their positions of control and authority as senior officers and directors of Popular, were able to and did control the content of the various press releases, SEC filings and other public statements issued by Popular during the Class Period. Each of the Officer Defendants during his tenure with the Company was provided with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of the Officer Defendants is responsible for the accuracy of the public statements detailed herein.

26.    Defendant Manuel Morales ("Morales"), a resident and citizen of Puerto Rico, has served as a Director of Popular since 1990. As set forth below, Defendant Morales signed the Company's materially misstated Offering Documents pursuant to which Popular Series B preferred shares were offered and sold to the public during the Class Period, and was a Popular Director at the time of the Series B Offering.

27.    Defendant Francisco M. Rexach ("Rexach"), a resident and citizen of Puerto Rico, has served as a Director of Popular since 1990. As set forth below, Defendant Rexach signed the Company's materially misstated Offering Documents pursuant to which Popular Series B preferred shares were offered and sold to the public during the Class Period, and was a Popular director at the time of the Series B Offering.

28.    Defendant Juan J. Bermúdez ("Bermúdez"), a resident and citizen of Puerto Rico, has served as a Director of Popular since 1990. As set forth below, Defendant Bermúdez signed the Company's materially misstated Offering Documents through which Popular Series B preferred shares were offered and sold to the public during the Class Period, and was a Popular director at the time of the Series B Offering.

29.    Defendant Maria L. Ferré ("Ferré"), a resident and citizen of Puerto Rico, has served as a Director of Popular since April 2004. As set forth below, Defendant Ferré signed the Company's materially misstated Offering Documents through which Popular Series B preferred shares were offered and sold to the public during the Class Period, and was a Popular director at the time of the Series B Offering.

30.    Defendant William J. Teuber ("Teuber"), a resident and citizen of Massachusetts, has served as a Director of Popular since 2004. As set forth below, Defendant Teuber signed the Company's materially misstated Offering Documents through which Popular Series B

preferred shares were offered and sold to the public during the Class Period, and was a Popular director at the time of the Series B Offering.

31.    Defendant José R. Vizcarrondo ("Vizcarrondo"), a resident and citizen of Puerto Rico, has served as a Director of Popular since 2004.  As set forth below, Defendant Vizcarrondo signed the Company's materially misstated Offering Documents through which Popular Series B preferred shares were offered and sold to the public during the Class Period, and was a Popular director at the time of the Series B Offering.

32.    Defendant Frederic V. Salerno ("Salerno"), a resident and citizen of New York, has served as a Director of Popular since 2003.  As set forth below, Defendant Salerno signed the Company's materially misstated Offering Documents through which Popular Series B preferred shares were offered and sold to the public during the Class Period, and was a Popular director at the time of the Series B Offering.

33.    Defendant Michael J. Masin ("Masin"), a resident and citizen of Florida, has served as a Director of Popular since January 2007.  As set forth below, Defendant Masin was a popular director at the time of the Series B Offering.

34.    Defendants Morales, Rexach, Bermúdez, Ferré, Teuber, Vizcarrondo, Salerno, and Masin are referred to herein collectively as the "Director Defendants."

35.    Defendant PricewaterhouseCoopers LLP ("PwC"), which served as the Company's outside auditor at all relevant times, provided audit and tax services to the Company prior to and throughout the Class Period.  PWC issued a clean and unqualified audit opinion letter on the Company's financial statements for the year-ended December 31, 2007.  PwC consented to the incorporation by reference in the Offering Documents for the Series B Offering of its clean and unqualified audit opinion letter on the Company's financial statements and its

opinion letter on management's assessment of internal controls for the year ended December 31, 2007. For the years ended December 31, 2007, PwC was paid: (a) fees for audit services of approximately $4,462,593; and (b) fees for other services, including due diligence services related to mergers and acquisitions, of approximately $1,094,753. PwC maintains its national headquarters at 300 Madison Avenue, 24th Floor, New York, NY 10017.

36.    Defendant UBS Financial Services Incorporated of Puerto Rico ("UBS") is an investment bank and acted as a joint book-running manager of the Series B Offering. UBS's headquarters are located at 250 Ave Munoz Rivera Ph, San Juan, PR 00918.

37.    Defendant Popular Securities, Inc. ("Popular Securities"), a wholly-owned subsidiary of Popular, is an investment bank and acted as a joint book-running manager of the Series B Offering. Popular Securities' headquarters are located at 209 Ponce de Leon Ave. Ste. 1200, San Juan, PR 00918.

38.    Citigroup Global Markets, Inc., ("Citigroup") is an investment bank and acted as the senior manager of the Series B Offering. Citigroup's headquarters are located at 388 Greenwich St., New York, NY 10013.

39.    UBS, Popular Securities and Citigroup are referred to herein collectively as the "Underwriter Defendants."

40.    Popular, the Officer Defendants, the Director Defendants, PwC and the Underwriter Defendants are referred to herein collectively as the "Securities Act Defendants."

## FACTUAL ALLEGATIONS PERTAINING TO
## THE EXCHANGE ACT CLAIMS

**A.    BACKGROUND**

41.    Popular operates in two main target markets: Puerto Rico (previously defined as "Popular PR") and the mainland United States (previously defined as "Popular US"). Throughout the Class Period, Popular PR offered retail and commercial banking services through its principal bank subsidiary, Banco Popular de Puerto Rico, Puerto Rico's largest bank, and Popular US offered retail and commercial banking services through Banco Popular North America ("BPNA") and consumer finance services through Popular Financial Holdings, Inc. ("PFH").  BPNA's operating subsidiaries included E-LOAN, a provider of online consumer direct lending.  PFH's operating subsidiaries included Equity One, a subprime loan originator and provider of mortgage and consumer loans, and Popular Mortgage Servicing, Inc., a third party mortgage servicing provider which housed Popular's manufactured housing loan portfolio.  Below is a relevant organizational chart of Popular during the Class Period:



42.     Puerto Rico is classified by the U.S. government as an independent taxation authority by mutual agreement with the U.S. Congress. According to the Company's 2007 Form 10-K, "[t]he Corporation's U.S. subsidiaries . . . are considered foreign under Puerto Rico income tax law . . ." As a result, deferred tax assets accumulated by the Company from its Popular US operations could only be realized by future profits earned from Popular US (as opposed to from Popular PR).[1]

B.    **THE EXCHANGE ACT DEFENDANTS FAILED TO RECORD A VALUATION ALLOWANCE FOR POPULAR'S U.S. MAINLAND DEFERRED TAX ASSETS IN VIOLATION OF GAAP**

1.    **GAAP Standards Regarding Deferred Tax Assets And Valuation Allowances**

43.     Deferred tax assets are losses, credits and other tax deductions that may be used to offset taxable income in future years. Deferred tax assets can be used in the future to reduce a company's tax payments by offsetting the deferred tax assets against future taxable income.

44.     During the relevant period, GAAP were those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provided that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.[2]

45.     The GAAP standards for accounting for deferred tax assets are set forth in the SFAS No. 109, "Accounting for Income Taxes," published in 1992 ("SFAS 109"). SFAS 109

---

[1] The Company also operated processing and other technology services in Venezuela and the Dominican Republic.

[2] During the relevant period, GAAP principles were the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP consisted of a hierarchy of authoritative literature. The highest authority was comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS").

"establishes financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities for financial accounting and reporting for income taxes."

46.    At all times throughout the Class Period, the Exchange Act Defendants asserted that the Company's "consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")," including "SFAS 109, 'Accounting for Income Taxes.'"

47.    Under SFAS 109, a company must offset the value of its deferred tax assets with a valuation allowance if it is "more likely than not" that some or all of the deferred tax assets will not be realized with future taxable income.  Recognizing a deferred tax asset that is not expected to be realized without taking a full valuation allowance is prohibited.

48.    SFAS 109, ¶17e provides that a company must:

> [R]educe deferred tax assets by a **valuation allowance** if, based on the weight of available evidence, it is *more likely than not* (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. The valuation allowance should be sufficient to reduce the deferred tax asset to the amount that is *more likely than not* to be realized.  (Emphasis in original.)

49.    Important evidence to consider in determining whether a valuation allowance is required includes an enterprise's results for recent prior years, its current financial position, and currently available information about future years.  (SFAS 109, ¶20.)

50.    Cumulative losses by an enterprise in prior years are significant evidence that a valuation allowance is necessary under SFAS 109.  For example, SFAS 109, ¶23 provides that "[f]orming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years."  (Emphasis added.)

51.    Similarly, SFAS 109, ¶100 provides that "a cumulative pretax loss for financial reporting for the current and two preceding years" is "significant negative evidence about an

enterprise's profitability that creates significant uncertainty about an enterprise's ability to earn taxable income and realize tax benefits in future years."

52.     Where there is significant negative evidence, such as a cumulative loss, an enterprise must record a valuation allowance unless it provides positive evidence supporting a conclusion that a valuation allowance is not required.  (SFAS 109, ¶25 at 13.)  Such positive evidence includes: (a) "existing contracts or firm sales backlog that will produce more than enough taxable income to realize a deferred tax asset based on existing sales practices"; (b) "an excess of appreciated asset value over the tax basis for the entity's net assets in an amount to realize the deferred tax asset"; and (c) "a strong earnings history exclusive of the loss that created the future deductible amount . . . coupled with evidence indicating that the loss . . . is an aberration rather than a continuing condition."  (*Id.* at 13-14.)

53.     But SFAS 109 warns that overcoming significant negative evidence in the form of a cumulative loss is a heavy burden:

> The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified.  The more negative evidence that exists (a) the more positive evidence is necessary and (b) the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion of all of the deferred tax asset.  (*Id.* ¶25.)

54.     Notably, Popular's own auditor, PwC, has observed in its 2007 "Guide to Accounting for Income Taxes" that a projection of future income is insufficient to avoid a valuation allowance when a corporation has cumulative losses in recent years:

> A projection of future taxable income is inherently subjective and generally will not be sufficient to overcome negative evidence that includes cumulative losses in recent years, particularly if the projected future taxable income is dependent on an anticipated turnaround to operating profitability that has not yet been demonstrated.[3]

---

[3]     PwC "Guide to Accounting for Income Taxes" at 93 (2007), *available at* http://www.pwc.com/us/en/insurance/accounting-for-income-taxes-guide-2007.jhtml.

55.     Indeed, GAAP provides that overcoming cumulative losses "requires positive evidence of sufficient quality and quantity to counteract negative evidence in order to support a conclusion that, based on the weight of *all* available evidence, a valuation allowance is not needed."  (SFAS 109, ¶103 at 37 (emphasis in original).)  Thus, SFAS 109 concludes that "[a] cumulative loss in recent years is a significant piece of negative evidence that is difficult to overcome."  (*Id.*)

56.     In determining the amount of a valuation allowance when presented with significant negative evidence such as a cumulative three year loss, an enterprise can take into account "tax planning strategies."  (*Id.* ¶22.)   However, SFAS 109 provides that tax planning strategies must meet specified standards to legitimately offset a valuation allowance.  They must be actions that: "(a) are prudent and feasible, (b) an enterprise ordinarily might not take, but would take to prevent an operating loss or tax credit carryforward from expiring unused, and (c) would result in realization of deferred tax assets."  (*Id.*)

57.     Popular's auditor PwC has stated in its own tax guide that "[m]oving income from a nontax jurisdiction to a taxable one solely to realize net operating loss carryforwards" is an "Action[] That Generally Would Not Qualify as Tax-Planning Strategies" to avoid a valuation allowance under SFAS 109.  ("Guide To Accounting for Income Taxes" at 117.)

58.     Significantly, "[i]mplementation of the tax-planning strategy must be primarily within the control of management" for it to meet the "prudent and feasible" requirements of GAAP.  (SFAS, ¶107.)

59.     As set forth below, SFAS 109 required Popular to record a valuation allowance against Popular's U.S. mainland deferred tax assets by the beginning of the Class Period because: (1) Popular US was operating at a three-year cumulative loss as of December 31, 2007;

17

(2) Popular did not retain U.S. mainland operations "more likely than not" to realize its U.S. mainland deferred tax assets; and (3) Popular did not have any "prudent and feasible" tax strategies that would have enabled it to avoid taking a full valuation allowance for its U.S. mainland deferred tax assets.

### 2. Popular's Failure To Record A Valuation Allowance Against Its Mainland U.S. Deferred Tax Assets Violated GAAP

60. Throughout the Class Period, Popular failed to record required valuation allowances against its U.S. mainland deferred tax assets in violation of GAAP.

61. Before the start of the Class Period, Popular US's operations were unsuccessful and incurred increasingly larger losses. At that time, Popular sought to reassure investors about the financial stability of the Company by touting its plans to exit its wholesale subprime lending business in the U.S. and to significantly restructure Popular US. Specifically, in January 2007, one year before the start of the Class Period, Popular announced a plan to restructure its U.S. mainland subsidiary, Popular Financial Holdings ("PFH"), by exiting the wholesale subprime business (the "PFH Restructuring Plan"). Then, in November 2007, Popular announced that it removed over $3 billion of subprime loans from its balance sheets by recharacterizing certain securitizations as "sales" under GAAP. Popular also announced a plan to significantly restructure and downsize its U.S. E-LOAN business to engage in less risky lending (the "E-LOAN Restructuring Plan").

62. At the same time, Popular failed to record a valuation allowance to Popular US's deferred tax assets consistent with GAAP. Specifically, Popular began to report its large losses at Popular US as "deferred tax assets," without recording any meaningful valuation allowance against them. Popular failed to do so, even though GAAP required a valuation allowance because its history of U.S. mainland losses, downsizing of U.S. mainland operations, and

knowledge that Popular's future US business prospects were unlikely to be positive; *i.e.*, it was more likely than not that Popular would not realize the benefit of those mainland U.S. deferred tax assets.

63.     During the course of the Class Period, Popular's gross deferred tax assets ("Gross DTA") nearly tripled, from $420 million to $1.22 billion:

|  | 3Q 2007 | 2007 10-K | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 |
|---|---|---|---|---|---|---|
| Gross DTA | $420M | $520M | $694M | $808M | $1.024B | $1.22B |
| Quarterly % Increase | n/a | 23.8% | 33.5% | 16.4% | 26.7% | 16.1% |

64.     As Popular acknowledged in its public filings, virtually all of the increase in its deferred tax assets during the Class Period was derived from losses at Popular US.  Indeed, by the end of the Class Period, when Popular finally recorded a full valuation allowance on its U.S. mainland deferred tax assets, the portion of Popular's gross deferred tax assets from Popular US had grown to $861 million.

65.     Popular's failure to record a valuation allowance against its U.S. mainland deferred tax assets artificially inflated Popular's reported earnings by hundreds of millions of dollars.  Further, Popular's improper accounting for its deferred U.S. mainland deferred tax assets artificially inflated its liquidity, making Popular US appear to have more capital and liquidity than it actually did.  In particular, Popular used the improperly reported U.S. mainland deferred tax assets to hide the fact that as of the second quarter of 2008, Popular US was no longer "well-capitalized" under the regulations promulgated under the FDIA.  Had this fact been disclosed, it would have had dramatic consequences for Popular's stock price, and would have prevented Popular from operating as a financial holding company permitted to engage in

19

key nonbanking activities under the Gramm-Leach-Bailey Act and from holding or earning interest on brokered deposits, *see infra* Section C.

66.    Popular was required to record a full valuation allowance on its U.S. mainland deferred tax assets at the beginning of the Class Period under GAAP because Popular US's operations were not "more likely than not" to realize the benefit of those assets.

67.    Ultimately, on October 22, 2008, Popular issued a press release announcing that it expected to report a net loss of $668.5 million for the third quarter ended September 30, 2008. Popular's press release stated that the loss for the quarter was "principally impacted" by a $360.4 million valuation allowance "against the Corporation's deferred tax assets related to U.S. operations."

68.    As Popular explained in its Third Quarter Form 10-Q filed on November 10, 2008, the Company's $360.4 million valuation allowance followed a determination that Popular US's operations were in a cumulative loss position as of September 30, 2008:

> The Corporation's U.S. mainland operations are in a cumulative loss position for the three-year period ended September 30, 2008. For purposes of assessing the realizibility of the deferred tax assets in the U.S. mainland, this cumulative loss position is considered significant negative evidence and has caused us to conclude that the Corporation will not be able to fully realize the deferred tax assets in the future.

69.    Then, on January 22, 2009, Popular announced a $702.9 million net loss for the fourth quarter ended December 31, 2008, and highlighted as a "principal item" that "impacted" its results a "valuation allowance on the Corporation's deferred tax assets related to the U.S. operations of $462.8 million." Popular again cited its U.S. mainland operations' cumulative loss position as the basis for its valuation allowance. Popular stated that "this cumulative loss position, along with evaluation of all sources of taxable income available to realized the deferred tax asset . . . is considered significant negative evidence and has caused management to

conclude that the Corporation will not be able to fully realize the deferred tax asset in the future." The impact of the Company's valuation allowance on its net deferred tax assets ("Net DTA") is demonstrated in the chart below:

|  | 3Q 2007 | 2007 10-K | 1Q 2008 | 2Q 2008 | 3Q 2008 | 4Q 2008 |
| --- | --- | --- | --- | --- | --- | --- |
| Valuation Allowance | $0.04M | $0.04M | $0.04M | $0.04M | $360.4M | $860M |
| Net DTA | $420M | $520M | $694M | $808M | $663M | $358M |

### 3. Popular US Was Operating At A Three-Year Cumulative Loss From The Very Beginning Of The Class Period

70.     As discussed above, under SFAS 109, "[a] cumulative loss in recent years is a significant piece of negative evidence that is difficult to overcome." (SFAS 109, ¶103 at 37.) In fact, when the Company finally did record a partial and then full valuation allowance for its U.S. mainland deferred tax assets, Popular admitted that the reason it was forced to do so was because of the fact that its Popular US was at a three-year cumulative loss position.

71.     However, Popular US was at a three-year cumulative loss position at the very start of the Class Period, with a cumulative before tax loss of $465 million for the years ended December 31, 2005 through December 31, 2007.

72.     Specifically, in a January 24, 2008 press release, Popular reported an estimated net loss of $64.5 million for the year-ended 2007, including a $294.1 million loss for the quarter-ending on December 31, 2007. Popular US's share of the net losses was $357 million for the quarter-ending December 31, 2007, and $465 million for the year-ended December 31, 2007. Popular attributed the main causes of its annual loss to: (a) a $274.9 million increase in the provision for loan losses due to a slowdown in the U.S. mainland housing sector, as well as weak economic conditions in Puerto Rico; (b) a decrease of $115.2 million in non-interest income, mostly driven from the sale of loans from PFH announced in December 2007; and (c) a

final valuation of $211.8 million from the impairment of E-LOAN's goodwill and trademark through the E-LOAN Restructuring Plan (an increase from Popular's prior estimate of $175 million).

73.    In fact, just one month into the Class Period, on February 22, 2008, Popular disclosed further costs resulting from the hemorrhaging U.S. operation losses.  Popular announced that it would recognize a negative adjustment of $280-300 million based on a fair valuation of PFH's remaining portfolio of mortgage loans, home equity loans, and certain related liabilities.  This would be reflected as a reduction of Popular's retained earnings, and thus its capital and liquidity, as of January 1, 2008.

74.    In reporting the Company's deferred tax assets, Popular's 2007 Form 10-K does not provide any information or evidence to overcome the "significant" and "difficult to overcome" negative evidence of the three-year cumulative loss in Popular US.  Instead, Popular's disclosures about its ability to realize its Popular US's deferred tax assets merely stated:

> The only portion of the deferred tax asset that has a limited life is the portion related to the net operating loss carryforward of the Corporation's U.S. operations.  Since its expiration term is of 20 years, the Corporation expects to generate enough taxable income prior to such expiration term to fully realize it. Based on the information available as of March 31, 2008, the Corporation expects to fully realize the net deferred tax asset.

75.    As discussed above in Section B.1., this justification was plainly insufficient under GAAP.  Accordingly, Popular should have recorded a full valuation allowance against its mainland US deferred tax assets a full year earlier than it did – or by January 2008, at the start of the Class Period.

76.    In the Company's 2008 Form 10-K for the following year filed on March 2, 2009 (after the end of the Class Period), Popular attempted to provide a post-hoc justification for its

failure to write down its deferred tax assets by January 2008. Specifically, Popular stated that it did not need to take a valuation allowance for all of its U.S. mainland deferred tax assets at that time because Popular US's cumulative taxable loss was "temporary" and due to "unprecedented market conditions."

77.    However, Popular US's cumulative taxable loss over the prior three years prior to the start of the Class Period was far from temporary. Since the fourth quarter of 2006 – two years earlier – Popular US had been reporting significant losses. Specifically, Popular US had suffered losses ranging from $24 to $473 million in six of the eight quarters from the fourth quarter 2006 through the third quarter of 2008. These included losses of $24.5 million in the fourth quarter of 2006; $99 million in the first quarter of 2007; $74 million in the third quarter of 2007; $473 million in the fourth quarter of 2007; $114 million in the second quarter of 2008; and $78 million in the third quarter of 2008. In the two quarters where Popular's U.S. operations actually showed a profit, it was a microscopic $1.6 and $3.2 million, amounts far outweighed by Popular US's significant losses over this period which resulted in annual losses, and plainly insufficient to support the Company's deferred tax assets.

78.    Popular's reliance on "unprecedented current market conditions" to explain its mainland U.S. losses was similarly unsupportable. For more than a year before it finally recorded a full valuation allowance of its U.S. mainland deferred tax assets, Popular had been blaming "unprecedented" market conditions for Popular US's skyrocketing losses. For example, in an October 19, 2007 press release explaining significant Popular US's operation losses, Popular stated that its U.S. operations had trouble maintaining liquidity and earnings because "[t]he U.S. credit markets have been marked by unprecedented instability and disruption since the beginning of the third quarter of 2007."

79.    Moreover, at all relevant times, the Exchange Act Defendants knew or recklessly disregarded that Popular US was in a cumulative loss position by the start of the Class Period. In particular:

- The Exchange Act Defendants reviewed and personally certified the accuracy of Popular's financial statements, including Popular's January 24, 2008 report of its earnings and 2007 Form 10-K, filed on February 29, 2008, which reported Popular US's earnings for 2005-2007, and revealed that Popular US was operating at a three-year cumulative loss as of December 31, 2007;

- The Exchange Act Defendants, and in particular Defendant Junquera who has an extensive financial background, knew or recklessly disregarded the significant negative evidence created by Popular US's three-year cumulative loss. SFAS 109 is unambiguous that such a loss is significant negative evidence that is difficult to overcome;

- The Exchange Act Defendants knew or recklessly disregarded the potentially catastrophic impact on Popular's core operations and financial statements of a valuation allowance for Popular's U.S. mainland deferred tax assets. If the truth that Popular US was not "well capitalized" was revealed beginning in the second quarter of 2008, then Popular would have been prohibited from engaging in core operations, including key nonbanking activities and brokered deposit activities under FDIC regulations.

- The Exchange Act Defendants repeatedly demonstrated their knowledge of SFAS 109 by quoting it in the Company's Forms 10-K and 10-Q throughout the Class Period, and by repeatedly claiming that the Company's financial statements complied with SFAS 109; and

- The magnitude of the cumulative loss and overstated deferred tax assets also supports a strong inference of fraudulent conduct on the part of the Exchange Act Defendants. The Exchange Act Defendants misstated the value of Popular's mainland U.S. deferred tax assets by hundreds of millions of dollars for over a year.

### 4.    Popular Did Not Retain Any U.S. Mainland Operations During The Class Period That Were More Likely Than Not To Realize A Benefit From Its U.S. Mainland Deferred Tax Assets

80.    Due to Popular US's three-year cumulative loss position, Popular was required under SFAS 109 to record a valuation allowance for the full value of its U.S. mainland deferred tax assets unless it could point to significant and objectively verifiable positive evidence that Popular US was more likely than not to realize a substantial profit. Popular could not – and did not – point to any such significant positive evidence.

24

81.    Instead, quite the opposite was true.  Before and during the Class Period, Popular US was significantly downsized and Popular incurred significant losses from its remaining U.S. businesses.  The ongoing major losses from its U.S. operations left Popular with no basis for concluding that it was more likely than not to realize the benefit of its U.S. mainland deferred tax assets.

82.    Indeed, Confidential Witness ("CW") 1, a Vice President and Regional Manager at BPNA from November 2003 to November 2008, responsible for running BPNA's problem loan and workout area for New York and Florida, stated that after Popular US sustained its loss in 2007, he "did not hear or see anything within the company that indicated that Popular had any chance whatsoever of booking a profit in 2008."  In fact, CW 1 stressed that there was nothing to indicate that things at the company "were going to turn around."  According to CW 1, Popular knew that the Company was going to take a larger loss in 2008 than in 2007, "and it did."

83.    In fact, Popular itself acknowledged that it would continue to suffer such losses going forward.  In particular, Popular acknowledged, as early as 2007, that the credit and subprime crisis was significantly harming its U.S. operations and would likely keep them from earning any significant profit going forward.  For example, in the Company's 2007 Form 10-K, Defendant Carrión acknowledged that "[u]nprecedented conditions and turmoil in the financial services industry have put our organization to the test."  Popular thus engaged in a drastic restructuring of its mainland U.S. operations, while continuing to recognize substantial losses from those operations.

84.    In January 2007, Popular announced that the global credit crisis had caused it to restructure Popular US's PFH subsidiary to exit the wholesale subprime business.  Then, in

November 2007, Popular announced a restructuring plan for Popular US's E-LOAN business, which would reduce E-LOAN's workforce by two-thirds. The PFH and E-LOAN restructuring plans imposed significant restructuring and goodwill impairment costs on Popular US's operations prior to and during the Class Period, as did the losses Popular recognized as it sold several of its U.S. business at a loss to preserve its liquidity and implement these plans. Popular US's significant restructuring left it with U.S operations that were unlikely to generate profits necessary to realize the benefit of its U.S. mainland deferred tax assets under GAAP, because they had consistently posted significant losses and lacked the critical mass to generate sizable profits.

85. At the same time, delinquency rates and defaults on U.S. subprime mortgages rose, leading to bankruptcies at several subprime lenders. In December 2006 and January 2007, interest rate premiums on collateralized debt obligations ("CDOs"), many of which had subprime mortgages as the underlying securities, jumped sharply in response to the spike in defaults. Responding to the problems in the subprime mortgage market, during the summer of 2007, the three largest credit rating agencies announced plans to downgrade hundreds of bonds backed by subprime residential mortgages.

86. The ratings downgrades immediately concerned an already nervous market, leading investors to flee certain stocks and risky mortgage bonds. Similarly, mortgage defaults and provisions for future defaults caused profits at the depository institutions insured by the FDIC to decline from $35.2 billion in the fourth quarter of 2006 to $646 million in the same quarter a year later, a decline of 98%. The fourth quarter of 2007 also saw the worst bank and thrift quarterly performance since 1990. In all of 2007, banks and thrifts earned approximately

$100 billion, down 31% from a profit of $145 billion in 2006.  Profits declined from $35.6 billion in the first quarter of 2007 to $19.3 billion in the first quarter of 2008, a decline of 46%.

87.    In October 2007, major financial institutions started to announce substantial writedowns on CDO positions and other subprime assets as a result of the deterioration of the subprime market.  For example, by the end of October 2007, Merrill Lynch reported the biggest loss in its 93-year history after taking $8.4 billion in writedowns, primarily on subprime mortgages and CDO positions.  In December 2007, UBS announced a further $10 billion writedown in debts linked to subprime U.S. residential mortgages, on top of $ 3.7 billion in writedowns it had announced just two months earlier.  Morgan Stanley followed UBS, reporting a $9.4 billion writedown, primarily due to soured bets on mortgage-related debt.  In January 2008, Citigroup wrote down approximately $18.1 billion on subprime mortgage-related debt, resulting in a $9.83 billion fourth-quarter loss, the largest quarterly loss in Citigroup's history.

88.    As a result of the rising delinquency rates on U.S. subprime mortgages precipitating the financial crisis, Popular began to experience huge loan losses.  As demonstrated in the chart below, in 2005, Popular's provision for loan losses was only $195,272,000.  But by 2006, Popular's provision for loan losses grew by 50% to $287,800,000 and by 2007 it had doubled to $562,700,000:

| YEAR | LOAN LOSS | % INCREASE FROM PRIOR YEAR |
|---|---|---|
| 2004 | $178,657,000 | n/a |
| 2005 | $195,272,000 | 9% |
| 2006 | $287,800,000 | 47% |
| 2007 | $562,650,000 | 96% |

89.    Popular's provision for loan losses between 2006 and 2007 highlight that the losses in Popular US's operations were a continuing condition making the realization of its deferred tax assets unlikely – and no aberration.  By the time the Class Period began,

disruptions in the credit markets had been a persistent problem for Popular US for several years, and was expected to continue to be a problem for some time in the future.

90.    Indeed, the Exchange Act Defendants knew the cataclysmic effect the U.S. financial crisis was having on Popular, and Popular US in particular.  Both prior to and during the Class Period, these Defendants repeatedly warned that:

- Weakness in the economy and in the real estate market in the geographic footprint of Popular has adversely impacted and may continue to adversely impact Popular.  2007 Form 10-K, filed on February 29, 2008 (emphasis added).

- The current state of the economy and uncertainty in the private and public sectors has had an adverse effect on the credit quality of the Corporation's loan portfolios.  The continuation of the economic slowdown could cause those adverse effects to continue, as delinquency rates may increase in the short-term, until more sustainable growth resumes.  Also, a potential reduction in consumer spending may also impact growth in other interest and non interest revenue sources of the Corporation.  Id. (emphasis added).

- A prolonged economic slowdown, a continuing decline in the real estate market in the U.S. mainland, and ongoing disruptions in the capital markets have harmed and could continue to harm the results of operations of PFH, one of the Corporation's business segments.  Id. (emphasis added).

- The housing market in the U.S. is undergoing a correction of historic proportions. After a period of several years of booming housing markets, fueled by liberal credit conditions and rapidly rising property values, since early 2007, the sector has been in the midst of a substantial dislocation, since 2007.  It has had a significant impact on some of the Corporation's U.S.-based business sectors and has the potential to affect its ongoing financial results and condition.  Declining property values could impact the credit quality of the Corporation's U.S. mortgage loan portfolio because the value of the homes underlying the loans is a primary source of repayment in the event of foreclosure.  Id. (emphasis added).

91.    Accordingly, in order to stem the avalanche of the Company's mounting provisions for loan losses and the effect of the financial crisis on the Company, Popular embarked on a drastic plan to exit the subprime mortgage business and curtail its other mainland U.S. businesses, all before the start of the Class Period.

92.    On January 9, 2007, Poplar announced that PFH was exiting the wholesale subprime mortgage origination business, resulting in charges of $39 million.  Specifically,

Popular announced that the Company had adopted a PFH Restructuring Plan, which called for PFH to exit the wholesale subprime mortgage loan origination business during early first quarter of 2007 and to shut-down the wholesale broker, retail and call center business divisions. The PFH Restructuring Plan additionally called for the consolidation of PFH support functions with its sister U.S. banking entity, Banco Popular North America, creating a single integrated North American financial services unit.

93.    The need to restructure or sell PFH was known to the Exchange Act Defendants even earlier than January 2007.  CW 2, a former Senior Vice President, Chief Risk Officer and Credit Officer at PFH from June 2005 through December 2008, who reported directly to Popular's CEO and Board of Directors, stated that Popular realized that Popular US's subsidiary PFH was not profitable in the Fall of 2005 and thus decided to downsize or sell PFH.  CW 2 stated that in November 2005, Popular retained the consulting firm Speer & Associates to "come in and sort of help dissect the organizations profitability and that's when they came up with the game plan to lay people off and close down certain businesses and keep a couple of other businesses open."   Popular then began to implement this plan in early 2006.

94.    Similarly, CW 3, a senior accountant at PFH from August 2004 through June 2007 responsible for reporting on the profitability of all of PFH, including Equity One, stated that there had been a "pretty consistent decline in profitability" at PFH and that PFH was "not making any money" from at least as early as August 2004.  In fact, CW 3 described PFH as a "sinking ship from beginning to end" throughout his tenure at the Company.  CW 3 also stated that the subprime business was "a very large part" of PFH, and that when it started to fall apart prior to 2007, it "certainly put a hurting" on the Company.  In addition, CW 3 stated that "the

Company [all business segments and divisions under the PFH umbrella] was not in a good situation from beginning to end."

95.     CW 4, an Operations Analyst at Equity One from August 2005 through March 2008, also confirmed that Popular's senior management "knew that certain entities under PFH were struggling" as early as August 2005 when CW 4 started at the Company.

96.     The PFH Restructuring Plan was just the beginning of Popular's plan to divest itself from its U.S. mainland operations.  Throughout the remainder of 2007 and the beginning of 2008, Popular significantly downsized its remaining U.S. mainland operations through either sales or restructurings that saddled Popular with additional losses.

97.     On November 9, 2007, Popular announced in its Form 10-Q for the third quarter of 2007, that its Board of Directors had adopted a Restructuring Plan for its internet financial services subsidiary E-LOAN.  Popular announced that "[c]onsidering the losses in the operation of E-LOAN, market conditions and other factors, the Board of Directors approved a substantial reduction of marketing and personnel costs at E-LOAN.  This change will include concentrating marketing investment toward the internet and the origination of first mortgage loans that are actually being sold to Government Sponsored Entities (GSEs)."

98.     The E-LOAN Restructuring Plan would substantially reduce the size of E-LOAN, and "result in the elimination of approximately 513 positions out of a total of 771 and will be substantially accomplished in the fourth quarter of 2007."  Although Popular hoped to achieve cost savings through the E-LOAN Restructuring Plan, it acknowledged that "this change in E-LOAN's business model could result in impairment in the value of its recorded goodwill and trademark," of up to $228 million.

99.    The Exchange Act Defendants were also well aware of the problems at E-LOAN far earlier than November 2007.  CW 5, the Vice President of Finance at E-LOAN throughout the Class Period who reported to both the President of E-LOAN and the CFO of BPNA, stated that prior to the start of the Class Period "it was pretty evident that there would be a slowdown in business at E-LOAN."  In fact, he stated that there was "concern and discussions amongst management at the Company about a decrease in the business as a whole" by that time.  As a result, according to CW 5, by the beginning of the Class Period, the Company had started forecasting a decrease in volume.  CW 5 also stated that due to the Company's expectation of decreased business, Popular began planning for a reduction in force as early as September 2007, which it ultimately implemented in November 2007.

100.    Similarly, CW 6, an Assistant Vice President in Business Banking from January 2006 through June 2008 in charge of business development, stated that E-LOAN was "never profitable" while under Banco Popular.  In fact, CW 6 recounted a meeting in Chicago in October 2007 – more than three months before the beginning of the Class Period – when "things were getting really bad," at which the CEO of Banco Popular North America, Roberto Herencia, told her and other business bankers that the Company was in "struggling times" and that the Company was seeing negative effects on some of the businesses they purchased.

101.    Just one week after Popular announced the E-LOAN Restructuring Plan, Moody's placed Popular's ratings on review for "possible downgrade."  Moody's review was based on its opinion that "the ongoing credit market disruption will make it more challenging for Popular to finance its Popular Financial Holdings consumer loan subsidiary.  That subsidiary is the source of most of Popular's U.S. subprime mortgage portfolio and has been financed largely with short- and medium-term wholesale borrowings.  A particular challenge for Popular is that the

turmoil in credit markets has been marked by an aversion on the part of investors to finance any subprime-related assets."

102.  On December 21, 2007, Popular announced two further developments in its efforts to exit its PFH subprime lending business and effectuate the E-LOAN restructuring. First, Popular announced that it had recharacterized $3.2 billion of on-balance sheet securitizations as "sales" under GAAP which had the effect of removing approximately $2.4 billion in subprime loans from its books.  Because Popular was so desperate to get these subprime loans off its books, however, it had to do so at a loss.  Popular estimated at that time that it would need to take a net loss of "approximately $90 million and $165 million" by recharacterizing these loans.

103.  Second, Popular announced that as a result of its E-LOAN Restructuring Plan, it would have to recognize an impairment charge of at least $175 million impairment charge off the value of E-LOAN's goodwill and trademark.

104.  As a result of these announcements, Moody's promptly downgraded Popular's credit rating.  Moody's concluded that "[r]esidual interests, in the form of IOs and MSRs, will remain on Popular's balance sheet, as will an additional $2.7 billion of subprime mortgages. The remaining U.S. subprime exposure, combined with the impairment of the E-LOAN platform and the lackluster profitability of Popular's U.S. branch banking business, highlight significant challenges in Popular's U.S. operations that will take time to resolve."

105.  In downgrading Popular's credit rating, Moody's specifically relied upon Popular's liquidity problems and the inability of Popular to make a profit through its U.S. operations.  It noted that "Popular's holding company liquidity needs over the next twelve months remain significant.  Specifically, the Popular North America holding company balance

sheet at September 2007 noted more than $1 billion in debt maturing within one year at that point in time, in addition to the commercial paper then outstanding." Further, it opined that "2008 will be challenging from a profitability standpoint. Popular's core Puerto Rico market is expected by many economic observers to remain in a recession, the mainland economy is also expected to be under pressure and Popular's subprime exposures will likely require elevated provisioning."

106. Similarly, securities analyst firm Sterne Agee & Leach, Inc. ("Sterne Agee") reported on January 15, 2008 that its "main concern with Popular remains credit which continues to deteriorate driven by continued recessionary trends in Puerto Rico coupled with continued weakness in U.S. markets."

107. Then, on January 23, 2008 (the day before the start of the Class Period), Popular announced that it had agreed to sell a significant portion of the mortgage loan and consumer finance portfolio of Equity One, the consumer finance operation of Popular's U.S. subsidiary, PFH, to American General Finance, Inc. for approximately $1.5 billion. As a result of this sale, PFH closed down all of its consumer finance operations.

108. After the sale of PFH's Equity One, all that remained of Popular US's operations were the substantially reduced E-LOAN business, BPNA, and the remnants of PFH, consisting of roughly $1.2 million of loan and mortgage servicing assets and a very small manufactured housing loan portfolio. All of these businesses were insufficient at the start of the Class Period to support Popular's mainland U.S. material and growing deferred tax assets under GAAP.

109. Thereafter, during the Class Period, on August 29, 2008, Popular announced that it was selling approximately $1.2 billion of loans and mortgaging servicing assets of PFH to various Goldman Sachs affiliates. Although the transaction would provide Popular with $700

million in liquidity and reduce Popular's subprime exposure, it would also impose on Popular an additional significant loss of $450 million, further limiting any likelihood of sufficient net income from Popular US's operations.

110.    Then, on September 11, 2008, *Business News Americas* reported that Popular had hired Citigroup to find a buyer for its Banco Popular North America (BPNA) mainland unit. This was due to further pressure to boost Popular's liquidity levels to repay $880 million in debt coming due in the second quarter of 2009.  Given that Popular was considering selling its entire remaining U.S. operations on this date, and since it had been absorbing losses on it recent sales, it continued to be "more likely than not" that Popular could not have expected to recognize sufficient net income from Popular US operations that would offset its roughly $700 million U.S. deferred tax asset as of September 2008.

111.    On September 18, 2008, Popular further demonstrated its desperation to obtain liquidity even at the expense of significant losses when it announced the sale of PFH's manufactured housing loan assets at a $70 million pre-tax loss to 21st Mortgage Corp. & Vanderbilt Mortgage and Finance.  Popular was willing to sacrifice such a significant loss because this transaction would provide Popular with $194 million in much needed liquidity.

112.    Popular's willingness to incur significant ongoing losses to restructure E-LOAN and PFH, and sell PFH's $1.2 million remaining loan portfolio and manufactured housing loan assets, demonstrates that Popular recognized from the beginning of the Class Period that losses from Popular US's operations were a continuing condition.  These ongoing losses left Popular with no basis to conclude it was "more likely than not" that Popular would be able to realize the benefit of Popular's U.S. mainland deferred tax assets as required by GAAP.

113.    Moreover, the significant negative evidence that Popular was unlikely to realize the benefit of its U.S. mainland deferred tax asset continued to mount throughout the Class Period.  Indeed, the consistent and cumulative losses at Popular US and its business units made the conclusion that Popular needed to take a valuation allowance on all of its U.S. mainland deferred tax assets by the beginning of the Class Period inescapable.

114.    For example, Popular US was not only already operating at a cumulative three year loss, but it also had reported significant losses for four of the five quarters preceding the beginning of the Class Period, with pre-tax losses over that period of roughly $670 million.  Similarly, Popular US's PFH unit had operated at a loss for ten consecutive quarters leading up to the Class Period, and Popular planned to impose additional losses on PFH through its PFH Restructuring Plan.  Likewise, Popular US's E-LOAN business segment had operated at a significant loss for four consecutive quarters before the Class Period, and Popular's E-LOAN Restructuring Plan had so severely damaged E-LOAN's brand that Popular had to recognize a major goodwill and trademark impairment charge of $211.8 million.  Finally, Popular US's commercial and retail banking operation, BPNA, began to operate at a significant loss by the second quarter of 2008, which continued each quarter for the rest of 2008.

115.    Nevertheless, when faced with these consistent U.S. losses in its major U.S. operating segments, Popular continued to recognize the full value of its U.S. mainland deferred tax assets on its books.  Even worse, Popular lacked any valid justification for continuing to do so.

116.    At all relevant times, the Exchange Act Defendants knew or recklessly disregarded that Popular US did not retain mainland U.S. operations capable of realizing its deferred tax assets.  In particular:

- The Exchange Act Defendants repeatedly acknowledged prior to and during the Class Period that Popular US had been performing poorly and was expected to continue to do so in 2008 and 2009 due to the U.S. financial crisis;

- The Exchange Act Defendants personally issued each and every one of the adverse press release announcements and SEC disclosures cited above;

- The Exchange Act Defendants reviewed and certified the accuracy of Popular's financial statements, including Popular's January 24, 2008 report of its earnings and 2007 10-K, filed on February 29, 2008, which reported Popular US's earnings for 2005-2007, and revealed that Popular US was operating at a three year cumulative loss as of December 31, 2007;

- Defendant Junquera had intimate knowledge regarding Popular US's poor performance due to his intimate familiarity with Popular's US operations. As B. Riley reported on September 18, 2007, Defendant Junquera had supervised Popular's original expansion efforts into the mainland United States between 1996-2001; and

- The Exchange Act Defendants knew or recklessly disregarded the potentially catastrophic impact on Popular's core operations and financial statements of a valuation allowance for Popular's U.S. mainland deferred tax assets. If the truth that Popular US was not "well capitalized" was revealed beginning in the second quarter of 2008, then Popular would have been prohibited from engaging in core operations, including key non-banking activities and brokered deposit activities under FDIC regulations.

### 5. Popular's Reliance On A Standard Expiration Term Of 20 Years Or Longer Was Insufficient Under GAAP To Justify Failing To Record A Valuation Allowance Against Up To $700 Million Of U.S. Mainland Deferred Tax Assets

117. During the first two quarters of 2008, Popular sought to justify not recording a significant valuation allowance against its material and increasing U.S. mainland deferred tax assets by relying solely on the fact that those assets had a standard expiration term of 20 years or longer.

118. For example, in its 2007 Form 10-K filed on February 29, 2008, Popular disclosed that it maintained $520 million in deferred tax assets. Popular subsequently disclosed in 2009 that $289 million of this amount was from Popular US. In the 2007 10-K, Popular US disclosed only that the $520 million included "$175 million relating to net operating losses carry forward in the U.S. operations." The only justification Popular gave for the retention of the full amount of those deferred tax assets without a valuation allowance was:

The realization of the deferred tax asset related to the net operating loss carryforward of the Corporation's U.S. operations is dependent upon the existence of, or generation of, taxable income prior to their expiration term of 20 years. Based on the information available as of December 31, 2007, the Corporation expects to fully realize the net deferred tax asset.

119.  Similarly, in Popular's Form 10-Q for the first quarter of 2008, filed on May 12, 2008, Popular reported a $694 million deferred tax asset, primarily from Popular US.  As in the Company's 2007 Form 10-K, Popular justified its retention of the full amount of its U.S. deferred tax assets solely on their 20-year expiration term:

The realization of the deferred tax asset related to the net operating loss carryforward of the Corporation's U.S. operations is dependent upon the existence of, or generation of, taxable income prior to their expiration term of 20 years.  The only portion of the deferred tax asset that has a limited life is the portion related to the net operating loss carryforward of the Corporation's U.S. Operations.  Since its expiration term is of 20 years, the Corporation expects to generate enough taxable income prior to such expiration term to fully realize it.  Based on the information available as of March 31, 2008, the Corporation expects to fully realize the net deferred tax asset.

120.  Popular relied on the same language, updated for the time period, in its Form 10-Q for the second quarter of 2008, filed on August 11, 2008.

121.  Popular's reliance on a standard 20-year expiration term for its U.S mainland deferred tax assets was an improper and insufficient basis to avoid a valuation allowance under SFAS 109.  SFAS 109, ¶20 provides that an enterprise should look to "[i]nformation about an enterprise's current financial position and its results of operations for current and preceding years."  Further, financial information should be "supplemented by all currently available information about future years."  *Id.*

122.  The standard 20-year expiration term for a portion of Popular's U.S. mainland deferred tax assets, however, explains nothing about whether Popular would be "more likely than not" to earn sufficient profit from Popular U.S. to realize the benefit of the deferred tax assets as is required under GAAP.  The standard 20-year expiration term simply provides no

evidence about whether Popular US itself would be able to generate sufficient net income to realize the benefit of those tax assets as is required under GAAP.   That was particularly true given that Popular US had been operating at a cumulative three-year loss from the beginning of 2008.

123.   SFAS 109 requires enterprises to rely upon existing positive financial factors such as "existing contracts or firm sales," "[a]n excess of appreciated asset value of the tax basis of the entity's asset," or "[a] strong earnings history exclusive of the loss that created the future deductible amount" as the kind of "positive evidence" that could avoid requiring a valuation allowance.  (*Id.* ¶24.)  Such financial information is necessary so that future income "can be objectively verified."  (*Id.* ¶25.)  But Popular's 20-year expiration justification failed to provide any positive evidence of future income to offset its U.S. mainland deferred tax assets as required by GAAP.

124.   As SFAS 109 explicitly states, the requirement that a deferred tax asset be more likely realizable than not "requires positive evidence of sufficient quality and quantity to counteract negative evidence in order to support a conclusion that, based on the weight of all available evidence, a valuation allowance is not needed."  Because Popular's standard 20-year expiration term justification did not provide any positive financial evidence of company-specific future income from Popular US to offset Popular's U.S. mainland deferred tax assets, it was plainly insufficient to justify avoiding a valuation allowance in both the first and second quarters of 2008.

125.  Moreover, as Popular's own auditor has recognized, it would have been insufficient under GAAP for Popular to rely upon undisclosed forecasts of future profits to avoid a valuation allowance in the face of its cumulative three year loss:

A projection of future taxable income is inherently subjective and generally will not be sufficient to overcome negative evidence that includes cumulative losses in recent years, particularly if the projected future taxable income is dependent on an anticipated turnaround to operating profitability that has not yet been demonstrated.[4]

126.    Notably, Popular's lack of any appropriate justification for avoiding a valuation allowance on its increasingly larger U.S. deferred tax assets drew concern from one securities analyst, Sterne Agee.  In a report issued on July 22, 2008, Sterne Agee stated that "Popular's deferred tax asset (DTA) was a staggering $808 million in 2Q, up from $694 million in 1Q and $525 million in 4Q08.  This 'asset' now totals nearly 27% of tangible equity (preferreds included).  While we think Popular will be able to utilize a large portion of DTA over time, we continue to question the viability of the U.S. related portion of this asset."  (Emphasis added.)

127.    Despite being on notice of Sterne Agee's questioning, Popular did not provide any further justification for it continuing to increase its deferred tax assets without recording a valuation allowance for its U.S. mainland deferred tax assets.

128.    At all relevant times, the Exchange Act Defendants knew or recklessly disregarded that Popular's reliance on the standard 20-year expiration term to avoid recording a valuation allowance against Popular's U.S. mainland deferred tax assets violated GAAP.  In particular:

- The Exchange Act Defendants repeatedly demonstrated their knowledge of the relevant GAAP requirements by quoting SFAS 109 in the Company's Forms 10-K and 10-Q throughout the Class Period, and repeatedly claiming that the Company's financial statements complied with SFAS 109;

- Notwithstanding their extensive knowledge of GAAP (SFAS 109) and the unambiguous standard set forth is SFAS 109, the Exchange Act Defendants misleadingly represented throughout the Class Period that it was more likely than not that all deferred tax assets (net of relatively minor tax valuation allowances) would reduce Popular's taxes payable in future years based on a standard 20-year expiration term for its U.S. mainland deferred tax assets;

---

[4] PwC "Guide to Accounting for Income Taxes" at 93 (2007).

- The Exchange Act Defendants relied upon the 20-year expiration term of US deferred tax assets to justify their failure to record a valuation allowance while knowingly and recklessly disregarding that the standard duration of U.S. deferred tax assets explains nothing about whether Popular itself would be more likely than not be able to earn sufficient profit from its U.S. mainland operations to realize the benefit of its reported deferred tax assets;

- The Exchange Act Defendants either knew or recklessly disregarded the fact that an analyst at Sterne Agee noted on six separate occasions starting on June 13, 2008 that Popular U.S. mainland deferred tax assets were likely overstated and that the deferred tax assets required either a "substantial writedown" or to be "written off in its entirety." Sterne Agee repeated these warnings on July 1, July 22, September 9, September 23, and October 28, 2008. Despite these repeated warnings, the Exchange Act Defendants did nothing to change their improper accounting; and

- The Exchange Act Defendants knew or recklessly disregarded the potentially catastrophic impact on Popular's core operations and financial statements of a valuation allowance for Popular's U.S. mainland deferred tax assets. If the truth that Popular US was not "well capitalized" was revealed beginning in the second quarter of 2008, then Popular would have been prohibited from engaging in core operations, including key nonbanking activities and brokered deposit activities under FDIC regulations.

### 6. Popular's Last-Minute "Tax Strategies" Were Improper Under GAAP To Justify Failing To Record A Valuation Allowance Against $323 Million Of U.S. Mainland Deferred Tax Assets

129. Just two months after proclaiming that the standard 20-year expiration of Popular's U.S. mainland deferred tax assets justified not taking an allowance, Popular finally conceded on October 22, 2008 that due to its three year cumulative loss position it was required to record a valuation allowance against Popular's U.S mainland deferred tax assets. However, instead of recording a full valuation allowance as it should have done at the beginning of the Class Period, Popular only recorded a partial valuation allowance, which did not cover $323 million in U.S. mainland deferred tax assets. In an attempt to justify its failure to record a full valuation allowance, Popular in its Form 10-Q filed on November 10, 2008 claimed that a full allowance was not necessary because of two new purported "tax strategies." Popular, however, failed to provide any substantive detail about those tax strategies. Indeed, prior to this

announcement, Popular had not previously disclosed that it was applying any tax strategy whatsoever that impacted the U.S. mainland deferred tax assets.

130.   Popular shifted course and stated:

In assessing the realizability of the deferred tax assets, management has considered all four sources of taxable income mentioned above, including its forecast of future taxable income, which includes assumptions about the unprecedented deterioration in the economy and in credit quality.  The forecast includes costs reductions initiated in connection with the reorganization of the U.S. mainland operations and two tax planning strategies.  The two strategies considered in management's analysis include the level of interest expense in the U.S. by transferring debt to the Puerto Rico operations and the transfer of a profitable line of business to the U.S. mainland operations.  (Emphasis added.)

131.   Conspicuously absent from this announcement is: (1) what debt Popular would attempt to transfer from the mainland U.S. to Puerto Rico; (2) how Popular would transfer such debt; (3) what the transfer of debt would cost; and (4) what the effect of the transfer of debt would have on the Company financially.  Similarly absent from this announcement is: (1) what profitable business line Popular would attempt to transfer from Puerto Rico to the mainland U.S.; (2) how Popular would transfer this business line; (3) what the transfer of the business line would cost; and (4) what the effect of the transfer of the business line would have on the Company financially.

132.   The Exchange Act Defendants' reliance on these two new purported tax strategies was also an improper method of avoiding tax valuation allowances under GAAP.  As Popular's own auditor, PwC stated in its own tax guide, "[m]oving income from a nontax jurisdiction to a taxable one solely to realize net operating loss carryforwards" is an "Action[] That Generally Would Not Qualify as Tax-Planning Strateg[y]" to avoid a valuation allowance under SFAS 109.  PwC "Guide To Accounting for Income Taxes" at 117.

133.   Moreover, since these purported tax planning strategies required the consent of third party regulators, they could not been deemed "primarily within the control of

41

management" and, therefore, "feasible" for GAAP planning purposes.  (SFAS 109, ¶107.) Specifically, because Popular is a highly regulated organization, it would face significant scrutiny from, among others, the FDIC, I.R.S., Federal Reserve, the Office of Comptroller of Currency and the Office of the Commissioner of Finance and Insurance of Puerto Rico about the viability and legitimacy of such transfers, particularly during the banking crisis occurring in the Fall of 2008.  For example, Popular would need to first obtain the consent of the Puerto Rico tax authorities to move a profitable line of business to the mainland U.S.  The requirement of obtaining such regulatory consent alone would make this tax planning strategy no longer "primarily in the control of management," as required to be valid under SFAS 109.  *Id.*  Indeed, Popular admitted that it generally did not have such control in its filings with the SEC.  For example, Popular stated in its 2007 Form 10-K that "[p]ositions taken in the Corporation's tax returns may be subject to challenge by the taxing authorities upon examination."

134.   Furthermore, in the event that Popular intended to only move its profits and not the actual business from this "profitable line of business" to the mainland U.S., Popular would have been hard-pressed to receive the approval of the cash-strapped Puerto Rican government. Conversely, in the event that Popular intended to move both its business and profits to the mainland U.S., Popular would have needed to expend considerable cash it did not have available.  Accordingly, Popular's last-minute tax planning strategies also were an improper basis to avoid a full valuation allowance under GAAP.

135.   Even if Popular's tax planning strategies were within the Company's control – which they were not – Popular also did not have a line of business in Puerto Rico that was profitable enough to counteract the remaining $323 million U.S. mainland deferred tax asset and simultaneously not threaten Popular's Puerto Rico operations.

136.   Beginning in 2006, the Puerto Rican economy had fallen into a recession. Accordingly, at the beginning of the Class Period in 2008, Puerto Rico had already been in a recession for over 2 years – the longest recession to ever hit Puerto Rico – and numerous economic observers and analysts projected that the recession would continue unabated for a number of years.  Specifically, economic observers and analysts were forecasting a continued significant contraction in Puerto Rico's economy for 2008 and unemployment rates exceeding 11%.  Consumer sentiment indices in Puerto Rico also forecasted a long-term economic slump; more than 65% of consumers expected the economy in Puerto Rico to get worse over the course of the year.

137.   Puerto Rico's economy only worsened over the course of the Class Period. Economic observers and analysts noted that the local economy remained under heavy pressure via higher oil prices, and that there were no signs of positive economic catalysts in either the near or distant future.

138.   The Exchange Act Defendants were well aware of the impact the recession in Puerto Rico had on the Company's ability to earn revenue.  For example, in the Company's Form 10-K for the year ended December 31, 2007, the Company stated:

> A significant portion of the Corporation's financial activities and credit exposure is concentrated in Puerto Rico (the "Island") and the Island's economy has been deteriorating.

139.   The Exchange Act Defendants also anticipated that the Puerto Rico recession would continue to have a significant negative impact on Popular's ability to generate revenue in 2008 and 2009.  For example, in a September 3, 2008 Form 8-K which attached a June 30, 2008 investor presentation entitled "Kaufman Bros.," Popular stated that "Management expects weakness in the [Puerto Rico] economy to continue throughout 2008 and into 2009."

140.    Then, in a November 18, 2008 Form 8-K which attached a B. Riley investor presentation, Popular stated "the challenging P.R. [Puerto Rico] economy is pressuring profitability at the segment.  The ongoing recession and deteriorating quality trends in the commercial and construction loan portfolios, have led to an increase in credit costs. Management expects weakness in economy to continue into 2009."

141.    Given the impact of the Puerto Rico recession on Popular's financial statements, Popular simply could not afford to transfer a hugely profitable business from Puerto Rico to the mainland U.S. in order to benefit from the remaining U.S. deferred tax assets.

142.    Indeed, CW 1 stated that he did not believe there were any profitable businesses in Puerto Rico in 2008 that could have been successfully transferred to mainland U.S.  In fact, CW 1 observed that at the end of 2008, "the Puerto Rican market was even weaker than the U.S. market."

143.    All of these facts reveal that the last-minute purported tax planning strategies relied upon by the Exchange Act Defendants to avoid taking a full valuation allowance were nothing more than an improper way to continue to avoid what they should have accounted for correctly from the very start of the Class Period.  Given the Company's extrication from the mainland U.S. and Popular US's history of mounting loan losses, Popular could not properly avoid material tax valuation allowances on its large and growing U.S. deferred tax assets throughout the Class Period.  Indeed, these purported tax planning strategies were completely infeasible and accordingly abandoned just two months later when the Exchange Act Defendants decided to "confront reality."

144.    At all relevant times, the Exchange Act Defendants knew or recklessly disregarded that Popular's reliance on last minute purported "tax strategies" to avoid recording

a full valuation allowance against Popular's U.S. mainland deferred tax assets violated GAAP.

In particular:

- The Exchange Act Defendants repeatedly demonstrated their knowledge of the relevant GAAP requirements by quoting SFAS 109 in the Company's Forms 10-K and 10-Q throughout the Class Period, and repeatedly claiming that the Company's financial statements complied with SFAS 109. SFAS 109 is unambiguous that tax strategies must be "prudent," "feasible" and within "management's control" to avoid taking a valuation allowance;

- Prior to the Company's 2008 third quarter Form 10-Q, the Exchange Act Defendants never disclosed reliance on any purported "tax planning strategies" and never disclosed any of the specific risks associated with those strategies. Even thereafter, when the purported tax planning strategies were introduced, the Exchange Act Defendants failed to offer any specifics supporting the strategies;

- The Exchange Act Defendants knew or recklessly disregarded that Popular's purported tax strategies required regulatory approval, and therefore were not in the control of management, in violation of GAAP;

- The Exchange Act Defendants knew or recklessly disregarded that Popular's purported tax strategies were extremely costly and risky to the Company; and

- The Exchange Act Defendants knew or recklessly disregarded that the transfer of a profitable line of business from Puerto Rico was not feasible or prudent because Popular PR's operations were being significantly and negatively impacted by the Puerto Rico recession. Given the Company's severe liquidity crisis, transferring a business to the U.S. from Puerto Rico would have been far too expensive for the Company to implement.

## C.    THE EXCHANGE ACT DEFENDANTS' IMPROPER ACCOUNTING ARTIFICIALLY INFLATED THE COMPANY'S REPORTED EARNINGS, LIQUIDITY AND REGULATORY CAPITAL RATIOS

145.    Throughout the Class Period, Popular's liquidity was falling rapidly. By the second quarter of 2008, analysts and rating agencies were constantly concerned about and commenting on the Company's dwindling liquidity. For example, on May 13, 2008, Moody's changed its rating outlook on Popular to "negative" from "stable." Moody's reported that this change "reflects Moody's concerns regarding Popular's weakening. . . liquidity profile." In particular, Moody's noted that Popular's usual liquidity sources "have been constrained by Popular's recent earnings challenges in its U.S. business."

146.   In response to those concerns, Popular was forced to resort to desperate measures to raise liquidity.  First, on May 22, 2008, Popular announced the Offering of $400 million of Series B preferred stock.  Popular made clear at the time that the proceeds of the preferred stock offering would be used for purposes including "increasing Popular's liquidity and capital."

147.   Then, on August 28, 2008, Popular announced that it would cut its quarterly dividend to investors in half, from $0.16 to $0.08, saving the company $90 million in capital per year.  In connection with this announcement, Popular's CEO Richard Carrión stated that "this is absolutely a necessary step given the continued uncertainty in the financial markets and extended fallout of the U.S. housing sector. . . . [t]he new rate will provide us with greater flexibility by significantly increasing our liquidity."

148.   Furthermore, as discussed in Section B.4 above, by late-August 2008, Popular's liquidity situation had become so dire that it had to resort to selling off its remaining U.S. operation assets at significant losses.

149.   Popular's desperate need for an infusion of capital was confirmed by former employees of the Company.  For example, CW 7, a District Manager for Equity One from February 2007 through March 2008, stated that Equity One was sold to help Popular survive. CW 7 explained that he was told on conference calls by the President of Equity One, Bill Williams, and the Executive Vice President of Equity One, Mike Duganich, that Popular used the funds from the sale of Equity One to give a "cash infusion to keep Banco Popular propped up while we weather the storm."

150.   CW 8, an Operations Manager, Compliance Resolution Manager and a Branch Manager from March 2002 through March 2008, also confirmed that the sale of Equity One was done to "make up for [Popular's] other problems."

151.    Ultimately, Popular's need for liquidity grew so urgent that it actively sought to sell virtually the remainder of its U.S. mainland operations.  On September 11, 2008, *Business News Americas* reported that Popular had hired Citigroup to find a buyer for its Banco Popular North America (BPNA) mainland unit.  This was due to Popular's pressure to boost liquidity levels to repay $880 million in debt coming due in the second quarter of 2009.

152.    In fact, Popular's liquidity situation became so bad that in November 2008, it was forced to petition the U.S. government for a significant amount of funding from the Troubled Asset Relief Program ("TARP").  On November 18, 2008, Popular obtained preliminary approval from the government to access $950 million in TARP funds through the Capital Purchase Program.  This transaction closed on December 5, 2008.

153.    Notably, Defendant Junquera admitted after the end of the Class Period at a March 4, 2009 Conference, that "[l]iquidity. . . It was a very serious problem from the end of '07 throughout '08."

154.    The capital shortage which was the cause of Popular's liquidity crisis, similarly affected the status of Popular's regulatory capital.  Accordingly, Popular was highly motivated not to record a valuation allowance for its U.S. mainland deferred tax assets.

155.    Indeed, had Popular recorded a valuation allowance for its U.S. mainland deferred tax assets as it was required to do under GAAP, Popular US's total risk-based capital-ratio would have fallen below the 10% United States Federal Deposit Insurance Act (the "FDIA") regulatory threshold for being "well capitalized" beginning in the second quarter of 2008.  This would have left Popular US merely "adequately capitalized" in both the second and third quarters of 2008.

156.   Had Popular not received the $950 million in TARP funds in December 2008 and recorded a valuation allowance for its U.S. mainland deferred tax assets as it was required to do under GAAP, both Popular US's and Popular PR's total-risk based capital ratio would have fallen below 8%, falling from "well capitalized" to a catastrophic "undercapitalized" in the fourth quarter of 2008.

157.   The difference between classified by the FDIA as "well capitalized" as opposed to be classified as either "adequately capitalized" or "undercapitalized" was material to Popular and its shareholders, and would have had immediate and significant repercussions on the Company's ability to conduct business and earn income.

158.   As described in Popular's 2007 Form 10-K, the FDIA establishes five capital tiers: "well capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized," and "critically undercapitalized."  The relevant capital measures are the total risk-based capital ratio, the Tier 1 risk-based capital ratio and the leverage ratio.

159.   Rules adopted by the federal banking agencies provide that a depository institution will be deemed to be: (1) "well capitalized" if it maintains a leverage ratio of at least 5%, a Tier 1 risk-based capital ratio of at least 6% and a total risk-based capital ratio of at least 10% and is not subject to any written agreement or directive to meet a specific capital level; (2) "adequately capitalized," if it is not "well capitalized," but maintains a leverage ratio of at least 4% (or at least 3% if given the highest regulatory rating in its most recent report of examination and not experiencing or anticipating significant growth), a Tier 1 risk-based capital ratio of at least 4% and a total risk-based capital ratio of at least 8%; (3) "undercapitalized" if it fails to meet the standards for adequately capitalized institutions (unless it is deemed significantly or critically undercapitalized); (4) "significantly undercapitalized" if it has a leverage ratio of less

than 3%, a Tier 1 risk-based capital ratio of less than 3% or a total risk-based capital ratio of less than 6%; and (5) "critically undercapitalized" if it has tangible equity equal to 2% or less of total assets.

160.   To calculate a corporation's total risk-based capital ratio and tier 1 capital ratios under FDIA requirements, the corporation's capital is stated as a ratio in comparison to its total assets or a risk-weighted basis according to its credit risk.   Tier 1 capital includes shareholder equity, retained earnings and deferred tax assets.   Tier 2 capital consists of other types of capital, such as undisclosed reserves, revaluation reserves, general provisions, hybrid instruments and subordinated term debt.   The remainder of a corporation's assets not included in Tier 1 and Tier 2 capital includes riskier assets, such as subprime debt.   A corporation's total risk-based capital ratio is derived by taking the sum of its Tier 1 and Tier 2 capital, and dividing it by all of the corporation's assets weighted by credit risk.

161.   Throughout the Class Period, Popular reported that it was "well capitalized." However, as the chart below demonstrates, had Popular acted in accordance with GAAP and recorded a valuation allowance for its U.S. mainland deferred tax assets Popular US would have fallen from "well capitalized" to just "adequately capitalized" beginning in the second quarter of 2008:

| Quarterly Report | Reported Popular US Total Risk Based Capital Ratio | Actual Popular US Total Risk-Based Capital Ratio (w/ Valuation Allowance) |
|---|---|---|
| Q2 2008 | 10.38% | 9.59% |
| Q3 2008 | 10.11% | 9.62% |

162.   In addition, if Popular had not been bailed out by the U.S. government by receiving $950 million in TARP funds during the fourth quarter of 2008, Popular US's total risk-based capital ratio would have fallen to a catastrophically low 7.32%.   That would have left

Popular US "undercapitalized" under FDIA requirements.  Similarly, Popular PR would have fallen to a virtually identical ratio.

163.   Indeed, on September 23, 2008, an analyst at Sterne Agee specifically put Popular on notice of this problem when it warned that Popular was "undercapitalized."  Sterne Agee noted that Popular's $450 million loss on the PFH sale to Goldman plus a required "DTA valuation allowance that could be anywhere from $200-$400 million or more and a sale of U.S. assets that could trigger additional losses (including goodwill) in excess of $500 million, we remain concerned as to capital levels."

164.   Had Popular reported that, in reality, it was not "well-capitalized," it would have suffered material and catastrophic repercussions.  Most significantly, under the requirements of the Gramm-Leach-Bailey Act, Popular's failure to remain classified as "well-capitalized," would mean that it could not remain a financial holding company permitted to engage in a wide range of nonbanking activities.  As a result, Popular would have been forced to shut down or spin-off a number of its businesses, including at a minimum, PFH, Popular Insurance, Inc., Puerto Rico Popular Life REIT, Popular Insurance V.I., Popular Financial Management LLC, Popular Securities, Inc. and E-LOAN Insurance Services.

165.   Further, had Popular correctly reported that it was not in fact "well-capitalized," it would have been restricted from continuing to hold approximately $3 billion in brokered deposits on its financial statements and from receiving the customary higher interest on such brokered deposits, without a waiver from the FDIC.  Brokered deposits are investment vehicles similar to Certificates of Deposit ("CDs"), but instead involve an FDIC broker accumulating a large amount of money (usually through multiple investors) and then providing that pool of money to the bank.  Investors find brokered deposits attractive because banks usually offer a

larger return than for traditional CD's – usually more than 75 basis points over the prevailing market rate – in exchange for this larger influx of capital. Brokered deposits are restricted for banks that are not "well-capitalized" to prevent a bank from using them to support unsound or rapid expansion of its loan or investment portfolio, and from destabilizing interest rates in its market.

166. Notably, Popular acknowledged in its 2007 Form 10-K that FDIC restrictions would have barred it from retaining any brokered deposits without an FDIC waiver, and would have barred it from paying attractive interest rates if Popular US was not well-capitalized:

**Brokered Deposits**

FDIC regulations adopted under FDIA govern the receipt of brokered deposits. Under these regulations, a bank cannot accept, roll over or renew brokered deposits unless it is (i) well capitalized or (ii) adequately capitalized and receives a waiver from the FDIC. A bank that is adequately capitalized may not pay an interest rate on any brokered deposits, and a bank that is undercapitalized may not pay an interest rate on any deposits, in excess of 75 basis points over certain prevailing market rates specified by regulation. There are no such restrictions on a bank that is well capitalized. The Corporation does not believe the brokered deposits regulation has had or will have a material effect on the funding or liquidity of Banco Popular and BPNA.

167. Popular further admitted that it principally relied on brokered deposits to maintain its liquidity during the Class Period:

Brokered deposits, which amounted to $3.1 billion at December 31, 2008, continued to be used as an important funding source of on-hand liquidity amidst the financial industry developments in the second half of 2008. The level of brokered deposits at year-end 2008 was at the same level as in the previous year. One of the strategies followed by management during 2007 in response to the unprecedented market disruptions was the utilization of brokered deposits to replace short-term uncommitted lines of credit. (Emphasis added).

168. Thus, had Popular disclosed the truth about Popular US not being "well-capitalized," that would have threatened an important source of $3.1 billion in liquidity. Popular also would have lost the ability to attract future brokered deposits with attractive

interests rates. This would also have had a significant impact on Popular's earnings, as it would not have been able to accrue the significant amount of interest income it derived from such brokered deposits.

169. Finally, and equally important, had Popular disclosed that Popular US was no longer "well-capitalized," it would have caused rating agencies and analysts to significantly downgrade their ratings of Popular's debt and investment recommendations for Popular's stock.

170. In short, the potentially catastrophic consequences of Popular disclosing that Popular US was not "well capitalized" beginning in the second quarter of 2008 gave the Exchange Act Defendants a significant motive to mislead investors about Popular's U.S. mainland deferred tax assets.

171. At all relevant times, the Exchange Act Defendants knew or recklessly disregarded that Popular's improper accounting artificially inflated the Company's reported earnings, liquidity and regulatory capital ratios. In particular:

- The Exchange Act Defendants repeatedly demonstrated their knowledge of the relevant FDIC requirements for being "well-capitalized" by quoting the FDIC and Gramm-Leach-Bailey Act requirements extensively in Popular's SEC filings and by repeatedly claiming that the Company was well-capitalized under those regulatory requirements;

- The Exchange Act Defendants certified Popular's financial statements disclosing Popular's regulatory capital ratios using numbers that improperly included U.S. mainland deferred tax assets that Popular US was more likely than not to be unable to realize;

- The Exchange Act Defendants knew the tremendous impact the FDIC and Gramm-Leach-Bailey Act "well-capitalized" requirements had on Popular's ability to earn revenue from essential nonbanking activities and carry and earn interest from approximately $3 billion of brokered deposits;

- Given the severe repercussions from failing to be "well capitalized," the Exchange Act Defendants knew or recklessly disregarded that disclosing a material tax valuation allowance would threaten the Company's ability to qualify as "well-capitalized" under FDIA regulations;

- Beginning in the Summer of 2008, Sterne Agee questioned repeatedly whether Popular was undercapitalized and stated in September 2008 that the "Company Remains Undercapitalized." The Exchange Act Defendants did not respond; and

- The Exchange Act Defendants repeatedly acknowledged that Popular was experiencing significant liquidity issues in its U.S. operations due to the economic crisis in the U.S., but failed to discuss how that impacted the Company's capitalization ratio.

## D.    THE TRUTH ABOUT THE EXCHANGE ACT DEFENDANTS' IMPROPER ACCOUNTING BEGINS TO EMERGE

172.    By October 22, 2008, Popular could not continue to ignore that it did not need to record a valuation allowance for its U.S. mainland deferred tax assets, as it had just sold off PFH loan portfolios to Goldman Sachs to raise much needed cash.  Thus, Popular reported a $668.5 million loss for the third quarter 2008, ending September 30, 2008.  This loss was due primarily to Popular's recognition of a $360.4 million valuation allowance and its recognition of $457.3 million in losses from its sale of PFH loans to Goldman Sachs ($171.2 million of which was part of the $360.4 million valuation allowance).

173.    However, Popular still did not take the required full valuation allowance against all of its U.S. mainland deferred tax assets at this time, even though it admitted that its U.S. mainland operations had a cumulative loss for the prior three years and its remaining US business had been dramatically reduced.  Popular's CEO Richard Carrión reported that "[w]e have . . . taken a partial valuation allowance on our deferred tax assets related to our U.S. operations."    Instead, Popular chose to "maintain[] a deferred tax asset amounting to $323 million in its U.S. operations."  (As noted in Section C above, this allowed Popular to continue to claim it was "well capitalized," when that was not true.)

174.    Notably, in a report issued on October 28, 2008, Sterne Agee suggested that the Company's partial valuation allowance was not enough and that the Company should have recorded a full allowance for its U.S. mainland operations.  Specifically, Sterne Agee stated:

> **DTA written down but still overvalued** – Along with the PFH charge, Popular as we expected/suggested, took a valuation allowance of $360 million on a gross DTA that now totals over $1 billion with net DTA now at $663 million.  While we feel this is a step in the right direction, we would note that about half of the

> DTA ($323MM) pertains to U.S. operations that are unprofitable and a portion (or all) will likely be sold long before any profits materialize, assuming a buyer can be found.  We consider the U.S. portion of the DTA to be mostly valueless with a write-down likely to coincide with a sale of a portion of U.S. holdings.

175.   On January 22, 2009, after securing TARP funds, Popular finally revealed the need to record a full valuation allowance for its U.S. operations deferred tax assets (abandoning the purported tax strategies it relied on just months earlier).  On that day, Popular issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2008.  For the quarter, the Company reported a net loss of $702.9 million.  Defendant Carrión, commenting on the results, stated, in pertinent part, as follows:

> Our disappointing results reflect deteriorating economic conditions both in the U.S. mainland and Puerto Rico, which resulted in substantial loss for the fourth quarter principally caused by a significant increase in the allowance for loan losses and the valuation allowance equal to 100% of the deferred tax asset related to our U.S. mainland operations.

176.   According to CW 1, "nothing changed" at the Company between the third and fourth quarters of 2008 that "would have prompted Popular to take the valuation allowance in January 2009 when it had not taken it earlier,"

177.   Popular reported that "a principal item" causing its loss was a "valuation allowance of the Corporation's deferred tax assets related to the U.S. operations of $462.8 recorded during the fourth quarter of 2008."  As to its deferred tax assets, Popular disclosed as follows:

> The Corporation's net deferred tax assets (prior to deducting the valuation allowance) amounted to $1.2 billion as of December 31, 2008, of which $848 million pertains to the U.S. mainland operations.  As of December 31, 2008, the Corporation recorded a total valuation allowance . . . on the deferred tax assets of the Corporation's U.S. operations.  This full valuation allowance was recorded in consideration of the requirements of SFAS No. 109. . . . The Corporation's U.S. mainland operations are in a cumulative loss position for the three-year period ended December 31, 2008. . . this cumulative taxable loss position, along with the evaluation of all sources of taxable income available to fully realize the deferred tax asset, is considered significant negative evidence and has caused management

54

to conclude that the Corporation will not be able to fully realize the deferred tax assets in the future, considering solely the criteria of SFAS No. 109.

178.   The market reacted severely to Popular's revelation of the truth that it needed to record a full valuation allowance for all of its U.S. mainland operations.  Specifically, Popular's common stock price fell <u>over 50%</u>, from $4.98 (the close of trading on January 21, 2009) to $2.46 (the close of trading on January 22, 2009), on heavy volume.

179.   Analysts attributed Popular's stock drop on January 22, 2009 to the complete write-down of the Company's U.S. mainland deferred tax assets.  For example, in a report dated January 23, 2009, B. Riley reduced its Popular rating from "Buy" to "Sell," while noting that "a valuation allowance taken against the deferred tax asset" was one of two "biggest factors" causing this loss.  In particular, B. Riley noted that the valuation allowance completely covered the deferred tax assets "related to operating losses" in the U.S. "which have a useful life of 20 years," and which B. Riley had expected "to remain."

180.   Sterne Agee similarly attributed the Company's fourth quarter loss to the deferred tax asset writedown.  In a report issued on January 27, 2009, Sterne Agee reiterated a "SELL" rating on Popular stock, noting that "the primary factor driving the loss was a $463 million valuation adjustment for the U.S. operations DTA, now at zero, a measure we have been predicting for quite some time."

181.   Ratings agencies also attributed Popular's fourth quarter loss to its need to write-down its entire deferred tax asset.  Fitch downgraded Popular's ratings on January 22, 2009, and Moody's downgraded Popular on January 30, 2009.

182.   Yet, even as Popular finally disclosed the truth that a full valuation allowance was required against its U.S. mainland deferred tax assets causing significant losses, it sought to falsely reassure the market (including its common and its preferred shareholders) that it had

sufficient liquidity to manage through 2009 without taking further drastic action, such as cutting its dividend.  For example, Defendant Carrión stated in the January 22, 2009 press release announcing Popular's losses for the fourth quarter, that "the $935 million TARP funds provided us with solid regulatory capital ratios, which will permit us to manage through what we expect to be another extremely challenging year."

183.   Similarly, at a Citi Financial Services Conference Investor Presentation on January 27, 2009, Popular represented that "liquidity was substantially improved with the PFH asset sales announced in Q3 ($900M) and the TARP preferred stock sale in Q4.  We now have enough cash on hand to meet all obligations through mid-2010."  Popular went to great lengths during this presentation to reassure investors about its liquidity, reiterating that its "liquidity was significantly strengthened" during the fourth quarter of 2008.   Indeed, Popular went so far as to suggest that it had solved its liquidity problems, touting as the first point in the "Closing Thoughts" part of the presentation that its liquidity "has been normalized."

184.   But, in truth, Popular's liquidity as of January 27, 2009 was far from "strong" or "normalized."  As Sterne Agee noted in a report issued on January 27, 2009, Popular's liquidity through 2010 was at "an unacceptably low level."  As Sterne Agee noted: "At the very least, we think the company should immediately suspend its dividend of $0.08 per quarter.  Longer-term, we fail to see how the company can properly operate under the current capital structure and think there will be increasing pressure to raise further common equity."  Despite being on notice of Sterne Agee's analysis, Popular took no action to correct its misstatements to investors about how its liquidity was "normalized."

185.   On February 19, 2009, the last day of the Class Period, Popular announced that it had been forced to cut its dividend by 75%, from $0.08 to $0.02, in order to save "$68 million

in capital a year." In announcing the dividend cut, Popular stated that the dividend cut was "buil[t] on previous events" in order to provide greater flexibility to the Company. Indeed, it was a foreseeable consequence of the Company's write down of its U.S. mainland deferred tax assets that Popular was forced to cut its dividend. In response to this news, Popular's common stock fell an additional 11% (and its Series B preferred stock fell 43%).

186. In its 2008 Form 10-K filed on March 2, 2009 (after the end of the Class Period), Popular attempted to offer a post-hoc justification for its manipulation of deferred tax assets, and, in particular, its decision not to take a full valuation allowance earlier. It asserted that:

> Certain events transpired in the fourth quarter of 2008 that led management to reassess its expectations of the realization of the deferred tax assets of the U.S. mainland operations and to conclude that a full valuation allowance was necessary. These circumstances included a significant increase in the provision for loan losses for the PNA operations. The provision for loans losses for PNA consolidated amounted to $208.9 million for the fourth quarter of 2008, compared with $133.8 million for the third quarter of 2008. Actual loan net charge-offs were $105.7 million for the fourth quarter of 2008, compared with $70.2 million in the third quarter. This sharp increase has triggered an increase in the estimated provision for loan losses for 2009. Management had also considered during the third quarter further actions expected from the U.S. Government with respect to the acquisition of troubled assets under the TARP, that did not materialize in the fourth quarter of 2008. Additional uncertainty in an expected rebound in the economy and banking industry, based on most recent economic outlooks, forced management to place no reliance on forecasted income. A tax strategy considered in the September 30, 2008 analysis included the transfer of borrowings from PNA holding company to the Puerto Rico operations, particularly the parent holding company Popular, Inc. This tax planning strategy continues to be prudent and feasible but its benefit has been reduced after the credit rating agencies downgraded Popular, Inc.'s debt, which was expected to occur since the end of 2008 and was confirmed in January 2009. The rating downgrade would increase the cost of making any debt transfer and, accordingly, reduce the benefit of such action. The other tax strategy was the transfer of a profitable line of business from BPPR to BPNA. Although that strategy is still feasible, given the reduced profitability levels in the BPPR operations, which were reduced in the fourth quarter due to significant increased credit losses, management is less certain as to whether it is prudent to transfer a profitable business to the U.S. operations at this time.

187.   Each of these post-hoc justifications fails to justify Popular's decision not to take a full valuation in the face of its mainland U.S. operations' three year cumulative loss as of the start of the Class Period.  Each justification was not prudent, feasible or likely to result in the realization of deferred tax assets.  <u>First</u>, Popular's mainland U.S. operations faced increasingly large provision for loan losses and the threat of further larger provision for loan losses as of January 2008, when it announced that its provision for loan losses had risen significantly in 2007 compared to 2006.

188.   <u>Second</u>, Popular's reliance on "expected" further actions as to troubled assets under the TARP program was not feasible given that Popular had not even been approved for the $950 million it received through TARP until mid-November 2008, after it had announced third quarter 2008 earnings on October 22, 2008.  Popular had no reasonable expectation for additional amounts.  Further, Popular could not rely on "further actions expected from the U.S. government" under TARP because SFAS 109 limits evidence to be considered to avoid a valuation allowance to actions "primarily within the control of management."  (SFAS 109, ¶107.)

189.   <u>Third</u>, Popular's assertion that the benefit of its tax strategy of transferring debt to its Puerto Rico operations had been "reduced" during the fourth quarter due to expected credit downgrades is circular.  Standard & Poor's, Moody's and Fitch did not lower Popular's ratings until after, and as a result of, Popular's announcement in the fourth quarter on January 22, 2009 that it would need to record a valuation allowance for its entire U.S. mainland deferred tax assets.  Indeed, Standard & Poor's specifically cited "additional impairments on deferred tax assets" as a factor in its decision to downgrade Popular.

190.   Defendant Junquera admitted as much at a March 4, 2009 Keefe, Bruyette & Woods, Inc. Regional Bank Conference, when he stated that: "Credit ratings, as soon as we came out with our results for the fourth quarter of last year. . . . [The rating agencies] <u>did lower our rating as a result of those – of that press release and what – and the losses that the Company has sustained</u>."

191.   <u>Finally</u>, as discussed above in Section B.6., Popular's purported tax strategy of transferring a profitable line of business from Puerto Rico to the United States was not feasible from its inception due to the necessary regulatory approvals and attendant costs and risks of doing so.

192.   Indeed, during a March 4, 2009 conference call at a Keefe, Bruyette and Woods Inc. Regional Bank Conference, Defendant Junquera finally spoke candidly about Popular's deferred tax assets for its U.S. mainland operations.  As to "deferred tax assets," he admitted "<u>we had to confront reality toward the end of last year</u>."  Although Popular had hoped to maintain the deferred tax asset on its balance sheet, "<u>it was just unsustainable</u>, and we took the balance of about $501 million."

**E.     THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

193.   Throughout the Class Period, Popular included in its financial statements deferred tax assets arising from Popular US which the Company represented were in conformity with GAAP.  However, in violation of GAAP, the Company did not record a required full valuation allowance until the end of the Class Period.

194.   Given Popular US's three-year cumulative loss position, inability to meaningfully anticipate sufficient income to make use of its deferred tax assets, and lack of any meaningful and appropriate tax planning strategy, the Company could not satisfy the GAAP standards

required to maintain a substantial portion of the Company's deferred tax assets on Popular's balance sheet. Popular was required to record a full valuation allowance (as was finally announced by the Company on January 22, 2009) by no later than the first day of the Class Period. Thus, the financial statements issued by the Exchange Act Defendants throughout the Class Period were materially misstated and did not fairly and accurately represent the Company's financial position and results of operations.

195. On January 24, 2008, the first day of the Class Period, Popular issued a press release which quoted Defendant Carrión announcing its financial results for the fourth quarter and year-ended December 31, 2007. For the quarter, the Company reported an estimated net loss of ($294.1) million and an estimated basic and diluted net loss per common share of ($1.06). The press release contained financial highlights, consolidated balance sheets and consolidated statements of income purporting to reflect the Company's reported financial performance and assets and liabilities for 2007 in accordance with GAAP.

196. With regard to Equity One, the press release stated:

In January 2007, Popular's management announced that based on a comprehensive strategic and financial assessment of all of PFH's operations, the Corporation decided to adopt a Restructuring and Integration Plan at PFH, the holding company of Equity One (the "PFH Restructuring Plan"). The PFH Restructuring Plan called for PFH to exit the wholesale subprime mortgage loan origination business, to consolidate support functions with its sister U.S. banking entity, Banco Popular North America ("BPNA"), creating a single integrated North American financial services unit, and to focus on existing profitable businesses. At that time, Popular decided to continue the operations of Equity One and its subsidiaries ("Equity One"), with over 130 consumer services branches principally dedicated to direct subprime loan origination, consumer finance and mortgage servicing. However, given the unforeseen disruption in the capital markets since the summer of 2007 and its impact on funding, Popular's management now believes that it will be difficult to generate an adequate return on the capital invested at Equity One.

As indicated in the press release dated January 23, 2008, Popular, Inc. announced the signing of an Asset Purchase Agreement (the "Agreement") to sell certain assets of Equity One, the U.S. mainland consumer finance operations of Popular

Financial Holdings, to American General Finance, Inc., a member of American International Group. The Agreement contemplates the sale of a significant portion of Equity One's mortgage loan and consumer loan portfolio approximating $1.5 billion.

\*\*\*

It is anticipated that this restructuring plan (the "PFH Branch Network Restructuring Plan") will result in estimated combined charges for the Corporation of $19.5 million . . .

197.   On January 25, 2008, Raymond James upgraded Popular and stated that the Company has "refitted itself to be less risky."

198.   The next trading day, the price of the Company's shares rose $1.28 per share, or 12%, to close at $12.26 per share.

199.   On February 29, 2008, Popular issued a Form 10-K for the period ended December 31, 2007.   The 2007 Form 10-K contained consolidated balance sheets and consolidated statements of income purporting to reflect the Company's reported financial performance and assets and liabilities for the three months and year ended December 31, 2007 in accordance with GAAP.   The 2007 Form 10-K stated:   "Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")."   The 2007 Form 10-K reported a total deferred tax asset of approximately $520 million as of December 31, 2007, based on net operating loss carry-forwards, or NOLs, as of approximately $175 million and stated:

> The net deferred tax asset at December 31, 2007 amounted to $520 million of which $215 million was related to timing differences in the recognition of the provision for loan losses under GAAP and actual charge offs under the tax code, and $175 million was related to net operating losses carryforward in the U.S. operations. The realization of the deferred tax asset related to the net operating loss carryforward of the Corporation's U.S. operations is dependent upon the existence of, or generation of, taxable income prior to their expiration term of 20 years. Based on the information available as of December 31, 2007, the Corporation expects to fully realize the net deferred tax asset.

\*\*\*

> A valuation allowance of $39,000 is reflected in 2007 and 2006, related to deferred tax assets arising from temporary differences for which the Corporation could not determine the likelihood of its realization. Based on the information available, the Corporation expects to fully realize all other items comprising the net deferred tax asset as of December 31, 2007.

200.    The 2007 Form 10-K was signed by, among others, Defendants Carrión and Junquera.

201.    As set forth in Sections B.2-5 and C above, the above-referenced statements from the Exchange Act Defendants' January 24, 2008 press release and Form 10-K for the year-ended December 31, 2007, were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.

202.    Specifically, the statements referenced above were materially false and misleading when made because they misrepresented and failed to disclose that:

(a)    The Company's accounting for its deferred tax assets related to its mainland U.S. operations was materially overstated by approximately $289 million,[5] because it did not record a valuation allowance against its mainland U.S. deferred tax assets despite Popular US's three-year cumulative tax loss and downsized U.S. mainland operations;

(b)    The Company's balance sheet and assets were artificially inflated by approximately $289 million;

(c)    The Company was experiencing increasing losses in the mainland U.S. that prevented the Company from anticipating sufficient net income to use the U.S. mainland deferred tax assets on its balance sheet;

(d)    The Company's explanation that it would have 20 years to generate enough taxable income to justify its failure to take a valuation allowance violated GAAP; and

---

[5] Notably, Popular misleadingly did not separately disclose the total amount of its U.S. mainland deferred tax assets as of December 31, 2007 until it filed its 2008 Form 10-K in March 2, 2009. Rather, it reported $520 million in net deferred tax assets for all of Popular, without identifying the total amount arising from Popular US.

(e)    Popular US's mainland operations were at a three year cumulative loss as of December 31, 2007.

203.    On April 18, 2008, Popular issued a press release announcing its financial results for the first quarter of 2008, the period ended March 31, 2008. The press release contained quarterly financial highlights and a consolidated balance sheet, including income, purporting to reflect the Company's reported financial performance, assets and liabilities in accordance with GAAP. For the quarter, the Company reported net income of $103.3 million and basic and diluted earnings per common share (EPS) of $0.36 per share. Defendant Carrión explained that while "the quarter was a difficult one as credit and markets continued to deteriorate," Popular had "reduced [its] U.S. mortgage exposure."

204.    The press release highlighted that a higher provision for loan losses had impacted the Company's financial results in the first quarter. Specifically, the Company stated that:

> Higher provision for loan losses for the first quarter of 2008, which increased by $71.9 million as compared with the same period in 2007, driven principally by higher net charge-offs and additional reserves for certain specific commercial and construction loans considered impaired.

205.    On May 12, 2008, Popular issued a Form 10-Q for the period ending March 31, 2008. The Form 10-Q reported a total deferred tax asset of $694 million as of March 31, 2008 based on net operating loss carry-forwards, or NOLs of approximately $179 million and stated:

> The net deferred tax asset as of March 31, 2008, amounted to $694 million, compared with $525 million as of December 31, 2007. The net deferred tax asset as of March 31, 2008 consisted principally of $242 million related to timing differences in the recognition of the provision for loan losses under GAAP and actual net charge offs under the tax code, $179 million related to net operating losses carryforward in the U.S. operations and $146 million related to the measurement of certain loans and bonds certificates of PFH at fair value (SFAS No. 159). The realization of the deferred tax asset is dependent upon the existence of, or generation of, sufficient taxable income to utilize the deferred tax asset. The only portion of the deferred tax asset that has a limited life is the portion related to the net operating loss carryforward of the Corporation's U.S. operations. Since its expiration term is of 20 years, the Corporation expects to generate enough taxable income prior to such expiration term to fully realize it. Based on the information

available as of March 31, 2008, the Corporation expects to fully realize the net deferred tax asset.

206. Defendant Junquera signed the Form 10-Q and both Defendants Carrión and Junquera both certified that the Form 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

207. As set forth in Sections B.2-5 and C above, the above-referenced statements from the Exchange Act Defendants' April 18, 2008 press release and Form 10-Q for the period ending March 31, 2008, were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.

208. Specifically, the statements referenced above were materially false and misleading when made because they misrepresented and failed to disclose that:

    (a)    The Company's accounting for its mainland U.S. deferred tax assets was materially overstated by at least $439 million,[6] because it did not record a valuation allowance against its mainland U.S. deferred tax assets despite Popular US's three-year cumulative tax loss and downsized U.S. mainland operations;

    (b)    The Company's balance sheet and assets were artificially inflated by approximately $439 million;

    (c)    Company was experiencing increasing losses in the mainland U.S. that prevented the Company from anticipating sufficient net income to use the U.S. mainland deferred tax assets on its balance sheet;

---

[6] Notably, Popular misleadingly failed to separately disclose the total amount of its U.S. deferred tax assets as of March 31, 2008. It only reported a total amount for all of Popular. This $439 million figure is based on the $289 million in U.S. deferred tax assets as of December 31, 2007 that Popular subsequently disclosed, plus the $146 million deferred tax assets from PFH loans measured at fair value and $4 million in new net U.S. loss carry forwards disclosed in Popular's first quarter Form 10-Q. The total amount of Popular's U.S. mainland deferred tax assets was likely larger than $439 million at this time, because some of the deferred tax assets related to loan losses that Popular took this quarter came from Popular US.

      (d)     The Company's explanation that it would have 20 years to generate enough taxable income to justify its failure to take a valuation allowance violated GAAP; and

      (e)     Popular US's mainland operations were at a three year cumulative loss as of December 31, 2007.

209.   On July 17, 2008, Popular issued a press release announcing its financial results for the second quarter of 2008, the period ended June 30, 2008.  The press release contained quarterly financial highlights and a consolidated balance sheet, including income, purporting to reflect the Company's reported financial performance, assets and liabilities in accordance with GAAP.  For the quarter, the Company reported a profit of $24.3 million and basic and diluted earnings per common share (EPS) of $0.06 per share.  In the release, Defendant Carrión was forced to concede that the Company "continue[d] to feel the pressure of the turmoil in the financial markets and deteriorating economic conditions" and that it was now "fully engaged in the process of evaluating various strategic alternatives to improve the profitability of [its] operations in the United States" and that "[s]ome of these alternatives may involve the sale of some of these operations."  However, the release also quoted Carrión as continuing to reassure investors that Popular "remain[s] strongly capitalized with over $1 billion of Tier I capital in excess of the regulatory 'well capitalized requirement.'"

210.   The press release highlighted the following factors that had impacted the Company's financial results in the second quarter:

- Lower net interest income by $33.5 million due to the sale and reduction of various low margin assets.

- Higher provision for loan losses for the second quarter of 2008, which increased by $75.5 million as compared with the same period in 2007.

- Net losses attributable to changes in the fair value of Popular Financial Holdings' ("PFH") loans and bond certificates measured at fair value pursuant to SFAS No. 159 amounted to $35.9 million for the quarter ended June 30, 2008.

- Lower net gain on sale of loans and valuation adjustments on loans held-for-sale by $29.7 million for the second quarter of 2008, with PFH and E-LOAN showing a reduction of approximately $34 million.

211.   On August 11, 2008, the Company issued a Form 10-Q for the period ending June 30, 2008.  The Form 10-Q reported a total deferred tax asset of $808 million as of June 30, 2008 based on net operating loss carry-forwards, or NOLs of approximately $210 million and stated:

> The Corporation's net deferred tax assets as of June 30, 2008 amounted to $808 million, compared with $525 million as of December 31, 2007. The net deferred tax assets as of June 30, 2008 consisted principally of $264 million related to timing differences in the recognition of the provision for loan losses under GAAP and actual net charge-offs under the tax code, $210 million related to net operating losses carryforward in the U.S. operations, and $151 million related to the measurement of certain loans and bond certificates of PFH at fair value (SFAS No. 159). The realization of the deferred tax asset is dependent upon the existence of, or generation of, sufficient taxable income to utilize the deferred tax asset. The only portion of the deferred tax asset that has a limited life is the portion related to the net operating loss carryforward of the Corporation's U.S. operations. Since its expiration term is of 20 years, the Corporation expects to generate enough taxable income prior to such expiration term to fully realize it.

212.   In addition, with regard to the Company's capital requirements, the Form 10-Q stated that, "[t]he Corporation continues to exceed the well-capitalized guidelines under the federal banking regulations.  For this quarter, the ratios improved as a result of the $400 million preferred stock offering, which qualifies as "Tier I" capital.  The regulatory capital ratios and amounts of total risk-based capital, Tier 1 risk-based capital and Tier 1 leverage at June 30, 2008, December 31, 2007, and June 30, 2007 are presented on Table M.  As of such dates, BPPR, BPNA and Banco Popular, National Association were well-capitalized."

213.   Defendant Junquera signed the Form 10-Q and Defendants Carrión and Junquera both certified that the Form 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

214.   On August 28, 2008, the Company issued a press release announcing that the Board of Directors declared a cash dividend of $0.08 cents per common share.  According to the

press release, the new dividend rate represented "a reduction of 50 percent from its previous dividend payment.  Commenting on the announcement, Defendant Carrión stated that "[w]<u>hile Popular's capital base remains above 'well capitalized' ratios</u>, the new rate will provide us with greater flexibility by significantly increasing our liquidity and allows us to meet the challenges ahead from a position of strength."

215.   As set forth in Sections B.2-5 and C above, the above-referenced statements from the Exchange Act Defendants' July 17, 2008 and August 28, 2008 press releases and Form 10-Q for the period ending June 30, 2009, were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.

216. Specifically, the statements referenced above were materially false and misleading when made because they misrepresented and failed to disclose that:

(a)    The Company's accounting for its mainland U.S. deferred tax assets was materially overstated by $475 million to $663 million[7], because it did not take a valuation allowance against its mainland U.S. deferred tax assets despite Popular US's three-year cumulative tax loss and downsized U.S. mainland operations;

(b)    The Company's balance sheet and assets were artificially inflated by approximately $475 million to $663 million;

(c)    Popular US was not "well capitalized" under FDIA regulations during the second quarter of 2008 because had Popular taken a full valuation allowance against its US deferred tax assets as required under GAAP, its total risk-based capital ratio would have fallen to approximately 9.5%; below the 10% FDIA requirement for "well capitalized";

---

[7] Notably, Popular misleadingly failed to separately disclose the total amount of its U.S. mainland deferred tax assets as of June 30, 2008.  The $475 million to $663 million figure is based on the $289 million amount as of December 31, 2009, that Popular subsequently disclosed plus the additional $5 million deferred tax assets from PFH loans measured at fair value and $31 million in additional net U.S. loss carryforwards disclosed in Popular's second quarter For 10-Q. This amount was likely larger as Popular disclosed in its third quarter Form 10-Q that its U.S. mainland deferred tax assets totaled $663 million.

(d)    The Company was experiencing increasing losses in the mainland U.S. that prevented the Company from anticipating sufficient net income to use the U.S. mainland deferred tax assets on its balance sheet;

(e)    The Company's explanation that it would have 20 years to generate enough taxable income to justify its failure to take a valuation allowance violated GAAP; and

(f)    Popular US's operations were at a three year cumulative loss as of December 31, 2007.

217.    On October 22, 2008, Popular issued a press release announcing its financial results for the third quarter of 2008, the period ended September 30, 2008. The press release contained quarterly financial highlights and a consolidated balance sheet, including income, purporting to reflect the Company's reported financial performance, assets and liabilities in accordance with GAAP. For the quarter, the Company reported a net loss of $668.5 million. Defendant Carrión, commenting on the results, stated in pertinent part as follows:

These results are directly related to the decision announced two months ago to sell the assets and discontinue the operations of PFH. We have also taken a partial valuation allowance on our deferred tax assets related to our U.S. operations. We remain well capitalized and have raised liquidity to meet obligations through 2009.

218.    The press release highlighted the following factors that had impacted the Company's financial results in the third quarter:

- Losses of $457.3 million, net of tax, related to the discontinued operations of the U.S.-based reporting segment Popular Financial Holdings ("PFH"). The losses included write downs of assets, losses on the sales of loans and restructuring charges recorded in connection with actual sales and scheduled disposition of PFH's assets. Sales of PFH's portfolios in connection with the discontinuance of PFH's operations are expected to result in over $900 million in additional liquidity, of which $198 million was received in September 2008. The loan sales completed in September 2008 and the expected asset sales to Goldman Sachs scheduled for the fourth quarter of 2008, reduce PFH's assets by more than $1.2 billion. The results for the quarter also include the recording of a valuation allowance on deferred tax assets of $171.2 million.

- Losses from continuing operations of $211.2 million primarily resulting from a valuation allowance of $189.2 million against the Corporation's deferred tax assets related to U.S. operations and higher provision for loan losses of $165.8 million as a result of higher credit losses, particularly in real estate related loans.

219. On November 10, 2008, Popular filed a Form 10-Q for the period ending September 30, 2008. The Form 10-Q reported a total deferred tax asset of $1.0 billion ($663 net of a valuation allowance) as of September 30, 2008 based on net operating loss carry-forwards, or NOLs, of approximately $358 million and stated:

> The Corporation's U.S. mainland operations are in a cumulative loss position for the three-year period ended September 30, 2008. For purposes of assessing the realizability of the deferred tax assets in the U.S. mainland, this cumulative taxable loss position is considered significant negative evidence and has caused us to conclude that the Corporation will not be able to fully realize the deferred tax assets in the future. However, management has also concluded that $322 million of the U.S. deferred tax assets will be realized. In making this analysis, management evaluated the factors that contributed to these losses in order to assess whether these factors were temporary or indicative of a permanent decline in the earnings of the U.S. mainland operations. Based on the analysis performed, management determined that the cumulative loss position was caused primarily by a significant increase in credit losses in two of its main businesses due to the unprecedented current credit market conditions, losses related to the PFH discontinued business, and restructuring charges. In assessing the realizability of the deferred tax assets, management has considered all four sources of taxable income mentioned above, including its forecast of future taxable income, which includes assumptions about the unprecedented deterioration in the economy and in credit quality. The forecast includes cost reductions initiated in connection with the reorganization of the U.S. mainland operations and two tax-planning strategies. The two strategies considered in management's analysis include reducing the level of interest expense in the U.S. operations by transferring debt to the Puerto Rico operations and the transfer of a profitable line of business to the U.S. mainland operations. Based on the analysis as of September 30, 2008, and the weight of the evidence available, management determined that the Corporation's U.S. operations will not generate sufficient taxable income in the foreseeable future to fully realize the deferred tax assets. Accordingly, management concluded that it is more likely than not that the Corporation will not be able to fully realize the benefit of these deferred tax assets and thus, a valuation allowance for $360.4 million was recorded during the third quarter of 2008.

***

Income tax expense from continuing operations amounted to $148.3 million for the quarter ended September 30, 2008, compared with income tax expense of $23.1 million for the same quarter of 2007. As previously indicated in the

Overview section of this MD&A, during the quarter ended September 30, 2008, the Corporation recorded a valuation allowance on deferred tax assets of the U.S. mainland operations of $360.4 million. The recording of this valuation increased income tax expense by $189.2 million on the continuing operations and $171.2 million on the discontinued operations for the quarter and year-to-date periods ended September 30, 2008.

\*\*\*

Income tax expense for the continuing operations amounted to $152.5 million for the nine-month period ended September 30, 2008, compared with $105.6 million for the same period in 2007. The increase in income tax expense was primarily due to the impact on the recording of the valuation allowance previously indicated, partially offset by lower pre-tax earnings, and higher exempt interest income net of disallowance of expenses attributed to such exempt income.

\*\*\*

The Corporation's deferred tax assets as of September 30, 2008 amounted to $1.0 billion ($663 million, net of the valuation allowance) compared to $520 million as of December 31, 2007. Note 21 to the consolidated financial statements provides the composition of the net deferred tax assets as of such dates. Of the deferred tax assets as of September 30, 2008, $322 million are related to the Corporation's U.S. mainland operations (net of the valuation allowance) and $341 million pertain to the Puerto Rico operations. Of the amount related to the U.S. operations, without considering the valuation allowance, $358 million is attributable to net operating losses of such operations, which had an expiration term of up to 20 years. The Corporation assessed the realization of the deferred tax assets by weighing all available negative and positive evidence, including future profitability, taxable income on carryback years and tax planning strategies. This evaluation was made in accordance with SFAS No. 109 "Accounting for Income Taxes" ("SFAS No. 109") which requires the recognition of a valuation allowance for the deferred tax assets if it is more likely than not (a likelihood of more than 50%) that some portion or all of the deferred tax asset will not be realized. The realization of the deferred tax assets is dependent upon the generation of enough taxable income before the end of the expiration period. (Emphasis added.)

220.    Defendant Junquera signed the Form 10-Q and Defendants Carrión and Junquera both certified that the Form 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

221.    In a Form 8-K filed on November 18, 2008 attaching a presentation for a B. Riley investor conference, Popular represented that "[w]e have resolved the liquidity concerns at the BHCs [bank holding companies]. . . Capital, [is] at 'well capitalized' levels."

222.   As set forth in Sections B.2-6 and C above, the above-referenced statements from the Exchange Act Defendants' October 22, 2008 press release, Form 10-Q for the period ending September 30, 2008, and in the November 18, 2008 Form 8-K were materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.

223.   Specifically, the statements referenced above were materially false and misleading when made because they misrepresented and failed to disclose that:

   (a)   The Company's accounting for its deferred tax assets related to its mainland U.S. operations was materially overstated by approximately $323 million, because it did not record a full valuation allowance against its mainland U.S. deferred tax assets despite Popular US's three-year cumulative tax loss and downsized U.S. operations and because its purported "tax strategies" were not prudent, feasible or otherwise sufficient under GAAP;

   (b)   The Company's balance sheet and assets were artificially inflated by approximately $323 million;

   (c)   Popular US was not "well capitalized" under FDIA regulations during the third quarter of 2008, because had Popular taken a full valuation allowance against its US deferred tax assets as required under GAAP, its total risk-based capital ratio would have fallen to approximately 9.5%; below the 10% FDIA requirement for "well capitalized";

   (d)   The Company was experiencing increasing losses in the U.S. that prevented the Company from anticipating sufficient net income to use the U.S. mainland deferred tax assets on its balance sheet;

   (e)   The Company's new "tax-planning strategies" violated GAAP; and

   (f)   Popular's U.S. mainland operations were at a three-year cumulative loss as of December 31, 2007.

224.   Popular's false and misleading disclosures about taking a partial valuation allowance succeeded in misleading the investment community and market into believing that its valuation allowance and losses in the Third Quarter of 2009 were a one-time occurrence.  For

example, Bain Slack at Keefe Bruyette & Woods stated in an analyst report issued on October 22, 2008 after Popular reported its third quarter loss that, "I would be shocked to see another quarter of loss like that."

225.    However, one analyst continued to question Popular's deferred tax assets – to no avail or affect on the Company.  Sterne Agee seriously questioned Popular's decision not to take a full valuation allowance for its U.S. operations.  Specifically, Sterne Agee reported on October 28, 2008 that "[w]hile we feel this is a step in the right direction we would note that about half of the DTV ($323MM) pertains to U.S. operations that are unprofitable and a portion (or all) will likely be sold long before any profits materialize, assuming a buyer can be found. We consider the U.S. portion of the DTA to be mostly valueless with a write-down likely to coincide with a sale of a portion of U.S. holdings."

## F.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS WERE MATERIAL

226.    Given the Exchange Act Defendants' repeated assertions that the Company's financial statements were presented in accordance with GAAP (including, specifically SFAS 109), the severe tax consequences of the Company's improper accounting were not known and could not have been anticipated by investors.

227.    When the Company's $462.8 million valuation allowance was finally disclosed to investors on January 22, 2009, the price of Popular common stock declined in one trading day by a staggering 50% on extraordinary trading volume, demonstrating that the Company's tax valuation allowance was unquestionably material to investors.

228.    Similarly, when the Company's dividend cut was disclosed to investors on February 19, 2009, the price of Popular commons stock declined in one trading day by 11% and

the price of Popular Series B stock declined in one trading day by 43%, demonstrating that the Company's resulting liquidity problems were material to investors.

229.    Accordingly, the Exchange Act Defendants' failure to comply with GAAP resulted in the Company's financial statements being materially misstated throughout the Class Period and at the time of the Offering.

## G.    THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER

230.    At all relevant times, the Exchange Act Defendants acted with scienter, in making materially false and misleading statements throughout the Class Period.  Each of the Exchange Act Defendants had actual knowledge that the statements made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements.  The Exchange Act Defendants' intent to deceive or reckless disregard for the truth is demonstrated by substantial circumstantial evidence supporting a strong inference of scienter.

231.    As set forth above, throughout the Class Period, the Exchange Act Defendants failed to record a valuation allowance under GAAP – specifically, SFAS 109 – for the Company's material and growing deferred tax asset notwithstanding Popular US's history of large loan losses, three-year cumulative loss position beginning as early as the start of the Class Period and lack of any viable U.S. mainland business from which to meaningfully anticipate sufficient profit in the near future.  Indeed, as discussed above, the Exchange Act Defendants repeatedly noted both prior to and throughout the Class Period that Popular US's operations were being significantly and negatively impacted by the U.S. financial crisis.

232.    For example, Defendants made the following acknowledgements that the U.S. financial crisis was harming Popular US's core operations, thus undermining their recognition of deferred tax assets without a full valuation allowance during the Class Period:

- April 19, 2007: "With respect to credit losses, lower levels of home price appreciation, declining demand for housing units leading to rising inventories, housing affordability challenges and general tightening of underwriting standards are expected to lead to higher cumulative losses."

- October 19, 2007:  "The results of the third quarter continue to reflect the impact of unprecedented market conditions, particularly on our mainland U.S. operations."

- January 24, 2008:  Year-ended results were principally impacted by "A $274.9 million increase in the provision for loan losses for the year 2007 as compared with 2006, which was mostly influenced by a slowdown in the housing sector, principally in the U.S. mainland."

- February 22, 2008: "U.S. Business . . . has been particularly affected by. . . Impact of market disruption on gain on sales volumes & margins . . . Increased writedowns in the value of subprime-related assets. . . Changes in market conditions have required a review of U.S. business."

- February 29, 2008:  Defendant Carrión, "Popular's financial performance in 2007 was significantly influenced by the negative impact of the mortgage industry downturn in the results of our nonbanking operations in the United States. . . In retrospect, 2007 was definitely one of the most challenging years that our Corporation has faced to date."

- February 29, 2008:  "The housing market in the U.S. is undergoing a correction of historic proportions. After a period of several years of booming housing markets, fueled by liberal credit conditions and rapidly rising property values, since early 2007, the sector has been in the midst of a substantial dislocation, since 2007. It has had a significant impact on some of the Corporation's U.S-based business sectors and has the potential to affect its ongoing financial results and condition."

- June 30, 2008:  "US business has been significantly impacted by credit market dislocation . . . Rising charge-offs in PFH wholly-owned loans. . . Increased writedowns in the value of subprime-related assets, including loans at PFH and securitization residuals. . . Rising Credit Costs as U.S. bank, reflecting weaker U.S. economy. . . Changes in market conditions have resulted in a number of restructuring efforts to refocus the business."

- July 17, 2008:  Defendant Carrión, "We continue to feel the pressure of the turmoil in the financial markets and deteriorating economic conditions . . . We are fully engaged in the process of evaluating various strategic alternatives to improve the profitability of our operations in the United States."

- August 28, 2008:  Defendant Carrión stated that cutting Popular's dividend by 50% "is absolutely a necessary step given the continued uncertainty in the financial markets and extended fallout of the U.S. housing sector."

233.   Indeed, Defendant Junquera later acknowledged how bad Popular US was doing in 2007 and 2008 at a March 4, 2009 Keefe, Bruyette & Woods Regional Bank Conference following the end of the Class Period:

- "When we look at our US operations here it was a problem as we cited and where we are losing a lot of money.  Our biggest problem was the acquisition business of subprime asset through Popular Financial Holdings like (inaudible) in the US.  And it took us a couple of years to clean up the balance sheet here.  And finally we have sold the assets of that company but it came at a price.  We did have to take huge losses that were reflected in 2007 and—principally in 2008."

- "Our experiences here in the US mainland, although we were able to grow assets, we were not able to grow them in a very profitable way.  We were making money marginally during normal time.  And now during difficult times, you know we're losing money.  So we have changed the platform.  And now it will be operated as a region of Puerto Rico."

- "Liquidity . . . It was a very serious problem from the end of '07 throughout '08."

234.   Indeed, Defendant Junquera had specific knowledge regarding the improper reporting of Popular US deferred tax assets because of his intimate familiarity with Popular's US operations and due to his extensive accounting background.  As B. Riley reported on September 18, 2007, Defendant Junquera had supervised Popular's original expansion efforts into the mainland United States from 1996-2001.  Thus he was intimately familiar with Popular US's businesses and inability to meaningfully anticipate a profit sufficient to realize Popular's U.S. deferred tax assets.

235.   A strong inference of scienter is further supported by the straightforward nature of the accounting rules at issue.  The demanding "more likely than not" standard established by SFAS 109 is unambiguous – particularly in situations in which a company is in a three-year cumulative loss, like Popular US was by the very start of the Class Period.  The Exchange Act

Defendants repeatedly demonstrated their knowledge of the relevant GAAP requirements by quoting SFAS 109 in the Company's Forms 10-K and 10-Q throughout the Class Period, and repeatedly claiming that the Company's financial statements complied with SFAS 109. Thus, the Exchange Act Defendants acted knowingly or at least recklessly throughout the Class Period.

236. Notwithstanding their extensive knowledge of GAAP and the unambiguous standard set forth is SFAS 109, the Exchange Act Defendants misleadingly represented throughout the Class Period that it was more likely than not that all U.S. deferred tax assets would reduce Popular's taxes payable in future years based only on a standard 20-year expiration term for its U.S. mainland deferred tax assets. Prior to the Company's 2008 third quarter Form 10-Q, the Exchange Act Defendants never disclosed reliance on any "tax planning strategies" or any of the specific risks associated with those strategies. Even thereafter, when purported tax planning strategies were introduced, the Exchange Act Defendants concealed the fact that the Company was still improperly avoiding a material valuation allowance based on Popular's improper and undisclosed tax planning strategies.

237. First, the Exchange Act Defendants improperly relied upon the standard 20-year expiration term of Popular US's mainland deferred tax assets to justify their failure to record a valuation allowance in violation of GAAP. By relying on the standard 20-year expiration terms of Popular US's mainland deferred tax assets, the Exchange Act Defendants knowingly or recklessly disregarded that the standard duration of U.S. deferred tax assets explains nothing about whether Popular itself would be more likely than not be able to earn sufficient profit from its U.S. mainland operations to realize the benefit of its reported deferred tax assets.

238.   Second, the Exchange Act Defendants improperly relied on last-minute purported tax strategies (at least until) TARP funding was received two months later at which time these strategies were immediately abandoned.   The Exchange Act Defendants knowingly or recklessly disregarded that the tax strategies they now proposed – transferring debt from the U.S. to Puerto Rico and transferring a profitable Puerto Rico line of business to the United States – were simply not feasible because of necessary regulatory approvals, the significant cost and risk of transferring debt and businesses to new locations, and the fact that transferring a profitable enough business from Puerto Rico to the mainland U.S. would put into jeopardy the Company's Puerto Rico operations.   Indeed, as discussed above, the Exchange Act Defendants repeatedly noted both prior to and throughout the Class Period that Popular PR's operations were being significantly and negatively impacted by the Puerto Rico recession.   Given the Company's severe liquidity crisis, transferring a business to the U.S. from Puerto Rico would have been far too expensive for the Company to implement.

239.   The facts cited above reveal that the Exchange Act Defendants' reliance on the mere 20-year standard expiration term for the U.S. mainland deferred tax assets and subsequent last minute reliance upon purported tax planning strategies were improper schemes to avoid what these Defendants should have – but were unwilling – to disclose from the start of the Class Period.   That is, given Popular US's history of huge loan losses, three year cumulative loss position and lack of any viable business from which to earn sufficient profit revenue in the near future, Popular could not properly avoid tax valuation allowances on its large and growing deferred tax assets throughout the Class Period.

240.   The magnitude of the scheme also supports a strong inference of fraudulent conduct on the part of the Exchange Act Defendants.  The Exchange Act Defendants misstated Popular US's deferred tax asset by hundreds of millions of dollars for over a year.

241.   The tremendous impact the deferred tax assets had on the Company's financial statements also supports a strong inference of scienter.  Given the material size of Popular US's deferred tax assets, the Exchange Act Defendants were keenly aware of the potentially devastating impact on Popular's financial condition that would result if the Company complied with SFAS 109 and recorded a full valuation allowance at the beginning of the Class Period. For example, had Popular recorded a valuation allowance by January 2008 as it was required to do, Popular would not have qualified as "well capitalized" under FDIA regulations starting in the second quarter of 2008.  As discussed above, it was of enormous significance to Popular's earnings and liquidity that the Company qualify as "well capitalized."  Specifically, in the event that Popular was no longer qualified as "well capitalized," it: (1) could no longer remain a financial holding company permitted to engage in a wide range of nonbanking activities and would be forced to shut down or spin-off a number of its businesses; and (2) could no longer accept, renew or roll over any brokered deposits which accounted for billions of dollars of Popular's "important" on hand liquidity, without first obtaining FDIC approval.

242.   Given the extreme core importance of the Company's FDIA capitalization rating to Popular's operations and ability to generate revenue, the Exchange Act Defendants knew or recklessly disregarded that disclosing a full valuation allowance would threaten the Company's ability to qualify as "well capitalized" under FDIA regulations.  Indeed, even when the Exchange Act Defendants were forced to report a valuation allowance as a result of the sale of PFH's portfolio to Goldman Sachs, these Defendants created last minute purported tax

strategies (aborted just two months later) to avoid taking a full valuation allowance in the third quarter of 2008 which would have caused the Company to no longer qualify as "well capitalized" under FDIA regulations.   Conversely, when Popular received sufficient TARP funds to avoid this dramatic blow, the Exchange Act Defendants abandoned the tax strategies (just two months after they were created).

243.   Further evidencing the Exchange Act Defendants' scienter is the fact that an analyst at Sterne Agee noted on six separate occasions questioned whether Popular US's deferred tax assets were overstated and surmised that the deferred tax assets required either a "substantial writedown" or to be "written off in its entirety."   For example, Sterne Agee noted as early as June 13, 2008, that "[w]hile predicting specific writedowns is difficult, another area that concerns us is the deferred tax asset (DTA).  The net DTA as of March 31, 2008, amounted to $694 consisting principally of . . . $179 million related to net operating losses carryforward in the U.S. operations, and $146 million related to the measurement of certain loans and bonds certificates of PFH at fair value."   On July 1, 2008, Sterne Agee then questioned whether the PFH and other U.S. operations portion of the deferred tax assets should be "written off in their entirety."   Despite these repeated warnings, the Exchange Act Defendants did nothing to change their improper accounting.

## LOSS CAUSATION

244.   During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Popular securities and operated as a fraud or deceit on Class Period purchasers of Popular securities by failing to disclose the Company's true financial condition.   When the Exchange Act Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Popular securities fell precipitously as the prior

artificial inflation came out.  As a result of their purchases of Popular securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

245.   By failing to disclose the Company's true financial condition, the Exchange Act Defendants presented a misleading picture of Popular's business and prospects. The Exchange Act Defendants' false and misleading statements had the intended effect and caused Popular common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $14.07 per share on February 1, 2008.

246.   As a direct result of the Exchange Act Defendants' disclosures on January 22, 2009, the price of Popular common stock fell precipitously, falling $2.52 per share, or approximately 50%. This drop removed a substantial part of the inflation from the price of Popular common stock, causing economic loss to investors who had purchased Popular common stock during the Class Period.

247.   The 50% decline in the price of Popular common stock after these disclosures came to light was a direct result of the nature and extent of the Exchange Act Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in Popular common stock negates any inference that the loss suffered by Plaintiff Detroit General and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff Detroit General and the other Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the prices of Popular common stock and the subsequent

significant decline in the value of Popular common stock when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct were revealed.

248.   Finally, as a foreseeable consequence of the Company's writedown of its deferred tax assets in January 2009, on February 19, 2009, the Officer Defendants were forced to cut Popular's dividend by 75%, from $0.08 to $0.02, in order to save "$68 million in capital a year."   In announcing the dividend cut, Popular stated that the dividend cut was "buil[t] on previous events" in order to provide greater flexibility to the Company.   In response to this announcement, Popular's common stock fell again, from $1.79 to $1.59, or 11% in one day, and the price of Popular Series B preferred stock fell by 43% in one day.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

249.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this complaint.  First, none of the statements complained of herein was a forward-looking statement, nor were any of the statements identified as forward-looking statements when made.  Rather the statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

250.   To the extent to which any of the false or misleading statements alleged herein can be construed as forward-looking statements, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  In fact, the only cautionary language in Popular's financial statements regarding its deferred tax assets was the generic warning that "it is possible that the final tax authority will take a tax position that is materially different than that which is

reflected in our income tax provision and other tax reserves" and that "due to significant estimate utilization in establishing the valuation allowance and the potential for changes in facts and circumstances, it is facts and circumstances, it is reasonably possible that we will be required to record the adjustments to the valuation allowance in future reporting periods. Additionally, continued loss from operations in future reporting periods may require us to adjust the valuation allowance against out deferred tax assets"  Such generic risk factors obviously were insufficient to provide meaningful cautionary language as to Popular's knowingly misstated deferred tax assets and then-existing undisclosed tax strategies.

251.  Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Popular who knew that the statement was materially false or misleading when made.

### THE PRESUMPTION OF RELIANCE

252.  The market for Popular common stock and Series B preferred stock was, at all relevant times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of these Popular securities.

253.  Popular common stock and Series B preferred stock were traded on NASDAQ, a highly efficient market.  The Company was consistently followed, before and throughout the Class Period, by a number securities analysts who published reports regarding Popular.  The prices of Popular common stock and Series B preferred stock reacted promptly to the

dissemination of new information regarding the Company.  Popular common stock and Series B preferred stock were actively traded throughout the Class Period.

254.    Accordingly, Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market prices for Popular common stock and Series B preferred stock and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

255.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons and entities who purchased or acquired Popular, Inc. ("Popular" or the "Company") common stock and/or Series B preferred stock during the time period between January 24, 2008 and February 19, 2009 inclusive (the "Class Period"), and were injured thereby.  Excluded from the Class are:  (a) Defendants; (b) members of the immediate families of the Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person or entity who is a partner, executive officer, director, or controlling person of Popular (including any of its subsidiaries or affiliates) or any other Defendant; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors and assigns of any such excluded party.

256.    The members of the Class are so numerous that joinder of all members is impracticable.  As of August 5, 2009, Popular had 282,031,548 shares of common stock issued and outstanding.  Throughout the Class Period, Popular common stock and Series B preferred stock were actively traded on NASDAQ.  While the exact number of purchasers of Popular

common stock and Series B preferred stock is unknown to Plaintiffs at this time, Plaintiffs believe that Class members number in the thousands.

257.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and the other members of the Class acquired Popular securities in the Series B Offering, pursuant to a registration statement, or in the market, and sustained damages as a result of Defendants' conduct complained of herein.

258.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

259.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

260.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

b.    whether the Registration Statement and Prospectus for the Company's Series B preferred Offering contained material misstatements or omitted to state material information;

c.    whether the SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

d.      whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

e.      whether and to what extent the market prices of the Company's securities were artificially inflated during the Class Period due to the non-disclosures and/or misstatements complained of herein;

f.      whether, with respect to Plaintiffs' claims under the Securities Act, Defendants named in those claims can sustain their burden of establishing an affirmative defense pursuant to the applicable statute;

g.      whether, with respect to Plaintiffs' claims under the Exchange Act, Defendants named in those claims acted with scienter;

h.      whether, with respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act and Section 15 of the Securities Act, Defendants named in those claims are controlling persons of Popular;

i.      whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

j.      whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

261.    The names and addresses of those persons and entities which purchased Popular common stock and Series B preferred stock during the Class Period and in the Offering are available from the Company's transfer agent(s) and/or from the Underwriter Defendants. Notice may be provided to such purchasers and/or record owners via first class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

## COUNT ONE

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against The Exchange Act Defendants

262.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

263.   This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and the other members of the Class against the Exchange Act Defendants.

264.   As alleged herein, throughout the Class Period, the Exchange Act Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  These Exchange Act Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiff Detroit General and the other members of the Class; (ii) artificially inflate and maintain the prices of Popular securities; and (iii) cause Plaintiffs and the other members of the Class to purchase Popular securities at artificially inflated prices.

265.   The Exchange Act Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and the other members of the Class, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

266.   As set forth above, these Exchange Act Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and

fraud upon Plaintiffs and the other members of the Class who purchased Popular securities during the Class Period.

267.  In ignorance of the false and misleading nature of these Exchange Act Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Popular securities, Plaintiffs and the other members of the Class purchased Popular securities at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and the other members of the Class would not have purchased Popular securities at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Popular securities declined precipitously and Plaintiffs and the other members of the Class were harmed and damaged as a direct and proximate result of their purchases of Popular securities at artificially inflated prices and the subsequent decline in the prices of Popular securities when the truth was disclosed.

268.  By reason of the foregoing, the Exchange Act Defendants are liable to Plaintiffs and the other members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT TWO

### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Carrión and Junquera

269.  Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein, except Plaintiffs expressly disclaim any claim of strict liability or negligence.

270.  This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Carrión and Junquera on behalf of Plaintiffs and the other members of the Class.

271.  As alleged herein, Popular violated Section 10(b) and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale

of securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of Defendants Carrión and Junquera and others who knew of or recklessly disregarded the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

272.    Defendants Carrión and Junquera were controlling persons of Popular during the Class Period, due to their senior executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of the Company's public filings.

273.    By virtue of the foregoing, Defendants Carrión and Junquera each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Popular, including the content of its financial statements and public statements.

274.    As set forth above, these Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Popular securities during the Class Period.

275.    In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Popular securities, Plaintiffs and the other members of the Class purchased Popular securities at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and the other members of the Class would not have purchased Popular securities at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Popular securities declined precipitously and Plaintiffs and the other members of the

Class were harmed and damaged as a direct and proximate result of their purchases of Popular securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth was disclosed.

276. By reason of the foregoing, Defendants Carrión and Junquera are liable to Plaintiffs and the other members of the Class for violations of Section 20(a) of the Exchange Act.

## ALLEGATIONS RELATING TO CLAIMS
## BROUGHT PURSUANT TO THE SECURITIES ACT

277. In the allegations and claims set out in this part of the Complaint (Three through Fifth Claims for Relief), Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act. The Securities Act claims are asserted against the Company, the Officer Defendants who were signatories to Popular's Registration Statement and prospectuses and Popular Officers at the time of the offering, the Director Defendants who either were signatories to Popular's Registration Statement and prospectuses or were Popular Directors at the time of the Offering, the Underwriter Defendants and PwC. Each of these Defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in Popular's registration statements and prospectuses, including Popular's materially misstated financial statements incorporated therein, for the Series B preferred Offering.

278. Plaintiffs also assert claims under Section 12 of the Securities Act, and control person liability claims under Section 15 of the Securities Act against the senior officers of Popular.

279. Plaintiffs' Securities Act claims are not based on any knowing or reckless misconduct on behalf of the Defendants – *i.e*., they do not allege, and do not sound in, fraud – and Plaintiffs specifically disclaim any allegations of fraud in these non-fraud claims under the

Securities Act, including without limitation, the allegations in paragraphs 79, 116, 128, 144, 170-71, 230-43 above.

280.   On May 6, 2008, with the Company's stock trading as high as $25 per share in intraday trading, the Officer Defendants allowed and/or caused Popular to announce that it was "planning to commence a public offering of $350 million of non-cumulative perpetual preferred stock pursuant to an existing effective Popular registration statement."

281.   Thereafter, on May 22, 2008, the Officer Defendants allowed and/or caused the Company to price the previously announced public offering of non-cumulative perpetual preferred stock offering and to increase the offering size by $50 million to $400 million. According to the Company's release issued that day, the "resulting offering of 16,000,000 shares was priced at 8.25% with a purchase price of $25 per share" and that it would be completed on May 28, 2008.

282.   Between May 22, 2008 and May 28, 2008, Popular sold approximately 16,000,000 shares of its 8.25% Non-cumulative Monthly Income Preferred Stock, Series B to the investing public at $25 per share, raising net proceeds of approximately $386,150,000 million.  Popular stated that the net proceeds were going to be used to for "general corporate purposes, which may include increasing the liquidity and capital of Popular, Inc. for their general corporate purposes, including the repayment of indebtedness or increasing the liquidity and capital of such subsidiaries."

283.   In connection with its Series B Offering, Popular filed with the SEC a registration statement (SEC File No. 333-135093) dated June 16, 2006 (the "Registration Statement"), a prospectus also dated June 16, 2006, a preliminary prospectus dated May 14, 2008, and a

prospectus supplement pursuant to Rule 424(b)(2) dated May 22, 2008 (collectively, the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents").

284. The Registration Statement was signed by Defendants Morales, Rexach, Bermúdez, Ferré, Teuber, Vizcarrondo, Salerno, Junquera and Carrión.  At the time the Series B Offering was conducted, and at the time the Registration Statement became effective, Defendants Junquera and Carrión served as executive officers of Popular and Defendants Carrión, Morales, Rexach, Bermúdez, Ferré, Teuber, Vizcarrondo, Salerno and Masin served on Popular's Board of Directors.

285. For the Series B Offering, UBS Financial Services Incorporated of Puerto Rico and Popular Securities, Inc. acted as the joint book-running managers and Citigroup Global markets, Inc. acted as the senior manager.  These Underwriter Defendants were "underwriters," as described in Section 2(11) of the Securities Act of 1933, of the Series B stock offering.

286. As set forth herein, the Offering Documents and the documents incorporated therein by reference pursuant to which Plaintiffs Picó and Puig-Rivera and other members of the Class were induced to purchase Popular Series B preferred stock, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements contained therein not misleading.

287. The Offering Documents included Popular's historical financial data. Specifically, the SEC permitted Popular to "incorporate by reference" information that Popular had previously filed with it, meaning that popular disclosed "important information" by referring investors to those filings.

288. Popular's 2007 Form 10-K, filed on February 29, 2008 and 2008 Form 10-Q, filed on May 12, 2008, was incorporated by express reference in the Prospectus Supplement.

Specifically, attached to the Prospectus Supplement was the Prospectus filed on June 16, 2006, which stated that "all documents filed by the Company under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 on or after the date of this prospectus and before the termination of this offering" are incorporated by reference into the Prospectus.

289.  Popular's 2007 Form 10-K reported the Company's financial results for the year ended December 31, 2007.  PwC audited Popular's financial statements included in the 2007 10-K and issued its unqualified auditor's report thereon on February 29, 2008 (the "PwC 2007 Audit Report").  In the PwC 2007 Audit Report, PwC stated, in pertinent part, that it "conducted its audits in accordance with auditing standards generally accepted in the United States" and that, in its opinion:

> [T]he accompanying consolidated statements of condition and the related consolidated statements of operations, comprehensive income, changes in stockholders' equity and cash flows present fairly, in all material respects, the financial position of Popular, Inc. and its subsidiaries at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America.

290.  The PwC 2007 Audit Report was expressly incorporated into the Prospectus Supplement with the consent of PWC.  Specifically, under the caption "Experts" in the Prospectus Supplement, Popular stated that the financial statements set forth in the 2007 Form 10-K were included "in reliance upon" PwC's unqualified auditor's report and "given on the authority of said firm as experts in auditing and accounting."  As set forth in Sections B.2-5 and C above, this 2007 PwC Audit Report was materially misstated and omitted to state material facts required therein or necessary to make the statements contained therein not misleading, at all times throughout the Class Period.

291.   The financial statements included and/or incorporated by reference within the Series B Offering Documents were materially misstated, and thus, the Series B Offering Documents were materially misstated.

292.   Specifically, Popular's Form 10-K for the period ended December 31, 2007 filed on February 29, 2008, contained consolidated balance sheets and consolidated statements of income purporting to reflect the Company's reported financial performance and assets and liabilities for the three months and year-ended December 31, 2007 in accordance with GAAP. The 2007 Form 10-K stated:  "Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")."  The 2007 Form 10-K reported a total deferred tax asset of approximately $520 million as of December 31, 2007, based on net operating loss carry-forwards, or NOLs, as of approximately $175 million and stated:

> The net deferred tax asset at December 31, 2007 amounted to $520 million of which $215 million was related to timing differences in the recognition of the provision for loan losses under GAAP and actual charge offs under the tax code, and $175 million was related to net operating losses carryforward in the U.S. operations. The realization of the deferred tax asset related to the net operating loss carryforward of the Corporation's U.S. operations is dependent upon the existence of, or generation of, taxable income prior to their expiration term of 20 years. Based on the information available as of December 31, 2007, the Corporation expects to fully realize the net deferred tax asset.
>
> ***
>
> A valuation allowance of $39,000 is reflected in 2007 and 2006, related to deferred tax assets arising from temporary differences for which the Corporation could not determine the likelihood of its realization. Based on the information available, the Corporation expects to fully realize all other items comprising the net deferred tax asset as of December 31, 2007.

293.   The 2007 Form 10-K was signed by, among others, Defendants Carrión and Junquera.

294.   Popular's Form 10-Q for the period ending March 31, 2008 filed on May 12, 2008 reported a total deferred tax asset of $694 million as of March 31, 2008 based on net operating loss carry-forwards, or NOLs of approximately $179 million and stated:

> The net deferred tax asset as of March 31, 2008, amounted to $694 million, compared with $525 million as of December 31, 2007. The net deferred tax asset as of March 31, 2008 consisted principally of $242 million related to timing differences in the recognition of the provision for loan losses under GAAP and actual net charge offs under the tax code, $179 million related to net operating losses carryforward in the U.S. operations and $146 million related to the measurement of certain loans and bonds certificates of PFH at fair value (SFAS No. 159). The realization of the deferred tax asset is dependent upon the existence of, or generation of, sufficient taxable income to utilize the deferred tax asset. The only portion of the deferred tax asset that has a limited life is the portion related to the net operating loss carryforward of the Corporation's U.S. operations. Since its expiration term is of 20 years, the Corporation expects to generate enough taxable income prior to such expiration term to fully realize it. Based on the information available as of March 31, 2008, the Corporation expects to fully realize the net deferred tax asset.

295.   Defendant Junquera signed the Form 10-Q and Defendants Carrión and Junquera both certified that the Form 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

296.   As set forth herein, the statements concerning the Company's financial results for 2007 contained in Popular's 2007 Form 10-K and the statements concerning the Company's financial results for the first quarter of 2008 contained in Popular's Form 10-Q for the quarter-ended March 31, 2008, filed on May 12, 2008, were materially misstated because:

- The Company's accounting for its U.S. mainland deferred tax assets was materially overstated because it did not record a required valuation allowance against its U.S. mainland deferred tax assets despite Popular US's three-year cumulative tax loss and downsized US operations;

- The Company was experiencing increasing losses in the U.S. that prevented the Company from meaningfully anticipating sufficient net income to use the U.S. deferred tax assets on its balance sheet;

- The Company's explanation that it would have 20-years to generate enough taxable income to justify its failure to take a valuation allowance violated GAAP; and

- The Company's U.S. mainland operations were at a three year cumulative loss as of December 31, 2007.

297.  As a result of these GAAP violations, Popular's originally-issued financial statements for the year ending December 31, 2007, as well as the financial statement for the quarter-ended March 31, 2008, each of which are incorporated by reference into the Offering Documents, are "presumed to be misleading or inaccurate."  Regulation S-X, SEC Rule 4-01(a), 17 C.F.R. § 210.4-01(a)(1).  Similarly, PwC's statements regarding its audit work were materially misstated as set forth in ¶¶301-12 below.

## A.    THE SECURITIES ACT DEFENDANTS' NEGLIGENCE

298.  None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Due diligence is a critical component of the issuing and underwriting process.  Directors, officers, and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information.  Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process.  At a minimum, due diligence for every public offering should involve: interviews of upper and mid-level management; a review of the auditor's management letters and a review of items identified therein;  a review of the company's SEC filings (particularly those incorporated by reference); a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present;  a review of the company's internal controls; a review of negative facts and concerns within each underwriter's

organization and within the syndicate of underwriters; and a review of critical non-public documents forming the basis for the company's earnings. Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer. Had the non-issuer Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

### 1. The Underwriter Defendants

299. The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Documents and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated. In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding the Company's deferred tax assets. The Underwriter Defendants could not simply rely on the work of Popular's outside auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. Thus, the Underwriter Defendants must conduct their own, independent (and reasonable) investigation into the accuracy of the Company's financial statements and assessments of internal controls. Had the Underwriter Defendants conducted a reasonable investigation, they would have learned that the Company's disclosed justifications for maintaining its large and growing U.S. mainland deferred tax assets did not comply with the express language of GAAP, SFAS 109, and a valuation allowance was required.

### 2. The Officer and Director Defendants

300. Similarly, the Officer Defendants and the Director Defendants who signed the Offering Documents and were senior officers and directors at the time of the Offering failed to conduct a reasonable investigation of the statements contained therein and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated. Had the Officer and Director Defendants conducted a reasonable investigation, they would have learned that the Company's disclosed justifications for maintaining its large and growing U.S. mainland deferred tax assets did not comply with the express language of GAAP, SFAS 109, and a valuation allowance was required.

### 3. PwC

301. Public investors, creditors and others rely on independent, registered public accounting firms to audit financial statements and assess internal controls when deciding whether to invest in or do business with a public company.

302. Defendant PwC, who consented to the inclusion of its opinion in the Offering Documents, failed to perform its audit of Popular in a reasonable manner; did not comply with Generally Accepted Auditing Standards ("GAAS")[8]; and its audit did not constitute a reasonable investigation of whether the Company's financial statements were presented in

---

[8] The Public Company Accounting Oversight Board ("PCAOB"), established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that must be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, "Generally Accepted Auditing Standards," and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. All references to GAAS hereinafter include PCAOB standards.

compliance with GAAP and management's assessment of internal controls was properly and accurately presented.

303.    Specifically, during the Class Period, PwC issued a clean, unqualified audit opinion on the Company's financial statements for the year ended December 31, 2007.  PwC also consented to the incorporation by reference in the prospectus supplement for the Offering of its clean and unqualified audit opinion letter on the Company's financial statements for the year ended December 31, 2007.  In its opinion letter, PwC stated that it performed its audits and evaluations in accordance with the standards of the PCAOB, or GAAS.  This statement was materially misstated when made and at the time of the Offering, as PwC's audit failed to comply with GAAS.

304.    In certifying Popular's 2007 financial statements, PwC specifically represented that those financial statements were prepared in accordance with GAAP and that PwC's audits were conducted in accordance with the standards of the PCAOB, or GAAS.  These statements were materially untrue when made.  When an auditor represents that a company's financial statements conform in all material respects with GAAP, the auditor "indicates [his] belief that the financial statements taken as a whole are not materially misstated." AU § 312.[9]  Indeed, "[f]inancial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with [GAAP]."  AU § 312.

305.    PwC's statements were similarly materially misstated because its audits did not confirm to GAAS.  Specifically, PwC was responsible for auditing whether the Company

---

[9] GAAS includes Statements on Auditing Standards ("SAS") issued by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA"), which are codified in *AICPA Professional Standards* under the prefix "AU."

properly applied the provisions of SFAS 109. Indeed, PwC's 2007 audit report specifically stated that "[o]ur audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation." Had PwC properly analyzed the Company's application of SFAS 109 and actually examined evidence supporting the deferred tax asset amount in the Company's financial statements, the only reasonable professional conclusion was that the Company's deferred tax assets were overstated and its valuation allowance understated.

306. GAAS General Standard No. 3 requires an auditor to exercise due professional care in the performance of the audit and preparation of the report. AU § 150.02. PwC violated General Standard No. 3 by, among other things, disregarding Popular's materially growing U.S. mainland deferred tax asset and simultaneously shrinking profitable U.S. mainland operations and the lack of a sufficient valuation allowance, and three year cumulative loss. Had PwC complied with GAAS, the only reasonable professional conclusion it could have drawn was that the Company's valuation allowance for its deferred tax assets were insufficient and, consequently, the Company had overstated its net income and the value of its assets in violation of GAAP.

307. GAAS Standard of Fieldwork No. 1 requires an auditor to plan the audit, which "involves developing an overall strategy for the expected conduct and scope of the audit." AU § 311.03. This requires understanding the entity's business sufficiently to identify areas of risk. AU §311.06. PwC violated Standard of Fieldwork No. 1 by, among other things, failing to plan and conduct an audit that would include identifying and assessing PwC's areas of risk, specifically, its deferred tax asset amount. Had PwC complied with GAAS, the only reasonable

professional conclusion it could have drawn was that the Company improperly failed to record an adequate valuation allowance for its deferred tax assets.

308.   GAAS Standards of Fieldwork Nos. 2 and 3 require that an independent auditor obtain, through inspection, observation, inquiries and confirmations, competent, sufficient evidential matter to afford a reasonable basis for its opinion.  AU § 150.02.  PwC violated Standard of Fieldwork Nos. 2 and 3 by, among other things, failing to obtain evidence that Popular had sufficient U.S. mainland taxable income to support its failure to establish an adequate valuation allowance and later to establish that Popular's purported tax strategies were feasible and within management's control.  Had PwC complied with GAAS, the only reasonable professional conclusion it could have drawn was that Popular's U.S. mainland taxable income was insufficient to support its failure to establish an adequate valuation allowance and that its tax strategies were neither feasible nor within the Company's control in violation of GAAP.

309.   Standard of Reporting No. 4 requires an auditor to express an opinion on the financial statements of a company taken as a whole, or to state that an opinion cannot be expressed. AU § 150.02.  As a result of PwC's violations of GAAS set forth above, it also violated the Standard of Reporting No. 4 because PwC had an insufficient basis to express an unqualified opinion on its 2007 audit of Popular.  Accordingly, as set forth above, PwC's public statements concerning those audits were untrue and contained omissions of material facts.

310.   Notably, Popular's accounting under SFAS 109 was in violation of PwC's own "Guide to Accounting for Income Taxes."

311.   In particular, PwC allowed Popular to record U.S. mainland deferred tax assets without any valuation allowance despite the fact that Popular US was already in a cumulative

loss position at the beginning of 2008 and the Class Period.   PwC did so even though Popular did not present any evidence to counterbalance Popular US's cumulative loss.  Further, PwC did so, even though it recognized in its own tax guide that Popular could not avoid a valuation allowance merely by relying on projections of future income within the standard 20-year duration of the assets:

> A projection of future taxable income is inherently subjective and generally will not be sufficient to overcome negative evidence that includes cumulative losses in recent years, particularly if the projected future taxable income is dependent on an anticipated turnaround to operating profitability that has not yet been demonstrated."  PwC "Guide to Accounting for Income Taxes" at 93 (2007).

312.   In addition, PwC's own tax guide provides that a company, like Popular, that was relying on restructuring plans to reduce costs and potentially return to profitability, should have taken a valuation allowance against its deferred tax assets due to a three year cumulative loss:

> An enterprise with significant negative evidence, such as a history of recent losses, normally will find it very difficult to demonstrate that even an implemented exit plan provides sufficient objective evidence that the enterprise will be restored to profitability, prior to the time that it actually becomes profitable.  In these circumstances, it would be that much more difficult to demonstrate that an unimplemented exit plan provides sufficient evidence to overcome the negative evidence present.

## B.     LOSS CAUSATION

313.   During the Class Period, as detailed herein, the Securities Act Defendants' either materially misstated the Offering Documents, including those documents incorporated therein, or failed to conduct adequate due diligence to discover that the Offering Documents were materially misstated.   As a result, the price of Popular's Series B preferred shares was artificially inflated throughout the Class Period.

314.   When the Securities Act Defendants' materially misleading statements were disclosed and became apparent to the market, the price of Popular's Series B preferred shares fell precipitously as the prior artificial inflation came out.  As a result of their purchases or

acquisitions of Popular Series B preferred stock issued pursuant and/or traceable to the Registration Statement, Plaintiffs Picó and Puig-Rivera and the other class members suffered economic loss; *i.e.* damages, under the federal securities laws.

315.    Specifically, as a foreseeable consequence of the Company's writedown of its deferred tax assets in January 2009, on February 19, 2009, the Officer Defendants caused Popular to reduce its quarterly dividend to $0.02, a 75% reduction to the previous quarterly dividend payment rate of $0.08 cents per quarter that had been established with the 50% dividend cut (from $0.16 cents per share) announced in August 2008.    In announcing the dividend cut, Popular stated that the dividend cut was "buil[t] on previous events" in order to provide greater flexibility to the Company.    The reason Popular was forced to again cut its dividend was a result of its increased losses and reduced asset base and liquidity due to the write down of the deferred tax assets in January 2009.    In response to this announcement, Popular's Series B shares fell from $14 to $8, or 43%.    Accordingly, the Securities Act Defendants will not meet their affirmative defense of proving loss causation at trial.

## CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

## COUNT THREE

### For Violations of §11 of the Securities Act
### Against The Securities Act Defendants

316.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except for those paragraphs solely based on fraud, including but not limited to ¶¶79, 116, 128, 144, 170-71, 230-43.    For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act of 1933.

317.    This claim is brought on behalf of Plaintiffs Picó and Puig-Rivera and other members of the Class who, during the Class Period, purchased or otherwise acquired Popular Series B preferred shares issued pursuant and/or traceable to the Registration Statement and were damaged by acts alleged herein.

318.    Popular, Inc. was the issuer for the Offering.  As issuer of the Securities, Popular, Inc. is strictly liable to Plaintiffs Picó and Puig-Rivera and the Class for the misstatements and omissions contained and incorporated within the Offering Documents.  As discussed above, between May 22, 2008 and May 28, 2008, Popular, Inc. issued and sold to investors 16,000,000 shares of its 8.25% Non-cumulative Monthly Income Preferred Stock, Series B to the investing public at $25 per share.

319.    The Officer Defendants and the Director Defendants named herein were responsible for the contents and dissemination of the Offering Documents.  Each of the Officer Defendants and Director Defendants signed or authorized the signing of the Offering Documents or was a director at the time of the Offering.  None of the Officer Defendants or the Director Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

320.    Defendant PwC was the auditor of Popular throughout the Class Period and consented to being named in the Offering Documents as a party who certified the audited financial statements contained or incorporated by reference therein.  PwC's 2007 audit report incorrectly stated that its audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

321.   Defendants UBS, Popular Securities and Citigroup acted as underwriters for the Series B Offering.

322.   The securities described in this Count were issued and sold pursuant to the Offering Documents.  The Offering Documents contained untrue statements of material fact, including the financial statements of Popular.  In addition, the Offering Documents omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including Popular's violations of GAAP.  The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Documents.  Plaintiffs Picó and Puig-Rivera and members of the Class acquired the Series B preferred shares relying upon the statements in the Offering Documents.

323.   In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

324.   The Securities Act Defendants owed to Plaintiffs Picó and Puig-Rivera and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

325.   The Securities Act Defendants did not make a reasonable investigation of the statements contained and incorporated by reference in the Offering Documents and did not possess reasonable grounds for believing that the Offering Documents did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or

necessary to make the statements therein not misleading.  Due diligence is a critical component of the issuing and underwriting process.  Directors, officers, and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information.  Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process.  At a minimum, due diligence for every public offering should involve: interviews of upper and mid-level management; a review of the auditor's management letters and a review of items identified there;  a review of the company's SEC filings (particularly those incorporated by reference); a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present;  a review of the company's internal controls; a review of negative facts and concerns within each Underwriter's organization and within the syndicate of Underwriters; and a review of critical non-public documents forming the basis for the company's earnings.  Red flags uncovered through this process must be investigated.  Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.  Had the non-issuer Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

326.   Plaintiffs Picó and Puig-Rivera and members of the Class purchased Popular Series B preferred shares issued in, or traceable to, the Registration Statement and were damaged thereby.

327.   Plaintiffs Picó and Puig-Rivera and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or

omissions of material facts in the Offering Documents when they purchased or acquired the shares.

328.    By reason of the foregoing, the Securities Act Defendants are liable to Plaintiffs Picó and Puig-Rivera and members of the Class for violations of Section 11 of the Securities Act.

329.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Offering Documents.

### COUNT FOUR

**For Violations of §12(a) (2) of the Securities Act
Against Defendant Popular and the Underwriter Defendants**

330.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except for those paragraphs solely based on fraud, including but not limited to ¶¶79, 116, 128, 144, 170-71, 230-43.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act of 1933.

331.    This claim is brought on behalf of Plaintiffs Picó and Puig-Rivera and other members of the Class who, during the Class Period, purchased or otherwise acquired Popular Series B preferred stock issued pursuant to the Offering Documents, including the Prospectus, and were damaged by acts alleged herein.

332.    By means of the Offering Documents, including the Prospectus, and by using the means and instrumentalities of transportation and communication in interstate commerce and of the mails, Defendant Popular solicited the purchase of the Series B preferred shares to members of the Class.

333.  The Underwriter Defendants committed to and purchased the Series B Preferred shares from Popular and sold the Series B preferred shares to Plaintiffs Picó and Puig-Rivera and members of the Class by means of the Prospectus.

334.  Defendant Popular and the Underwriter Defendants were responsible for the contents and dissemination of the Prospectus.  As alleged herein, the Prospectus contained untrue statements of material fact, including the financial statements of Popular.  In addition, the Prospectus omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including Popular's violations of GAAP.  The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

335.  Defendant Popular and the Underwriter Defendants owed Plaintiffs Picó and Puig-Rivera and the other members of the Class who purchased the Series B preferred stock based on the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in therein to ensure that those statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Popular and the Underwriter Defendants in the exercise of reasonable care, should have known of the misstatements and omissions contained and incorporated by reference in the Prospectus as set forth above.

336.  Defendant Popular and the Underwriter Defendants did not make a reasonable investigation of the statements contained and incorporated by reference in the Prospectus and did not possess reasonable grounds for believing that the Prospectus did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  Had they exercised reasonable care,

these Defendants would have known of the material misstatements and omissions alleged herein.

337.   Plaintiffs Picó and Puig-Rivera and members of the Class purchased Popular Series B preferred shares in the Offering by means of the materially misstated Prospectus and were damaged thereby.

338.   Plaintiffs Picó and Puig-Rivera and members of the Class who purchased Popular Series B preferred stock in the Offering did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Prospectus at the time Plaintiffs acquired the shares.

339.   By reason of the foregoing, Defendants are liable to Plaintiffs Picó and Puig-Rivera and members of the Class for violations of Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs Picó and Puig-Rivera and Class members who purchased or otherwise acquired Popular's Series B preferred shares hereby tender their shares to Defendants and seek rescission of their purchases to the extent they continue to own such securities.  Class members who have sold their Securities seek damages to the extent permitted by law.

340.   This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Documents and within three years after the Offering.

## COUNT FIVE

### For Violations of §15 of the Securities Act
### Against the Officer Defendants

341.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except for those paragraphs solely based on fraud, including but not limited to ¶¶79, 116, 128, 144, 170-71, 230-43.  For the purposes of this claim, Plaintiffs assert only strict

liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

342.    This claim is brought pursuant to Section 15 of the Securities Act against the Officer Defendants on behalf of Plaintiffs Picó and Puig-Rivera, and other members of the Class who purchased or acquired Popular Series B preferred shares issued pursuant and/or traceable to the Offering Documents and were damaged by acts alleged herein.

343.    As alleged herein, Popular violated Section 11 of the Securities Act by issuing the Offering Documents which included untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading.    The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Documents.

344.    At all relevant times, the Officer Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.    As set forth herein, because of their positions in the Company the Officer Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged herein.

345.    Specifically, the Officer Defendants were controlling persons of Popular due to their senior executive positions at Popular; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and/or their signatures on and participation in the preparation and dissemination of the Offering Documents.

346.    By virtue of the foregoing, the Officer Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Popular, including the content of its financial statements and of the Offering Documents.

347.   The Officer Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Offering Documents and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

348.   Plaintiffs Picó and Puig-Rivera and members of the Class purchased Popular Series B preferred shares issued in, or traceable to, the Offering Documents and were damaged thereby.

349.   Plaintiffs Picó and Puig-Rivera and the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Offering Documents when they purchased or acquired the shares.

350.   By reason of the foregoing, the Officer Defendants are liable to Plaintiffs and members of the Class for violations of Section 15 of the Securities Act.

## JURY DEMAND

351.   Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

## PRAYER FOR RELIEF

352.   WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

A.      Determining that this action is a proper class action and certifying as Lead Plaintiffs Detroit General, Picó and Puig-Rivera under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

C.      Awarding rescission and/or rescissory damages in favor of Plaintiffs and the other members of the Class;

D.      Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiffs and the other members of the Class;

E.      Awarding Plaintiffs and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

F.      Granting such other and further relief as the Court may deem just and proper.


RESPECTFULLY SUBMITTED,
In San Juan, Puerto Rico, this
19th day of October 2009

THE LAW OFFICES OF ANDRÉS W.
   LOPÉZ, P.S.C.
ANDRÉS W. LOPÉZ (USDC NO. 215311)

_____ /s/ ANDRÉS W. LOPÉZ _____
        ANDRÉS W. LOPÉZ
207 Del Parque Street, Third Floor
San Juan, PR 00912
Telephone: (787) 641-4541
Facsimile: (787) 641-4544

*Liaison Counsel*

BERNSTEIN LITOWITZ BERGER &
   GROSSMANN LLP
SALVATORE J. GRAZIANO
SAMUEL J. LIEBERMAN
LAURA H. GUNDERSHEIM
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

*Co-Lead Counsel for Plaintiffs*