# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

------------------------------------------------------------------------x

RUSSELL HOFF, Individually and on Behalf of All
Others Similarly Situated,

                Plaintiff,

                v.

POPULAR INC., RICHARD CARRIÓN, JORGE
A. JUNQUERA, MANUEL MORALES, FRANCISCO
M. REXACH, JUAN J. BERMÚDEZ, MARIA L. FERRÉ,
WILLIAM J. TEUBER, JOSE R. VIZCARRONDO,
FREDERIC V. SALERNO, MICHAEL J. MASIN,
PRICEWATERHOUSE COOPERS LLP, UBS
FINANCIAL SERVICES INCORPORATED OF
PUERTO RICO, POPULAR SECURITIES, INC., and
CITIGROUP GLOBAL MARKETS, INC.,

                Defendants.

------------------------------------------------------------------------x

Civil Action No. 09-01428
(GAG)(BJM) (Consolidated)

## MEMORANDUM OF LAW IN SUPPORT OF
## POPULAR, INC. AND THE INDIVIDUAL DEFENDANTS'
## MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Néstor M. Méndez-Gómez
PIETRANTONI MÉNDEZ &
ALVAREZ LLP
Popular Center, 19th Floor
209 Muñoz Rivera Avenue
San Juan, Puerto Rico  00918
Tel:  (787) 274-1212

*Counsel for Popular Inc. and the
Individual Defendants except
Francisco M. Rexach*

Joseph E. Neuhaus (pro hac vice)
Jeffrey T. Scott (pro hac vice)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000

*Counsel for Popular Inc. and the
Individual Defendants*

Ana Matilde Nin-Torregrosa
NIN-TORREGROSA &
RODRÍGUEZ-RUIZ
Citibank Tower, Suite 1801
252 Ponce de León Avenue
San Juan, Puerto Rico  00918
Tel:  (787) 282-6687

*Counsel for Francisco M. Rexach*

January 11, 2010

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................1

ALLEGATIONS OF THE COMPLAINT...........................................................4

        A.    Popular and the Individual Defendants..........................................4

        B.    Deferred Tax Assets and GAAP ...................................................5

        C.    Popular's Deferred Tax Assets .....................................................6

        D.    Allegations of Corporate Wrongdoing...........................................9

ARGUMENT ...................................................................................................12

    I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SECURITIES FRAUD UNDER SECTION 10(b) OF THE EXCHANGE ACT .....................................12

        A.    Plaintiffs Fail To Plead Any Material Misstatements or Omissions...................................................................................13

        B.    Plaintiffs Fail To Plead Scienter ................................................17

        C.    Plaintiffs Fail To Plead Loss Causation.......................................23

        D.    The Alleged Misstatements Fall Under the PSLRA's Safe Harbor for Forward-Looking Statements...................................26

    II.    PLAINTIFFS FAIL TO STATE SECTION 20(a) CLAIMS AGAINST THE INDIVIDUAL OFFICER DEFENDANTS ...................................................30

    III.    PLAINTIFFS FAIL TO STATE ANY CLAIMS FOR VIOLATIONS OF SECTION 11 OR 12(a)(2) OF THE SECURITIES ACT .....................................30

    IV.    PLAINTIFFS FAIL TO STATE SECTION 15 CLAIMS AGAINST THE INDIVIDUAL OFFICER DEFENDANTS ..........................................................33

CONCLUSION................................................................................................34

# TABLE OF AUTHORITIES

Page(s)

## CASES

*60223 Trust* v. *Goldman, Sachs & Co.*,
   540 F. Supp. 2d 449 (S.D.N.Y. 2007) ........................................................................26

*ACA Fin. Guar. Corp.* v. *Advest Inc.*,
   512 F.3d 46 (1st Cir. 2008) .............................................................................12, 30

*Aldridge* v. *A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) .............................................................................22

*Alvarado* v. *Morgan Stanley Dean Witter, Inc.*,
   448 F. Supp. 2d 333 (D.P.R. 2006) ........................................................................30

*Ashcroft* v. *Iqbal*,
   129 S. Ct. 1937 (2009) .............................................................................12

*Baron* v. *Smith*,
   380 F.3d 49 (1st Cir. 2004) .............................................................................30

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007) .............................................................................12

*Blackstone Realty LLC* v. *FDIC*,
   244 F.3d 193 (1st Cir. 2001) .............................................................................31

*Cooperman* v. *Individual, Inc.*,
   171 F.3d 43 (1st Cir. 1999) .............................................................................33

*Coors Brewing Co.* v. *Mendez-Torres*,
   562 F.3d 3 (1st Cir. 2009) .............................................................................31

*Diana Paolucci Corp.* v. *Carbonell & Astor*,
   949 F. Supp. 65 (D.P.R. 1996) .............................................................................13

*DiLeo* v. *Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) .............................................................................16

*Dura Pharm., Inc.* v. *Broudo*,
   544 U.S. 336 (2005) .............................................................................23, 26

*Ernst & Ernst* v. *Hochfelder*,
   425 U.S. 185 (1976) .............................................................................17

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Ezra Charitable Trust* v. *Tyco Int'l, Ltd.*,
    466 F.3d 1 (1st Cir. 2006) ...................................................................22, 23

*Fidel* v. *Farley*,
    392 F.3d 220 (6th Cir. 2004)..................................................................21

*Fox* v. *First BanCorp*,
    No. 05-2148, 2006 WL 4128534 (D.P.R. Nov. 6, 2006) ......................33

*Greebel* v. *FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) .............................................................15, 17

*Greenhouse* v. *MCG Capital Corp.*,
    392 F.3d 650 (4th Cir. 2004)..................................................................25

*Gross* v. *Summa Four, Inc.*,
    93 F.3d 987 (1st Cir. 1996) ...............................................................13, 19

*GSC Partners CDO Fund* v. *Washington*,
    368 F.3d 228 (3d Cir. 2004)...................................................................27

*Hess* v. *Am. Physicians Capital Inc.*,
    No. 5:04-CV-31, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005) .........20, 28

*Horizon Asset Mgmt. Inc.* v. *H & R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009)..................................................................22

*In re 2007 Novastar Fin. Inc. Sec. Litig.*,
    No. 07-0139, 2008 WL 2354367 (W.D. Mo. June 4, 2008) ..................14, 20

*In re AOL Time Warner Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007) ...................................................23

*In re Biogen IDEC, Inc. Sec. Litig.*,
    No. 05-10400, 2008 WL 4810045 (D. Mass. Oct. 25, 2007)................28

*In re Boston Tech., Inc. Sec. Litig.*,
    8 F. Supp. 2d 43 (D. Mass. 1998) .........................................................19

*In re The First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ...................................................28

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*In re Galileo Corp. S'holders Litig.*,
    127 F. Supp. 2d 251 *(D. Mass. 2001)* ....................................................................21

*In re Huffy Corp. Sec. Litig.*,
    577 F. Supp. 2d 968 (S.D. Ohio 2008) ................................................................28

*In re Levi Strauss & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) .............................................................19, 20

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ...............................................................................29

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...................................................................1

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003) ...................................................................1

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) .................................................................26

*In re Polaroid Corp. Sec. Litig.*,
    465 F. Supp. 2d 232 (S.D.N.Y. 2006) .................................................................16

*In re SeaChange Int'l Inc. Sec. Litig.*,
    No. Civ. A. 02-12116, 2004 WL 240317 (D. Mass. Feb. 6, 2004)............................31

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    604 F. Supp. 2d 332 (D. Mass. 2009) .................................................................28

*In re Sonus Networks, Inc. Sec. Litig.*,
    No. Civ. A. 04-10294, 2006 WL 1308165 (D. Mass. May 10, 2006) ..................21, 22

*In re Stone & Webster, Inc., Sec. Litig.*,
    253 F. Supp. 2d 102 (D. Mass. 2003) .................................................................22

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005) .......................................................................13, 27, 30

*In re Tyco Int'l, Ltd.*,
    Nos. 02-1335-B, 02-266-B, 2004 WL 2348315 (D.N.H. Oct. 14, 2004) ..................18

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*In re Tycom Ltd. Sec. Litig.*,
No. 03-CV-1352, 2006 WL 39237 (D.N.H. Jan. 6, 2006) ..........................................31

*In re Washington Mut.*,
259 F.R.D. 490 (W.D. Wash. 2009) .........................................................................5

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..............................................15, 16, 19, 20

*Lalor* v. *Omtool, Ltd.*,
No. 99-469M, 2000 WL 1843247 (D.N.H. Dec. 14, 2000) ......................................31

*Lattanzio* v. *Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007) ....................................................................................24

*Lentell* v. *Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ...............................................................................23, 24

*Limantour* v. *Cray Inc.*,
432 F. Supp. 2d 1129 (W.D. Wash. 2006) ..........................................................16, 27

*NJ Carpenters Pension & Annuity Funds* v. *Biogen IDEC Inc.*,
537 F.3d 35 (1st Cir. 2008) ...............................................................................20, 28, 30

*Payne* v. *DeLuca*,
433 F. Supp. 2d 547 (W.D. Pa. 2006) ......................................................................30

*PR Diamonds, Inc.* v. *Chandler*,
364 F.3d 671 (6th Cir. 2004) ....................................................................................19

*Sable* v. *Southmark/Envicon Capital Corp.*,
819 F. Supp. 324 (S.D.N.Y. 1993) .........................................................................17

*Semerenko* v. *Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000) ....................................................................................32

*Serabian* v. *Amoskeag Bank Shares, Inc.*,
24 F.3d 357 (1st Cir. 1994) ......................................................................................22

*Shaw* v. *Digital Equip. Corp.*,
82 F.3d 1194 (1st Cir. 1996) ....................................................................................33

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Suna* v. *Bailey Corp.*,
    107 F.3d 64 (1st Cir. 1997) ......................................................................16, 20

*Taubenfeld* v. *Hotels.com*,
    385 F. Supp. 2d 587 (N.D. Tex. 2004) ...........................................................28

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...............................................................................3, 5, 17

*Thor Power Tool Co.* v. *C. I. R.*,
    439 U.S. 522 (1979) ..................................................................................3, 15

## STATUTES

15 U.S.C. § 77k ......................................................................................................30

15 U.S.C. § 77l ......................................................................................................30

15 U.S.C. § 77m .....................................................................................................32

15 U.S.C. § 78u-4 ........................................................................................13, 17, 23

15 U.S.C. § 78u-5 ............................................................................................26, 27

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(b)........................................................................................ passim

Fed. R. Civ. P. 12 ...................................................................................................12

Fed. R. Civ. P. 15 ...................................................................................................32

## PRELIMINARY STATEMENT

Shareholder class actions, like this one here, are inevitably and unfortunately filed whenever the price of a company's stock significantly declines.  In the wake of the extraordinary financial crisis and severe dislocation of the global financial markets, Popular, Inc. ("Popular" or the "Company")—like its peers and virtually every major financial institution in the world— suffered a decline in its stock price.  From January 24, 2008 to February 19, 2009, the relevant period in this litigation, Popular's stock fell from $10.71 to $1.60 per share, an 85% decline.  Popular and its shareholders were not alone in suffering substantial losses during this "once-in-a-century credit tsunami"[1]; the S&P Banking Index, comprised of a broad range of commercial banks, fell by a commensurate 77%.  Indeed, the entire financial services industry dramatically changed.  Lehman Brothers and Washington Mutual declared bankruptcy; Bear Stearns, Merrill Lynch and Wachovia failed; Fannie Mae and Freddie Mac were placed in government conservatorship; and Congress enacted a $700 billion bailout of the financial services industry.

In this purported securities fraud class action, one of many such actions filed against financial institutions in federal courts in the aftermath of the market-wide downturn, plaintiffs claim to represent a putative class of persons who bought Popular securities from January 24, 2008 to February 19, 2009 (the "Class Period").  Plaintiffs implausibly claim that revelation of purported corporate fraud—rather than "the most wrenching [financial crisis] since the end of the second world war"[2]—caused the decline in Popular's stock price.  Specifically, plaintiffs allege that during

---

[1]    Associated Press, *Greenspan: Financial Crisis is a 'Once-in-a-Century Credit Tsunami'*, Oct. 23, 2008.  On a motion to dismiss, the Court may take judicial notice of news articles, *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 251 n.5 (S.D.N.Y. 2003), and the credit crisis, *see In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003).

[2]    Alan Greenspan, *We Will Never Have a Perfect Model of Risk*, Financial Times (London), Mar. 17, 2008, at 9.

the Class Period, Popular issued fraudulent financial disclosures in which the Company overstated the value of its deferred tax assets ("DTAs") and thereby artificially inflated its earnings and liquidity.  Plaintiffs assert that Generally Accepted Accounting Principles ("GAAP") required the Company to take a full valuation allowance against its U.S. mainland DTAs as early as January 24, 2008, but that Popular failed to do so until January 22, 2009.  According to plaintiffs, when Popular took the full valuation allowance, Popular's stock price dropped 50% in response to that decision.

Plaintiffs assert claims against Popular and certain officers of the Company pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (Counts One and Two).  Plaintiffs also assert claims pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") (Counts Three, Four and Five), claiming that the offering materials issued in connection with a May 2008 public offering of Popular Series B preferred stock contained material misstatements and omissions concerning the value of the Company's DTAs.  Plaintiffs name the outside directors on Popular's Board of Directors as defendants for purposes of the Section 11 claim only.[3]  For the following reasons, each of these claims suffers from incurable fatal defects and should be dismissed:

*First*, plaintiffs have failed to plead any material misstatements or omissions under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil Procedure 9(b).  Under these standards, plaintiffs must allege, among other things, particularized facts explaining why the alleged misstatements were false when made.  Plaintiffs allege that, under GAAP, Popular should have recorded a full valuation allowance

---

[3]    Plaintiffs also assert the Section 11 and/or 12(a)(2) claims against Popular's independent auditor, PricewaterhouseCoopers LLP ("PwC"), and three underwriters of the May 2008 preferred stock offering—UBS Financial Services Incorporated of Puerto Rico, Popular Securities, Inc. and Citigroup Global Markets, Inc. (the "Underwriter Defendants").  PwC and the Underwriter Defendants are separately moving to dismiss the claims against them.

several months before it did.  But plaintiffs do not offer any facts—particularized or otherwise—for the critical conclusion on which this allegation is based:  that, after shedding certain money-losing operations, the Company's remaining profitable operations could not at that time be expected to earn sufficient income to absorb the DTAs.  Plaintiffs also do not allege that the Company concealed any information from the market.  Rather, plaintiffs simply disagree with Popular's business judgment.  But GAAP "tolerate[s] a range of reasonable treatments, leaving the choice among alternatives to management." *Thor Power Tool Co.* v. *C. I. R.*, 439 U.S. 522, 544 (1979) (internal quotation marks omitted).  Plaintiffs' disagreement with Popular's judgment is insufficient as a matter of law to state a claim for material misrepresentations under the federal securities laws.

*Second*, plaintiffs' Section 10(b) claim fails because they have failed to plead, as required under the PSLRA, facts supporting a strong inference of scienter.  This standard requires that plaintiffs plead particularized facts that show that the inference of scienter is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Here, contrary to plaintiffs' wholly conclusory allegations that Popular and the named officer defendants "knew" that the alleged misstatements were false when made, the far more compelling inference is that Popular adjusted its estimation of projected future taxable income—a key component in valuing DTAs—as market conditions sharply deteriorated in the latter half of 2008.  At most, plaintiffs claim that Popular's projections proved to be too optimistic; "wrong" projections, however, are not the same as committing securities fraud.

*Third*, plaintiffs have not adequately pled loss causation, another requisite element of a Section 10(b) claim.  Plaintiffs must adequately allege that revelation of the purported fraud caused their purported economic losses.  In asserting that the drop in the stock's price on January 22, 2009 establishes loss causation, plaintiffs fail to account for other negative company-specific

news released the same day that was unrelated to the alleged fraud, or the fact that Popular's stock was already in the midst of a nearly 12-month decline prior to "disclosure" of the alleged fraud on January 22.

*Fourth*, the allegedly false and misleading statements are not actionable under Section 10(b) because they fall under the PSLRA's safe harbor for forward-looking statements.

*Fifth*, the Section 20(a) (controlling person) claim fails because plaintiffs have failed to plead an underlying violation of Section 10(b).  This claim also should be dismissed because plaintiffs have not pled culpable participation by the officer defendants in the alleged violation.

*Sixth*, plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act suffer from many of the same deficiencies as the Section 10(b) claim, including (i) failure to plead any untrue statements or actionable omissions, (ii) failure to plead loss causation, and (iii) that the claims are precluded by the statutory safe harbor for forward-looking statements.  In addition, plaintiffs' Section 11 claim against Popular's outside directors—the only claim asserted against them—is time-barred.  The Section 12(a)(2) claim against Popular fails because plaintiffs did not directly purchase the securities from Popular, and thus plaintiffs have no standing to bring such a claim against it.

*Seventh*, and finally, without showing an underlying violation of Section 11 or 12(a)(2), plaintiffs' Section 15 (controlling person) claim fails as well.

## **ALLEGATIONS OF THE COMPLAINT**

A.    **Popular and the Individual Defendants**

Popular is a publicly owned bank holding company that offers a variety of financial and banking services in Puerto Rico, the United States, the Caribbean and Latin America. (Consolidated Class Action Complaint, dated October 19, 2009 ("CAC" or the "Complaint"), Ex. 1

- 4 -

¶ 20.[4])  Popular's operations in the mainland United States during the relevant period consisted of Banco Popular North America ("BPNA"), Popular Financial Holdings, Inc. ("PFH"), and E-LOAN (a subsidiary of PFH until 2007, when it became a subsidiary of BPNA) (collectively, "Popular's U.S. operations").  (CAC ¶ 41.)  Richard L. Carrión is the Chief Executive Officer of Popular and Chairman of Popular's Board of Directors.  (*Id.* ¶ 21.)  Jorge A. Junquera is the Chief Financial Officer of Popular.  (*Id.* ¶ 22.)  Popular's outside directors are Juan J. Bermúdez, Maria L. Ferré, Michael J. Masin, Manuel Morales, Francisco M. Rexach, Frederic V. Salerno, William J. Teuber and Jose R. Vizcarrondo.  (*Id.* ¶¶ 26-34.)

## B.    Deferred Tax Assets and GAAP

DTAs are operating losses, tax credits and future tax deductions that can be used to reduce income taxes owed by a company in a subsequent tax period.  (Statement of Financial Accounting Standards No. 109 ("SFAS 109") Ex. 2 at 5, ¶ 3; *accord* CAC ¶ 43.)[5]  Such DTAs generally may be used for up to 20 years into the future.  (*See* CAC ¶¶ 119, 121.)  Under GAAP, a company must recognize most types of DTAs on its balance sheet.  If, however, the company's management in its "[j]udgment" determines, based on the "relative impact of negative and positive evidence," that it is "more likely than not" that the company will be unable to generate future taxable income to utilize its deferred tax assets in a future tax period, the company must take a so-called "valuation allowance." (SFAS 109, Ex. 2 ¶¶ 16-17, 25; *accord* CAC ¶¶ 47-48.  *See also* PwC's Guide to Accounting for Income Taxes, Ex. 3 at 89 (2007) ("The valuation allowance

---

[4]     The exhibits referenced in this memorandum are included in Defendants' Joint Appendix in Support of Their Motions to Dismiss, filed January 11, 2010.

[5]     In ruling on this motion, the Court may consider accounting standards, which plaintiffs refer to throughout the Complaint.  *See*, *e.g.*, *In re Washington Mut.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009) ("A court may also take judicial notice of public documents filed with the SEC, records and reports of administrative bodies, and accounting standards."); *see also Tellabs*, 551 U.S. at 322 (on a motion to dismiss, a court must consider "documents incorporated into the complaint by reference").

recorded should be based on management's judgment of what is 'more likely than not' considering all available information, both quantitative and qualitative.").)[6]

### C.    Popular's Deferred Tax Assets

Each of Popular's quarterly and annual financial statements during the purported Class Period discussed management's conclusions with respect to DTAs.  In its year-end filing for 2007, Popular explained that the realization of its DTAs was "dependent upon the existence of, or generation of, taxable income prior to their expiration term of 20 years" and "[b]ased on the information available as of December 31, 2007, the Corporation expect[ed] to fully realize" its DTAs.  (Form 10-K, for the year ended Dec. 31, 2007 ("2007 Form 10-K") Ex. 4 at Ex. 13.1, p. 16; *accord* CAC ¶ 118.)  The Company's quarterly filings for the first and second quarter of 2008 reported similar conclusions.  (Form 10-Q for the period ended Mar. 31, 2008 ("1Q08 Form 10-Q"), Ex. 5 at 81; Form 10-Q for the period ended June 30, 2008 ("2Q08 Form 10-Q"), Ex. 6 at 92.)

In each of these filings, the Company cautioned that these conclusions were matters of judgment based on "significant estimates" and that "changes in facts and circumstances" might result in a valuation allowance in future periods:

> Due to significant estimates utilized in establishing the valuation allowance and the potential for changes in facts and circumstances, it is reasonably possible that we will be required to record adjustments to the valuation allowance in future reporting periods. Our results of operations would be impacted negatively if we determine that increases to our deferred tax asset valuation allowance are required in a future reporting period.

(2007 Form 10-K, Ex. 4 at 30; *see also* 1Q08 Form 10-Q, Ex. 5 at 103 (referring to 2007 Form 10-

---

[6]    The Court may consider PwC's Guide to Accounting for Income Taxes because plaintiffs cite this document throughout the Complaint.  (*See* n.5 *supra*; CAC ¶¶ 54 & n.3, 57, 125 & n.4, 132, 310-11.)

K discussion of risk factors); 2Q08 Form 10-Q, Ex. 6 at 92 (same).)[7]  Further, these filings also specifically warned that they contained forward-looking statements that "involve certain risks, uncertainties, estimates and assumptions by management that are difficult to predict" and that "factors, some of which are beyond the Corporation's control, could cause actual results to differ materially from those expressed in, or implied by, such forward-looking statements."  (2007 Form 10-K, Ex. 4 at 2.  *See also* 1Q08 Form 10-Q, Ex. 5 at 3; 2Q08 Form 10-Q, Ex. 6 at 3.)[8]

In the third quarter of 2008, such factors materialized.  The Company reported that "a significant increase in credit losses in two of its main businesses due to the unprecedented current credit market conditions, losses related to the PFH discontinued business, and restructuring charges" caused Popular to "conclude that the Corporation [would] not be able to fully realize the deferred tax assets in the future."  (3Q08 Form 10-Q, Ex. 12 at 50-51, 102.  *Accord* CAC ¶ 219.)  In particular, BPNA, which previously had been a significant contributor to earnings of Popular's U.S. operations, had become significantly unprofitable in the third quarter, suffering a loss of $51.7 million.  (3Q08 Form 10-Q, Ex. 12 at 62.)[9]

---

[7]  Similar cautionary language was included in, or referred to by, notes to subsequent financial statements and press releases during the purported Class Period.  (*See* Jan. 24, 2008 Press Release, Ex. 7 at 7-8; Apr. 18, 2008 Press Release, Ex. 8 at 6; July 17, 2008 Press Release, Ex. 9 at 6; Aug. 28, 2008 Press Release, Ex. 10 at 1; Oct. 22, 2008 Press Release, Ex. 11 at 8; Form 10-Q for the period ended Sept. 30, 2008 ("3Q08 Form 10-Q"), Ex. 12 at 92.)  A court may consider these press releases and SEC filings, which are cited by plaintiffs throughout the Complaint.  (*See* n.5 *supra*.)

[8]  Similar disclosures were made in Popular's press releases and other filings with the SEC.  (*See* Jan. 24, 2008 Press Release, Ex. 7 at 7-8; Apr. 18, 2008 Press Release, Ex. 8 at 6; July 17, 2008 Press Release, Ex. 9 at 6; Aug. 28, 2008 Press Release, Ex. 10 at 1; Oct. 22, 2008 Press Release, Ex. 11 at 8; 3Q08 Form 10-Q, Ex. 12 at 3; Nov. 18, 2008 Form 8-K, Ex. 13 at Ex. 99.1, p. 1.)

[9]  Popular was not alone in experiencing unexpected worsening financial performance in the third quarter of 2008.  In September 2008, Lehman Brothers and Washington Mutual declared bankruptcy, Merrill Lynch failed, and Fannie Mae and Freddie Mac were placed in government conservatorship.  (*See* Federal Reserve Bank of St. Louis, *The Financial Crisis: A Timeline of Events and Policy Actions* ("Financial Crisis Timeline"), Ex. 14 at 6-8.)

As a consequence, Popular publicly reported that it would take a partial valuation allowance of $360.4 million against the value of its U.S. mainland DTAs. (3Q08 Form 10-Q, Ex. 12 at 50-51; CAC ¶ 68.) Because management concluded that some of Popular's losses were "temporary," rather than "indicative of a permanent decline in the earnings of the U.S. mainland operations" (3Q08 Form 10-Q at 50-51; *accord* CAC ¶ 219), the Company forecast future taxable income sufficient to realize a portion of its DTAs. As the Company explained in its Form 10-Q, this forecast was based in part on "cost reductions initiated in connection with the U.S. reorganization of the U.S. mainland operations and two tax-planning strategies" that were available to the Company to ensure that the U.S. operations generated sufficient taxable income in the future to absorb the booked DTAs: (1) "reducing the level of interest expense in the U.S. operations by transferring debt to the Puerto Rico operations"; and (2) "transfer[ing] a profitable line of business to the U.S. mainland operations." (*Id.*)[10]

As the financial crisis deepened in the fourth quarter of 2008,[11] Popular's management reassessed its expectations of the realization of its U.S. DTAs. The Company's year-end filing for 2008 stated: "Certain events transpired in the fourth quarter of 2008 that led management to reassess its expectations of the realization of the deferred tax assets of the U.S. mainland operations and to conclude that a full valuation allowance was necessary." (Form 10-K, for the year ended Dec. 31, 2008 ("2008 Form 10-K"), Ex. 15 at Ex. 13.1, p. 29; *accord* CAC

---

[10]    Popular may use DTAs created by its U.S. operations to reduce income taxes owed only by those operations, not its Puerto Rico operations. (SFAS 109, Ex. 2 ¶ 17 (DTAs "shall be determined separately for each tax-paying component (an individual entity or group of entities that is consolidated for tax purposes) in each tax jurisdiction"). *Accord* CAC ¶¶ 42, 105.)

[11]    For example, in October 2008, Wachovia was on the brink of collapse and agreed to be acquired by Wells Fargo. Additionally, Congress enacted the unprecedented $700 billion Troubled Asset Relief Program, and dozens of banks were forced to take funds under that program due to the worsening financial crisis. (Financial Crisis Timeline, Ex. 14 at 9-10.)

¶ 186.)  First, the provision for loan losses at Popular's U.S. operations increased significantly in the fourth quarter of 2008, prompting "an increase in the estimated provision for loan losses for 2009" as well.  (2008 Form 10-K, Ex. 15, at Ex. 13.1, p. 29.)  Second, the anticipated U.S. government acquisition of certain troubled assets failed to materialize.  (*Id.*)  Third, "[a]dditional uncertainty in an expected rebound in the economy and banking industry . . . forced management to place no reliance on forecasted income."  (*Id.*)  Fourth, the two tax strategies that Popular had considered in the third quarter had become less beneficial because of changes in Popular's debt ratings (increasing the cost of shifting debt to Puerto Rico) and the reduction in the profitability at the Puerto Rico operations (creating uncertainty as to whether management should shift a business from Puerto Rico to the U.S.).  (*Id.*)  For these reasons, on January 22, 2009, Popular disclosed it would record a valuation allowance of $462.8 million to cover all its U.S. mainland DTAs.  (CAC ¶ 69.)

### D.    Allegations of Corporate Wrongdoing

Plaintiffs claim Popular should have recorded a valuation allowance to cover its DTAs from its U.S. operations not when it did—at the end of the third quarter 2008 and in January 2009—but rather nine months or a year earlier, at the beginning of 2008.  (*Id.* ¶¶ 6, 113, 194.)  Plaintiffs argue that as of the beginning of 2008, Popular's U.S. operations were in a three-year cumulative loss position, which under SFAS 109 is a "significant piece of negative evidence" in determining whether a valuation allowance must be recorded.  (*Id.* ¶¶ 6, 55, 70-72, 113, 194.)[12]

Plaintiffs further argue that by disposing of, or downsizing, its U.S. operations, Popular was left with an insufficient basis to make money to absorb the DTAs in the future.  (CAC

---

[12]    Specifically, plaintiffs contend that by not recording the valuation allowance earlier, Popular's press releases and/or SEC filings on January 24, 2008, February 29, 2008, April 18, 2008, May 12, 2008, July 17, 2008, August 11, 2008, August 28, 2008, October 22, 2008, November 10, 2008, and November 18, 2008 contained statements that "were materially false and misleading when made."  (CAC ¶¶ 193-229.)

¶¶ 202, 208, 216, 223.)  But plaintiffs' argument overlooks that what Popular disposed of or downsized beginning in 2007 were the historically *money-losing* components of Popular's U.S. operations—PFH and E-LOAN.  (*See*, *e.g.*, 2007 Form 10-K, Ex. 4 at Ex. 13.1, pp. 137-38 (reporting that PFH lost $269.4 million and $61.7 million in years 2007 and 2006, respectively; E-LOAN lost $245.7 million and $33 million during those same years); CAC ¶ 61 (discussing plans to "restructure" PFH and "restructure and downsize" E-LOAN).)  Moreover, almost two-thirds of the 2007 losses in the PFH and E-LOAN segments were in fact one-time losses associated with the restructuring.  (2007 Form 10-K, Ex. 4 at 13.1, pp. 8-10, 137-38 (PFH restructuring charges and one-time characterization charge of $105 million, E-LOAN restructuring and goodwill impairment charges of $232 million, for a total of $337 million out of the total PFH and E-LOAN losses of $515 million).)  Popular retained the portion of the Company that had been making money—BPNA. (*See*, *e.g.*, 2007 Form 10-K, Ex. 4 at Ex. 13.1, p. 138 (reporting that BPNA, excluding E-LOAN, earned $50.5 million in 2007 and $101.3 million in 2006).)

Plaintiffs do not dispute these facts.  (*See* CAC ¶ 84 (noting one-time restructuring and goodwill charges in 2007), ¶ 114 (PFH "had operated at a loss for ten consecutive quarters leading up to the Class Period"; E-LOAN "had operated at a significant loss for four consecutive quarters before the Class Period"; BPNA "began to operate at a significant[13] loss by the second quarter of 2008").)  But they ignore the implications of these facts under GAAP:  this is precisely the kind of "positive evidence" that counteracts "negative evidence" such as a three-year cumulative loss.  Indeed, PwC's Guide to Accounting for Income Taxes, upon which the Complaint repeatedly relies (*see* n.6 *supra*), describes two different scenarios in which a company downsizes or discontinues an unprofitable line of business and focuses on its profitable line of business—one

---

[13]     As discussed *infra*, it was only in the third quarter of 2008 that BPNA's losses became "significant" by any ordinary definition of that term.

scenario involving cessation of the business and the other a sale of the related assets—as examples where "Positive Evidence Outweighed Significant Negative Evidence."  (Ex. 3 at 94-95.)

BPNA (excluding E-LOAN) continued to be profitable in the first half of 2008, earning $15.8 million in the first quarter and suffering a relatively small loss of $12.7 million in the second, leaving half-year earnings of about $3.1 million.  (1Q08 Form 10-Q, Ex. 5 at 48; 2Q08 Form 10-Q, Ex. 6 at 55.)  It was only when the financial crisis dramatically accelerated and BPNA's losses increased—in the third quarter of 2008 its losses were $51.7 million—that Popular's management concluded that the negative evidence of the three-year cumulative loss was no longer outweighed by sufficient positive evidence to record the full amount of its U.S. DTAs without a valuation allowance.  (3Q08 Form 10-Q, Ex. 12 at 50-51, 62.  *Accord* CAC ¶ 219.)  This is precisely what management was expected to do under SFAS 109.  (*See* PwC's Guide to Accounting for Income Taxes, Ex. 3 at 95 ("In assessing changes in the valuation allowance, it is important to consider again the basis for amounts previously provided and how new information modifies previous judgments.").)

Plaintiffs claim that the "true facts about the Company's U.S. mainland deferred tax assets were finally revealed on January 22, 2009" when Popular announced that it was taking the full valuation allowance for its U.S. DTAs.  (CAC ¶ 11.)  On that day, the price of Popular common stock declined from $4.98 to $2.46.  (*Id.*)  Plaintiffs attribute this drop in price to the announcement of the valuation allowance.  But in addition to announcing the valuation allowance, Popular also disclosed on January 22 that it had "a significant increase in the allowance for loan losses" (*id.* ¶ 175), faced a weakening credit environment, suffered losses in all of its U.S. operating segments, saw its net interest income decrease, and had further restructured BPNA and E-LOAN.  (Jan. 22, 2009 Press Release, Ex. 16 at 1-5.)  Popular also missed analysts' consensus earnings estimate even

after adjusting for one-time losses (B. Riley Analyst Report for Popular, Inc., dated Jan. 23, 2009, Ex. 17 at 1), and had its credit ratings downgraded by Fitch Ratings (CAC ¶ 181).  Plaintiffs allege that the valuation allowance "helped force the Company on February 19, 2009 [nearly a month after the full valuation allowance announcement], to cut its dividend by 75% to preserve its dwindling liquidity," causing Popular's common stock to decline 11% from $1.79 to $1.59, and Popular's preferred stock to fall 43% from $14 to $8.  (*Id.* ¶ 11.)

## ARGUMENT

Under Federal Rule of Civil Procedure 12(b)(6), a court should dismiss any claims for which a plaintiff fails to make factual allegations that "raise a right to relief above the speculative level."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).  The Court should disregard "legal conclusions" or "mere conclusory statements" and should sustain a complaint only if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Thus, where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

## I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SECURITIES FRAUD UNDER SECTION 10(b) OF THE EXCHANGE ACT.

In order for the Complaint "to state a claim for securities fraud under section 10(b) and Rule 10b-5, it must plead six elements:  (1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  *ACA Fin. Guar. Corp.* v. *Advest Inc.*, 512 F.3d 46, 58 (1st Cir. 2008).  Securities fraud claims brought under Section 10(b) and Rule 10b-5 are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  *Id.* at 58 & n.7.  Plaintiffs' Section 10(b) claims are fatally defective because they

fail to plead:  (a) a material misstatement or omission with particularity—*i.e.*, facts that show exactly why Popular's statements about its DTAs were misleading; (b) a strong inference of scienter—*i.e.*, that the Company's statements about its DTAs were knowingly false when made; and (c) loss causation—*i.e.*, that the drop in Popular's stock price was caused by the allegedly false statements about DTAs not the concededly true and timely disclosures regarding the Company's underlying business.  In addition, the alleged misstatements are not actionable as a violation of the Exchange Act because of the statutory safe harbor for forward-looking statements.[14]

### A.        Plaintiffs Fail To Plead Any Material Misstatements or Omissions.

Under the PSLRA's heightened pleading requirements, plaintiffs "must provide . . . facts that show exactly why the statements or omissions were misleading." *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 194 (1st Cir. 2005) (internal quotation marks omitted); *see also* 15 U.S.C. § 78u-4(b)(1) (complaint must state "the reason or reasons why the statement is misleading").  Plaintiffs also must satisfy Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The First Circuit has "been especially rigorous in demanding such factual support in the securities context to minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement, rather than in the hopes that the process will reveal relevant evidence." *Diana Paolucci Corp.* v. *Carbonell & Astor*, 949 F. Supp. 65, 67 (D.P.R. 1996) (internal quotation marks omitted).

---

[14]    Plaintiffs lack standing to challenge any of the alleged misstatements that occurred after June 24, 2008, the latest date that plaintiffs claim to have purchased shares of Popular stock.  (CAC Exs. A-C.)  *See Gross* v. *Summa Four, Inc.*, 93 F.3d 987, 993 (1st Cir. 1996) (holding that a plaintiff has no standing to complain about purported misstatements made after the plaintiff purchases stock even if the plaintiff brings his claims on behalf of a class).  However, as discussed *infra*, even if the Court considers statements made after June 24, 2008, plaintiffs' claims would still fail as a matter of law.

Plaintiffs entirely fail to meet these standards.  Plaintiffs contend that ten press releases or filings issued by Popular in 2008 (*see* n.12 *supra*) "were materially false and misleading when made because they misrepresented and failed to disclose that":

- "The Company's accounting for its deferred tax assets related to its mainland U.S. operations was materially overstated . . . because it did not record a valuation allowance against its mainland U.S. deferred tax assets despite Popular US's three-year cumulative tax loss and downsized U.S. mainland operations";
- "The Company's balance sheet and assets were artificially inflated";
- "[H]ad Popular taken a full valuation allowance against its US deferred tax assets as required under GAAP" Popular's U.S. operations would not have been "'well capitalized' under FDIA regulations during the second [and third] quarter[s] of 2008";
- "The Company was experiencing increasing losses in the mainland U.S. that prevented the Company from anticipating sufficient net income to use the U.S. mainland deferred tax assets on its balance sheet";
- "The Company's new 'tax-planning strategies' [announced by Popular in its filings for the third quarter of 2008] violated GAAP"; and/or
- "The Company's explanation that it would have 20 years to generate enough taxable income to justify its failure to take a valuation allowance violated GAAP."

(CAC ¶¶ 202, 208, 216, 223.)  All of these allegations are dependent on plaintiffs adequately pleading facts that the Company violated GAAP in accounting for its DTAs.  Plaintiffs have not come remotely close to doing so under the PSLRA's pleading standards and Rule 9(b).

As an initial matter, nobody—not the SEC, Popular's independent auditor, or anyone else—has suggested that Popular should or must restate its financial statements.  *See In re 2007 Novastar Fin. Inc. Sec. Litig.*, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008) (finding such facts "noteworthy").  Indeed, although plaintiffs' allegations are couched in terms of GAAP principles, plaintiffs merely take issue with Popular's business judgment, claiming that, in hindsight, the Company should have recorded a full valuation allowance months before it did.  But GAAP "tolerate[s] a range of reasonable treatments, leaving the choice among alternatives to

management." *Thor Power Tool*, 439 U.S. at 544 (internal quotation marks omitted); *Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999). (*See also* SFAS 109, Ex. 2 ¶ 25 (the decision as to whether to take a valuation allowance is a matter of "[j]udgment").)  That plaintiffs disagree with Popular's judgment in calculating its DTAs does not demonstrate that Popular violated GAAP or made material misrepresentations.

For example, in *In re Wet Seal, Inc. Securities Litigation*, the court found that plaintiffs had "failed adequately to plead a falsity in the form of a GAAP violation" where plaintiffs contended that "given Wet Seal's cumulative losses, GAAP required that a loss reserve be recorded for deferred tax assets."  518 F. Supp. 2d 1148, 1162 (C.D. Cal. 2007).  The *Wet Seal* court recognized that while cumulative losses in recent years are negative evidence that supports taking a valuation allowance, "this does not mean that an earlier recording [of a valuation allowance] was *required*, and Plaintiffs do not allege any facts showing that the conclusion or testing was improperly made or done." *Id.* (emphasis in original).  "[T]hat Wet Seal cash flow estimates proved in hindsight to be too optimistic does not mean that the failure to take an impairment charge earlier was a violation of GAAP." *Id.*  The court also considered and rejected plaintiffs' attempts to show a GAAP violation by pointing to the company's underperforming assets and declining sales. *Id.* The court concluded:  "Plaintiffs simply do not provide enough information about the allegedly underperforming stores—even in light of their other allegations of Wet Seal's weakened position— to lead reasonably to the inference that GAAP was violated." *Id.*

This case is no different.  Plaintiffs here contend that cumulative losses in recent years compelled Popular to record a valuation allowance (*see*, *e.g.*, CAC ¶ 6 ("Popular was required to record a valuation allowance against its U.S. mainland deferred tax assets because Popular US was in a three-year cumulative loss position at the beginning of the Class Period.")), but as *Wet Seal*

- 15 -

recognized this is not sufficient.  518 F. Supp. 2d at 1162.  (*See also* SFAS 109, Ex. 2 ¶¶ 100, 103 (rejecting a hard and fast rule requiring a valuation allowance where a company has suffered cumulative losses in recent years).)  Plaintiffs also assert, without any supporting detail, that Popular's "downsized U.S. mainland operations" would not support the Company "anticipating sufficient net income to use" its DTAs.  (CAC ¶¶ 202, 208, 216, 223.)  But plaintiffs fail to plead any particularized facts about Popular's U.S. operations that leads reasonably to the inference that those operations would not generate taxable income over the next 20 years to absorb the DTAs.

To the contrary, BPNA (excluding E-LOAN) earned $50.5 million in 2007 and $101.3 million in 2006 and continued to be profitable in the first half of 2008.  (2007 Form 10-K, Ex. 4 at Ex. 13.1, p. 138; 2Q08 Form 10-Q, Ex. 6 at 55.)  That Popular's business weakened in the wake of the financial crisis in late 2008, causing Popular to reconsider BPNA's ability to generate taxable income and the Company's ability to implement its contemplated tax strategies, does not show that its prior projections were false and misleading.  Rather, it shows changed circumstances that the Company properly and promptly took into account.  *See*, *e.g.*, *Limantour* v. *Cray Inc.*, 432 F. Supp. 2d 1129, 1156 (W.D. Wash. 2006) (finding that company's recording of deferred tax assets "based on recent profitability" followed by later valuation allowance was not materially misleading).  Similarly, it is well-established that the mere fact that forecasted events do not materialize does not state a violation of GAAP or a claim for fraud.  *See*, *e.g.*, *Suna* v. *Bailey Corp.*, 107 F.3d 64, 70-71 (1st Cir. 1997) ("[T]here is no factual support that Bailey made materially false or misleading statements when it presented positive future expectations. . . .  That Bailey may have been mistaken in its projections, which were apparently based on facts that appellants do not contend were false, is not enough."); *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627-28 (7th Cir. 1990) (dismissing claim that an alleged delay in writing down a loan violated GAAP).  *Cf. In re Polaroid*

*Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 243 (S.D.N.Y. 2006) (that a company "in retrospect made insufficient profits to enable it to utilize its deferred tax assets is equally consistent with over-optimistic forecasting as it is with fraudulent forecasting").

Additionally, plaintiffs do not allege that Popular concealed any information that would have revealed the need for an earlier recording of a full valuation allowance nor that Popular hid the possibility that it may have to take a future valuation allowance. Indeed, in arguing that Popular should have taken a full valuation allowance earlier than it did, plaintiffs essentially rely entirely on information that was publicly available at the time. Popular stated multiple times in the very disclosures on which plaintiffs rely that it might have to adjust its projections and potentially take a valuation allowance in future reporting periods if circumstances so warranted, and that such an allowance would negatively impact Popular's bottom line. (*See* pp. 6-7 *supra*.) This was completely accurate and further undercuts plaintiffs' allegations that Popular's statements were false. *See*, *e.g.*, *Sable* v. *Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("[P]laintiffs cannot state a claim of misrepresentation premised upon facts that were admittedly disclosed.") (internal quotation marks omitted).

For the foregoing reasons, plaintiffs have not pled any actionable misstatements or omissions, and thus their Section 10(b) claim should be dismissed.

## B.    Plaintiffs Fail To Plead Scienter.

Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required state of mind, or scienter, has been "defined as 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Greebel*, 194 F.3d at 194 (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). To qualify as "strong" under the PSLRA, "an inference of scienter

must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

In an attempt to show "a strong inference of scienter," plaintiffs point to:

- "circumstantial evidence" in the form of (a) Popular's U.S. operations being in a "three-year cumulative loss position," (b) statements by the Company that the "U.S. financial crisis was harming Popular US's core operations," and (c) Mr. Junquera having "specific knowledge regarding the improper reporting of Popular US deferred tax assets because of his intimate familiarity with Popular's US operations and due to his extensive accounting background" (CAC ¶¶ 230-34);

- "the straightforward nature of the accounting rules at issue" and "improper" reliance on tax strategies relied on by Popular (*id.* ¶¶ 235-39);

- the "magnitude of the scheme" and the "impact the deferred tax assets had on the Company's financial statements" (*id.* ¶¶ 240-41);

- the officer defendants' "motive" to keep Popular "'well capitalized' under FDIA regulations" (*id.* ¶¶ 170, 241-42); and

- an analyst at Sterne Agee "on six separate occasions question[ing] whether Popular US's deferred tax assets were overstated" (*id.* ¶ 243).

Taken singly or together, these allegations are insufficient to raise a strong inference of scienter.[15]

*First*, the core problem with plaintiffs' "circumstantial evidence" is that plaintiffs have not excluded the more plausible explanation that in early 2008 Popular was in the process of shedding unprofitable U.S. operations and expected the remaining historically profitable operations that remained to continue to be profitable in the future. Beginning in 2007, Popular worked to reduce the money-losing components of Popular's U.S. operations—PFH and E-LOAN—while focusing the U.S. operations on the portion that had been making money—BPNA. (*See, e.g.*, 2007 Form 10-K, Ex. 4 at Ex. 13.1, pp. 137-38.) BPNA, excluding E-LOAN, earned $50.5 million in

---

[15] The Complaint contains no allegations about Mr. Carrión's knowledge. For this reason alone, plaintiffs fail to plead that he acted with the requisite scienter, and this Court should dismiss the claim against him. *See In re Tyco Int'l, Ltd.*, 2004 WL 2348315, at *2 (D.N.H. Oct. 14, 2004) ("[T]he [group pleading] doctrine does not relieve a plaintiff of the duty to plead sufficient facts as to each defendant to support a strong inference that the defendant acted with scienter.").

- 18 -

2007 and $101.3 million in 2006 and remained profitable in the first half of 2008.  (*Id.* at Ex. 13.1,

p. 138; 2Q08 Form 10-Q, Ex. 6 at 55.)

As in *Wet Seal*, a case which involved similar allegations of a failure to book an

adequate DTA valuation allowance, "The Most Reasonable Inference Derived From Defendants'

Statements Is Cautious Optimism, Not Fraud."  518 F. Supp. 2d at 1165.  Indeed, the fact that

Popular repeatedly disclosed the effects that the financial crisis was having on its U.S. operations

cuts against, not in favor, of a finding of fraud.  As the court said in *Wet Seal*:

> [T]his is not a case where Defendants used fraudulent accounting to portray a failing company as a profitable one.  Even accepting Plaintiffs' allegations as true, Defendants accurately portrayed Wet Seal as what it was—a struggling company seeking to turn itself around in a very competitive market.  This also cuts against scienter and in favor of optimism.

*Id.* at 1166 (citing *PR Diamonds, Inc.* v. *Chandler*, 364 F.3d 671, 686 (6th Cir. 2004)).

In these circumstances, plaintiffs must plead much more than that the Company

acknowledged that the financial crisis was negatively affecting its operations.  Specifically, "[i]n the

First Circuit, . . . [a] 10b-5 plaintiff must allege 'details of [defendants'] alleged fraudulent

involvement,' including specifics as to what defendants had knowledge of and when."  *In re Boston*

*Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 57 (D. Mass. 1998) (quoting *Gross*, 93 F.3d at 991).  The

Complaint, however, is devoid of such particularized allegations.  There are no allegations at all

about the decision-making process at the Company concerning the valuations of DTAs, nor are

there any allegations about management's prior receipt of information demonstrating the falsity of

statements at the time they were made.

Courts have rejected similar allegations as insufficient to plead scienter.  For

example, in *In re Levi Strauss & Co. Securities Litigation*, even though the company had restated its

financial statements to increase its valuation allowance for its DTAs and then dramatically

increased its valuation allowance in later periods, the court found that plaintiffs had not pled

particularized facts that the original misstated valuation allowance "was intentional or deliberately reckless." 527 F. Supp. 2d 965, 990 (N.D. Cal. 2007).[16] Similarly, in *Hess* v. *Am. Physicians Capital Inc.*, where plaintiffs alleged that defendants had failed to adequately reserve for malpractice claims and DTAs, the Court concluded that plaintiffs had not pled scienter because "the Complaint does not plead with particularity to show 'how,' 'when,' and 'where' Defendants learned of the inadequacy of the loss reserves." 2005 WL 459638, at *11 (W.D. Mich. Jan. 11, 2005). *See also Wet Seal*, 518 F. Supp. at 1163 ("Plaintiffs were required to provide details concerning the individual defendants' roles in the alleged accounting fraud.").[17]

Here, too, although the Complaint spans 111 pages and 352 paragraphs, it does not contain a single particularized allegation about defendants' knowledge that the Company's deferred tax assets were understated. *See Novastar*, 2008 WL 2354367, at *2, *4 ("One might be tempted to

---

[16]    Notably, the plaintiff in *Levi Strauss* offered purported statements by insiders and "confidential witnesses" about alleged withholding of information from auditors and other misdeeds. The court found that "none of those allegations relates to decisions to understate the valuation allowance." 527 F. Supp. 2d at 990. Plaintiffs here likewise cite purported "confidential witnesses" who have nothing to say about management's evaluation of whether a valuation allowance was appropriate in 2007 or the first half of 2008. Indeed, the "confidential witnesses" do nothing more than affirm that the U.S. segments that Popular reported were losing money—PFH and E-LOAN—indeed were doing so, and that at "the end of 2008" the Puerto Rico market was in a downturn as well. (CAC ¶¶ 93-95, 99-100, 142, 149-50.) Moreover, plaintiffs' conclusory allegations lack the basic indicia that the First Circuit demands of confidential sources: that the "source had access to information and that the information has the earmarks of credibility." *NJ Carpenters Pension & Annuity Funds* v. *Biogen IDEC Inc.*, 537 F.3d 35, 51-52 (1st Cir. 2008) (noting that on a motion to dismiss courts must take a "hard look" at confidential source allegations "to evaluate their worth").

[17]    Plaintiffs' conclusory allegations about Mr. Junquera's "specific knowledge" (CAC ¶ 234) likewise do not show scienter. *First*, while Mr. Junquera may have been in a position to reach a different conclusion, that does not mean that he did so; instead, his expertise makes more plausible the conclusion that he conducted the DTA analysis properly, especially since plaintiffs do not allege "any facts showing that the conclusion or testing was improperly made or done." *Wet Seal*, 518 F. Supp. 2d at 1162. *Second*, "even when the fraud relates to matters peculiarly within the [defendant's] knowledge," a securities fraud plaintiff must allege "specific facts that make it reasonable to believe that defendants knew that a statement was materially false or misleading." *Suna*, 107 F.3d at 68 (citations omitted). Plaintiffs allege no such facts here.

think that a complaint spanning more than 100 pages and consisting of more than 200 paragraphs could not fail to be specific.  The temptation is dangerous and must be resisted.").

       *Second*, plaintiffs mischaracterize the purportedly "straightforward nature of the accounting rules at issue" and wrongly assert that Popular's reliance on tax strategies was "improper."  (CAC ¶¶ 235-39.)  Far from mandating mathematically precise conclusions, the accounting rules explicitly state that "[j]udgment must be used in considering the relative impact of negative and positive evidence."  (SFAS 109, Ex. 2 at 6.)  SFAS 109 requires that a company consider tax strategies in determining whether to take a valuation allowance.  (SFAS 109, Ex. 2 at ¶¶ 21-22.)  Plaintiffs offer no particularized allegations that provide a basis for disagreeing with management's conclusion.  For example, plaintiffs claim that there was no entity in Puerto Rico with sufficient profits to transfer (CAC ¶¶ 135-42), but Popular's Puerto Rico operations remained profitable, earning $35.4 million in the third quarter of 2008 alone (3Q08 Form 10-Q, Ex. 12 at 57).  Plaintiffs' disagreement with Popular's accounting is not a particularized pleading of fraudulent intent.  *See In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251, 265-66 *(*D. Mass. 2001) ("Subject thus to judgments, as to which reasonable persons might disagree, the proposition that collectability of the Imagyn revenues was not reasonably assured, standing alone as an allegation in this case, cannot support the strong inference of scienter required by the PSLRA and Rule 9(b).").

       *Third*, that the amounts involved here are relatively large does not advance plaintiffs' scienter case.  An "inference of scienter based on the magnitude of fraud" is not appropriate where it would "allow the court to engage in speculation and hindsight."  *In re Sonus Networks*, *Inc. Sec. Litig.*, 2006 WL 1308165, at *17 (D. Mass. May 10, 2006) (citing *Fidel* v. *Farley*, 392 F.3d 220, 231 (6th Cir. 2004)).  Here, plaintiffs' entire theory is based on hindsight.  The case rests on clairvoyance—that management must have seen coming the dramatic escalation of the economic

downturn in the latter half of 2008.  This is both unfair and legally unsound.  To accept plaintiffs'

allegations would have the Court "draw the impermissible 'fraud-by-hindsight' inference, which

proceeds on 'the assumption that the defendants must have known of the severity of their problems

earlier because conditions became so bad later on.'"  *Id.* (quoting *Serabian* v. *Amoskeag Bank*

*Shares, Inc.*, 24 F.3d 357, 367 (1st Cir. 1994)).

   *Fourth*, the motive that plaintiffs attribute to the officer defendants in an attempt to

plead scienter—to keep Popular "well capitalized" (CAC ¶¶ 170, 241-42)—is no different "than the

usual concern by executives to improve financial results."  *Ezra Charitable Trust* v. *Tyco Int'l, Ltd.*,

466 F.3d 1, 10 (1st Cir. 2006) (internal quotation marks omitted).  Such generalized motives are not

sufficient to plead scienter.  *See In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 128-

29 (D. Mass. 2003) ("[T]he important consideration . . . is whether defendants benefitted in some

concrete and personal way from the purported fraud.") (internal quotation marks omitted); *Horizon*

*Asset Mgmt. Inc.* v. *H & R Block, Inc.*, 580 F.3d 755, 761-62 (8th Cir. 2009) ("The desire to make a

company seem more profitable is a desire universally held among corporations and their executives,

and thus insufficient to support an inference of scienter . . . .").  Moreover, the Complaint lacks any

allegations regarding the officer defendants' opportunity, *i.e.*, "'the means and likely prospect of

achieving concrete benefits by the means alleged.'"  *Aldridge* v. *A.T. Cross Corp.*, 284 F.3d 72, 82

(1st Cir. 2002) (citation omitted).  Plaintiffs do not allege that defendants personally benefited or

could have benefited by waiting to take a valuation allowance on Popular's U.S. DTAs.

   *Fifth*, that an analyst at Sterne Agee questioned whether Popular should take a

valuation allowance merely shows disagreement with Popular's analysis under GAAP, not an intent

to deceive.  Indeed, it reveals that there was no concealment of relevant facts and that the question

of when and whether to take a valuation allowance was only one of judgment.  Management,

supported by its auditors, reached one conclusion.  An analyst reached another.  That does not give rise to a "strong inference" that management lied.

*Sixth*, and finally, weighing against a finding of scienter is that Popular disclosed all of the information that plaintiffs, claim should have led to a valuation allowance and the risk that the Company might need to take a valuation for its DTAs.  (*See* Part I.D, *infra*.)  Where, as here, the Company "attempts to provide investors with warnings of risks" the inference of scienter is "generally weaken[ed]."  *Ezra Charitable Trust*, 466 F.3d at 8.

Plaintiffs thus have not raised a "strong inference of scienter."  The far more compelling inference is that Popular adjusted its estimation of projected future taxable income as market conditions sharply deteriorated in the second-half of 2008.

### C.    Plaintiffs Fail To Plead Loss Causation.

To plead loss causation, a plaintiff must allege (1) that a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security," and (2) that the loss was a "foreseeable" consequence of the misrepresentation or omission.  *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  The loss causation requirement is crucial; the purpose of the securities fraud statutes is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005).  *See also* 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages.").  Here, the Complaint fails to plead the requisite causal connection between the alleged misrepresentations and plaintiffs' alleged losses.

*First*, plaintiffs must allege that the "market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material

- 23 -

information had been omitted." *In re AOL Time Warner Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007). But plaintiffs here identify no such "corrective disclosure." The mere fact that the Company recorded a full valuation allowance on January 22, 2009—which plaintiffs claim caused Popular's stock price to fall 50% (CAC ¶ 246)—does not reveal, as it must to constitute a corrective disclosure, that any of Popular's prior statements about its DTAs were false. Rather, it reveals only that Popular determined that a valuation allowance was necessary in January 2009 and, at most, that Popular's earlier forecasts of future taxable income were, in hindsight, too optimistic. Courts have held that in the similar case of analyst ratings, where an analyst downgrades its rating on a stock from "buy" to "sell," the new rating does not reveal that the rating published earlier was false, and so a stock drop after a downgrade is not traceable to the alleged falsity of the prior rating. *See*, *e.g.*, *Lentell*, 396 F.3d at 175 n.4 (ratings downgrades "do not reveal to the market the falsity of the prior [ratings]"). The same is true here.

      *Second*, plaintiffs fail to account for other factors affecting Popular's common stock price on January 22, 2009. In order to plead loss causation, plaintiffs must "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [the] misstatements" as opposed to other negative disclosures unrelated to the alleged fraud. *See Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). In addition to announcing the valuation allowance, Popular disclosed on January 22 an array of negative news about its fundamental business operations, including that it had suffered losses in all of its U.S. operating segments, increased its allowance for loan losses, in plaintiffs' words, "significant[ly]" (CAC ¶ 175), faced a weakening credit environment, saw its net interest income decrease, and had further restructured BPNA and E-LOAN (Jan. 22, 2009 Press Release, Ex. 16 at 1-5). By anyone's reckoning, these are all far more fundamental indicators of business problems than the DTA allowance. Popular also missed

analysts' consensus earnings estimate (Ex. 17 at 1), and had its credit ratings downgraded by Fitch Ratings (CAC ¶ 181).[18]

    *Third*, and finally, plaintiffs fail to account for the credit crisis and market-wide downturn as intervening causes of the decline in Popular's stock price. Plaintiffs contend that the "timing and magnitude" of the January 22 decline "negates any inference that the loss suffered by [plaintiffs] was caused by market conditions, macroeconomic or industry factors." (CAC ¶ 247.) But plaintiffs cannot avoid the fact that Popular's stock declined in tandem with other peer banking stocks during the Class Period. From the beginning of the Class Period through January 22, 2009, Popular stock fell 77%, compared with a commensurate drop in the S&P Banking Index of 70.5%.[19]



---

[18]    Plaintiffs falsely contend that analysts "attributed Popular's stock drop on January 22, 2009 to the complete write-down of the Company's U.S. mainland deferred tax assets." (CAC ¶ 179.) The two reports plaintiffs cite—from analysts at B. Riley and Sterne Agee (*id.* ¶¶ 179-80)—do not discuss the drop in Popular's stock price on January 22 at all. Indeed, the analysts set the valuation allowance to one side as a non-recurring item in calculating their target stock price and assigning their "buy/sell" rating. (Jan. 23, 2009 B. Riley Report, Ex. 17 at 3 ("While the bulk of the loss in the quarter was due to non-recurring items, there was still considerable deterioration in key operating metrics such as the NIM [net interest margin] and NPLs [non-performing loans] that will have an impact in 2009."); Analyst Report by Sterne Agee for Popular, Inc., dated Jan. 27, 2009, Ex. 18 at 1 ("Adjusting for the DTA and $34 million in restructuring and impairments for E-Loan, we roughly estimate an operating loss of ($0.71) . . . .").)

[19]    The Court may take judicial notice of stock prices on a motion to dismiss. *See*, *e.g.*, *Greenhouse* v. *MCG Capital Corp.*, 392 F.3d 650, 655 & n.4 (4th Cir. 2004).

(Exs. 19 and 20 contain schedules setting forth historical price data from Jan. 23, 2008 to Jan. 23, 2009 for Popular common stock and the S&P Banking Index, respectively.)

As the U.S. Supreme Court has recognized, a stock drop could be caused by "not the earlier misrepresentation, but [by] changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 343. Plaintiffs cannot "distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price," *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (quoting *Dura*, 544 U.S. at 343), and, therefore, cannot plead loss causation. *See id.* at 364 ("[T]he present Complaint does not address the ten-month decline of CMGI's stock price and does not attempt to explain how the decline of the stock price following the issuance of the October 4, 2000 report was attributable to the alleged fraud, rather than simply a continuation of the loss in value that afflicted CMGI during the Internet sector's collapse."); *60223 Trust* v. *Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) ("The essential point is that by the time of the disclosures which allegedly caused the economic loss . . . the stock had already lost almost all its value—declining from 24.75 on January 25 to 5.01 on June 14.").[20]

### D.   The Alleged Misstatements Fall Under the PSLRA's Safe Harbor for Forward-Looking Statements.

The PSLRA creates a "[s]afe harbor" for "forward-looking" statements that are (a) "identified" as "forward-looking," and (b) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). This protection is so strong as to create

---

[20]   Plaintiffs also point to a drop in the price of Popular's common stock and Series B preferred shares on February 19, 2009, after Popular announced it would cut its dividend. (CAC ¶ 248.) As set forth at pp. 31-32 *infra*, the February 19 announcement provides no support for plaintiffs' loss causation theory, but, in fact, suggests the opposite: that the price drop on that date was not due to the announcement of the DTA valuation allowance, which had occurred a month earlier.

the "surprising rule" that even "the maker of knowingly false and willfully fraudulent forward-looking statements, designed to deceive investors, escapes liability for the fraud" as long as these conditions are met. *In re Stone & Webster*, 414 F.3d at 212.  Here, as discussed below, the alleged misrepresentations were forward-looking, identified as such, and accompanied by meaningful cautionary language.[21]

## 1.    The Alleged Misstatements Are Forward-Looking.

Forward-looking statements include:  (i) a statement containing a projection of revenues, income, earnings per share, capital expenditures, or other financial items; (ii) a statement of the plans and objectives of management for future operations; (iii) a statement of future economic performance; and (iv) any statement of the assumptions underlying or relating to the preceding statements.  15 U.S.C. § 78u-5(i)(1)(A)-(D).

Here, the allegedly false or misleading statements qualify as forward-looking because the calculation of a valuation allowance is a prediction of the future.  Determining whether to take a valuation allowance is a "judgment call" as to whether the company will have sufficient future taxable income.  *Limantour*, 432 F. Supp. 2d at 1156.  Plaintiffs admit as much:

> Deferred tax assets are losses, credits and other tax deductions that may be used to offset taxable income *in future years*.  Deferred tax assets can be used in the future to reduce a company's tax payments by offsetting the deferred tax assets against *future taxable income*.

(CAC ¶ 43 (emphasis added); *see also id.* ¶ 5 (noting that deferred tax assets "may be used to offset taxable income in future years").)  The statements thus easily qualify as "forward-looking" under

---

[21]    A defendant's forward-looking statements are also protected if a plaintiff fails to show that the statement was made with "actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i)-(ii).  As explained in Part I.B, *supra*, the Complaint fails to raise an inference of fraudulent intent.  Therefore, the statements are protected under this provision of the safe harbor as well.  *See, e.g.*, *GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (affirming dismissal of complaint where plaintiffs failed to demonstrate that defendants had "actual knowledge" of falsity).

the PSLRA safe harbor.  *See In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145,

161-62 (D. Mass. 2009) (finding that allegedly "false and misleading financial results" were

protected by the safe harbor where they were "projections"); *see also Hess*, 2005 WL 459638, at *6

(finding loss reserves forward-looking).[22]

Further, in every document with an alleged misstatement, the document stated that it

contained "forward-looking statements."  (*See* p. 7 & n.8 *supra*.)  This is sufficient to identify the

alleged misstatements as forward-looking.  *See, e.g.*, *Taubenfeld* v. *Hotels.com*, 385 F. Supp. 2d

587, 591-92 (N.D. Tex. 2004) (finding press release adequately identified particular paragraphs as

forward-looking where the press release stated that it "contain[ed] forward-looking statements"); *In*

*re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1014-15 (S.D. Ohio 2008) (finding that press

release identified itself as forward-looking in part by cautioning "that statements containing words

such as 'expect' were forward-looking").

### 2.    The Alleged Misstatements Were Accompanied by Meaningful Cautionary Language.

All of Popular's allegedly misleading statements were accompanied by meaningful

cautionary language.  Specifically, Popular emphasized that its disclosures were "based on

management's current expectations and involve certain risks and uncertainties that may cause actual

results to differ materially from those expressed in forward-looking statements."  (*See, e.g.*, Jan. 24,

---

[22]    Plaintiffs assert that "the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP."  (CAC ¶ 249.)  But this does not help plaintiffs.  Most of the alleged misstatements are contained in press releases (or, in one case, an analyst presentation) not financial statements.  (*Id.* ¶¶ 195-96, 203-04, 209-10, 214, 217-18, 221.)  For the other documents pointed to by plaintiffs, the allegedly misleading statements are separate and distinct from the "financial statements" in these documents.  (*See, e.g.*, 2007 Form 10-K, Ex. 4 at Table of Contents; 2Q08 Form 10-Q, Ex. 6 at Index; CAC ¶¶ 199, 205, 211-12, 219.)  Consequently, the safe harbor still applies to these statements.  *See, e.g.*, *In re Biogen IDEC, Inc. Sec. Litig.*, 2008 WL 4810045, at *10 (D. Mass. Oct. 25, 2007) ("Forward-looking statements are often contained in financial filings."), *aff'd*, *Biogen IDEC*, 537 F.3d 35; *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 341 (D. Mass. 2009) (examining defendants' press releases and SEC filings and finding that some statements therein were forward-looking).

2008 Press Release, Ex. 7 at 7.)  The Company explained that "[f]actors such as changes in interest rate investment, losses on the subprime portfolio, as well as general changes in business market and economic conditions may cause actual results to differ from those contemplated by such forward-looking statements."  (*Id.*)[23]

The Popular press releases to which plaintiffs point also specifically referred to the Company's 2006 and 2007 Form 10-Ks for a further description of relevant risk factors.  *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005) (affirming dismissal of complaint where "[t]he cautionary language was sufficient because the press release incorporated by reference the cautionary statements in Merck's 2000 Form 10-K, as well as those in its periodic reports").  Popular's 2006 and 2007 Form 10-Ks specifically emphasized the risks inherent in calculating DTAs.  (*See* p. 6 *supra* (quoting 2007 Form 10-K, Ex. 4 at 30); *see also* Form 10-K, for the year ended Dec. 31, 2006, Ex. 21 at Ex. 13.1, p. 13 (noting that "[d]ifferences in the actual outcome of these future tax consequences could impact the Corporation's financial position or its results of operations").)  The disclosures in the Company's quarterly Form 10-Qs for 2008 also contained specific warnings that the Company's DTAs were dependent on its projected revenue for future years.  (2Q08 Form 10-Q, Ex. 6 at 92; 3Q08 Form 10-Q, Ex. 12 at 51, 128.)

Courts faced with similar cautionary language have held that it satisfies the PSLRA's standards.  In *Payne* v. *DeLuca*, the court found that a warning that the company may not achieve its projections due to various factors including "the [c]ompany's ability to generate a sufficient level of future earnings to use its deferred tax assets" sufficiently specified the risks facing the company. 433 F. Supp. 2d 547, 598 (W.D. Pa. 2006) (dismissing Section 10(b) claim).  The same is true here.

---

[23]    Every allegedly false or misleading disclosure contained the same or similar language.  (*See* p. 7 & n.8 *supra*.)

In short, the Company's statements are protected by the PSLRA's safe harbor and so plaintiffs' Section 10(b) claim should be dismissed. *See*, *e.g.*, *Baron* v. *Smith*, 380 F.3d 49, 54 (1st Cir. 2004) (affirming dismissal of complaint).

## II.    PLAINTIFFS FAIL TO STATE SECTION 20(a) CLAIMS AGAINST THE INDIVIDUAL OFFICER DEFENDANTS.

Plaintiffs assert that defendants Carrión and Junquera violated Section 20(a) of the Exchange Act by virtue of their "influence and control" of Popular during the period that the Company allegedly issued false and misleading statements. (CAC ¶¶ 269-76.) However, "[t]he plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation." *ACA Fin. Guar. Corp.*, 512 F.3d at 67. Because plaintiffs have not adequately pled an underlying Section 10(b) violation (*see* Part I *supra*), plaintiffs' Section 20(a) claims fail. *See*, *e.g.*, *Biogen IDEC*, 537 F.3d at 58.[24]

## III.    PLAINTIFFS FAIL TO STATE ANY CLAIMS FOR VIOLATIONS OF SECTION 11 OR 12(a)(2) OF THE SECURITIES ACT.

Sections 11 and 12(a)(2) of the Securities Act impose liability for issuing a registration statement (Section 11) or a prospectus (Section 12(a)(2)) that includes "an untrue statement of a material fact" or omits "to state a material fact" necessary to make the statements not misleading. 15 U.S.C. §§ 77k(a), 77l(a)(2). For their Securities Act claims, plaintiffs rely on the same theory as for their Section 10(b) claims—that Popular overstated its DTAs by failing to record

---

[24]    Moreover, these claims also fail because plaintiffs do not plead "culpable participation" on the part of Carrión and Junquera. "The seminal case adopting the 'culpable participant' requirement, equates culpable participation with lack of good faith," which the court defined as failing to have "a reasonable system of supervision, enforced with reasonable diligence." *Alvarado* v. *Morgan Stanley Dean Witter, Inc.*, 448 F. Supp. 2d 333, 339 (D.P.R. 2006) (citations omitted). *Cf. In re Stone & Webster*, 414 F.3d at 194 n.4 (stating that the First Circuit "has taken no position" on whether a plaintiff must prove "culpable participation"). Because the Complaint does not contain properly particularized allegations showing that Carrión and Junquera acted in bad faith (*see* Part I.B *supra*), plaintiffs' Section 20(a) claim should be dismissed.

a valuation allowance for year-end 2007—and point to the Offering Documents Popular used in its

May 2008 preferred stock offering, which incorporate the financial statement disclosures that form

the basis of plaintiffs' Section 10(b) claims.  (CAC ¶¶ 283, 296-97, 322, 334.)  But, for the reasons

discussed in Part I.A *supra*, plaintiffs fail to plead facts showing that any of the alleged

misstatements were actually false or misleading.  Having failed to make this threshold showing,

plaintiffs have not stated any securities law claims under the Securities Act.

The Securities Act claims also fail for the following reasons:

*First*, the alleged misstatements are forward-looking (*see* Part I.D.1 *supra*), and

Popular's Offering Documents speak specifically to the inherent "forward-looking" nature of its

DTAs and abound in meaningful cautionary language.  For example, Popular's May 14, 2008

Prospectus contains a nearly identical warning to the one found in Popular's 2007 Form 10-K

(quoted on p. 6 *supra*).  (May 14, 2008 Prospectus, Ex. 22 at S-13; *see also* May 22, 2008

Prospectus, Ex. 23 at S-14 (same); June 16, 2006 Registration Statement, Ex. 24 at 3 (discussing

forward-looking statements and risks).)  Consequently, the statements in Popular's Offering

Documents that address the Company's DTAs fall under the PSLRA's safe harbor for forward-

looking statements and cannot "be the source of § 11 or § 12 liability."  *See In re SeaChange Int'l

Inc. Sec. Litig.*, 2004 WL 240317, at *5 (D. Mass. Feb. 6, 2004).

*Second*, the face of the Complaint proves that the Offering Documents could not

have caused plaintiffs any loss on their preferred shares.[25]  Plaintiffs allege, in conclusory fashion,

---

[25]    For "claims under § 11 and 12 of the Securities Act, 'loss causation' is . . . an affirmative defense
that may be raised by a defendant."  *Lalor* v. *Omtool, Ltd.*, 2000 WL 1843247, at *3 (D.N.H. Dec.
14, 2000).  The First Circuit will adjudicate affirmative defenses on a motion to dismiss when they
are clearly supported.  *Blackstone Realty LLC* v. *FDIC*, 244 F.3d 193, 197 (1st Cir. 2001).  *See also
Coors Brewing Co.* v. *Mendez-Torres*, 562 F.3d 3, 6 (1st Cir. 2009) (noting that affirmative defenses
may be adjudicated on a motion to dismiss); *In re Tycom Ltd. Sec. Litig.*, 2006 WL 39237, at *1
(D.N.H. Jan. 6, 2006) (dismissing Section 11 claim because "the affirmative defense of no loss
causation is readily established on the face of the complaint").

that "[w]hen the Securities Act Defendants' materially misleading statements were disclosed and became apparent to the market, the price of Popular's Series B preferred shares fell precipitously as the prior artificial inflation came out."  (CAC ¶ 314.)  However, plaintiffs do not allege that the value of their Series B shares decreased significantly on January 22, 2009—which plaintiffs characterize as the day "the true facts about the Company's U.S. mainland deferred tax assets were finally revealed."  (CAC ¶ 11; *see also id.* ¶¶ 178, 227, 246 (referring to January 22 drop in "common stock" price).)  Instead, they point to a drop in the value of the Series B shares that took place on February 19, 2009 (*see*, *e.g.*, *id.* ¶¶ 11, 315), but provide no explanation for why the market would take nearly one month to incorporate the January 22 disclosure into Popular's Series B share price.  This is insufficient.  *Semerenko* v. *Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000) ("Where the value of a security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation.").

      *Third*, plaintiffs' Section 11 claim against Popular's outside directors—defendants Bermúdez, Ferré, Masin, Morales, Rexach, Salerno, Teuber and Vizcarrondo (CAC ¶¶ 26-34)—is time-barred.  The statute of limitations for a Section 11 claim is one year from the date that a plaintiff discovered or should have discovered the alleged misstatement or omission in the registration statement.  15 U.S.C. § 77m.  Plaintiffs first filed suit against the outside directors on October 19, 2009.[26]  As set forth in Part I of the Memorandum of Law in Support of PricewaterhouseCoopers LLP's Motion to Dismiss, filed January 11, 2010, which is incorporated herein by reference, plaintiffs' theory as to why the Offering Documents contain misleading

---

[26]     *See* Docket No. 1 and *Otero* v. *Popular, Inc. et al.*, 09-cv-1582, Docket No. 1 (initial complaints brought only against Popular, Carrión, and Junquera).  Plaintiffs' claim does not "relate back" to the filing of the initial complaint because the outside directors are new parties and plaintiffs' failure to sue the directors in the initial complaint was not the result of a mistake of identity.  *See* Fed. R. Civ. P. 15(c)(1)(C)(ii).

statements is based entirely on information that was publicly disclosed and readily available to plaintiffs at the time of the May 2008 preferred stock offering.  Thus, plaintiffs knew or should have known of the alleged misstatements at least seventeen months before they filed suit against Popular's outside directors.  Plaintiffs assert no other claims against the outside directors.  The outside directors thus should be dismissed from this action.

> *Fourth*, "[a] plaintiff has standing to bring a Section 12(a)(2) claim only against the person or entity from whom he directly purchased the security." *Fox* v. *First BanCorp*, 2006 WL 4128534, at *5 (D.P.R. Nov. 6, 2006) (Gelpí, J.).  Plaintiffs, however, admit that the "Underwriter Defendants committed to and purchased the Series B Preferred shares from Popular and sold the Series B preferred shares to Plaintiffs . . . and members of the Class."  (CAC ¶ 333.)  Therefore, plaintiffs cannot bring a Section 12(a)(2) claim against Popular.  *See*, *e.g.*, *Fox*, 2006 WL 4128534, at *5 (dismissing Section 12(a)(2) claim against non-statutory seller); *Shaw* v. *Digital Equip. Corp.*, 82 F.3d 1194, 1215-16 (1st Cir. 1996) (same).

## IV.    PLAINTIFFS FAIL TO STATE SECTION 15 CLAIMS AGAINST THE INDIVIDUAL OFFICER DEFENDANTS.

> Plaintiffs contend that defendants Carrión and Junquera violated Section 15 of the Securities Act by virtue of their "influence and control" of Popular during the time that the Company issued disclosures in connection with the May 2008 preferred stock offering.  (CAC ¶¶ 341-50.)  These claims fail because plaintiffs have not properly alleged a violation of Section 11 or 12(a)(2).  (*See* Part III *supra*); *Fox*, 2006 WL 4128534, at *7 ("The elements of control person liability under Section 15 are:  (i) an underlying violation of Section 11 or 12 and (ii) control of the primary violator by the defendant."); *Cooperman* v. *Individual, Inc.*, 171 F.3d 43, 52 (1st Cir. 1999) ("A necessary element of a § 15 claim is a primary violation of § 11.").

## CONCLUSION

Plaintiffs' 352-paragraph complaint boils down to a single proposition: that Popular management had no basis in early 2008 to conclude that Popular's remaining, historically profitable U.S. operations would continue to be profitable so as to permit the Company's U.S. mainland DTAs to be used over the next 20 years. This charge is in turn based on nothing more than hindsight: that management somehow should have foreseen, or did foresee and lied about it, that the financial crisis would worsen more than virtually anyone in the world thought it would. The Complaint does not come close to pleading sufficient facts to support these claims, and the Court should dismiss it with prejudice.

**WHEREFORE**, Popular and the individual defendants hereby respectfully request this Honorable Court dismiss the Complaint in its entirety as to these defendants without leave to replead.

**WE HEREBY CERTIFY** that today we electronically filed the document with the Clerk of Court using the CM/ECF system.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 11th day of January, 2010.

Joseph E. Neuhaus (pro hac vice)
Jeffrey T. Scott (pro hac vice)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
Fax: (212) 558-3588

*Counsel for Popular Inc. and the*
*Individual Defendants*

Ana Matilde Nin-Torregrosa
USDC No. 124607
NIN-TORREGROSA &
RODRÍGUEZ-RUIZ
Citibank Tower, Suite 1801
252 Ponce de León Avenue
San Juan, Puerto Rico  00918
Tel:  (787) 282-6687
Fax: (787) 767-0729

*Counsel for Francisco M. Rexach*

By: /s/ Néstor Méndez-Gómez
Néstor M. Méndez-Gómez
USDC No. 118409
nmendez@pmalaw.com

PIETRANTONI MÉNDEZ &
ALVAREZ LLP
Popular Center, 19th Floor
209 Muñoz Rivera Ave.
San Juan, Puerto Rico  00918
Tel:  (787) 274-1212
Fax: (787) 274-1470

*Counsel for Popular Inc. and the*
*Individual Defendants except Francisco*
*M. Rexach*

- 35 -