UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

—————————————————

|  |  |  |
|---|---|---|
| RUSSELL HOFF, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| POPULAR INC., RICHARD CARRIÓN, JORGE A. JUNQUERA, MANUEL MORALES, FRANCISCO M. REXACH, JUAN J. BERMÚDEZ, MARIA L. FERRÉ, WILLIAM J. TEUBER, JOSÉ R. VIZCARRONDO, FREDERIC V. SALERNO, MICHAEL J. MASIN, PRICEWATERHOUSECOOPERS LLP, UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO, POPULAR SECURITIES, INC., and CITIGROUP GLOBAL MARKETS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 3:09-cv-01428-GAG |
| Defendants. | ) ) | |

—————————————————

**MEMORANDUM OF LAW IN SUPPORT OF
PRICEWATERHOUSECOOPERS LLP'S MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Russell A. Del Toro
Roberto Santana Aparicio
Del Toro & Santana
Plaza Scotiabank, Suite 610
273 Ponce de León Avenue
San Juan, Puerto Rico 00917

Elizabeth V. Tanis
John P. Brumbaugh
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309

Attorneys for Defendant PricewaterhouseCoopers LLP

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 3

LEGAL ARGUMENT ......................................................................................................... 8

I.      PLAINTIFFS' CLAIM AGAINST PWC IS BARRED BY THE STATUTE OF LIMITATIONS ................................................................................................ 8

II.     PLAINTIFFS FAIL TO STATE A SECTION 11 CLAIM AGAINST PWC ................. 14

      A.     Plaintiffs Do Not State a "Plausible" Claim That Popular's 2007 Financial Statements Were Materially "False." ............................................. 15

      B.     Plaintiffs Do Not State a Plausible Claim that PwC's 2007 Audit Report Was Materially False. .................................................................................. 21

            1.     Plaintiffs Fail to Plead Sufficient Facts that PwC's Audit Opinion was Objectively or Subjectively False. .......................................... 22

            2.     Plaintiffs' Allegations Regarding PwC's Compliance with Auditing Standards Are Conclusory and Must Be Disregarded. ........................... 23

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*ACA Fin. Guaranty Corp. v. Advest, Inc.*,
  512 F.3d 68 (1st Cir. 2008)..................................................................................15

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937, 1949 (2009)........................................................................ Passim

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007)..................................................................14

*Conley v. Gibson*,
  355 U.S. 41, 78 S. Ct. 99 (1957)..........................................................................14

*DeBenedictis v. Merrill Lynch & Co., Inc.*,
  492 F.3d 209 (3d Cir. 2007)..................................................................................12

*In re Credit Suisse First Boston Corp.*,
  431 F.3d 36 (1st Cir. 2005)...................................................................................22

*In re NAHC, Inc. Securities Litigation*,
  306 F.3d 1314 (3d Cir. 2002)................................................................................10

*In re Polaroid Corporation. Securities Litigation*,
  465 F. Supp. 2d 232 (S.D.N.Y. 2006)............................................................. 12-13

*In re Tyco Int'l, Ltd., Sec. Litig.*,
  185 F. Supp. 2d 102 (D.N.H. 2002)......................................................................13

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................16

*In re Xchange Inc. Sec. Litig.*,
  No. Civ. A. 00-10322, 2002 WL 1969661 (D. Mass. Aug. 26, 2002) .....................9

*Jorge v. Rumsfield*,
  404 F.3d 556 (1st Cir. 2005)..............................................................................3, 15

*Kennedy v. Josephthal & Co.*,
  814 F.2d 798 (1st Cir. 1982)..................................................................................12

*LaChappelle v. Berkshire Life Ins. Co.*,
  142 F.3d 507 (1st Cir. 1998)....................................................................................8

*Limantour v. Cray Inc.*,
  432 F. Supp. 2d 1129 (W.D. Wash. 2006)...............................................................5

*Wagner v. First Horizon Pharmaceutical Corp.*,
    464 F.3d 1273 (11th Cir. 2006) ...........................................................15

*Young v. Lepone*,
    305 F.3d 1 (1st Cir. 2002).....................................................................9


**STATUTES**

15 U.S.C. § 77m.......................................................................... Passim

15 U.S.C. § 77k........................................................................... Passim


**OTHER AUTHORITIES**

Fed. R. Civ. P. 8......................................................................................15

Fed. R. Civ. P. 9......................................................................................15

Fed. R. Civ. P. 15....................................................................................14

Defendant PricewaterhouseCoopers LLP ("PwC") respectfully submits this memorandum of law in support of its Motion to Dismiss the Consolidated Class Action Complaint.

## INTRODUCTION

PwC is a public accounting firm and the independent auditor for Defendant Popular, Inc. ("Popular" or "the Company"), a publicly traded bank holding company headquartered in Puerto Rico with principal operations in Puerto Rico and the mainland United States. PwC audited and issued an audit report on Popular's financial statements for the year-ended December 31, 2007 ("2007 financial statements"). Popular's 2007 financial statements and PwC's audit report were included in the Form 10-K (the "2007 10-K") that Popular filed with the Securities and Exchange Commission ("SEC") on February 29, 2008. The 2007 10-K was subsequently incorporated by reference into a registration statement that Popular filed with the SEC in connection with its May 2008 public offering of preferred stock.

Lead Plaintiffs ("Plaintiffs"), two of whom allegedly purchased shares of that preferred stock, filed suit against PwC on October 19, 2009, alleging in their Consolidated Class Action Complaint (the "Complaint" or "CC", Dkt. # 91) that PwC violated Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (Count Three), because Popular's 2007 financial statements and PwC's audit report on those financial statements (the "2007 Audit Report") were materially misstated. The alleged misstatements relate exclusively to Plaintiffs' assertion that generally accepted accounting principles required Popular's 2007 financial statements to include a "valuation allowance" against certain deferred tax assets that Popular recorded in those financial statements.

This Court should dismiss Plaintiffs' Section 11 claim against PwC for two independent reasons:

1

I.    **Plaintiffs' claim under Section 11 against PwC is time-barred**.  The statute of limitations for a Section 11 claim is one year from the date that a plaintiff discovered or should have discovered the alleged misstatement in the registration statement.   15 U.S.C. § 77m. Plaintiffs' Complaint shows unequivocally that the facts that Plaintiffs allege as showing that misstatements existed in the registration statement were not concealed but rather were disclosed in the registration statement itself, which was filed in May 2008, as well as in other public filings that pre-dated the registration statement.   Thus, Plaintiffs knew or should have known of the alleged misstatements at least seventeen months before they filed suit against PwC.

II.    **The Consolidated Complaint fails to satisfy the pleading requirements of _Ashcroft v. Iqbal_, 129 S. Ct. 1937, 1949 (2009)**.   Under the United States Supreme Court's recent *Iqbal* decision, a plaintiff must plead sufficient "factual content" to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* at 1949.  Plaintiffs' allegations as to the falsity of Popular's 2007 financial statements and the 2007 Audit Report do not pass muster under *Iqbal* because they are refuted by the very accounting and auditing literature Plaintiffs cite in the Complaint, are refuted by facts that are either alleged or incorporated by reference in the Complaint, and depend on factually unsubstantiated conclusions that, under *Iqbal*, must be disregarded.   Plaintiffs' allegations as to the falsity of PwC's 2007 Audit Report are further deficient because they do not assert (and in fact disclaim) that PwC's audit opinion was subjectively false.

In addition, PwC incorporates by reference the argument by Popular and the Individual Defendants that the Complaint establishes as a matter of law that the alleged misstatements caused Plaintiffs no loss.   *See* Mem. of Law in Supp. of Popular, Inc. and the Individual Defs.'

2

Mot. to Dismiss at 23-26, 31-32.  For all these reasons, the Complaint must be dismissed as against PwC.

## BACKGROUND

Popular's principal operations are in Puerto Rico and the mainland United States.  (CC ¶ 41.)  Before 2008, Popular's mainland U.S. operations were divided into two reporting segments: (1) Popular's core retail and commercial banking operations, found in the Banco Popular North America ("BPNA") segment; and (2) Popular's non-core subprime consumer finance operations, found in the Popular Financial Holdings ("PFH") segment.  (2007 10-K at Ex. 13.1 p. 135, Ex. 4; CC ¶ 41.)[1]  BPNA's operations had a solid history of profitability, whereas PFH's operations began to lose money in 2005, and those losses mounted in 2006 and 2007 as problems with subprime loans began to surface.  (*See* Popular's Form 10-K for the year ended Dec. 31, 2006 ("2006 10-K") at Ex. 13.1 pp. 117-18, Ex. 21; 2007 10-K at Ex. 13.1 p. 137, Ex. 4).  Thanks to the strong profitability of BPNA, however, Popular's overall mainland U.S. operations generated profits in 2004, 2005, and 2006.  (*See id.*)[2]

Even though 2007 was a poor year for financial institutions generally, BPNA's core operations finished 2007 with over $50 million in profits.  (2007 Form 10-K at Ex. 13.1 p. 138, Ex. 4).  Recognizing PFH's struggles and rising losses, however, Popular took steps during 2007

---

[1] "Ex. __" refers to documents integral to or incorporated by reference in the Complaint that are included in the Joint Appendix filed contemporaneously in support of the Defendants' respective motions to dismiss.  This Court "may consider the whole of a document integral to or explicitly relied upon in a complaint, even if that document is not annexed to the complaint."  *Jorge v. Rumsfield*, 404 F.3d 556, 559 (1st Cir. 2005).

[2] Popular acquired its E-LOAN business, which provided direct loans to consumers over the internet, in 2005.  Its results were reported as part of the PFH segment in 2005 and 2006.  At year-end 2007, however, after E-LOAN became a subsidiary of BPNA as part of the restructuring described below, E-LOAN's results were reported as part of the BPNA business segment.  (2007 10-K at Ex. 13.1 p. 136, Ex. 4.)

to restructure and downsize PFH. In January 2007, Popular announced that it was exiting PFH's subprime mortgage origination business and integrating most of the rest of PFH's operations, including E-LOAN, within BPNA. (Jan. 9, 2007 press release, Ex. 25; 2007 10-K at Ex. 13.1 pp. 8-9, Ex. 4; CC ¶¶ 61, 84.) Later in 2007, Popular recharacterized PFH mortgage loan securitizations as sales, which removed over $3 billion in mortgage loans and related liabilities from Popular's balance sheet and caused a $90.1 million pre-tax loss in the fourth quarter of 2007. (Dec. 21, 2007 press release, Ex. 26; 2007 10-K at Ex. 13.1 pp. 9-10, Ex. 4; CC ¶ 102.) Popular sold much of PFH's remaining loan portfolio in the first quarter of 2008. (Jan. 23, 2008 press release, Ex. 27; 2007 10-K at Ex. 13.1 p. 10, Ex. 4; CC ¶ 107.) In November 2007, Popular also announced that it was downsizing and reorganizing E-LOAN, causing $231.9 million in restructuring and goodwill and trademark impairment charges in the fourth quarter of 2007. (Popular's Form 10-Q for the period ended September 30, 2007 ("3Q07 10-Q") at 9, Ex. 28; 2007 10-K at Ex. 13.1 p. 9, Ex. 4; CC ¶¶ 97-98.) Due in large part to one-time charges incurred in connection with these efforts to downsize PFH and E-LOAN, the overall mainland U.S. operations suffered a large loss in 2007 notwithstanding BPNA's profitability. (2007 10-K at Ex. 13.1 p. 137, Ex. 4.)

Popular filed its 2007 10-K on February 29, 2008. Popular reported net deferred tax assets ("DTAs") of $520 million, of which $175 million related to net operating losses carryforward in the mainland U.S. operations. (2007 10-K at Ex. 13.1 at p. 16, Ex. 4; CC ¶ 118.) Under generally accepted accounting principles ("GAAP"), DTAs are those items, such as income tax deductions and loss carryforwards, that the company anticipates being able to use to reduce its future income tax liability. (CC ¶ 43.) If, however, the company determines that its future taxable income is unlikely to be sufficient to utilize those DTAs in whole or in part,

GAAP requires the company to record a valuation allowance for the amount of the DTAs that the company does not expect that it will be able to use.  (*Id.* ¶¶ 47-48.)  The effect of recording a valuation allowance is to reduce the DTAs to the amount the company expects to be realized.

As GAAP recognizes, determining whether a valuation allowance is appropriate is a judgment call that involves weighing all available evidence and predicting the company's ability to generate sufficient future taxable income.  (Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes" (Feb. 1992) ("SFAS 109") ¶ 25, p. 14 ("An enterprise must use judgment in considering the relative impact of negative and positive evidence."), Ex. 2.)  *See also Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1156 (W.D. Wash. 2006) (determining whether valuation allowance is needed is "a judgment call").  At year-end 2007, it was Popular's judgment that it did not need to record a valuation allowance against its mainland U.S. DTAs because Popular believed that those operations would generate sufficient future taxable income to be able to use those loss carryforwards and tax deductions.  (CC ¶ 292; 2007 10-K at Ex. 13.1 pp. 16, 127-29, Ex. 4.)

PwC audited Popular's 2007 financial statements and issued its 2007 Audit Report, which was dated February 29, 2008.  The 2007 Audit Report contained PwC's "opinion" that the 2007 financial statements "present[ed] fairly, in all material respects, the financial position of Popular, Inc. and its subsidiaries . . . in conformity with accounting principles generally accepted in the United States of America."  (CC ¶ 289; 2007 10-K at Ex. 13.1 p. 75, Ex. 4.)  The 2007 Audit Report further stated that PwC's audit had been conducted "in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  (CC ¶ 289; 2007 10-K at Ex. 13.1 p. 75, Ex. 4.)  The 2007 financial statements have not been restated.

Between May 22 and May 28, 2008, Popular sold to the public approximately 16 million shares of 8.25% Non-cumulative Monthly Income Preferred Stock, Series B at $25 per share. (CC ¶ 282.)  The offering was pursuant to a "Prospectus Supplement" dated May 22, 2008, which expressly incorporated by reference Popular's 2007 10-K.  (Prospectus Supplement at S-41, Ex. 23.)  In connection with Popular's DTAs, the Prospectus Supplement specifically warned that "continued loss from operations in future reporting periods may require Popular, Inc. to adjust the valuation allowance against its deferred tax assets," *id.* at S-14, and that "[d]ue to significant estimates utilized in establishing the valuation allowance and the potential for changes in facts and circumstances, it is reasonably possible that Popular, Inc. will be required to record adjustments to the valuation allowance in future reporting periods." (*Id.*)

That 2008 was a difficult year for the U.S. economy and financial institutions in particular is a fact that requires no citation.  Popular was not immune.  Based in large part on increasing loan losses from Popular's mainland U.S. operations, Popular's net DTAs grew from $520 million at the end of 2007 to $694 million at the end of the first quarter of 2008 and $808 million at the end of the second quarter.  (CC ¶¶ 69, 126.)  After the end of the third quarter of 2008, Popular announced that it was recording a $360.4 million valuation allowance against its DTAs, explaining, "[b]ased on the expected future taxable income of the U.S. operations and considering the uncertainties in the current market conditions, management concluded that it is 'more likely than not' that the Corporation will not be able to fully realize the benefit of these deferred tax assets and thus, the valuation allowance was recorded during the third quarter of 2008."  (Oct. 22, 2008 press release, Ex. 11; *see also* Popular's Form 10-Q for the period ended Sept. 30, 2008 at 50-51, Ex. 12; CC ¶¶ 67-68.)

After another quarter of heavy mainland U.S. losses (and with the U.S. economy reeling from events during 2008 such as the bankruptcy of Lehman Brothers, the nationalization of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Mortgage Corporation ("Freddie Mac"), and the emergency acquisitions of Wachovia Bank and Merrill Lynch), Popular announced on January 22, 2009, that it was recording a valuation allowance equal to 100% of the DTAs related to Popular's mainland U.S. operations, effective December 31, 2008. (CC ¶¶ 69, 175.) Popular explained its increased valuation allowance in its 10-K for the year ended December 31, 2008 in pertinent part as follows:

> *The valuation of deferred tax assets requires judgment based on the weight of all available evidence. Certain events transpired in the fourth quarter of 2008 that led management to reassess its expectations of the realization of the deferred tax assets of the U.S. mainland operations and to conclude that a full valuation allowance was necessary. These circumstances included a significant increase in the provision for loan losses for the Popular North America ("PNA") operations.* The provision for loans losses for PNA consolidated amounted to $208.9 million for the fourth quarter of 2008, compared with $133.8 million for the third quarter of 2008. Actual loan net charge-offs were $105.7 million for the fourth quarter of 2008, compared with $70.2 million in the third quarter. This sharp increase has triggered an increase in the estimated provision for loan losses for 2009. Management had also considered during the third quarter further actions expected from the U.S. Government with respect to the acquisition of troubled assets under the TARP, that did not materialize in the fourth quarter of 2008.
>
> *Additional uncertainty in an expected rebound in the economy and banking industry, based on most recent economic outlooks, forced management to place no reliance on forecasted income.*

(2008 10-K at Ex. 13.1 pp. 143-44 (emphasis added), Ex. 15.)

Plaintiff Russell Hoff filed this action on May 14, 2009 but did not sue PwC. Lead Plaintiffs (represented by some of the same counsel) did not add PwC as a defendant until October 19, 2009, when they filed their Consolidated Complaint. Plaintiffs' claim against PwC is for violation of Section 11 of the Securities Act of 1933, which requires proof that a registration statement filed in connection with a public offering of securities contained, at the

time it became effective, "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. As an accounting firm, PwC may only be liable for portions of the registration statement that it "prepared" or "certified." *Id.* § 77k(a)(4).

With the benefit of hindsight, Plaintiffs claim that Popular should have recorded the full valuation allowance against its mainland U.S. DTAs an entire year earlier, in its 2007 financial statements. Plaintiffs allege that GAAP required Popular to record the full valuation allowance at the end of 2007 because (1) its mainland U.S. operations had suffered a three-year cumulative loss and (2) Popular was downsizing its U.S. operations and its "remaining" U.S. operations could not generate sufficient future taxable income to utilize its DTAs. (CC ¶ 296.) Plaintiffs claim that Popular's 2007 financial statements therefore were materially misstated. Plaintiffs allege that PwC's 2007 Audit Report was likewise false in that it stated PwC's opinion that Popular's financial statements were presented in all material respects in accordance with GAAP and that PwC had complied with applicable auditing standards when conducting its audit. None of these allegations states a claim against PwC.

## LEGAL ARGUMENT

## I.    PLAINTIFFS' CLAIM AGAINST PWC IS BARRED BY THE STATUTE OF LIMITATIONS.

"Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred." *LaChappelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998). This is such a case. Plaintiffs were required, but failed, to bring their Section 11 claims against PwC "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . .," 15 U.S.C. § 77m, and the relevant facts are on the

face of Plaintiffs' Complaint. *See also In re Xchange Inc. Sec. Litig.,* No. Civ. A. 00-10322, 2002 WL 1969661, at *1 (D. Mass. Aug. 26, 2002) (granting auditor's motion to dismiss Section 11 claim as barred by the one-year statute of limitations).

The First Circuit has most frequently decided statute of limitations issues in securities claims in the context of securities fraud claims, as opposed to Section 11 claims, which do not have fraud as an essential element. In the context of securities fraud claims, the First Circuit has set forth a two-step analysis to determine when a plaintiff should have discovered his or her fraud claim. The first step of that analysis looks at whether, and when, "storm warnings" of the "possibility" of fraud existed. If storm warnings existed, the second step of the analysis looks at when an investor exercising reasonable diligence to investigate those storm warnings should have discovered the fraud claim. *See, e.g., Young v. Lepone,* 305 F.3d 1, 8-9 (1st Cir. 2002).

The statute of limitations argument in this case is much more straightforward than is often found in a fraud-based case. Because fraud is not an essential element of a Section 11 case (as Plaintiffs point out in their Complaint at ¶¶ 279, 316), the statute of limitations for a Section 11 claim does not require discovery of fraud but rather is triggered simply when a plaintiff knows or should know of the alleged misstatement or omission in the registration statement. *See* 15 U.S.C. § 77m. Plaintiffs have not alleged that any of the facts that would have revealed the Section 11 claim were fraudulently concealed from them; to the contrary, as described below, Plaintiffs assert repeatedly that the facts revealing the alleged misstatements in the registration statement were publicly disclosed, both in the registration statement itself and in earlier public disclosures. Plaintiffs allege that they relied on the information in the registration statement when purchasing their preferred stock (CC ¶ 322), so they knew in May 2008 of the information in the registrations statement and, in any event, are charged with that knowledge as a matter of

9

law.  *See, e.g., In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314, 1325-27 (3d Cir. 2002) (imputing knowledge to plaintiffs when defendant's public filings and press releases had made it clear that a certain segment of the company was in deep trouble).

The primary facts that the Complaint alleges as the basis for why Popular was required to record a full valuation allowance as of December 31, 2007 (and thus why the 2007 financial statements were allegedly misstated) are: (1) Popular's mainland U.S. operations were operating at a three-year cumulative loss as of the end of 2007 (CC ¶¶ 70-79); and (2) Popular was downsizing those operations in 2007.  *Id.* ¶¶ 61, 84, 92-94, 97-98, 107.  As described below, these very facts were disclosed in the registration statement itself, as well as in numerous other public filings made several months before the registration statement was filed.  Moreover, Popular's warnings in the 2007 10-K and the Prospectus Supplement concerning the risk of future adjustments invited investors' attention to what Popular described as one of its "critical accounting policies / estimates."[3]  Thus, taking as true Plaintiffs' allegations that these facts show that the 2007 financial statements in the registration statement were false, Plaintiffs had all the information they needed for a Section 11 claim as soon as the registration statement was filed in May 2008.  Yet, Plaintiffs did not sue PwC until October 19, 2009, seventeen months later.

**U.S. Operations' Cumulative Loss**.  Plaintiffs' allegations place particular emphasis on a three-year cumulative loss in Popular's U.S. operation as of December 31, 2007, contending that these losses showed that a valuation allowance needed to be recorded in Popular's financial statements at year-end 2007.  (CC ¶¶ 70-79.)  Plaintiffs acknowledge, however, that the three-

---

[3] 2007 10-K at Ex. 13.1 pp. 11, 16, Ex. 4.  *See also id.* at 30 (warning that "[d]ue to significant estimates utilized in establishing the valuation allowance and the potential for changes in facts and circumstances, it is reasonably possible that we will be required to record adjustments to the valuation allowance in future reporting periods,"); Prospectus Supplement at S-14 (same), Ex. 23.

year cumulative loss was apparent on the face of Popular's 2007 10-K.  (*See* CC ¶ 79 ("The 2007 Form 10-K…revealed that Popular US was operating at a three-year cumulative loss as of December 31, 2007."))  The 2007 10-K reported Popular's U.S. operations for 2005, 2006, and 2007 in two segments, Banco Popular North America and Popular Financial Holdings:

### Financial Performance of Popular's U.S. Operations 2005-2007

| (In millions of dollars) | 2005 | 2006 | 2007 | Total |
|---|---|---|---|---|
| Banco Popular North America segment | 99.2 | 101.3 | (195.4) | 5.1 |
| Popular Financial Holdings segment | 8.9 | (95.6) | (269.4) | (356.1) |
| Total U.S. | 108.1 | 5.7 | (464.8) | (351.0) |

Note: For 2007, E-LOAN was reported as part of the Banco Popular North America segment due to the restructuring of PFH that occurred in 2007.  E-LOAN's losses in 2007 were $245.7 million, whereas BPNA's core operations had profits of $50.3 million, making BPNA's net losses $195.4 million ($245.7 million in E-LOAN losses less $50.3 million in BPNA core operation profits).  In prior years, E-LOAN was reported as part of the Popular Financial Holdings segment.

(2007 10-K at Ex. 13.1 p. 137, Ex. 4.)[4]  If, as Plaintiffs allege, the fact of a cumulative three-year loss meant that Popular had to record a valuation allowance, the existence of that misstatement was revealed in the very registration statement that Plaintiffs allege was misstated, so Plaintiffs knew or should have known of the alleged misstatement no later than May 22, 2008.

**Downsized U.S. Operations.**  The second fact that Plaintiffs cite as demonstrating that Popular was required to record a valuation allowance at year-end 2007 is that Popular downsized its U.S. operations in 2007 and early 2008 (before filing its 2007 10-K).  Accepting Plaintiffs' allegations as true, all of the information upon which Plaintiffs rely concerning downsized operations at PFH and E-LOAN was disclosed in press releases and SEC filings, including the 2007 10-K, before Popular's May 2008 preferred stock offering.  (*See* Jan. 9, 2007 press release,

---

[4] Plaintiffs allege that Popular's U.S. cumulative loss for the three years ending December 31, 2007 was $465 million.  (CC ¶ 71.)  That appears incorrect, but the difference is immaterial to this motion.

Ex. 25 & 2007 10-K at Ex. 13.1 pp. 8-9, Ex. 4 (disclosing PFH restructuring, cited in CC ¶¶ 61, 84, 92); 3Q07 10-Q at 9, Ex. 28 & 2007 10-K at Ex. 13.1 p. 9, Ex. 4 (disclosing restructuring of E-LOAN and a corresponding goodwill impairment charge, cited in CC ¶¶ 84, 97-98, 103); Dec. 21, 2007 press release, Ex. 26 & 2007 10-K at Ex. 13.1 pp. 9-10, Ex. 4 (disclosing removal of $3 billion of U.S. subprime loans from balance sheet, cited in CC ¶¶ 61, 84, 102); Jan. 23, 2008 press release, Ex. 27 & 2007 10-K at Ex. 13.1 p. 10, Ex. 4 (disclosing sale of PFH's subprime loan portfolio, cited in CC ¶ 107).)  Thus, as with the three-year cumulative loss, the downsizing of Popular's mainland U.S. operations was fully and publicly disclosed even before Plaintiffs purchased their preferred stock.

The facts here are uncannily similar to those in *In re Polaroid Corp. Securities Litigation*, 465 F. Supp. 2d 232 (S.D.N.Y. 2006), where the court dismissed as time-barred the plaintiffs' claims that Polaroid's officers and independent auditor committed securities fraud by, among other things, failing to cause Polaroid to record a valuation allowance against its DTAs.  *Id.* at 237-38.  Polaroid had recorded cumulative losses of almost $400 million for the four years preceding the financial statements at issue and had $202 million of DTAs on its books.  As Plaintiffs do here, the *Polaroid* plaintiffs alleged that the cumulative losses "'militate[d] against forming a conclusion that a valuation analysis [was] not needed.'"  *Id.* at 243 (citation omitted). In finding the plaintiffs' claims time-barred, the court noted that the fact of Polaroid's cumulative losses was available to the public even before Polaroid issued the allegedly false financial statements.  *Id.* at 243.[5]

---

[5] *See also DeBenedictis v. Merrill Lynch & Co., Inc.*, 492 F.3d 209, 219 (3d Cir. 2007) (affirming dismissal of claims barred by statute of limitations when "[t]he information provided in the Registration Statements, the news articles, and the NASD press releases were sufficient storm warnings to trigger inquiry notice."); *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 801 (1st

Here, Plaintiffs' allegations go even farther than those in *Polaroid*.  In addition to alleging that Popular's mainland U.S. operations had a three-year cumulative loss and that Popular had downsized those operations by year-end 2007, which Plaintiffs contend proves the existence of a misstatement of material fact in the registration statement, Plaintiffs allege that the securities analyst Sterne Agee warned that "Popular['s] U.S. mainland deferred tax assets were likely overstated" (CC ¶ 128) on five different occasions between the preferred stock offering and October 19, 2008, the cut-off date for the Section 11 statute of limitations -- warnings that Plaintiffs contend constituted "notice" of problems with Popular's 2007 financial statements. (CC ¶¶ 127.)   Yet, Plaintiffs did not even file suit against PwC within twelve months of the Sterne Agee announcements.

Finally, the fact that certain of Plaintiffs' counsel filed the original *Hoff* complaint in this matter on May 14, 2009 -- within one year of the preferred stock offering -- underscores that Plaintiffs should have discovered their Section 11 claim against PwC and likewise filed their claim within the one year period.  Like the Complaint that added PwC as a defendant, the original complaint alleged securities fraud because of "materially overstated" DTAs.  (Class Action Complaint ¶¶ 30, 38(a), Dkt. # 1.)  *See, e.g.*, *In re Tyco Int'l, Ltd., Sec. Litig.*, 185 F. Supp. 2d 102, 116 (D.N.H. 2002) (plaintiffs' ability to bring securities fraud claims within a year of publication of information supported argument that the same information provided notice of Section 11 claims).

In short, the face of Plaintiffs' Complaint shows that, if Plaintiffs' allegations as to the existence of material misstatements in the registration statement are taken as true, the one-year statute of limitations began running much more than a year before they sued PwC in October

Cir. 1982) (discrepancy between oral misrepresentations and offering memorandum placed plaintiff on notice on misstatement).

2009.  Thus, Plaintiffs' claim against PwC is time-barred and should be dismissed with prejudice.[6]

## II.    PLAINTIFFS FAIL TO STATE A SECTION 11 CLAIM AGAINST PWC.

Plaintiffs' claim should also be dismissed for the independent reason that Plaintiffs have failed to plead a Section 11 claim against PwC.  In *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009), the Supreme Court set forth a two-step analysis that a court must undertake when deciding a motion to dismiss.  *See also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 562-63, 127 S. Ct. 1955 (2007) (overruling "no set of facts" pleading standard of *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99 (1957)).  First, the court must identify and disregard all conclusory allegations in the complaint.  The court need not accept "a legal conclusion couched as a factual allegation" as true, and "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal,* 129 S. Ct at 1949-50 (internal quotation and citation omitted).  *See also Twombly,* 550 U.S. at 555 & n.3, 127 S. Ct. 1955 (rejecting as insufficient "blanket assertions," "bare averment[s]," and "legal conclusion[s] couched as . . . factual allegations").

Second, a court must subject any remaining factual allegations in the complaint to a "plausibility" test.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955).  The "plausibility standard" requires "more than a sheer possibility" of the defendant's liability; where a complaint's allegations are '"merely consistent with"' a defendant's liability, they fall short.  *Id.*  When ascertaining whether a complaint's allegations state a "plausible" claim, the Court should "draw

---

[6] Plaintiffs' claim against PwC does not "relate back" to the filing of Hoff's original complaint. An amended complaint adding a new defendant relates back only where (among other criteria) the failure to sue the defendant in the initial pleading was a result of "a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C)(ii).  No such mistake exists here.

on its judicial experience and common sense" to determine whether the "well-pleaded facts . . .

permit the court to infer more than the mere possibility of misconduct … ." *Id.* at 1950.[7]

**A.    Plaintiffs Do Not State a "Plausible" Claim That Popular's 2007 Financial Statements Were Materially "False."**

Plaintiffs' Complaint devotes one hundred paragraphs to a repetitious and misleadingly

simplistic description of GAAP governing whether a company should record a valuation

allowance.   Plaintiffs allege that the applicable GAAP is found in Statement of Financial

Accounting Standards No. 109, "Accounting for Income Taxes" (Feb. 1992) ("SFAS 109"), and

also rely heavily on PwC's 2007 "Guide to Accounting for Income Taxes" ("2007 Guide") (Ex.

3).   Because SFAS 109 and the 2007 Guide are referenced in the Complaint, they are

incorporated by reference therein and may be considered in full on this motion to dismiss.   *See*

*Jorge*, 404 F.3d at 559.   As shown below, Plaintiffs' allegations ignore provisions in SFAS 109

and the 2007 Guide that show that Popular's accounting judgments with regard to the valuation

allowance were appropriate.

Under SFAS 109, a company must record a valuation allowance "if, based on the weight

of the available evidence, it is more likely than not (a likelihood of more than 50 percent) that

some portion of or all of the deferred tax assets will not be realized."  (SFAS 109 ¶ 17(e), p. 11,

Ex. 2.  *See also* CC ¶¶ 47-48.)  Importantly, SFAS 109 says that a company ***must*** consider "*[a]ll*

---

[7] Further, where a complaint "sounds in fraud," a plaintiff must satisfy the heavier burden of pleading "the circumstances constituting fraud" with particularity.  Fed. R. Civ. 9(b).  *See also ACA Fin. Guaranty Corp. v. Advest, Inc.*, 512 F.3d 68 (1st Cir. 2008) (applying Rule 9(b) to claim under Section 12 of Securities Act because claim was "grounded in fraud").  The essence of Plaintiffs' claims against Popular and its officers is fraud. Plaintiffs' disclaimer for purposes of Section 11 of "any allegation that could be construed as alleging fraud or intentional or reckless misconduct" (CC ¶ 316) is ineffective.   *See, e.g., Wagner v. First Horizon Pharmaceutical Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) (disclaimer ineffective to prevent application of Rule 9(b) to Securities Act claim).  Because, however, Plaintiffs do not state a "plausible" claim under Fed. R. Civ. P. Rule 8(a), it is unnecessary to decide whether Fed. R. Civ. P. 9(b) applies.

available evidence," including information about the company's "current financial position and its results of operations for the current and preceding years" plus "all currently available information about future years." (SFAS 109 ¶ 20, p. 12 (emphasis added), Ex. 2.) SFAS 109 lists examples of "negative" evidence that a company should consider, including cumulative losses in recent years (*id.* ¶ 23, p. 13, Ex. 2), and also examples of "positive" evidence "that might support a conclusion that a valuation allowance is not needed when there is negative evidence," including "a strong earnings history exclusive of the loss that created the future deductible amount … coupled with evidence indicating that the loss (for example, an unusual, infrequent, or extraordinary item) is an aberration rather than a continuing condition." (*Id.* ¶ 24, pp. 13-14, Ex. 2.) SFAS 109 also recognizes that "[a]n enterprise must use judgment in considering the relative impact of negative and positive evidence." (*Id.* ¶ 25, p. 14, Ex. 2.) In addition, the 2007 Guide recognizes that weighing the available evidence is a "highly subjective" endeavor. (2007 Guide at 89, Ex. 3.) Thus, application of the controlling accounting principles is not "black and white" but rather entails subjective judgment calls and predictions of the future.

Ignoring that Popular was required to consider "all available evidence" applying reasoned judgment, Plaintiffs' theory of liability focuses almost exclusively on the three-year cumulative loss of Popular's U.S. operations at the end of 2007, as if that loss alone mandated that Popular record a valuation allowance in its 2007 financial statements. (*See* CC ¶¶ 70-79.) It clearly did not: SFAS 109 provides that "[f]orming a conclusion that a valuation allowance is not needed is *difficult*" if there is evidence of a cumulative loss. (SFAS 109 ¶ 23, p. 13 (emphasis added), Ex. 2.) But difficult does not mean impossible. *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1160-62 (C.D. Cal. 2007) (drawing this distinction and dismissing claim that financial statements were "false" for failure to take valuation allowance when company had sustained a

cumulative loss).  Moreover, SFAS 109 makes clear that a detailed analysis of "all available evidence" is required.  Although the cumulative loss in Popular's U.S. operations did constitute "negative evidence" that GAAP required Popular to consider, "*[t]he existence of cumulative losses* (or lack thereof) *is only one piece of evidence that should be considered* in assessing the need for a valuation allowance."  (2007 Guide at 93 (emphasis added), Ex. 3.)

Of particular relevance, the 2007 Guide contains two examples where companies had "positive" evidence of their ability to generate future taxable income that overcame the "negative" evidence of a cumulative loss.  In the first example quoted below, the positive evidence was a history of profitable "core" operations and action taken by the company (also a bank) to prevent losses from "non-core" operations from recurring:

> During the past five years, a bank incurred substantial losses as a direct result of commercial real estate and lesser-developed country (LDC) loans.  The bank has fully reserved these problem loans and has not originated any new commercial real estate or LDC loans.  The bank's core earnings, which are primarily from consumer and non-real estate commercial lending, historically have been, and continue to be, very profitable.
>
> Management forecasts that, based on historical trends, these core earnings will, over the next five years, be more than sufficient to recover the losses resulting from the old commercial real estate and LDC loans.  Accordingly, it was concluded that a valuation allowance was not necessary for the bank's DTA.

(2007 Guide at 94, Ex. 3.)  In the second example quoted below, the positive evidence was two profitable lines of business and action taken by the company to discontinue its loss-producing line of business:

> An enterprise had three separate and distinct lines of business.  Historically, two of the lines have been, and continue to be, profitable.  The third line incurred substantial losses that led to an NOL [net operating loss] carryforward on the enterprise's consolidated tax return.  The enterprise recently discontinued its unprofitable line and sold the related assets.
>
> The historical profit levels of the continuing operations were such that the enterprise could "utilize" the NOL in approximately eight years.  Because this was well within the NOL carryforward period in the applicable tax jurisdiction, it

was concluded that a valuation allowance was not necessary for the enterprise's
NOL carryforward DTA.

(2007 Guide at 95, Ex. 3.)

Both examples (which Plaintiffs omit from their lengthy discussion of the Guide) are directly analogous to Popular's situation at year-end 2007.  As noted above, the cumulative three-year loss in Popular's mainland U.S. operations as of year-end 2007 was caused by losses at PFH and E-LOAN, which were not part of Popular's core U.S. operations.  *See supra* at 4, 11-12.  *See also, e.g.,* CC ¶¶ 93-95, 99.  The core U.S. banking operations at BPNA remained profitable in 2007 and preceding years, enjoying three-year net ***earnings*** of over $250 million.[8]  Even Plaintiffs allege that BPNA's operations had been profitable throughout the relevant time period, with the first loss in those core operations not occurring until the second quarter of 2008, months *after* the 2007 financial statements were issued.  (CC ¶ 114.)  Based upon BPNA's solid history of profitability and the steps taken in 2007 to reduce future losses at PFH and E-LOAN, Popular's management had a reasonable basis under GAAP to expect the core mainland U.S. operations of BPNA to generate taxable income permitting the use of the U.S. DTAs, just as the companies did in the examples provided in the Guide.

Plaintiffs try to use Popular's restructuring plans for PFH and E-LOAN as evidence that Popular's "remaining" mainland U.S. operations would not generate sufficient taxable income to absorb the U.S. DTAs.  (CC ¶¶ 61-62, 84, 92-94, 97-98, 107-08.)  Plaintiffs, however, fail to allege a single fact to substantiate these allegations.  Under *Iqbal*, these conclusory allegations must be disregarded.  Furthermore, these conclusory allegations are baseless, as shown by the undisputed information in Popular's public filings that are incorporated by reference in

---

[8] *See* 2006 10-K at Ex. 13.1 pp. 117-18 (reporting net income of $101.3 million for 2006 and $99.2 million for 2005), Ex. 21; 2007 10-K at Ex. 13.1 p. 138 (reporting net income of $50.5 million for 2007), Ex. 4.

Plaintiffs' Complaint.  As discussed above, Popular's 10-Ks show that its core mainland U.S. banking operations had been so profitable that, until 2007, they overcame the losses generated by Popular's non-core operations (PFH and E-LOAN) enough that the overall U.S. operations showed a profit.  *See supra* at 4, 11-12.  In 2007, the BPNA core operations were likewise profitable but, due to the especially large losses in the non-core U.S. operations, those BPNA core profits were not sufficient to make the overall mainland U.S. operations profitable.  By downsizing or eliminating its loss-producing U.S. businesses, Popular could only expect to make its U.S. operations more profitable, as they would no longer be offset by large losses incurred by the non-core operations.[9]  The relative profitability of BPNA is shown in the following table, which contains information from Popular's 10-Ks for 2006 and 2007:

Core Banking Operations

| (In millions of dollars) | 2005 | 2006 | 2007 | Total |
|---|---|---|---|---|
| Banco Popular North America segment (excluding E-LOAN in 2007) | 99.2 | 101.3 | 50.5 | 251 |

Discontinued/Downsized Operations

| (In millions of dollars) | 2005 | 2006 | 2007 | Total |
|---|---|---|---|---|
| Popular Financial Holdings segment (including E-LOAN in 2007) | 8.9 | (95.6) | (515.1) | (601.8) |

Sources: 2006 10-K at Ex. 13.1 pp. 117-18, Ex. 21; 2007 10-K at Ex. 13.1 p. 138, Ex. 4.

Adding to the reasonableness of Popular's decision at year-end 2007 that a valuation allowance was unnecessary, approximately $337 million of the $515 million in losses incurred by PFH and E-LOAN in 2007 were due to one-time charges associated with the restructuring

---

[9] Indeed, Plaintiffs repeatedly allege that the rise in subprime loan problems in 2007 should have alerted Popular to the unlikelihood of future income being generated in the U.S. operations.  (CC ¶¶ 85-88.)  Popular's mainland U.S. subprime operations, however, were non-core operations contained in PFH, whose operations were downsized in 2007 and discontinued in 2008.  (*Id.* ¶¶ 92, 102, 107.)

that would be unlikely to recur.[10]  Per SFAS 109, that BPNA's operations had a long history of profitability and that these losses were expected to be "an aberration rather than a continuing condition" is "positive evidence" that Popular would have been permitted to consider when evaluating whether a valuation allowance was required.  (SFAS 109 ¶ 24(c), p. 14, Ex. 2.)[11]

Finally, Plaintiffs' criticism of Popular's "reliance" on the 20-year expiration terms of the loss carryforwards that made up a large portion of Popular's mainland U.S. DTAs is a red herring.  (CC ¶¶ 117-28.)  Plaintiffs assume that the 20-year expiration term was the only basis upon which Popular concluded not to record a valuation allowance because other evidence was not disclosed in the SEC filings at issue.  *See id.* ¶¶ 122 (20-year term "explains nothing" about whether Popular would earn a sufficient U.S. profit), 123 (Popular "failed to provide any positive evidence . . ."), 124 (Popular "did not provide any positive financial evidence . . .").  But GAAP did not require Popular to discuss in its SEC filings the evidence its management considered in arriving at the judgment that a valuation allowance was not required.  Plaintiffs are not entitled to presume that, simply because information Popular was not required to disclose was not in fact disclosed, such information did not exist or was not considered.

At year-end 2007, when Plaintiffs allege Popular should have taken a full valuation allowance against its mainland U.S. DTAs, Popular had a proven and lengthy history of positive earnings in its core mainland U.S. banking business (BPNA); it had taken steps to downsize or eliminate the non-core, loss-producing portions of its U.S. mainland business (PFH and E-

---

[10] PFH incurred restructuring charges of $14.7 million and a loss upon the recharacterization of mortgage loan securitizations of $90.1 million.  E-LOAN incurred restructuring charges and goodwill impairment charges totaling $231.9 million.  (2007 10-K at Ex. 13.1 pp. 8-10, Ex. 4.)

[11] This concept is also reflected in the 2007 Guide's example about the bank, quoted above. There, the "reserves" taken with respect to the non-core operations were likewise one-time charges that the company could reasonably expect would not be repeated in the future.

LOAN); and a large portion of those losses consisted of one-time charges associated with the restructuring -- all "positive" evidence under SFAS 109 that Popular was required under GAAP to consider. Popular's situation was thus very much like the two examples featured in the 2007 Guide: in each, the company had a history of positive earnings from its core operations and had taken steps to stem the losses from non-core operations. Under these circumstances, SFAS 109 and the 2007 Guide, upon which Plaintiffs base their allegations, show that Popular's management could reasonably conclude -- as it did -- that a valuation allowance was not required. [12]

Given the controlling accounting literature and the key facts -- all of which appear on the face of the Complaint or in documents incorporated by reference into the Complaint -- Plaintiffs' allegations show at most merely a "possibility" of PwC's liability and thus fail *Iqbal*'s plausibility test. Accordingly, Plaintiffs' allegations that Popular's 2007 financial statements were not stated in accordance with GAAP and thus contained a material misstatement fail to state a claim upon which relief can be granted.

**B.    Plaintiffs Do Not State a Plausible Claim that PwC's 2007 Audit Report Was Materially False.**

Plaintiffs allege that PwC's audit report on Popular's 2007 financial statements was "false" because it contained an opinion that the 2007 financial statements were prepared in accordance with GAAP and stated that PwC's audits were conducted in accordance with the

---

[12] It would have been impermissible under GAAP for Popular to record a valuation allowance when, as happened here, Popular's good faith weighing of the available evidence caused it to conclude that it was more likely than not that the DTA would be realized. If a company determines that a valuation allowance is no longer necessary, the unnecessary portion is released into income. The SEC has been critical of situations where registrants recorded valuation allowances in order to have a "rainy day" fund from which the company could later reverse the allowance and thereby smooth earnings in a subsequent reporting period.

standards of the PCAOB when allegedly neither statement was true.  (CC ¶ 304.)  These allegations fail to state a claim against PwC.

### 1.    Plaintiffs Fail to Plead Sufficient Facts that PwC's Audit Opinion was Objectively or Subjectively False.

Plaintiffs' allegations that PwC's 2007 Audit Report was false because it contained PwC's opinion that the 2007 financial statements were stated in all material respects in accordance with GAAP are based on Plaintiffs' allegations that the 2007 financial statements were themselves misstated.  For the same reasons that Plaintiffs' allegations regarding the falsity of the 2007 financial statements fail, Plaintiffs' claim regarding PwC's audit opinion also fails.

Plaintiffs' allegations about PwC's audit opinion fail for the additional reason that Plaintiffs do not allege, even in conclusory fashion, that PwC's opinion was subjectively false -- that is, that PwC did not in fact hold the opinion that it expressed in its 2007 Audit Report.  In material part, PwC's 2007 Audit Report states: "In our *opinion,* the accompanying consolidated statements of condition and the related consolidated statements of operations, comprehensive income, changes in stockholders' equity and cash flows present fairly, in all material respects, the financial position of Popular, Inc. . . . in conformity with accounting principles generally accepted in the United States of America."  (2007 10-K at Ex. 13.1 p. 75 (emphasis added), Ex. 4.)  Plaintiffs acknowledge that an auditor's audit opinion is a statement of the auditor's "'*belief* that the financial statements taken a whole are not materially misstated.'"  (CC ¶ 304 (quoting SAS 47, AU § 312) (emphasis added).)

Under First Circuit law, plaintiffs alleging that a statement of opinion or belief is false must allege that the statement was "subjectively false," *i.e.*, that the defendant did not actually hold the belief expressed.  *See In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 47, 53-54 (1st Cir. 2005) (holding that a plaintiff alleging securities fraud regarding a statement of opinion must

plead the speaker's "subjective falsity;" because the plaintiffs did not "clear the subjective falsity hurdle," their allegations were insufficient to show that the financial services firm's "buy" ratings were false or misleading when made).  Plaintiffs do not plead that PwC's opinion on Popular's 2007 financial statements was "subjectively false."  To the contrary, Plaintiffs expressly disclaim any allegation "that could be construed as alleging fraud or intentional or reckless misconduct . . . ."  (CC ¶ 316; *see also id.* ¶ 279.)  Therefore, Plaintiffs' claim based on PwC's audit opinion must be dismissed.

### 2.   Plaintiffs' Allegations Regarding PwC's Compliance with Auditing Standards Are Conclusory and Must Be Disregarded.

In its 2007 Audit Report, PwC states that "[w]e conducted our audits [of these financial statements] in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  (2007 10-K at Ex. 13.1 p. 75, Ex. 4.)  Plaintiffs allege that this statement was false (CC ¶ 303), but plead no facts to substantiate their conclusory allegation.

Plaintiffs' sole basis for alleging that PwC failed to comply with the applicable auditing standards is the logic that, had PwC complied with these standards, "the only reasonable professional conclusion" that PwC could have drawn was that Popular's 2007 financial statements were misstated due to their failure to include a valuation allowance.  (*E.g.*, CC ¶¶ 305-08.)  Plaintiffs' allegations fail because their allegations of the falsity of the 2007 financial statements fail.  In addition, Plaintiffs' allegations are not only conclusory (and thus must be disregarded under *Iqbal*) but also are based upon a fundamental misconception of an audit.

Under the applicable auditing standards,[13] the company's management is responsible for the financial statements and the representations made in those financial statements.  (*See* SAS 1,

---

[13] The standards of the PCAOB are in large measure the same as generally accepted auditing standards ("GAAS").  (CC ¶ 302 n.8.)  GAAS consists of ten standards, as to which guidance is provided in "Statements on Auditing Standards" ("SAS").  (*See id.* ¶ 304 n.9.)

AU § 110.03; *see also* 2007 10-K at Ex. 13.1 p. 75 (2007 Audit Report) (stating that "[t]he Corporation's management is responsible for these financial statements"), Ex. 4.)  In contrast, the independent auditor's responsibility is confined to conducting an audit of those financial statements and, if appropriate, issuing an opinion as to whether the company's financial statements are presented fairly, in all material respects, in accordance with GAAP.  (SAS 1, AU § 110.03 ("[T]he fair presentation of financial statements in conformity with generally accepted principles is an implicit and integral part of management's responsibility," with "the auditor's responsibility for the financial statements []confined to the expression of his or her opinion on them.").)

As the 2007 Audit Report states on its face, auditing standards require that the auditor obtain "reasonable assurance" about whether the financial statements are free from material misstatement.  (2007 10-K at 75, Ex. 4.)  Because audits obtain reasonable, but not absolute, assurance, a properly performed audit will not necessarily detect a material misstatement in the financial statements.  (*See, e.g.,* SAS 1, AU § 110.02 ("Because of the nature of audit evidence … the auditor is able to obtain reasonable, but not absolute, assurance that material misstatements are detected.").)  Thus, Plaintiffs' after-the-fact surmising that the audit *must* not have been conducted in accordance with auditing standards merely because the financial statements were, in Plaintiffs' view, misstated is inconsistent with the auditing standards themselves and is not supported by facts or logic as required to pass the *Iqbal* plausibility test.[14]

---

[14] The Complaint refers to information from so-called "Confidential Witnesses," but that information appears to be in support of Plaintiffs' scienter allegations directed to the "Exchange Act Defendants" and is therefore expressly excluded from the Section 11 claim.  (*See* CC ¶ 316.) In any event, none of the CWs purports to have any information about management's evaluation of whether a valuation allowance was required at year-end 2007.

## CONCLUSION

For the foregoing reasons, PwC respectfully requests that the Court dismiss the Section 11 claim in its entirety.

PwC HEREBY CERTIFIES that today it electronically filed the foregoing document with the Clerk of Court using the CM/ECF system.

Respectfully submitted.

At San Juan, Puerto Rico, this 11th day of January, 2010.

ATTORNEYS FOR:
PRICEWATERHOUSECOOPERS LLP

KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel (404) 572-4600
Fax (404) 572-5100

s/ELIZABETH V. TANIS, admitted *pro hac vice*
E-mail: btanis@kslaw.com
s/JOHN P. BRUMBAUGH, admitted *pro hac vice*
E-mail: pbrumbaugh@kslaw.com

DEL TORO & SANTANA
Plaza Scotiabank, Suite 610
273 Ponce de León Avenue
San Juan, Puerto Rico 00917
Tel (787) 754-8700
Fax (787) 756-6677

s/ RUSSELL A. DEL TORO
USDC-PR 121302
E-mail: rdeltoro@dtslaw.com
s/ ROBERTO SANTANA APARICIO
USDC-PR 122811
E-mail: rsantana@dtslaw.com