## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

---------------------------------------------------------------------------x

RUSSELL HOFF, Individually and on Behalf of All
Others Similarly Situated,

        Plaintiff,

      v.

POPULAR INC., RICHARD CARRIÓN, JORGE
A. JUNQUERA, MANUEL MORALES, FRANCISCO
M. REXACH, JUAN J. BERMÚDEZ, MARIA L. FERRÉ,
WILLIAM J. TEUBER, JOSE R. VIZCARRONDO,
FREDERIC V. SALERNO, MICHAEL J. MASIN,
PRICEWATERHOUSE COOPERS LLP, UBS
FINANCIAL SERVICES INCORPORATED OF
PUERTO RICO, POPULAR SECURITIES, INC., and
CITIGROUP GLOBAL MARKETS, INC.,

        Defendants.

Civil Action No. 09-01428
(GAG)(BJM) (Consolidated)

---------------------------------------------------------------------------x

### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
### POPULAR, INC. AND THE INDIVIDUAL DEFENDANTS'
### <u>MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT</u>

Néstor M. Méndez-Gómez
PIETRANTONI MÉNDEZ &
ALVAREZ LLP
Popular Center, 19th Floor
209 Muñoz Rivera Avenue
San Juan, Puerto Rico  00918
Tel:  (787) 274-1212

*Counsel for Popular Inc. and the
Individual Defendants except
Francisco M. Rexach*

Joseph E. Neuhaus (pro hac vice)
Jeffrey T. Scott (pro hac vice)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000

*Counsel for Popular Inc. and the
Individual Defendants*

Ana Matilde Nin-Torregrosa
NIN-TORREGROSA &
RODRÍGUEZ-RUIZ
Citibank Tower, Suite 1801
252 Ponce de León Avenue
San Juan, Puerto Rico  00918
Tel:  (787) 282-6687

*Counsel for Francisco M. Rexach*

May 10, 2010

# <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ...................................................................................................3

    I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SECURITIES
        FRAUD UNDER SECTION 10(b) OF THE EXCHANGE ACT ..........................3

        A.    Plaintiffs Fail To Plead a Material Misstatement or
              Omission ................................................................................3

        B.    Plaintiffs Fail To Plead Scienter ...............................................7

              1.    Plaintiffs' Allegations that Popular Violated GAAP
                     Do Not Raise a Strong Inference of Scienter..................8

              2.    Plaintiffs' Other Scienter Allegations Fail....................11

              3.    Plaintiffs' Scienter Allegations Fail When Viewed
                     "Holistically" ...............................................................15

        C.    Plaintiffs Fail To Plead Loss Causation....................................17

        D.    The Alleged Misstatements Are Protected as Forward-
              Looking Statements ................................................................20

              1.    The Alleged Misstatements Are Forward-Looking ......20

              2.    The Alleged Misstatements Were Accompanied by
                     Meaningful Cautionary Language ................................21

    II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATIONS OF
        SECTION 11 OR 12(a)(2) OF THE SECURITIES ACT ....................................22

    III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION
        20(a) OF THE EXCHANGE ACT OR SECTION 15 OF THE
        SECURITIES ACT ................................................................................26

# TABLE OF AUTHORITIES

Page(**s**)

**CASES**

*ACA Fin. Guar. Corp.* v. *Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ................................................................................15, 26

*Alvarado* v. *Morgan Stanley Dean Witter, Inc.*
    448 F. Supp. 2d 333 (D.P.R. 2006) ...........................................................................26

*Berson* v. *Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ....................................................................................17

*Blackstone Realty LLC* v. *FDIC*,
    244 F.3d 193 (1st Cir. 2001) ....................................................................................22

*Borochoff* v. *GlaxoSmithKline PLC*,
    No. 07 Civ. 5574, 2008 WL 2073421 (S.D.N.Y. May 9, 2008) ...............................21

*Catogas* v. *Cyberonics*,
    292 F. App'x 311 (5th Cir. 2008) .............................................................................17

*Colon* v. *Diaz-Gonzalez*,
    No. 04 Civ. 2371, 2009 WL 498288 (D.P.R. Feb. 19, 2009) ...................................25

*DSAM Global Value Fund* v. *Altris Software, Inc.*,
    288 F.3d 385 (9th Cir. 2002) ......................................................................................9

*Dura Pharm.* v. *Boudo*,
    544 U.S. 336 (2005) ..................................................................................................17

*Ezra Charitable Trust* v. *Tyco Int'l, LTD*,
    466 F.3d 1 (1st Cir. 2006) .............................................................................8, 12, 15

*Fisher* v. *SpecTran Corp.*,
    No. 99 Civ. 12359, 2001 WL 34644311 (D. Mass. May 31, 2001) .........................21

*Fox* v. *First Bancorp*,
    No. 05 Civ. 2148, 2006 WL 4128534 (D.P.R. Nov. 6, 2006) ....................12, 13, 18, 22, 26

*García* v. *Popular, Inc.*,
    No. K AC2009-1316 (906) (Commonw. Ct. of P.R. Mar. 23, 2010) .........................6

*Gross* v. *Summa Four, Inc.*,
    93 F.3d 987 (1st Cir. 1996) ....................................................................................7, 8

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Hess* v. *American Physicians Capital Inc.*
No. 04 Civ. 31, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005)............................................9, 10

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
No. 08 Civ. 411, 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010) ...............................................20

*In re Boston Tech., Inc. Sec. Litig.*,
8 F. Supp. 2d 43 (D. Mass. 1998) ...........................................................................................8

*In re Cabletron Sys.*,
311 F.3d 11 (1st Cir. 2002)...................................................................................................12

*In re Century Bus. Servs. Sec. Litig.*,
No. 99 Civ. 02200, 2002 WL 32254513 (N.D. Ohio June 27, 2002).....................................14

*In re Credit Suisse-AOL Sec. Litig.*
465 F. Supp. 2d 34 (D. Mass. 2006) ................................................................................19, 20

*In re Dothill Sys. Corp. Sec. Litig.*,
No. 06 Civ. 228, 2009 WL 734296 (S.D. Cal. Mar. 18, 2009)...............................................17

*In re Eaton Vance Corp. Sec. Litig.*,
206 F. Supp. 2d 142 (D. Mass. 2002) ...................................................................................12

*In re Elan Corp. Sec. Litig.*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008)......................................................................................4

*In re Global Crossing, Ltd. Sec. Litig.*,
No. 02 Civ. 910, 2003 WL 22999478 (S.D.N.Y. Dec. 22, 2003)...........................................26

*In re HealthSouth Corp. Sec. Litig.*,
261 F.R.D. 616 (N.D. Ala. 2009)...........................................................................................23

*In re Homebanc Corp. Sec. Litig.*,
No. 08 Civ. 1461, 2010 WL 1524836 (N.D. Ga. Apr. 13, 2010) ...........................................19

*In re Intelligroup Sec. Litig.*,
527 F. Supp. 2d 262 (D.N.J. 2007) .......................................................................................15

*In re Levi Strauss & Co. Sec. Litig.*,
527 F. Supp. 2d 965 (N.D. Cal. 2007) .................................................................................9, 10

*In re March & McLennan Cos., Inc. Sec. Litig.*,
No. 04 Civ. 8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)...........................................20

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) .................................................................................1

*In re NovaGold Res. Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) ...............................................................................18

*In re Scottish Re Group Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) .......................................................................... passim

*In re Sonus Networks, Inc. Sec. Litig.*,
  No. 04 Civ. 10294, 2006 WL 1308165 (D. Mass. May 10, 2006) ....................................13, 25

*In re StockerYale Sec. Litig.*,
  453 F. Supp. 2d 345 (D.N.H. 2006) ...................................................................................20

*In re Stone & Webster, Inc. Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005) ..........................................................................................4, 20

*In re Stone & Webster, Inc. Sec. Litig.*,
  253 F. Supp. 2d 102 (D. Mass. 2003) ................................................................................12

*In re The First Marblehead Corp. Sec. Litig.*
  639 F. Supp. 2d 145 (D. Mass. 2009) ................................................................................19

*In re Tyco Int'l, Ltd.*,
  No. 02 Civ. 1335, 2007 WL 1703023 (D.N.H. June 11, 2007) ..............................................26

*In re Tycom Ltd. Sec. Litig.*,
  No. 03 Civ. 1352, 2006 WL 39237 (D.N.H. Jan. 6, 2006) ....................................................23

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ......................................................................... passim

*In re Xchange Inc. Sec. Litig.*,
  No. 00 Civ. 10322, 2002 WL 1969661 (D. Mass. Aug. 26, 2002) .........................................24

*Ind. State Dist. Council of Laborers* v. *Omnicare, Inc.*,
  583 F.3d 935 (6th Cir. 2009) ........................................................................................17, 18

*Iron Workers Local No. 25 Pension Fund* v. *OshKosh Corp.*,
  No. 08 Civ. 797, 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010).........................10, 11, 15, 16

*Lalor* v. *Omtool, Ltd.*,
  No. 99 Civ. 469M, 2000 WL 1843247 (D.N.H. Dec. 14, 2000) ............................................25

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lattanzio* v. *Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007)....................................................................19

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005).............................................................18, 19

*Limantour* v. *Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006)..................................3, 5, 6

*Masters* v. *GlaxoSmithKline*,
    271 F. App'x 46 (2d Cir. 2008) ...........................................................17

*McAdams* v. *McCord*,
    584 F.3d 1111 (8th Cir. 2009) .............................................................17

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .............................................................17

*Miller* v. *Champion Enters. Inc.*,
    346 F.3d 660 (6th Cir. 2003) ...............................................................21

*Payne* v. *DeLuca*,
    433 F. Supp. 2d 547 (W.D. Pa. 2006)..................................................21

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)................................................................14

*Serabian* v. *Amoskeag Bank Shares, Inc.*,
    24 F.3d 357 (1st Cir. 1994)..................................................................13

*Shaw* v. *Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ...........................................................4, 25

*Sloman* v. *Presstek, Inc.*,
    No. 06 Civ. 377, 2007 WL 2740047 (D.N.H. Sept. 18, 2007) ...............20

*Teachers' Ret. Sys. of LA* v. *Hunter*,
    477 F.3d 162 (4th Cir. 2007) ...............................................................17

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................4, 7, 8, 15

*Thor Power Tool Co.* v. *C.I.R.*,
    439 U.S. 522 (1979).................................................................................3

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States* v. *Bestfoods*,
    524 U.S. 51 (1998).............................................................................................25

*Young* v. *Lepone*,
    305 F.3d 1 (1st Cir. 2002)...............................................................................24

### STATUTES

15 U.S.C. § 78u-5 ...............................................................................................21

15 U.S.C. § 78u-4 .................................................................................................7

### OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ...............................................................................................3

## PRELIMINARY STATEMENT

Plaintiffs' opposition (the "Opposition" or "Opp.") (Docket No. 146) rests on a hope that the Court will ignore the unexpected and extraordinary global financial crisis that significantly affected the financial services industry in the latter half of 2008.[1]  Plaintiffs charge that the stock-price drop that Popular[2] experienced (along with every other bank in Puerto Rico and beyond) was due to a supposedly erroneous accounting judgment that management made several months before the market collapse.  They blindly posit that "nothing had changed" between January 24, 2008—the time Popular's management purportedly should have taken a full valuation allowance for the DTAs associated with its U.S. operations—and the time that the Company took a full valuation allowance twelve months later.  (Opp. at 21.)  But of course everything had changed (*see*, *e.g.*, Defs.' Mem. at 7 n.9), and plaintiffs' theory of securities law violations relies entirely on 20-20 hindsight.  Their argument on this motion is essentially that they should be allowed to impose hundreds of thousands or millions of dollars in discovery costs on the defendants because of the defendants' inability to predict that the global credit crisis would dramatically escalate in the second half of 2008.

In particular, all of plaintiffs' Exchange Act and Securities Act claims require that the Complaint (Docket No. 91) contain particularized facts showing that it was unreasonable for

---

[1]    Indeed, the impact of that crisis continues to weigh heavily on the financial sector even today, especially on banks based in Puerto Rico.  *See*, *e.g.*, Matthias Rieker and Damian Paletta, *FDIC Closes Three Banks in Cleanup in Puerto Rico*, The Wall Street Journal, May 1, 2010, at B1 ("Three Puerto Rican banks were closed by regulators [on April 30, 2010] . . . in one of the biggest single cleanups of failing banks in the current financial crisis. . . . The sweeping move by the regulators and the FDIC seeks to repair the island's banking system and provide support for its ailing economy."). The Court may take judicial notice of news articles.  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 251 n.5 (S.D.N.Y. 2003).

[2]    Unless otherwise indicated, capitalized terms and abbreviations used in this memorandum have the same meaning as those used in the Memorandum of Law in Support of Popular Inc. and the Individual Defendants' Motion to Dismiss the Consolidated Class Action Complaint, filed January 11, 2010 ("Opening Brief" or "Defs.' Mem.") (Docket No. 117) and exhibits cited in this reply memorandum are attached to Defendants' Joint Appendix in Support of Their Motions to Dismiss (Docket No. 117, Attachment #1).

Popular's management to determine in January 2008 that there was at least a 50% likelihood that the Company could generate future taxable income to utilize its DTAs in a future tax period. There is no dispute about this standard. (Opp. at 6.) Plaintiffs have not made and cannot make this showing. On the facts alleged in the Complaint, together with the documents on which the Complaint incorporates by reference, a far more plausible conclusion is that Popular management reasonably believed that the Company would generate future taxable income to utilize its DTAs because the Company was implementing a restructuring plan in 2008 that was designed to dispose of and downsize its money-losing U.S. operations while retaining its historically profitable business, BPNA. It was only after the global financial crisis dramatically worsened in the third quarter of 2008 that management reevaluated its restructuring plans, expectations of continued profitability at BPNA, and ability to implement tax strategies.

The Opposition accuses defendants of impermissibly providing the Court with an "alternative set of facts." (Opp. at 20; *see also id.* at 24, 26, 42.) In fact, defendants have merely supplemented the information plaintiffs cherry-picked from Popular's SEC filings with other information from those very same filings. That is not an "alternative set of facts." That is the set of facts that management was obligated to consider under GAAP, which required the Company to consider all available evidence—not just the portions that a plaintiff may later pick—in determining whether to take a valuation allowance. The Court must do the same in evaluating whether plaintiffs have raised an adequate claim that that decision was fraudulent or otherwise improper.

On the law, plaintiffs largely rest their case on *In re Scottish Re Group Securities Litigation*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007), another case dealing with DTAs. The Opposition cites to it sixteen times for eight different propositions. (Opp. at 25-26, 29, 31, 34, 36-39, 43-45, 71 n.34.) But plaintiffs overlook a crucial distinction in *Scottish Re*:  management disposed of the

historically money-*making* assets, not the money-*losing* assets, so there was no chance those assets

would continue to produce any taxable income for the company thereafter.  Popular, by contrast,

was in the process of downsizing and disposing of its money-losing operations while retaining its

money-earning operations.  This case is more like cases involving DTA-accounting judgments in

which the courts have dismissed complaints as impermissibly seeking to impose liability for overly

optimistic forecasting or a failure to predict a change in circumstances.  *See*, *e.g.*, *In re Wet Seal,

Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007); *Limantour* v. *Cray Inc.*, 432 F. Supp. 2d

1129 (W.D. Wash. 2006).

        As detailed herein and in defendants' Opening Brief, the Complaint suffers from

many other pleading defects under both the Exchange Act and the Securities Act that are not refuted

in the Opposition.  The Court should dismiss the Complaint with prejudice.

## ARGUMENT

I.    **PLAINTIFFS FAIL TO STATE A CLAIM FOR SECURITIES FRAUD UNDER SECTION 10(b) OF THE EXCHANGE ACT.**

    A.    **Plaintiffs Fail To Plead a Material Misstatement or Omission.**

        The parties agree that the Court cannot find that the Complaint alleges material

misstatements or omissions unless plaintiffs adequately pled that Popular violated GAAP in

accounting for its U.S. DTAs.  (Defs.' Mem. at 14; Opp. at 20.)  But as plaintiffs recognize, GAAP

allows for "a range of 'reasonable treatments'" (Opp. at 33 (quoting *Thor Power Tool Co.* v. *C.I.R.*,

439 U.S. 522, 544 (1979))) and while plaintiffs claim that only one application of GAAP was

reasonable—*i.e.*, that the Company was required to record a full valuation allowance for its U.S.

DTAs as of January 24, 2008 (*see id.* at 8; CAC ¶¶ 75, 194, 241)—the Complaint is devoid of the

particularized facts supporting this conclusion that are required under the heightened pleading

standards of the PSLRA and Federal Rule of Civil Procedure 9(b).  In the absence of such facts, the

Complaint must be dismissed.  *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 194-95 (1st Cir. 2005).

        Plaintiffs contend that the Court may not consider the "positive evidence" of the Company's restructuring plans—its disposal or downsizing of money-losing U.S. operations, PFH and E-LOAN, and retention of the historically profitable BPNA—because it allegedly presents a "competing version of the facts" that plaintiffs omitted from the Complaint.  (Opp. at 24.)  But there is nothing "competing" about these facts or wrong with defendants relying on them.  Indeed, as noted above, in evaluating whether plaintiffs have presented a sufficiently plausible theory of a GAAP violation, the Court must look to "[a]ll available evidence," as management was required to do in determining whether to take a valuation allowance.  (SFAS No. 109, Ex. 2, at ¶ 20.)  And plaintiffs may not avoid inconvenient facts by simply omitting them from the Complaint.  *See, e.g.*, *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").[3]  As the First Circuit explained:

> In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment.  Were the rule otherwise, a plaintiff could maintain a claim of fraud by excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement.

*Shaw* v. *Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (citations omitted).

---

[3]    There is no dispute that defendants may rely on documents incorporated into the Complaint.  *See, e.g.*, *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (on a motion to dismiss, a court "must consider . . . documents incorporated into the complaint by reference"); *accord* Opp. at 26 ("'Opposing inferences may only be based on the allegations of the Complaint . . . and other documents properly before the court on a motion to dismiss.'") (quoting *Scottish Re*, 524 F. Supp. 2d at 390 n.149).  Plaintiffs quote and cite the documents relied on by defendants in the Complaint (*see, e.g.*, CAC ¶¶ 42, 63, 68, 76, 97, 119-20, 139, 215, 221) and even attach portions of these documents to their Opposition (Opp. at Exs. 1-4).

In advancing their claim that only one inference from the facts is possible, plaintiffs argue that "there is no basis for Defendants to exclude E-LOAN" from BPNA's results.  (Opp. at 26.)  But plaintiffs simply ignore that Popular's restructuring plan was designed to downsize E-LOAN and focus on BPNA.  (*See*, *e.g.*, Popular Form 10-K for the year ended Dec. 31, 2007, at 6 ("[T]he Board of Directors approved a substantial reduction of marketing and personnel costs at E-LOAN and changes in E-LOAN's business model to align it with revenue expectations.") (attached hereto as Ex. A).)  So in evaluating the likely *future* profitability, it is perfectly reasonable to ask whether the projected ongoing operations were profitable.

Plaintiffs concede that this precise scenario is an "example[]" cited in PwC's Guide to Accounting of "the kind of positive evidence that may, in some circumstances, permit a company to maintain DTAs even in the face of the kind of cumulative historical loss experienced by Popular US.  In each example, the company in question exited unprofitable businesses, while retaining profitable ones." (Opp. at 27 (citation omitted).)  Plaintiffs try to avoid the implications of this, however, by arguing that such a conclusion requires an analysis of "complex factual factors."  (*Id.* at 28.)  But that a decision may be complex does not relieve plaintiffs of their burden on this motion to demonstrate with particularity the "factors" that allegedly required Popular to take a valuation allowance.

Courts have found allegations similar to plaintiffs' allegations here—that GAAP had been violated by a failure to record a valuation allowance—to be insufficient to withstand a motion to dismiss.  *See*, *e.g.*, *Wet Seal*, 518 F. Supp. 2d at 1161-62 (dismissing Section 10(b) claim based on contention that "GAAP required that a loss reserve be recorded for deferred tax assets"); *Limantour*, 432 F. Supp. 2d at 1156-57 (finding a company's recording of DTAs followed by a later valuation allowance was not materially misleading).  Indeed, in dismissing a books-and-records

action brought against Popular, the Commonwealth of Puerto Rico Court of First Instance examined the allegations in this action, which had been incorporated into the books-and-records complaint, and concluded that they did not provide even a "credible basis" for claims of mismanagement and wrongdoing.  Sentencia, *García* v. *Popular, Inc.*, No. K AC2009-1316 (906), at 15 (Commonw. Ct. of P.R. Mar. 23, 2010) (attached as Ex. B).

 Plaintiffs' attempts to distinguish these cases fail.  They claim that the *Wet Seal* plaintiffs "had not alleged 'the necessary facts' to meet the pleading requirements."  But those plaintiffs made allegations similar to those plaintiffs make here—the presence of a three-year cumulative loss from declining sales—and the court flatly rejected them.  518 F. Supp. 2d at 1161-62.  They attempt to distinguish *Limantour* and "the numerous cases that the Exchange Act Defendants cite for the proposition that the failure of forecasted events to materialize is not actionable" by arguing that, in those cases, the courts found the subsequent recording of a valuation allowance or other accounting action only necessary because of "changed circumstances."  (Opp. at 31.)  But plaintiffs ignore the changed circumstances applicable here.  (*See, e.g.*, *id.* at 21 ("[N]othing had changed between the beginning of the Class Period and . . . October 22, 2008.").)  In September 2008 alone, Lehman Brothers and Washington Mutual declared bankruptcy, Merrill Lynch failed, and Fannie Mae and Freddie Mac were placed in government conservatorship.  (*See* Defs.' Mem. at 7 n.9.)  These catastrophic business failures exemplify the unexpected and devastating financial credit crisis in the second half of 2008 that took its toll on all financial institutions, including Popular.

 This is a second reason why *Scottish Re*, the case on which plaintiffs almost exclusively rely to support their claim that they have pled a GAAP violation (Opp. at 25-26, 29, 31, 34), is inapposite.  As noted above at pp. 2-3, *Scottish Re* is entirely distinguishable from this case

because the company in *Scottish Re* was shedding historically profitable operations, *Scottish Re*, 524 F. Supp. 2d at 393-94 ("The Scottish Re Defendants knew . . . that such a securitization, once complete, would preclude the Company from using any income generated by the securitized assets in the future."), and Popular was shedding money-losing operations.  Additionally, *Scottish Re* did not involve any suggestion of changed circumstances such as those present here.  Plaintiffs do not dispute this.  (Opp. at 44 (*Scottish Re* "'is not a case where plaintiffs are pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements'" (quoting *Scottish Re*, 524 F. Supp. 2d at 394)).)[4]

###    B.    Plaintiffs Fail To Plead Scienter.

Plaintiffs remarkably claim that "it is the *defendant's* burden to demonstrate the allegations in the Complaint give rise to an inference of nonculpable conduct that is stronger than the inference of scienter."  (Opp. at 36 (emphasis added).)  This is preposterous.  The PSLRA squarely states that one of the fundamental "[r]equirements for securities fraud actions" is that "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see also Tellabs*, 551 U.S. at 333.  As defendants explained in their Opening Brief, that places on plaintiffs the burden of alleging in their Complaint an inference that is "more than merely plausible or reasonable," but also "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at

---

[4]    Plaintiffs claim that they have standing to challenge the alleged misstatements made after June 24, 2008, because even though they last purchased Popular stock on that date, they allege a purported continuing scheme to defraud that continued after that date.  (Opp. at 19-20 n.10.)  *Gross* v. *Summa Four, Inc*., 93 F.3d 987, 989-90 (1st Cir. 1996), cited in the Opening Brief, however, addressed this exact situation of a plaintiff trying to challenge alleged misstatements made before and after the last date of the plaintiff's purchase.  The First Circuit found standing only as to those statements made before plaintiff's last purchase.  *Id.* at 993-94.

314. This plaintiffs have not done. Plaintiffs' attempt to rewrite the burden of proof on the scienter requirement says volumes about their confidence that they have met their real burden.

### 1.    Plaintiffs' Allegations that Popular Violated GAAP Do Not Raise a Strong Inference of Scienter.

Plaintiffs attempt to plead scienter by pointing to (i) the same allegations that they claim establish a GAAP violation—*e.g.*, Popular's cumulative losses—and (ii) defendants' alleged knowledge of SFAS 109. (Opp. at 36-39.) These generalized allegations do nothing to show that any defendant knowingly misapplied SFAS 109. To adequately plead scienter "[i]n the First Circuit, . . . [a] 10b-5 plaintiff must allege 'details of [defendants'] alleged fraudulent involvement,' including specifics as to what defendants had knowledge of and when." *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 57 (D. Mass. 1998) (quoting *Gross*, 93 F.3d at 991). Plaintiffs, however, utterly fail to identify *any* such "specifics" (Opp. at 35-45) and, as such, fail to plead that any defendant had knowledge that Popular's DTAs were misstated at any time. Indeed, the Complaint contains no allegations about the decision-making process at Popular with regard to accounting for its DTAs, the internal auditing of Popular's financial documents, what information management received prior to making the allegedly false and misleading statements, or when they received that information. Such "omissions and ambiguities count against inferring scienter." *Tellabs*, 551 U.S. at 326. *See also Ezra Charitable Trust* v. *Tyco Int'l, LTD*, 466 F.3d 1, 12 (1st Cir. 2006) ("Merely stating in conclusory fashion that a company's books are out of compliance with GAAP would not itself demonstrate liability under section 10(b) or Rule 10b-5.") (internal quotation marks omitted).

The kind of generalized allegations that plaintiffs make here have been widely rejected, including cases that deal specifically with allegedly misstated DTAs. For example, in finding that the plaintiffs did not adequately plead scienter, the court in *Wet Seal* pointed to the

complaint's lack of detail concerning "the contemporaneous decision-making behind the alleged accounting errors that would combine to show the required scienter." 518 F. Supp. 2d at 1163 (internal quotation marks omitted). *See also id.* at 1162-63 (even where there was a GAAP violation, to establish scienter a "'plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts'") (quoting *DSAM Global Value Fund* v. *Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002)). Similarly, the court in *Hess* v. *American Physicians Capital Inc.* found that plaintiffs had failed to raise a strong inference of scienter where they did "not plead with particularity to show 'how,' 'when,' and 'where' Defendants learned of the inadequacy of the loss reserves." 2005 WL 459638, at *11, *13 (W.D. Mich. Jan. 11, 2005). *See also In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 990 (N.D. Cal. 2007) ("[A]lthough Levi misstated its 2001 and 2002 financial statements by failing to record a proper valuation allowance, it is unclear from plaintiffs' allegations that such failure was intentional or deliberately reckless. Notably, . . . none of [plaintiffs'] allegations relates to decisions to understate the valuation allowance for foreign net operating loss carryforwards.").

Plaintiffs purport to distinguish *Wet Seal* because the clothing retail company in that case "had a legitimate hope of turning its fortunes around" from plans for a new line of clothing; yet plaintiffs fail to explain why a new line of clothing is a "legitimate" cause for corporate optimism, but Popular's significant restructuring plan is not. (Opp. at 42-43.) Plaintiffs state that in *Hess*, "the plaintiffs' only basis for alleging scienter on the part of the individual defendants was their status as 'top officers.'" (*Id.* at 43 n.21.) That is untrue. The *Hess* court also expressly discussed scienter allegations remarkably similar to those here—the "magnitude" of the valuation allowance, the

individual defendants' access to the relevant information, and their alleged motive to commit fraud—and still found the requisite strong inference lacking. 2005 WL 459638, at *9-13. Plaintiffs attempt to distinguish *Levi Strauss* by arguing that the amount of DTAs involved were less than is at issue here and that the Court "found that the plaintiffs' scienter allegations related to other alleged improprieties, not to the company's valuation allowance . . . ." (Opp. at 43 n.21.) But, the size of the DTAs involved—largely a reflection of the size of the company and the severity of the downturn—is not a rational basis for distinguishing the cases: it makes no sense to say that plaintiffs can state a claim for fraud more easily against a big company than a small one. And in arguing that the dismissal of the scienter allegations in *Levi Strauss* related to other allegations, plaintiffs misread the decision: the court's conclusion expressly related to the plaintiffs' allegations that "Levi fraudulently understated its valuation allowance." *Levi Strauss*, 527 F. Supp. 2d at 991.

The one opinion discussing an alleged failure to take a valuation allowance that plaintiffs rely on—*Scottish Re*—does not in fact support their argument. The *Scottish Re* court focused its scienter analysis on the defendants' alleged knowledge that the company had no possibility of earning future taxable income from assets it had securitized because it was logically impossible to expect income to Scottish Re from assets that had been committed to others. 524 F. Supp. 2d at 393-94. As noted above, the allegations here are entirely different. By retaining its historic money-earning operations, Popular was not precluded from earning future taxable income, and unlike in *Scottish Re*, there clearly were "changed circumstances," *id.* at 394, here—namely, a global credit crisis of a severity that had not been seen since the Great Depression.

A much closer case to this one is *Iron Workers Local No. 25 Pension Fund* v. *OshKosh Corp.*, 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010). In that case, plaintiffs alleged fraud in the context of a company's alleged failure to take a timely valuation allowance for its goodwill

assets.  In finding that plaintiffs had not raised a strong inference of scienter, the *Iron Workers* court explained:

> [T]he amended complaint alleges the Defendants knew generally that the European economy was weak, or that restructuring efforts would fail, or that the company's historical profits did not justify its goodwill valuation.  These general allegations are not substitutes for actual knowledge that the company's forecasts were unreasonable, however.  There are no allegations of secret internal forecasts predicting gloom, doctored books hiding the truth or accounting gimmicks painting a rosier picture.  None of the confidential witnesses stated that any of the Defendants knew X was true while they said Y, or that internal projections showed something different from what was publicly disclosed.

2010 WL 1287058, at *19.  The Court should reach the same conclusion.

### 2.     Plaintiffs' Other Scienter Allegations Fail.

Plaintiffs assert a host of other allegations in an attempt to transform an accounting judgment into intentional fraud.  But each of these allegations—Popular management's alleged motive to keep the Company well-capitalized, the "magnitude of the DTAs" recorded, Popular's completion of a preferred stock offering, and an analyst questioning "whether Popular U.S.'s DTAs were overstated" (Opp. at 39-41)—are identical to allegations that courts have regularly rejected.  And adding them together "holistically" does not transform lead into gold.

### a.     Popular Management's Alleged Motive Is Insufficient.

Plaintiffs argue that defendants were aware of "the relevant FDIC requirements for being 'well-capitalized'" and were motivated not to take a valuation allowance so Popular could avoid losing its well-capitalized status.  (Opp. at 37, 40.)  Noticeably absent from the Complaint, however, are particularized allegations—based on "confidential witnesses" or otherwise—demonstrating that this was an actual concern of any defendant or that the Company could not have maintained its well-capitalized status in the absence of fraud.  Indeed, plaintiffs' own allegations show that, like most public companies, Popular had numerous non-fraudulent options for raising

capital.  The Complaint alleges that Popular was able to raise "net proceeds of $386,150,000" through a May 2008 preferred stock offering "that would be used for purposes including increasing Popular's liquidity and capital."  (CAC ¶¶ 146, 282 (internal quotation marks omitted).)  In any case, without allegations tying the facts of this case to an alleged concern about capitalization, plaintiffs' motive theory amounts to no more than mere speculation, which is insufficient to raise any inference of scienter.  *See*, *e.g.*, *In re Stone & Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d 102, 134 (D. Mass. 2003) (declining to credit allegation of motive "not supported by anything more than plaintiffs' speculation").

Moreover, an alleged concern about capitalization levels would be applicable to executives in virtually any bank in this period.  This is insufficient to raise an inference of scienter.  *See*, *e.g.*, *In re Eaton Vance Corp. Sec. Litig.*, 206 F. Supp. 2d 142, 154 (D. Mass. 2002) ("Stripped of pure speculation, . . . [t]his is a generalized motive and opportunity pleading that would apply in nearly every business, and is not enough, by itself, to give rise to a strong inference that the defendants acted with scienter.").  Plaintiffs' reliance on *In re Cabletron Sys.*, 311 F.3d 11 (1st Cir. 2002), and *Fox* v. *First Bancorp*, 2006 WL 4128534 (D.P.R. Nov. 6, 2006) (Opp. at 44-45), is misplaced for exactly this reason.  As the First Circuit pointed out in *Cabletron* and other similar cases, plaintiffs need to allege some personal financial incentive by the executives in order to raise an inference of scienter, not just "'the usual concern by executives to improve financial results.'"  *See Ezra Charitable Trust*, 466 F.3d at 10-11 (quoting *Cabletron*, 311 F.3d at 39) (no scienter from an allegation that the defendants were motivated by "desperation to save Tyco from bankruptcy").  *Fox* is the same:  "[T]he individual defendants were motivated by the prospect of receiving substantial incentive compensation that was tied directly to First BanCorp's reported net income."

2006 WL 4128534, at *9.  Plaintiffs have not alleged that Popular's management would gain such a personal benefit.

### b.      The 'Magnitude of the DTAs' Is Insufficient.

Plaintiffs argue that the "magnitude of the DTAs" supports a finding of scienter. (Opp. at 39.)  This could mean one of two things.  *First*, it could mean that the DTAs were so big in January 2008 that management must have focused on them, so the failure to take a valuation allowance could not have been inadvertent.  But no one is suggesting inadvertence.  To the contrary, as Popular's contemporaneous disclosures show (*e.g.*, Popular Form 10-Q for the period ended Mar. 31, 2008, Ex. 5, at 81), its management made a conscious decision that projected income would absorb the recorded DTAs.  The amount of the DTAs involved does not contribute in any way to a conclusion that that decision was in bad faith.

*Second*, the argument could refer to the magnitude of the DTAs ultimately covered by a valuation allowance.  As noted in the Opening Brief, courts have observed that an inference of scienter based on the magnitude of the amounts at issue is improper where it involves an exercise in "speculation and hindsight" by proceeding on "'the assumption that the defendants must have known the severity of their problems earlier because conditions became so bad later on'"  *In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165, at *17 (D. Mass. May 10, 2006) (quoting *Serabian* v. *Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 367 (1st Cir. 1994)).  (Defs.' Mem. at 21-22.)  Plaintiffs argue that their theory is not based on hindsight because they have "given a host of evidence of contemporaneous knowledge of falsity."  (Opp. at 44.)  That is untrue.  The Complaint does not contain a single allegation showing *any* "knowledge of falsity," contemporaneous or otherwise.  In fact, plaintiffs' fraud theory rests on hindsight—that defendants must have known in January 2008 that the global credit crisis would dramatically escalate in the second half of 2008 and jeopardize the success of Popular's restructuring plans, because, in hindsight, it did.

### c.    Popular's Preferred Stock Offering Is Insufficient.

Plaintiffs also point to Popular's May 2008 preferred stock offering without any explanation as to how it would lead to a "strong inference of scienter." (Opp. at 40.) Courts have found bare allegations that defendants engaged in stock offerings during the Class Period insufficient to raise an inference of scienter. Again, a desire for a stock offering to succeed is shared by all companies approaching the capital markets. Plaintiffs must tie the offering to some personal benefit different from that shared by all such corporate executives. They have not done so. *See*, *e.g.*, *Rombach* v. *Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (secondary offering of securities during class period did not show scienter because "plaintiffs nowhere allege[d] that defendants engaged in [that] transaction[] to secure personal gain," but rather as "part of the officers' and directors' financial responsibilities to the Company" (internal quotation marks omitted)); *In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513, at *7 (N.D. Ohio June 27, 2002) ("[E]ven if defendants intended to benefit, the shareholders themselves also would benefit from a high stock price in the . . . public offering context. Such an allegation is insufficient where it does not show an intent to benefit the defendants at the expense of the shareholders.").

### d.    The Sterne Agee Report Is Insufficient.

Plaintiffs do not even attempt to explain how an analyst at Sterne Agee "question[ing] whether Popular U.S.'s DTAs were overstated" does any more than indicate that one person disagreed with Popular management's reasonable decision not to take a full valuation allowance in January 2008. (*Compare* Defs.' Mem. at 22-23 *with* Opp. at 40-41.) Such an allegation does not give rise to any inference that Popular management *knew* that the Company's DTAs were overstated.

### 3.    Plaintiffs' Scienter Allegations Fail When Viewed "Holistically."

Independently, each of plaintiffs' scienter allegations does not raise an inference of scienter. Viewing plaintiffs' allegations "holistically" (Opp. at 35) does not change the outcome: the allegations of scienter in this case are nowhere close to "cogent" or as "compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.[5]

Plaintiffs admit that Popular's outside auditor issued clean, unqualified opinions on Popular's financial statements (CAC ¶¶ 35, 303), which weighs against an inference of scienter. *See*, *e.g.*, *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 349 n.63 (D.N.J. 2007) ("[A] 'clean' outside audit provides certain grounds for Defendants' placid state of mind and advocates against [an] inference of scienter.").[6] Also weighing against an inference of scienter is the fact that Popular fully disclosed the financial information that plaintiffs contend required Popular to take a valuation allowance (Opp. at 45; Defs.' Mem. at 9-12), and that Popular's financial statements specifically warned of the possible need to take a valuation allowance in the future (Defs.' Mem. at 6-7, 23, 28-29). *See Ezra Charitable Trust*, 466 F.3d at 8 ("[A]ttempts to provide investors with warnings of risks generally weaken the inference of scienter."); *ACA Fin. Guar. Corp.* v. *Advest, Inc.*, 512 F.3d 46, 66-67 (1st Cir. 2008) (finding "competing inferences of non-fraudulent conduct" strengthened

---

[5]    In discussing scienter, plaintiffs again implore the Court not to review any information in the documents incorporated into the Complaint. (Opp. at 42 (portraying information intentionally omitted by plaintiffs from the Complaint as an "alternative set of facts").) This fails for the reasons set forth at page 4 & note 3, *supra*.

Plaintiffs do not dispute that the Complaint contains no allegations about Mr. Carrión's knowledge. For this reason alone plaintiffs fail to plead that he acted with the requisite scienter, and thus the Section 10(b) claim asserted against Mr. Carrión should be dismissed. (*See* Defs.' Mem. at 18 n.15.)

[6]    Plaintiffs argue that the lack of restatement is not sufficient to defeat securities fraud allegations. (Opp. at 32.) That is a straw man. It is indisputable that the absence of a restatement *supports* the conclusion that Popular's management acted reasonably. (Defs.' Mem. at 14.) *See also Iron Workers*, 2010 WL 1287058, at *19 ("[T]he fact that one of the Big Four accounting firms evidently agreed with their approach weakens the inference that the need to recognize an impairment was so manifest that the failure to do so was fraudulent.").

where defendants "fully-disclosed" the college's underlying financial problems); *Iron Workers*, 2010 WL 1287058, at *21 ("[B]ecause the company actually provided all the underlying data required to make the accounting judgment in question, it is difficult to believe that the failure to take an impairment was part of some scheme to deceive.").[7] Plaintiffs also do not dispute that their purported "confidential witnesses" do nothing more than affirm the information in Popular's disclosures and say nothing about management's evaluation of whether a valuation allowance was appropriate. (*Compare* Defs.' Mem. at 20 n.16 *with* Opp. at 23 n.12.)

The more compelling inference raised by the allegations in the Complaint is nonfraudulent: Popular management's belief that implementing restructuring plans would lead to taxable income sufficient for the Company to use its DTAs proved too optimistic in light of the unforeseen and sharp downturn in late 2008. In *Wet Seal*, the court faced a very similar situation: the defendant retailer had experienced financial losses, but was implementing a "turnaround plan" in an attempt to return to profitability. 518 F. Supp. 2d at 1153. The court concluded that "the most reasonable inference from the record is that Defendants simply delayed taking the charge hoping that the 2004 back-to-school line would succeed and thereby reverse Wet Seal's declining fortunes." *Id.* at 1165. In such circumstances, "The Most Reasonable Inference Derived from Defendants' Statements Is Cautious Optimism, Not Fraud." *Id.* As the court noted, "[e]ven accepting Plaintiffs' allegations as true, Defendants accurately portrayed Wet Seal as what it was—

---

[7]     Plaintiffs argue that the fact that Popular revealed negative financial data should not weigh against scienter, citing the conclusion in *Scottish Re* that "the investing public was unaware of the consequences those plans would have on the deferred tax assets." (Opp. at 45 (quoting *Scottish Re*, 524 F. Supp. 2d at 390) (emphasis removed).) But again here the facts are different: plaintiffs cannot dispute that the investing public knew the consequences because plaintiffs' entire case is built on the fact that public financial data should have put the defendants on notice that a valuation allowance was needed. (CAC ¶¶ 62-64, 71-77, 118-20.) Indeed, plaintiffs argue that the Sterne Agee analyst concluded on more than "six separate occasions" from that same public data that Popular should take a substantial or full valuation allowance. (CAC ¶¶ 126, 128, 174, 225, 243; Opp. at 40-41.) Clearly, Popular was not hiding facts from which a contrary DTA conclusion could even arguably be reached, which supports a conclusion that management honestly made its best judgment.

a struggling company seeking to turn itself around in a very competitive market. This also cuts

against scienter and in favor of optimism." *Id.* at 1166. The same is true here.

C.    **Plaintiffs Fail To Plead Loss Causation.**

As an initial matter, plaintiffs again attempt to reduce their pleading burden, this time

contending that they do not need to plead loss causation with any specificity and that loss causation

cannot "be decided on a Rule 12(b)(6) motion to dismiss." (Opp. at 46.) Both contentions misstate

the law. At least three circuits have held that plaintiffs must plead loss causation with a level of

specificity beyond "the minimal notice pleading burden" that plaintiffs claim.[8] And in *Dura*, the

Supreme Court held the "complaint legally insufficient" because of a failure to adequately plead

loss causation. 544 U.S. at 348. Dozens of other cases similarly have dismissed (or affirmed

dismissals of) complaints for failure to plead loss causation.[9]

Plaintiffs contend that the disclosure of management's decision to take an additional

valuation allowance in January 2009 was a "corrective disclosure," though it did not address in any

---

[8]    *Teachers' Ret. Sys. of LA* v. *Hunter*, 477 F.3d 162, 186 (4th Cir. 2007) ("A failure to recognize that loss causation be specifically alleged . . . 'would tend to transform a private securities action into a partial downside insurance policy.'") (quoting *Dura Pharm.* v. *Boudo*, 544 U.S. 336, 347-48 (2005)); *Catogas* v. *Cyberonics*, 292 F. App'x 311, 312 (5th Cir. 2008) ("We hold plaintiffs failed to plead loss causation with the requisite particularity."); *In re Dothill Sys. Corp. Sec. Litig.*, 2009 WL 734296, at *5 (S.D. Cal. Mar. 18, 2009) ("[T]he Ninth Circuit requires 'sufficient detail to give defendants ample notice of plaintiffs' loss causation theory, and to give [the court] some assurance that the theory has a basis in fact.'") (quoting *Berson* v. *Applied Signal Tech., Inc.*, 527 F.3d 982, 989-90 (9th Cir. 2008)).

[9]    *See, e.g.*, *Masters* v. *GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir. 2008) ("Although the complaint alleges two stock losses, . . . [it] fails to demonstrate a causal link between these alleged losses and the alleged misconduct."); *Ind. State Dist. Council of Laborers* v. *Omnicare, Inc.*, 583 F.3d 935, 945 (6th Cir. 2009) ("[W]e cannot conclude that loss causation has been adequately pled . . . ."); *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1065 (9th Cir. 2008) (affirming dismissal on loss causation grounds because defendant "persuasively explain[ed]" why inference from complaint was unwarranted); *Hunter*, 477 F.3d at 188 (affirming dismissal because "plaintiffs [did] not allege[] that any previously concealed risk materialized . . . , causing their loss"); *McAdams* v. *McCord*, 584 F.3d 1111, 1115 (8th Cir. 2009) (affirming dismissal because "the complaint [did] not show that the investors' losses were caused by [defendant's] misstatements").

way the state of facts that management faced three months to a year earlier. (Opp. at 47-50.)

Plaintiffs do not dispute that the analyst rating case cited in defendants' Opening Brief, *Lentell* v.

*Merrill Lynch & Co*., 396 F.3d 161 (2d Cir. 2005), is good law. In that case, plaintiffs claimed that

analysts falsely inflated their ratings on stocks to keep those stocks' prices high. *Id.* at 172. The

Second Circuit held that when the stocks' prices dropped after later ratings downgrades, those

ratings downgrades did not constitute corrective disclosures for purposes of loss causation. *Id.* at

175 n.4. *Lentell* is on all fours with this one and plaintiffs do not address this part of the Court's

holding. As the Sixth Circuit held in *Omnicare*, 583 F.3d at 945, "In short, the complaint does not

suggest that the alleged GAAP violations were ever recognized by or revealed to the market.

Therefore, loss causation is . . . lacking."

      Plaintiffs vaguely hint at another theory of loss causation. On page 49 of their

Opposition, they assert that plaintiffs "were harmed by the revelation of information that

Defendants had previously concealed" about "the impropriety of Popular's DTAs and its need to

take a valuation allowance." This may be intended to suggest that, rather than correcting previously

withheld information, Popular's January 22, 2009, disclosure of its valuation allowance was a

"materialization" of a risk that had been previously misstated or concealed altogether. This is a

recognized theory of loss causation, *see Lentell*, 396 F.3d at 175 (finding allegations of "misstated

or omitted risks that did lead to the loss" may show loss causation), but it does not apply here.

      *First*, even if the theory were fully articulated in the Opposition—which does not

even identify how the failure to take a valuation allowance in 2008 concealed a "risk" of a valuation

allowance in 2009—plaintiffs may not amend the Complaint through the Opposition. *See*, *e.g.*, *In*

*re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 304 n.24 (S.D.N.Y. 2009) (declining to

address plaintiff's "new theory" because it was raised for the first time in plaintiff's opposition brief).

        *Second*, where, as here, the Company's disclosures expressly warned of the risk of a future valuation allowance (*see* Defs.' Mem. at 6-7, 28-29), the "materialization of risk" theory of loss causation requires that plaintiffs also plead facts sufficient to show that the loss was due to the supposedly concealed portion of the risk or to the fact of the concealment, and not to other factors. *Lentell*, 396 F.3d at 177.[10]  Plaintiffs, however, make no attempt to account for the host of negative data released on January 22, 2009—the date of the stock price drop—including that Popular had business problems far more fundamental than a full valuation allowance, missed analysts' consensus earnings estimates, and had its credit ratings downgraded by Fitch.  (*See* Defs.' Mem. at 24-25 (citing CAC ¶¶ 175, 181).)[11]  This omission is fatal.  *See, e.g.*, *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) ("Plaintiffs have not alleged facts to show that Deloitte's misstatements, among others (made by Warnaco) that were much more consequential and numerous, were the proximate cause of plaintiffs' loss; nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to Deloitte's misstatements. Accordingly, plaintiffs have not alleged loss causation.") (citation omitted); *In re Homebanc Corp. Sec. Litig.*, 2010 WL 1524836, at *21 (N.D. Ga. Apr. 13, 2010) ("[T]he complaint here fails to

---

[10]     Plaintiffs' attempt to analogize this action to *In re Credit Suisse-AOL Sec. Litig.* (Opp. at 49-50) is inapt because in that case the company's "generic statements" were inadequate "to trigger" these additional pleading requirements.  465 F. Supp. 2d 34, 49-50 (D. Mass. 2006).  Far more analogous is *In re The First Marblehead Corp. Sec. Litig.*, in which defendants provided "detailed disclosures regarding credit criteria and default rates, and the risks associated with . . . the projected financial results."  639 F. Supp. 2d 145, 164 (D. Mass. 2009) (footnotes omitted).  The court held that "[d]efendants' detailed disclosures, the deterioration in the credit markets, and First Marblehead's preexisting pattern of stock declines negate[d] Lead Plaintiffs' theory of loss causation."  *Id.* at 165.

[11]     Plaintiffs do not dispute that they falsely allege that analysts "attributed Popular's stock drop on January 22, 2009 to the complete write-down of the Company's U.S. mainland deferred tax assets."  (*See* Defs.' Mem. at 25 n.18 (quoting CAC ¶ 179).)

make any allegations that would allow the Court to distinguish between any losses caused by Defendants' alleged misrepresentations and the collapse of the mortgage industry as a whole.").[12]

**D.    The Alleged Misstatements Are Protected as Forward-Looking Statements.**

**1.    The Alleged Misstatements Are Forward-Looking.**

Plaintiffs take the illogical position that even if Popular's statements about its DTAs "contain[] a reference to the future" (Opp. at 52), these statements should not be protected by the PSLRA's safe harbor for forward-looking statements because they misrepresented the "*current* likelihood, based on the weight of *currently available information*" that the Company's DTAs would be absorbed (*id.* at 53).  Plaintiffs' theory would eviscerate the PSLRA's safe harbor because *all* "'projections and predictions of future economic performance,'" which are what qualify for protection under the safe harbor (*id.* at 52 (quoting *Stone & Webster*, 414 F.3d at 212)), are necessarily based on the "current likelihood" and "currently available information"—*i.e.*, not future information, which is not yet available.[13]

---

[12]    None of the cases cited in response by plaintiffs (Opp. at 50-51) deal with the situation here: negative events disclosed the *same day* as the alleged revelation of falsity to the market.  *See Sloman* v. *Presstek, Inc.*, 2007 WL 2740047, at *11 (D.N.H. Sept. 18, 2007) (finding negative information that resulted in a stock decline before alleged stock drop (not the same day) did not undermine plaintiff's loss causation theory); *Credit Suisse-AOL*, 465 F. Supp. 2d at 46 (discussing "intervening events," not events that occurred the same day as the alleged drop); *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) (no indication of timing of other negative factors); *In re March & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at*25 (S.D.N.Y. Dec. 23, 2009) (not deciding a dispositive motion or discussing standards for such a motion).

[13]    Plaintiffs concede that if the Court finds Popular's alleged misstatements forward-looking, the safe harbor protects the statements Popular issued in press releases and one analyst presentation. (*Compare* Defs.' Mem. at 28 n.22 *with* Opp. at 54.)  Even if the remaining alleged misstatements are not protected by the statutory safe harbor because they appear in "financial statements" (Opp. at 54 & n.25), the statute is merely a "safe harbor" and does not exhaust the protection for forward-looking statements.  Under the common law "bespeaks caution" doctrine, these statements are not actionable because, as set forth in the next section, they were accompanied by adequate warnings that Popular may need to take a future valuation allowance.  *See, e.g., In re Ambac Fin. Group, Inc. Sec. Litig.*, 2010 WL 727227, at *30-31 (S.D.N.Y. Feb. 22, 2010) (applying "bespeaks caution" doctrine to protect alleged misstatement in defendant company's financial statements).

## 2.    The Alleged Misstatements Were Accompanied by Meaningful Cautionary Language.

Plaintiffs claim that the cautionary language in Popular's disclosures are "boilerplate." (Opp. at 55.) But plaintiffs do not discuss any of the specific language in question. (*Id.*) In fact, all of Popular's allegedly misleading statements were accompanied by statements that explained in detail which factors "may cause actual results to differ from those contemplated." (*See* Defs.' Mem. at 6-7, 28-29.) Courts faced with cautionary language similar to the language appearing in Popular's statements have held that it satisfies the PSLRA's standards, regardless of whether plaintiffs claim it is "boilerplate." *See*, *e.g.*, *Fisher* v. *SpecTran Corp.*, 2001 WL 34644311, at *4 n.5 (D. Mass. May 31, 2001) (finding meaningful cautionary language where press release included the following statement: "In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the company or any other person that the objectives and plans of the company will be achieved"); *Payne* v. *DeLuca*, 433 F. Supp. 2d 547, 598 (W.D. Pa. 2006) (dismissing Section 10(b) claim because a warning that the company may not achieve its projections due to various factors including "the [c]ompany's ability to generate a sufficient level of future earnings to use its deferred tax assets" sufficiently specified the risks facing the company).[14]

---

[14]    Plaintiffs also contend that the PSLRA's "safe harbor does not apply if the plaintiff proves that the forward-looking statement 'was made with actual knowledge' that it was false." (Opp. at 55.) This is incorrect. The PSLRA's safe harbor protects forward-looking statements in two separate and distinct situations: (A) statements "accompanied by meaningful cautionary statements"; <u>or</u> (B) statements for which "the plaintiff fails to prove" that the statements were "made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. §78u-5(c)(1)(A)-(B); *see also Miller* v. *Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) ("[I]n the case of 'forward-looking statements' that are not accompanied by meaningful cautionary language, actual knowledge of their false or misleading nature is required."). For the reasons stated in Part I.B, the Complaint does not contain a single pertinent fact that Popular's statements were made with "actual knowledge." That requirement is "marginally higher" than the PSLRA's normal scienter standard. *Borochoff* v. *GlaxoSmithKline PLC*, 2008 WL 2073421, at *10 (S.D.N.Y. May 9, 2008) (internal quotation marks omitted).

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATIONS OF SECTION 11 OR 12(a)(2) OF THE SECURITIES ACT.

The parties agree that if the Court finds that plaintiffs have failed adequately to allege that Popular made material misstatements or omissions for their Section 10(b) claims, plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act fail as well. (*Compare* Opp. at 58 *with* Defs.' Mem. at 30-31.) For the reasons stated in Part I.A, *supra*, plaintiffs have not made this threshold showing, and so the Court must dismiss plaintiffs' Securities Act claims. Additionally, for the reasons stated in Part I.D, *supra*, the statements in Popular's Offering Documents are forward-looking and the safe harbor similarly applies to plaintiffs' Securities Act claims.

Plaintiffs' responses to the remaining bases for dismissal of their Securities Act claims also fail.

**Loss Causation.** Plaintiffs offer two arguments to try to avoid the very significant problem for their Securities Act claims that their Complaint does not plead any drop in price of the Series B shares on January 22, 2009—which they characterize as the day "the true facts about the Company's U.S. mainland deferred tax assets were finally revealed." (CAC ¶ 11; *id.* ¶¶ 178, 227, 246 (referring to January 22 drop in "common stock" price).)[15] *First*, plaintiffs argue in the Opposition that the Series B shares declined by "almost 9%"—in fact, 8.8%—that day. (Opp. at 59.) Plaintiffs may not, however, amend their allegations in an opposition brief. (*See* pp. 18-19, *supra*.) Moreover, even if the Court considered this new allegation, it is insufficient to plead a plausible theory of loss causation because plaintiffs have failed to plead any facts to show that that

---

[15]    Plaintiffs concede that defendants "may raise loss causation as an affirmative defense at the motion to dismiss stage" and that dismissal is appropriate where the defense is "'clear on the face of plaintiff's pleadings.'" (Opp. at 59 (quoting *Blackstone Realty LLC* v. *FDIC*, 244 F.3d 193, 197 (1st Cir. 2001)).)

drop was not caused by ordinary market fluctuations or macroeconomic causes.  In fact, Standard & Poor's Banking Index suffered a commensurate almost 7% decline—in fact, 6.8%—that same day. (*See* S&P Banking Index Historical Prices, Ex. 20, at 6.)

    *Second*, plaintiffs point to a price drop a month after the alleged corrective disclosure, when Popular cut its dividend from eight cents to two cents.  (Opp. at 59-60.)  Even though plaintiffs contend that the dividend cut was a "'foreseeable consequence' of the Company's writedown of its DTAs in January 2009," they argue that the market for the Series B shares waited to drop until February 19 because the dividend cut "was a subsequent disclosure of the effect of the fraud" and because "preferred stock often reacts differently than common stock to disclosures of fraud due to their different features."  (*Id*.)  If the dividend cut was a "foreseeable consequence" of the valuation allowance, however, the market should have promptly incorporated that expectation. Indeed, plaintiffs expressly allege that the market for Series B shares was "efficient" and "promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the price[]" of the Series B shares.  (CAC ¶ 252.)  Additionally, plaintiffs' assertions that "preferred stock often reacts differently than common stock" fails because (i) it was not in the Complaint; (ii) it says nothing about how the Popular Series B preferred shares themselves reacted; and (iii) it is utterly unsupported.  The "authority" cited by plaintiffs does not discuss preferred shares at all, let alone how they react to market disclosures.  (*See* Opp. at 60 (citing *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 631-33 (N.D. Ala. 2009) (discussing differences between stocks and bonds)).)[16]

---

[16]  Plaintiffs also promise that loss causation will be "demonstrated at trial" (Opp. at 60), but this is insufficient to overcome their pleading failure here.  *See In re Tycom Ltd. Sec. Litig.*, 2006 WL 39237, at *1 (D.N.H. Jan. 6, 2006) (dismissing Section 11 claim because "the affirmative defense of no loss causation is readily established on the face of the complaint").

**Statute of Limitations.**  The parties agree on the First Circuit's two-part test of whether the one-year limitations period has been triggered:  (1) defendants "must establish that there were sufficient 'storm warnings'"; and if they do, (2) plaintiffs may demonstrate "that even a reasonable and diligent inquiry by the plaintiff[s] would not have revealed the facts necessary to file a legally sufficient complaint."  (Opp. at 69); *Young* v. *Lepone*, 305 F.3d 1, 8-9 (1st Cir. 2002).[17]

According to plaintiffs' own allegations, "storm warnings" existed before Popular ever issued the registration statement that is the subject of their Section 11 claim.  Plaintiffs' argument that Popular should have taken a valuation allowance for its U.S. DTAs as of January 24, 2008 is based *entirely* on information that was readily available in numerous public documents issued before Popular issued the registration statement.  (*See*, *e.g.*, Mem. of Law in Supp. of PwC's Mot. to Dismiss, filed Jan. 11, 2010, at 10-12 (Docket No. 120).)  Put another way, plaintiffs cannot argue that sufficient "storm warnings" did not exist, because their Complaint is predicated on Popular management's alleged failure to heed them.  *See*, *e.g.*, *In re Xchange Inc. Sec. Litig.*, 2002 WL 1969661, at *2-3 (D. Mass. Aug. 26, 2002) (dismissing Section 11 claims as time-barred because "the facts underlying plaintiffs' fraud claims . . . were matters of public record," so "plaintiffs [were] charged with such knowledge").

Plaintiffs attempt to satisfy the second prong with the single conclusory assertion that "all such facts were in the exclusive possession of the Defendants and unavailable to the investing public."  (Opp. at 70-71.)  But this is simply false:  the facts referred to are *all* facts in Popular's public filings.

**Standing.**  Plaintiffs concede that they did not purchase their shares from Popular directly (CAC ¶ 333 ("The Underwriter Defendants . . . sold the Series B preferred shares to

---

[17]    Popular's Series B Offering took place in May 2008 (CAC ¶ 282), but plaintiffs waited until October 19, 2009—nearly seventeen months later—to file their Section 11 claim.

Plaintiffs Picó and Puig-Rivera and members of the Class . . . .")), but nevertheless argue that they have standing to sue Popular because Popular allegedly "actively solicited the sale [sic] of the Series B preferred shares."  (Opp. at 62.)

Plaintiffs' allegations that Popular announced the offering, priced the offering, increased the offering size, announced the net proceeds, and prepared, filed, and signed the Offering Documents (*id.*), are insufficient to show active solicitation in the First Circuit:  "[N]either involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities, standing alone, demonstrates the kind of relationship between defendant and plaintiff that could establish statutory seller status."  *Shaw*, 82 F.3d at 1216 (citation and emphasis omitted).  Plaintiffs fail to allege that they "had any contact whatsoever with any of the defendants, or received any 'solicitations' from them (apart from the Prospectus)."  *Lalor* v. *Omtool, Ltd.*, 2000 WL 1843247, at *8 (D.N.H. Dec. 14, 2000) (dismissing Section 12(a)(2) claims for failing to adequately allege that defendants were "sellers").  *See also Sonus Networks*, 2006 WL 1308165, at *10 ("Plaintiff's attempt to avoid dismissal of the Section 12(a)(2) claims by relying on opinions from outside the First Circuit [is] unavailing.  *Shaw* is directly on point here and dooms Plaintiff's 12(a)(2) claims.").[18]

Plaintiffs also claim standing by asserting that Popular Securities, Inc., "the joint book-running manager of the Series B Offering—was a wholly-owned subsidiary of Popular, and thereby controlled by Popular."  (Opp. at 63 (emphasis omitted).)  However, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not

---

[18]    *Colon* v. *Diaz-Gonzalez*, 2009 WL 498288 (D.P.R. Feb. 19, 2009), which plaintiffs cite multiple times (Opp. at 61-62), is completely inapposite because that case did not involve an underwriting at all.

liable for the acts of its subsidiaries." *United States* v. *Bestfoods*, 524 U.S. 51, 61 (1998) (quotation

marks omitted).  The one case cited by plaintiffs is not to the contrary.  (Opp. at 63 (citing *In re*

*Global Crossing, Ltd. Sec. Litig.*, 2003 WL 22999478 (S.D.N.Y. Dec. 22, 2003), a case that allowed

a Section 11 (not a Section 12(a)(2)) claim to move forward against a parent company because that

company was alleged to be the underwriter, not because of the company's relationship to its

subsidiary).)

## III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT OR SECTION 15 OF THE SECURITIES ACT.

There is no dispute that, if plaintiffs have not stated claims under Section 10(b) of

the Exchange Act or Sections 11 or 12(a)(2) of the Securities Act, the Court should dismiss their

claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act as well.  *See*,

*e.g.*, *ACA Fin. Guar. Corp.*, 512 F.3d at 67 (Section 20(a) liability only exists where there is

liability under Section 10(b)); *Fox*, 2006 WL 4128534, at *7 (Section 15 liability only exists where

there is liability under Sections 11 or 12).[19]

---

[19]    Additionally, plaintiffs' Section 20(a) claims fail because they do not plead "culpable participation." Plaintiffs do not even attempt to address *Alvarado* v. *Morgan Stanley Dean Witter, Inc.*, in which this Court stated that the "seminal case adopting the 'culpable participant' requirement, equates culpable participation with lack of good faith," *i.e.*, management failed to have "a reasonable system of supervision, enforced with reasonable diligence."  448 F. Supp. 2d 333, 339 (D.P.R. 2006) (citations omitted).  Plaintiffs point to no particularized allegations that Messrs. Carrión and Junquera acted with a lack of good faith.  (*See* Part I.B, *supra*; *accord* Defs.' Mem. at 17-23, 30 n.24.)  Instead, plaintiffs claim that "culpable participation is adequately pleaded if plaintiffs allege that defendants signed false and misleading financial statements."  (Opp. at 56 n.28.)  But the two cases plaintiffs cite are quite different.  In each, the individual defendants were alleged to have greater involvement in the alleged wrongdoing than simply signing the financials.  *See Fox*, 2006 WL 4128534, at *8 (finding culpable participation where plaintiff also alleged material weaknesses in the defendants' system of internal controls and therefore an absence of a reasonable system of supervision); *In re Tyco Int'l, Ltd.*, 2007 WL 1703023, at *12 (D.N.H. June 11, 2007) (finding "culpable participation" based on "numerous specific facts" that "defendants exercised control over Tyco," not that defendants signed SEC filings).

**WHEREFORE**, Popular and the individual defendants hereby respectfully request this Honorable Court dismiss the Complaint in its entirety as to these defendants without leave to replead.

**WE HEREBY CERTIFY** that today we electronically filed the document with the Clerk of Court using the CM/ECF system.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 10th day of May, 2010.

Joseph E. Neuhaus (pro hac vice)
Jeffrey T. Scott (pro hac vice)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
Fax: (212) 558-3588

*Counsel for Popular Inc. and the Individual Defendants*

Ana Matilde Nin-Torregrosa
USDC No. 124607
NIN-TORREGROSA &
RODRÍGUEZ-RUIZ
Citibank Tower, Suite 1801
252 Ponce de León Avenue
San Juan, Puerto Rico  00918
Tel:  (787) 282-6687
Fax:  (787) 767-0729

*Counsel for Francisco M. Rexach*

By:  /s/ Néstor Méndez-Gómez
Néstor M. Méndez-Gómez
USDC No. 118409
nmendez@pmalaw.com

PIETRANTONI MÉNDEZ &
ALVAREZ LLP
Popular Center, 19th Floor
209 Muñoz Rivera Ave.
San Juan, Puerto Rico  00918
Tel:  (787) 274-1212
Fax:  (787) 274-1470

*Counsel for Popular Inc. and the Individual Defendants except Francisco M. Rexach*