**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**RUSSELL HOFF, Individually and on
Behalf of All Others Similarly Situated,**

    **Plaintiff,**

    **v.**

**POPULAR, INC., et al.,**

    **Defendants.**

**Civil No. 09-1428 (GAG/BJM)**

## OPINION AND ORDER

Lead plaintiffs, the General Retirement System of the City of Detroit, Nilda Pico and Jose L. Puig-Rivera (collectively "Plaintiffs"), brought this action individually and on behalf of all others similarly situated against Popular, Inc. ("Popular" or "the Company"), Richard Carrion ("Carrion"), Jorge A. Junquera ("Junquera"), Manuel Morales ("Morales"), Francisco M. Rexach ("Rexach"), Juan J. Bermudez ("Bermudez"), Maria L. Ferre ("Ferre"), William J. Teuber ("Teuber"), Jose R. Vizcarrondo ("Vizcarrondo"), Frederic V. Salerno ("Salerno"), Michael J. Masin ("Masin"), PricewaterhouseCoopers LLP ("Pricewaterhouse"), UBS Financial Services Incorporated of Puerto Rico ("UBS"), Popular Securities, Inc. ("Popular Securities"), and Citigroup Global Markets, Inc. ("Citigroup"), alleging violations of federal securities laws. Plaintiffs' claims arise out of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) & 78t(a), and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), & 77o.

Presently before the court are three motions to dismiss presented by the defendants (Docket Nos. 116, 119, and 124), the memoranda of law filed in support thereof (Docket Nos. 117 and 120), Plaintiffs' omnibus opposition to the defendants' motions to dismiss (Docket No. 146), and the defendants' replies (Docket Nos. 147, 149, and 150).

After reviewing the parties' pleadings and the relevant case law, the court **GRANTS in part and DENIES in part** Popular and the individual defendants' motion to dismiss (Docket No. 116),

and **GRANTS** Pricewaterhouse and the Underwriter Defendants' motions to dismiss (Docket Nos. 119 and 124).

I.      **Relevant Factual Background as Alleged in the Complaint**

        *A.      Parties*

        The lead plaintiffs in this consolidated class suit purchased or acquired Popular common stock and/or 8.25% non-cumulative monthly income preferred stock Series B ("Series B preferred stock") between January 24, 2008 and February 19, 2009 (the "class period").  Defendant Popular is a publicly traded bank holding company headquartered in San Juan, Puerto Rico that offers a variety of financial and banking services.  It operates in two main target markets: Puerto Rico ("Popular PR") and the mainland United States ("Popular US").  Throughout the Class Period, Popular PR offered retail and commercial banking services through its principal bank subsidiary, Banco Popular de Puerto Rico.  Popular US offered retail and commercial banking services through Banco Popular North America, Inc. ("BPNA") and consumer finance services through Popular Financial Holdings, Inc. ("PFH").  BPNA's operating subsidiaries included E-LOAN, a provider of online consumer direct lending, while PFH's operating subsidiaries included Equity One, a subprime loan originator and provider of mortgage and consumer loans, and Popular Mortgage Servicing, Inc., a third party mortgage servicing provider which housed Popular's manufactured housing loan portfolio.

        During the class period, defendant Carrion was CEO of Popular and Chairman and CEO of BPNA, and defendant Junquera was Popular's Senior Executive Vice President and Chief Financial Officer (collectively "Officer Defendants").  Defendants Morales, Rexach, Bermudez, Ferre, Teuber, Vizcarrondo, Salerno, and Masin were all outside directors of Popular during the relevant time period (collectively "Director Defendants").

        Defendant Pricewaterhouse served as Popular's outside auditor during the class period.  Meanwhile, defendants UBS and Popular Securities[1] are the investment banks that acted as joint book-running managers of the Series B preferred stock offering, while defendant Citigroup, also an

_____

[1]Popular Securities is also a wholly owned subsidiary of Popular.

1   investment bank, acted as the senior manager of the Series B offering (collectivelly "Underwriter

2   Defendants").

3           **B.     Popular's Financial Reporting Before and During the Class Period**

4           At the beginning of the class period, defendant Popular was at a three-year cumulative loss

5   position, with a cummulative before tax loss of $465 million for the years ending December 31,

6   2005 through December 31, 2007.  Popular US's share of the Company's net losses was $357

7   million for the quarter ending on December 31, 2007, and $465 million for the year ending on

8   December 31, 2007.  According to the complaint, Popular US had been reporting significant losses

9   since the fourth quarter of 2006.  Its losses ranged from $24 to $473 million in six of the eight

10  quarters, from the fourth quarter of 2006 through the third quarter of 2008.[2]

11          Before the class period began, Popular reassured investors about the financial stability of the

12  Company through various plans to improve the Company's balance sheet, profitability and liquidity.

13  In January 2007, Popular announced a plan to restructure its U.S. mainland subsidiary, PFH, by

14  exiting the wholesale subprime mortgage loan origination business during the early first quarter of

15  2007, and to shut-down its wholesale broker, retail and call center business divisions (the "PFH

16  restructuring plan").  (See Docket No. 117-6 at 10.)  The Company also announced that, as part of

17  Popular's stabilization plan, it removed approximately $3.2 billion in subprime mortgage loans from

18  its balance sheets by recharacterizing certain securitizations as "sales" under Generally Accepted

19  Accounting Principles ("GAAP"),[3] and $3.1 billion in related liabilities representing secured

---

21          [2] Plaintiffs allege that at the beginning of the class period, Popular US's PFH unit had
22  operated at a loss for ten consecutive quarters.  Likewise, Popular US's E-LOAN business segment
    had operated at a loss for four consecutive quarters before the class period.  In contrast, and as
23  pointed out by the defendants by reference to the public filings that were cited in the complaint, (see
    Docket No. 117 at 188) (citing Form 10-Q's for the periods ended Mar. 31 and June 30, 2008,
24  Docket No. 117-7 at 6 & 117-8 at 6), Popular US's commercial retail banking operation, BPNA,
25  began to operate at a significant loss once the class period began, in the second quarter of 2008.  In
    the first quarter of 2008, BPNA remained profitable, earning $15.8 million and suffering a relatively
26  small loss of $12.7 million in the second quarter, leaving its half-year earnings at about $3.1 million.
27  However, it operated at a loss in subsequent quarters during the class period.

28          [3]GAAP are a detailed framework of accounting principles accepted by the Securities and
    Exchange Commission ("SEC") and promulgated in part by the American Institute of Certified

borrowings.  (See id. at 12.)  In 2007, Popular also announced a plan to significantly restructure and downsize its E-LOAN business to engage in less risky lending (the "ELOAN restructuring plan"). Popular's 2007 Form 10-K,[4] filed on February 29, 2008, mentioned that, as a result of the restructuring plans for E-LOAN, Popular expected operating expenses to be reduced by approximately $77 million for 2008, and a decline of $15 million in E-LOAN's estimated net losses for the same year.

Plaintiffs allege that as a result of these stabilization strategies and the costs that they entailed,[5] Moody's downgraded Popular's credit rating, and stated that Popular's remaining U.S. subprime exposure, the impairment of the E-LOAN platform, and the lackluster profitability of its U.S. banking business, pointed to significant challenges in Popular's U.S. operations.  (Docket No. 91, ¶ 104.)  The securities analyst firm Sterne Agee & Leach, Inc. ("Sterne Agee") reported on January 15, 2008 that its main concern with Popular were credit conditions, which continued to deteriorate because of "recessionary trends in Puerto Rico coupled with continued weakness in U.S. markets."  (Id. at ¶ 106.)

On January 23, 2008 (the day before the start of the class period), Popular announced the sale of a significant portion of the mortgage loan and consumer finance portfolio of Equity One, PFH's subsidiary.  As a result, PFH closed down all of its consumer finance operations.  Plaintiffs' confidential witness ("CW") 7, a District Manager for Equity One from February 2007 to March

Public Accountants ("AICPA").  The Financial Accounting Standards Board ("FASB") is a non-profit entity responsible for developing generally accepted accounting principles.

[4]The 10-K and 10-Q are, respectively, annual and quarterly reports required by the SEC. They include financial statements, financial analysis, risk disclosures, and information about internal controls.

[5]Popular reported that the restructuring plan for PFH resulted in restructuring costs amounting to approximately $14.7 million in 2007, primarily in severance and lease termination charges, and a total of $21.4 million in impairment of long-lived assets and goodwill in 2006.  (See Docket No. 117-6 at 10.)  Plaintiffs allege that the E-LOAN restructuring plan resulted in impairment charges of at least $175 million off of E-LOAN's goodwill and trademark.  Similarly, Plaintiffs allege that the recharacterization of the on-balance sheet securitizations as "sales" involved a net loss of "approximately $90 and $165 million."  (Docket No. 91, ¶ 102.)

2008, stated that he was told in conference calls by the President and Executive Vice President of Equity One that Popular used funds from the sale of Equity One as a cash infusion to keep Popular "propped up" while they weathered the storm.  (Docket No. 91, ¶ 149.)  On February 22, 2008, Popular announced that it would recognize a negative adjustment of $280 to $300 million based on a fair valuation of PFH's remaining portfolio of mortgage loans, home equity loans, and certain related liabilities.

In order to raise liquidity, Popular announced on May 22, 2008 the offering of 16 million shares of its Series B preferred stock, ammounting to $400 million.  (See Docket No. 117-25 at 3.)  The sale of these shares between May 22 and 28, 2008, at $25 per share, raised net proceeds of approximately $386,150,000.  The May 2008 offering was made pursuant to a registration statement and prospectus signed by the Officer and Director Defendants and filed with the SEC.  Those filings expressly incorporated Popular's Form 10-K for the year ended December 31, 2007 and its Form 10-Q filed on May 12, 2008.  Pricewaterhouse audited Popular's financial statements included in the 2007 Form 10-K and issued its unqualified auditor's report on February 29, 2008, which was expressly incorporated into the prospectus supplement for the May 2008 offering.

Subsequently, on August 28, 2008, Popular announced it would cut its quarterly dividend to investors in half, from $0.16 to $0.08, saving the company $90 million in capital per year.  Plaintiffs argue, however, that by late-August 2008, Popular's liquidity had become so dire that it had to sell off its remaining U.S. operation assets at significant losses.

Since before the start of the class period, Popular reported its losses at Popular US as deferred tax assets,[6] without recording a valuation allowance against them.  In its 2007 Form 10-K, filed on February 29, 2008, Popular indicated that:

> The realization of the deferred tax asset related to the net operating loss carryforward of the Corporation's U.S. operations is dependent upon the existence of, or generation of, taxable income prior to their expiration term of 20 years. Based on the information available as of December 31, 2007, the Corporation expects to fully

---

[6] Deferred tax assets (DTAs) are operating losses, tax credits and future tax deductions that can be used to reduce income taxes owed by a company in a subsequent tax period. (Docket No. 91, ¶ 43.)

realize the net deferred tax asset.

(Docket No. 91, ¶ 118.)  Similarly, in Popular's Form 10-Q for the first quarter of 2008, filed on May 12, 2008, Popular reported a $694 million deferred tax asset, primarily from Popular US. Popular explained its retention of the full amount of the U.S. deferred tax assets based on their twenty-year expiration term, indicating that "[t]he only portion of the deferred tax asset that has a limited life is the portion related to the net operation loss carryforward of the Corporation's U.S. Operations.  Since its expiration term is of [twenty] years, the Corporation expects to generate enough taxable income prior to such expiration term to fully realize it."  (Id. at ¶ 119.)

Plaintiff's allege that defendants knew in 2007 that the credit and subprime crisis was significantly harming its U.S. operations and would likely keep them from earning a significant profit going forward.  While in 2005 Popular's provision for loan losses was only $195,272,000, in 2006 Popular's provision for loan losses had grown by 50% to $287,800,000, and doubled from that to $562,700,000 in 2007.  Plaintiff's CW 1, Vice President and Regional Manager at BPNA from November 2003 to November 2008, responsible for running BPNA's problem loan and workout area for New York and Florida, allegedly stated that after Popular US sustained its 2007 losses he did not see evidence that Popular would be able to turn a profit in 2008.  (Id. at ¶ 82.)  According to CW 1, Popular knew that the Company was going to take a larger loss in 2008 than in 2007.  (Id.)  In a report issued on July 22, 2008, Sterne Agee stated that "Popular's [DTA] was a staggering $808 million in 2Q, up from $694 million in 1Q and $525 million in 4Q08.  This 'asset' now totals nearly 27% of tangible equity (preferreds included).  While we think Popular will be able to utilize a large portion of DTA over time, we continue to question the viability of the U.S. related portion of this asset."  (Id. at ¶ 126.)

According to the complaint, on October 22, 2008 Popular announced that due to its three-year cummulative loss position it was required to record a partial valuation allowance against Popular's U.S. mainland deferred tax assets.  In its Form 10-Q, filed on November 10, 2008, Popular stated that, while the Company expected to realize $322 million of the DTA, it would need to take a valuation allowance for $360.4 million in the third quarter of 2008, in accordance with the FASB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes" ("SFAS No. 109"), which governs the maintenance of deferred taxes on a company's balance sheet.  Popular's forecast of future taxable income included "cost reductions initiated in connection with the reorganization of the U.S. mainland operations and two tax planning strategies."  (Id. at ¶ 130.)  The two tax strategies considered by management included reducing the level of interest expenses in the U.S. operations by transferring debt to the P.R. operations, and the transfer of a profitable line of business to the U.S. mainland operations.  (Id.)

In their subsequent October 28th report, Sterne Agee stated that "[a]long with the PFH charge, Popular as we expected/suggested, took a valuation allowance of $360 million on a gross DTA that now totals over $1 billion with net DTA now at $663 million.  While we feel this is a step in the right direction, we would note that about half of the DTA ($323MM) pertains to U.S. operations that are unprofitable and a portion (or all) will likely be sold long before any profits materialize, assuming a buyer can be found."  (Id. at ¶ 174.)  In the Company's 2008 Form 10-K, filed on March 2, 2009, Popular stated that it had not needed to take a full valuation allowance for all of its U.S. mainland deferred tax assets in the third quarter of 2008 because Popular US's cumulative taxable loss was "temporary" and due to "unprecedented market conditions."

According to the complaint, Popular reported a $668.5 million loss for the third quarter of 2008, ending on September 30th.  In November 2008, Popular petitioned the U.S. government and got preliminary approval for $950 million in funds from the Troubled Asset Relief Program ("TARP"), which transaction closed on December 5, 2008.  After the end of the class period, at a March 4, 2009 conference, defendant Junquera admitted that liquidity was "a very serious problem from the end of '07 throughout '08."  (Id. at ¶ 153.)

On January 22, 2009, Popular revealed the need to record a full valuation allowance for its U.S. operations DTA.  On that day, Popular issued a press release announcing its financial results for the fourth quarter and year ended on December 31, 2008, reporting a net loss of $702.9 million, compared with a net loss of $294.1 million in the same quarter of 2007 and a net loss of $668.5 million for the quarter ended September 30, 2008.  (See Docket No. 117-18 at 2.)  Popular reported

that for the year ended December 31, 2008, the net loss reported amounted to $1.2 billion, compared to a net loss of $64.5 million in the same period of the previous year.  (Id.)  The press release stated that Popular's "net deferred tax assets (prior to deducting the valuation allowance) amounted to $1.2 billion as of December 31, 2008, of which $848 million pertains to the U.S. mainland operations." (Docket No. 91, ¶ 177.)

Defendant Carrion indicated in the press release that Popular's dissapointing results "reflect deteriorating economic conditions both in the U.S. mainland and Puerto Rico, which resulted in substantial loss for the fourth quarter principally caused by a significant increase in the allowance for loan losses and the valuation allowance equal to 100% of the deferred tax asset related to our U.S. mainland operations."   (Docket No. 117-18 at 2.)   Carrion went on to state that "[n]otwithstanding these charges, our Puerto Rico operation produced over $200 million in profits," that the TARP funds provided Popular with solid regulatory capital ratios, and that "[t]he integration of the U.S. mainland franchise and [Popular's] Puerto Rico operation [was] underway to provide a more nimble organization focused on core banking and achieving the necessary operational synergies." (Id.)  The press release included announcements that Popular faced a weakening credit environment, suffered losses in all of its U.S. operating segments, saw its net interest income decrease, and had further restructured BPNA and E-LOAN.  (See Docket No. 117-18 at 2-3.)

Following this announcement, Popular's common stock fell over 50%, from $4.98 on the close of trading on January 21, 2009, to $2.46 on the close of trading on January 22, 2009.  In a report dated January 23, 2009, B. Riley reduced its Popular rating from "buy" to "sell," noting that "the biggest factors in the large loss were a much larger than anticipated loan loss provision and a valuation allowance taken against the deferred tax asset.  These two items accounted for roughly $1.81 of the 1.99 loss [per share] in excess of our estimate [of $0.56]."  (Docket No. 117-19 at 2.) In a report issued on January 27, 2009, Sterne Agee stated that "[i]n addition to further deterioration in credit, the primary factor driving [Popular's fourth quarter loss of $703 million] was a $463 million valuation adjustment for the U.S. operations DTA."  (Docket No. 117-20 at 2.)  In its report, B. Riley further indicated that "[w]ith the closing of PFH in [the fourth quarter of 2008], [they] had

expected the company to take a valuation allowance for the DTA related to this unit, but [they] had anticipated the DTA related to operating losses, which have a useful life of 20 years, to remain." (Id. at 3.)  The report went on to indicate that Popular decided to record an allowance for the full amount of its DTA based on the three-year cumulative loss position of its U.S. operations "and the inability to show a concrete, plausible plan for reaching profitability over a reasonable time frame in order to use the losses."  (Id.)

Plaintiffs allege that on February 19, 2009 (the last day of the class period), Popular announced that it had been forced to cut its dividend by 75%, from $0.08 to $0.02, in order to save $68 million in capital a year.  In announcing the dividend cut, Popular stated that it was built on previous events in order to provide greater flexibility to the Company.  (Docket No. 91, ¶ 185.) Plaintiffs allege that, in response to this news, Popular's common stock fell again from $1.79 to $1.59, or an additional 11% in one day, while its Series B preferred stock fell 43% in one day.

### C.    Defendants' Alleged Misleading Statements

Plaintiffs contend that the defendants committed securities fraud by making false or misleading statements about Popular's finances in order to artificially inflate the Company's earnings and liquidity.  Specifically, the Plaintiffs allege that the following documents contain false or misleading statements:

(1) a January 24, 2008 press release issued by Popular, and statements made therein by Carrion, announcing the Company's financial results for the fourth quarter and year ending on December 31, 2007, and referencing the sale of most of Equity One's portfolio as part of the PFH restructuring plan;

(2) Popular's 2007 Form 10-K, filed on February 29, 2008, containing consolidated balance sheets and statements of income purporting to reflect the Company's financial performance for the year ending on December 31, 2007 in accordance with GAAP, and indicating that the Company expected to fully realize its DTA;

(3) an April 18, 2008 press release issued by Popular announcing its financial results for the first quarter of 2008, which ended on March 31, 2008, also purporting to accurately reflect the

Company's performance in accordance with GAAP;

(4) Popular's Form 10-Q for the period ending on March 31, 2008, filed on May 12, 2008, reporting the Company's total DTA based on net operating loss carry-forwards and indicating the expectation of fully realizing the DTA, as well as Carrion and Junquera's certification therein that the same was a fair representation of Popular's financial condition;

(5) a July 17, 2008 press release issued by Popular announcing financial highlights for the second quarter of 2008, which ended on June 30, 2008, indicating that the same were reported in accordance with GAAP, and Carrion's statements therein that Popular was evaluating strategies to improve the profitability of its U.S. operations and that they remained strongly capitalized;

(6) Popular's Form 10-Q for the period ending on June 30, 2008, filed on August 11, 2008, indicating that the Company expected to generate sufficient taxable income prior to the twenty-year expiration term to fully realize its mainland U.S. DTA, and that the Company continued to exceed the well-capitalized guidelines under federal banking regulations;

(7) an August 28, 2008 press release issued by the Company wherein Carrion announced that Popular's capital base remained above "well capitalized" ratios;

(8) an October 22, 2008 press release issued by Popular announcing its financial results for the third quarter of 2008, which ended on September 30, 2008, indicating that Popular remained well capitalized, and stating that they had raised liquidity to meet obligations through 2009;

(9) Popular's Form 10-Q for the period ending on September 30, 2008, filed on November 10, 2008, reporting Popular's DTA and the Company's expectation of realizing the same, as well as Carrion and Junquera's certification therein that the same was a fair representation of Popular's financial condition; and

(10) Popular's Form 8-K, filed on November 18, 2008, attaching a presentation for a B. Riley investor conference wherein Popular represented that it had resolved their liquidity concerns and that they were at "well capitalized" levels.

Plaintiffs maintain that all of the above statements were materially false or misleading because: (1) under GAAP, Popular US's three-year cumulative loss position and the downsizing of

1   the U.S. mainland operations required the Company to record a full valuation allowance against its

2   Popular US DTA; (2) under GAAP, the Company's increasing losses on the mainland should have

3   prevented it from anticipating sufficient taxable income to realize its U.S. mainland DTA prior to

4   their twenty-year expiration period; (3) under GAAP, the Company's purported "tax strategies" were

5   not prudent, feasible, or otherwise sufficient; (4) Popular US was not "well capitalized" under FDIA

6   regulations because the recordation of the required full valuation allowance would have lowered

7   Popular's risk-based capital ratio below the 10% FDIA requirement; and (5) the Company's balance

8   sheet and assets were, thus, artificially inflated.

9   **II.      Standard of Review**

10          Under Rule 12(b)(6), a defendant may move to dismiss an action against it for failure to state

11   a claim upon which relief can be granted.  <u>See</u> Fed.R.Civ.P. 12(b)(6).  When considering a motion

12   to dismiss, the court must decide whether the complaint alleges enough facts to "raise a right to relief

13   above the speculative level." <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 1965

14   (2007).  In so doing, the court accepts as true all well-pleaded facts and draws all reasonable

15   inferences in the plaintiff's favor.  <u>Parker v. Hurley</u>, 514 F.3d 87, 90 (1st Cir. 2008).  However, "the

16   tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable

17   to legal conclusions."  <u>Ashcroft v. Iqbal</u>, --- U.S. ---, 129 S.Ct. 1937, 1949 (2009).  "Threadbare

18   recitals of the elements of a cause of action, supported by mere conclusory statements, do not

19   suffice."  <u>Id</u>. (citing <u>Twombly</u>, 550 U.S. at 555).  "[W]here the well-pleaded facts do not permit the

20   court to infer more than the mere possibility of misconduct, the complaint has alleged –but it has not

21   'show[n]'– 'that the pleader is entitled to relief.'"  <u>Iqbal</u>, 129 S. Ct. at 1950 (quoting Fed.R.Civ.P.

22   8(a)(2)).

23          In sum, when passing on a motion to dismiss the court must follow two principles: (1) legal

24   conclusions masquerading as factual allegations are not entitled to the presumption of truth; and (2)

25   plausibility analysis is a context-specific task that requires courts to use their judicial experience and

26   common sense.  <u>Id</u>. at 1949-50 (citing <u>Twombly</u>, 550 U.S. at 555-56).  In applying these principles,

27   courts may first separate out merely conclusory pleadings, and then focus upon the remaining well-

28   pleaded factual allegations to determine if they plausibly give rise to an entitlement to relief.  <u>Iqbal</u>

129 S. Ct. at 1950.

1

2   Counts one and two of Plaintiffs' complaint are brought under Sections 10(b) and 20(a) of

3   the Exchange Act, as well as under Rule 10b-5 of the Rules and Regulations of the Exchange Act,

4   17 C.F.R. § 240.10b-5.  Therefore, they are subject to the heightened pleading standards of Federal

5   Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"),

6   15 U.S.C. § 78u-4(b).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with

7   particularity the circumstances constituting fraud or mistake."  Fed.R.Civ.P. 9(b).  Similarly, "the

8   [PSLRA] requires plaintiffs to state with particularity both the facts constituting the alleged

9   violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate,

10   or defraud."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (internal

11   quotation marks and citations omitted).

12   Furthermore, when deciding a motion to dismiss, the court must consider the complaint in

13   its entirety, including documents which are integral to the complaint or are incorporated by reference

14   in the pleadings.  See Tellabs, Inc., 551 U.S. at 322-323 (citing 5B Wright & Miller § 1357 (3d ed.

15   2004 and Supp. 2007)); see also Young v. Lepone, 305 F.3d 1, 11 (1st Cir. 2002) (district court

16   entitled to consider letters that were not attached to the complaint when complaint contained

17   extensive excerpts from letters and references to them; when factual allegations of complaint

18   revolved around document whose authenticity is unchallenged, that document effectively merges

19   into pleadings); In re Raytheon Securities Litigation, 157 F. Supp. 2d 131, 146 (D. Mass. 2001)

20   (citing Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 n.3 (1st Cir. 1999) (considering

21   pertinent public offering materials submitted with the defendants' motion to dismiss, even though

22   the plaintiff did not atach a copy of the offering materials to his complaint)).

23   **III.    Discussion**

24   There are two sets of claims asserted in the complaint.  First, counts one and two assert

25   fraud-based claims under Sections 10(b) and 20(a) of the Exchange Act, as well as under Rule 10b-

26   5, promulgated thereunder, against those defendants who are alleged to have directly participated

27   in a fraudulent scheme during the class period, acting with knowledge or reckless disregard of the

28   true facts.  These defendants are Popular and the Officer Defendants, collectively referred to as the

"Exchange Act Defendants."

The second set of claims, counts three through five, assert strict liability negligence claims under Sections 11, 12(a)(2) and 15 of the Securities Act against those defendants who are statutorily responsible for the allegedly material misstatements of facts and omissions in the offering documents, pursuant to which Popular Series B preferred shares were offered to the public in May 2008. All of the defendants in this case are implicated in these claims, i.e. Popular, the Officer Defendants, the Director Defendants, Pricewaterhouse and the Underwriter Defendants, and are collectively referred to as the "Securities Act Defendants." Plaintiffs specifically disclaim any allegations of fraud in connection with these non-fraud claims.

The court will address the defendants' arguments for dismissal as to each set of claims *seriatim*.

### A.   Claims under Section 10(b) and Rule 10b-5 of the Exchange Act

Section 10(b) and Rule 10b-5 of the Exchange Act provide that it is unlawful for any person to commit fraud in connection with the purchase or sale of securities. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The elements of a claim under Section 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission; (2) made with scienter, (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 195 (1st Cir. 2005) (citing Dura Pharm, Inc. v. Broudo, 544 U.S. 336 (2005)).

Popular and the individual defendants argue in their motion to dismiss that Plaintiffs' claims fail because they have not pled with particularity certain elements of their causes of action, namely (i) a material misstatement or omission, (ii) scienter, or a wrongful state of mind, and/or (iii) loss causation, as required by the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA. They also argue that the alleged misrepresentations that form the basis of the claim are protected by the PSLRA's statutory safe-harbor for forward-looking statements. Furthermore, they argue that Plaintiffs' claim under Section 20(a) of the Exchange Act fails because it requires an underlying violation of Section 10(b), which they argue has not been adequately pled.

### 1.   Materiality

With respect to the first element of a Section 10(b) and Rule 10b-5 cause of action, "[a] misrepresented or omitted fact will be considered material only if a reasonable investor would have

viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'"  Gross  v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988)).  Under the PSLRA a misleading statement or omission is alleged when the plaintiff claims that the defendant made an  "untrue statement of material fact," 15 U.S.C § 78u-4(b)(1)(A), or "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading," 15 U.S.C. § 78u-4(b)(1)(B).  The First Circuit has held that "[w]hile a company need not reveal every piece of information that affects anything said before, it must disclose facts, 'if any, that are needed so that what was revealed [before] would not be so incomplete as to mislead.'" Mississippi Public Employees' Retirement Sys. v. Boston Scientific Corp., 523 F.3d 75, 87 (1st Cir. 2008) (quoting In re Cabletron Sys., Inc., 311 F.3d 11, 36 (1st Cir. 2002); Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990 (en banc)).

The PSLRA requires that when alleging that a defendant made a material misrepresentation or omission, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  If the allegation is "made on information and belief," then the complaint must "state with particularity all facts on which that belief is formed." Id.; see also Boston Scientific, 523 F.3d at 85. "[T]his holds true even when the fraud relates to matters peculiarly within the knowledge of the opposing party." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999) (quoting Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985) (internal quotation marks and citations omitted)).

In this case, Plaintiffs' theory of material falsity is premised on the allegation that, under GAAP, Popular should have recorded a full valuation allowance several months before it did.  As pointed out by the defendants, Plaintiffs do not allege that the Company concealed any information from the market.  Rather, they contend that Popular misapplied GAAP, specifically SFAS No. 109, which governs the maintenance of deferred taxes on a company's balance sheet.  Plaintiffs correctly argue that GAAP violations can give rise to Section 10(b) liability.  See 17 C.F.R. § 210.4-01(a)(1) ("Financial statements filed with the Commission which are not prepared in accordance with

1

2  generally accepted accounting principles will be presumed to be misleading or inaccurate, despite

3  footnote or other disclosures, unless the Commission has otherwise provided.")

4       Popular and the individual defendants contend that Plaintiffs' complaint does not offer any

5  facts, particularized or otherwise, to support the critical conclusion on which this allegation is based:

6  that, after shedding certain money-losing operations, the Company's remaining operations could not

7  at that time be expected to earn sufficient income to absorb the DTA. They characterize Plaintiffs'

8  allegations as purporting to hold the defendants liable for merely exercising their (allegedly)

9  erroneous business judgment, as permitted under SFAS No. 109. The court must, thus, analyze the

10  requirements of SFAS No. 109 to determine whether Plaintiffs' allegations sufficiently allege a

11  misstatement, i.e., a misapplication of GAAP.

12       Deferred tax assets arise when a company will be able to benefit in future years by

13  offsetting past tax losses against future taxable income. (See SFAS No. 109 Summary, Docket No.

14  117-4 at 6.) In accordance with SFAS No. 109, however, deferred tax assets may only be maintained

15  on a company's balance sheet when it is expected that they will be realized, i.e., that these losses will

16  be used to reduce taxes payable in future years. (Id.) SFAS No. 109 states that a valuation

17  allowance, or a reduction in the booked value of the DTA, should be taken "if, based on the weight

18  of available evidence, it is *more likely than not* (a likelihood of more than 50 percent) that some

19  portion or all of the deferred tax assets will not be realized." (SFAS No. 109 ¶ 17e, Docket No. 117-

20  4 at 12.) If so, "[t]he valuation allowance should be sufficient to reduce the deferred tax asset to the

21  amount that is more likely than not to be realized." (Id.)

22       In its Summary, SFAS No. 109 states that "[a]ll available evidence, both positive and

23  negative, is considered to determine whether, based on the weight of that evidence, a valuation

24  allowance is needed for some portion or all of the deferred tax asset. Judgment must be used in

25  considering the relative impact of negative and positive evidence." (Docket No. 117-4 at 7; see also

26  SFAS No. 109 ¶ 20 and 25, Docket No. 117-4 at 13 and 15.) Important evidence to consider in

27  determining whether a valuation allowance is required includes an enterprise's results for recent

28  prior years, its current financial position, and current available information about future years.

1

2    (SFAS No. 109 ¶ 20, Docket No. 117-4 at 13.)  "The more negative evidence that exists (a) the more

3    positive evidence is necessary and (b) the more difficult it is to support a conclusion that a valuation

4    allowance is not needed."  (SFAS No. 109 Summary, Docket No. 117-4 at 7.)

5              SFAS No. 109 indicates that it is difficult to conclude that a valuation allowance is not

6    needed "when there is negative evidence such as cumulative losses in recent years," or if there is

7    evidence of "unsettled circumstances" that if not resolved would adversely affect operations or

8    profits in the future. (SFAS No. 109 ¶ 23, Docket No. 117-4 at 14.)  However, among the positive

9    evidence that might support a conclusion that a valuation allowance is not needed is "[a] strong

10   earnings history exclusive of the loss that created the future deductible amount . . . coupled with

11   evidence indicating that the loss . . . is an aberration rather than a continuing condition." (SFAS No.

12   109 ¶ 24c, Docket No. 117-4 at 14-15.)  A company may also implement tax-planning strategies that

13   are "prudent and feasible" to prevent an operating loss or tax credit carryforward from expiring

14   unused, and that would result in the realization of deferred tax assets. (SFAS No. 109 ¶ 22, Docket

15   No. 117-4 at 14.)

16             The court understands that the allegations in the Complaint, taken as a whole and drawing

17   all reasonable inferences in Plaintiffs' favor, are adequate to plead that the Company's financial

18   statements were material misstated at this stage.  A reasonable inference may be drawn from the facts

19   alleged that Popular's three-year cumulative loss position, combined with the Company's significant

20   downsizing of its U.S. mainland operations and the worsening market conditions, constituted strong

21   evidence that at the beginning of the class period it was more likely than not that the Company would

22   not be able to realize the benefits of its Popular US DTA in full.  The complaint does not reflect that

23   Popular could rely on any significant positive evidence to justify tilting the scales against a valuation

24   allowance at the beginning of the class period.  Popular US did not have a strong earnings history,

25   nor would it have been reasonable for Popular to interpret that the historical losses in its U.S.

26   operations were an aberration or anything but a continuing condition.[7]  Nonetheless, the defendants

27   _____

28          [7] Popular concedes that it could not use the DTA created by its U.S. operations to reduce

repeatedly issued financial statements and signed certifications asserting that the Company was in compliance with SFAS No. 109.

Plaintiffs' claim is supported by several alleged facts and reasonable inferences drawn from those facts.  For example, (1) the statements of Company insiders to the effect that there was no significant evidence at the end of 2007 to suggest that Popular would be able to book a profit in 2008; (2) the defendants' own admissions in their financial statements regarding the impact of the credit and subprime crisis on Popular, whose PFH subsidiary in the United States had a wholesale subprime business, and on the banking sector in general; (3) the restructuring and divestment of Popular US's operations and assets, including the costs associated with those actions; (4) the downgrading of Popular's credit rating; (5) the Company's potential sale of all of its U.S. operations; (6) the negligible profits that Popular US's remaining operations were generating at the beginning of the class period, as seen against the magnitude of Popular US's share of the Company's total DTA; and, most importantly, (6) Popular US's cumulative losses over the preceding three years.  Moreover, the fact that the Company reported a relatively small valuation allowance against its Popular US DTA in October 2008, while continuing to state that it expected to realize $322 million of its DTA, may have further misled investors to believe that the Company was properly reporting and evaluating its DTAs and taking valuation allowances as needed.  See In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 390 (S.D.N.Y. 2007) (noting that the absence of a valuation allowance in light of a planned securitization could plausibly have suggested to investors that the securitization would have no negative effect).

Through the use of Popular's accounting documents, Plaintiffs have alleged with sufficient detail the manner in which the defendants improperly accounted for a DTA against Popular US's operations and failed to recognize their likely inability to realize that DTA in full, as per the

_____

income taxes owed by its Puerto Rico operations, such that Popular could not have reasonably relied on the continued profitability of Popular PR for its determination regarding the likelihood of realizing its Popular US DTA.  (See Docket No. 117 at 8 n.10) (citing SFAS No. 109, ¶ 17, Docket No. 117-4 at 12-13.)

requirements of SFAS No. 109. The court finds that "[t]he [plaintiffs'] interpretation of the internal documents is at least as plausible as the interpretation offered by the defendants." In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 148 (D. Mass. 2001). Therefore, it "would be improper at the motion to dismiss phase – where the Court must take all of the plaintiff's well-pleaded allegations as true – to prefer the defendants' explanation of the financial documents over that of the plaintiff." Id. (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1421 (3d Cir. 1997) ("It is a factual question whether [the defendant's] accounting practices were consistent with GAAP.") and SEC v. Caserta, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999) ("Whether GAAP has been violated is a fact-specific issue.")).

As the court finds that the complaint states a claim that the Exchange Act Defendants should have recorded a valuation allowance much earlier than they did, which renders the financial statements false when made, Defendants' motion to dismiss Plaintiffs' claim on this ground is, thus, **DENIED.**[8]

### 2.    Scienter

Although Plaintiffs have adequately pled falsity, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d at 393.

The Supreme Court has stated that scienter is a "mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.2 (1976), quoted in

---

[8] Other cases cited by the defendants that have dismissed securities fraud claims based on failure to take an earlier valuation allowance on deferred tax assets are distinguishable. See Limantour v. Cray Inc., 432 F. Supp. 2d 1129 (W.D. Wash. 2006) (dismissing for failure to allege that the financial statements were false when made as opposed to a change in circumstances followed by a prompt reporting of a valuation allowance and where there were no allegations of "systematic" over-reporting).

1

2    Boston Scientific Corp., 523 F.3d at 85.  Under First Circuit precedent, "a plaintiff can demonstrate

3    scienter by showing that defendants either 'consciously intended to defraud, or that they acted with

4    a high degree of recklessness.'"  Boston Scientific Corp., 523 F.3d at 85 (quoting Aldrige v. A.T.

5    Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)).  The definition of recklessness for Section 10(b) and

6    Rule 10b-5 purposes involves "a highly unreasonable omission, involving not merely simple, or even

7    inexcusable, negligence, but an extreme departure from the standards of ordinary care . . ."  Greebel,

8    194 F.3d at 198 (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th

9    Cir.1977)), cited in In re Stone & Webster, 253 F. Supp. 2d at 111-12.

10          Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong

11   inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The

12   Supreme Court has instructed that, to qualify as strong, "an inference of scienter must be more than

13   merely plausible or reasonable – it must be cogent and at least as compelling as any opposing

14   inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314.  Thus, the court must consider "not

15   only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the

16   facts alleged."  Boston Scientific Corp., 523 F.3d at 86 (quoting Tellabs, 551 U.S. at 314).  To show

17   a strong inference of scienter, as required by the PSLRA, "the plaintiff may combine various facts

18   and circumstances indicating fraudulent intent," including those demonstrating motive and

19   opportunity.  See Fox v. First BanCorp, 2006 WL 4128534, at *9 (D.P.R. 2006) (citing Aldridge,

20   484 F.3d at 82).

21          The court understands that Plaintiffs' allegations regarding Popular's scienter are sufficient

22   to meet the heightened pleading standards of Rule 9(b) and the PSLRA.  Plaintiffs have alleged in

23   their complaint that: (1) Popular repeatedly violated GAAP by improperly recording a DTA and not

24   taking the required valuation allowance against that DTA, as required by SFAS No. 109; (2) Popular

25   was motivated by a desire to achieve a well-capitalized status; (3) Popular concealed the accounting

26   ramifications of not taking a valuation allowance against such a large DTA; (4) this allowed Popular

27   to file annual and quarterly reports with the SEC that overstated Popular's balance sheets and assets;

28   and (5) during the time that Popular was improperly failing to record a full valuation allowance

regarding its Popular US DTA, it made a public offering that raised more than $380 million for the Company. Taken together, these allegations raise a strong inference that Popular acted with scienter. See Aldridge, 284 F.3d at 82 (motive and opportunity may be used to show a strong inference of scienter); Greebel, 194 F.3d at 203 (significant GAAP violations may provide evidence of scienter); In re Raytheon Securities Litigation, 157 F. Supp. 2d 131, 147-48 (D. Mass. 2001) (GAAP violations combined with large accounting overstatements may provide strong inference of scienter).[9]

Similarly, Plaintiffs' allegations regarding the Officer Defendants' scienter are sufficient to meet the heightened pleading standards of Rule 9(b) and the PSLRA, as the court finds that their decision to not take an earlier valuation allowance was "highly unreasonable" and an "extreme departure from the standards of ordinary care" to the extent that the danger was either known to the defendants or so obvious that they must have been aware of it.[10] Plaintiffs have alleged in their complaint that the Officer Defendants knew that SFAS No. 109 governed the application of DTAs and valuation allowances. It is also alleged that this standard was applied and quoted in the Company's financial statements both before and throughout the class period. Moreover, according to the complaint, at the time they made their statements, the Officer Defendants knew all of the

---

[9] Though the Supreme Court of the United States has indicated that GAAP principles "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management," Thor Power Took Co. v. Commissioner of Internal Revenue, 439 U.S. 522, 544 (1979) (indicating that), quoted in Greebel, 194 F.3d at 205, "an application of GAAP that strays beyond the boundaries of reasonableness will provide evidence from which scienter can be inferred," In re Raytheon Securities Litigation, 157 F. Supp. 2d 131, 148 (D. Mass. 2001).

[10] Plaintiffs put forth a motive theory of scienter, however they have not pled any concrete and personal benefit to the Officer Defendants. The Officer Defendants' motive to protect the Company from financial jeopardy, i.e., loosing its "well-capitalized" status, is a goal shared by all corporate officers. Ezra Charitable Trust, 466 F.3d at 10 ("'catch-all allegations' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA") (quoting In re Cabletron Syst., 311 F.3d at 39 (citations omitted)). The important consideration is whether "defendants benefited in some concrete and personal way from the purported fraud." In re Stone & Webster, 253 F. Supp. 2d at 128-29 (quoting Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000)). The complaint in this case does not allege that Junquera or Carrion personally benefited by waiting to take a valuation allowance on Popular US's DTA.

previously referenced negative evidence that made it more likely than not that Popular would not be able to realize its Popular US DTA.  "It is simply not a plausible opposing inference that the Company's officers – sophisticated executives actively engaged in the planning of these transactions – were ignorant of the transactions' consequences on the Company's deferred tax assets."  In re Scottish Re Group, 524 F. Supp. 2d at 394 (referring to Scottish Re Group's securitization of a large block of assets and the company's failure to record a valuation allowance against its DTA when they knew the company would not be able to use any taxable income from those assets in the future).  The complaint adequately alleges that the Officer Defendants knew, or were at the very least reckless in not knowing, that their restructuring plans and the downsizing of operations, within a market that had been declining since 2007, would render Popular's U.S. operations insufficient to generate the required amount of taxable income to realize the magnitued of its DTA in the future.  The "unsettled circumstances" from restructuring those operations and the weakness of the U.S. market were "staring them in the face."  Id.  Moreover, the fact that the additional valuation allowance that finally had to be recorded at the end of the class period, in January 2009, totaled upwards of $460 million (a difference of $100 million as compared to the partial valuation allowance taken the previous October of 2008, and a total of $848 million corresponding to the US DTA) also provides some circumstantial evidence of scienter.[11]

The court must, thus, **DENY** the defendants' motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claim on this ground.

### 3.   Loss Causation

A plaintiff bringing a claim under Rule 10b-5 must plead loss causation, that is, that the

---

[11] As stated by the U.S. District Court for the Southern District of New York in In re Scottish Re Group, "[e]ven though a GAAP violation itself is insufficient to establish scienter, that is not to say that it can never weigh in favor of scienter. '[T]o the contrary, when the number, size, timing, nature, frequency, and context of misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter (or, converserly, in favor of a nonculpable state of mind.'"  524 F. Supp. 2d at 394 n.174 (quoting In re MicroStrategy Inc. Secs. Litig., 115 F. Supp. 2d 620, 635 (E.D. Va. 2000)).

1

2  "defendants' misrepresentations 'caused the loss for which the plaintiff seeks to recover.'" Dura

3  Pharm., Inc. v. Broudo, 544 U.S. 366, 345-46 (2005); see also 15 U.S.C. §78u-4(b)(4). "[U]nlike

4  elements of a §10(b) claim such as fraud and scienter," however, "neither Federal Rule of Civil

5  Procedure 9(b) nor the [PSLRA] require that securities fraud plaintiffs plead loss causation with

6  specificity." In re Tyco Int'l, Ltd., 236 F.R.D. 62, 71 (D.N.H. 2006) (citing Dura, 544 U.S. at 347).

7  Therefore, it "should not prove burdensome for a plaintiff who has suffered an economic loss to

8  provide a defendant with some indication of the loss and the causal connection that the plaintiff has

9  in mind." Dura, 544 U.S. at 347; see also Colon v. Diaz-Gonzalez, 2009 WL 3571974, at *6 (D.P.R.

10  2009) ("the loss causation pleading requirements should be interpreted so as not to impose a

11  significant burden on plaintiffs"). Moreover, "[d]isputes about loss causation turn primarily on

12  questions of fact." In re Tyco Int'l, Ltd., 236 F.R.D. at 71 (citing Wortley v. Camplin, 333 F.3d 284,

13  295 (1st Cir. 2003)).

14          The complaint contains allegations that as a result of the Exchange Act Defendants'

15  disclosures on January 22, 2009 concerning the need to take a full valuation allowance, the price of

16  Popular common stock fell by 50%. They also allege that after the Company cut its dividend by 75%

17  on February 19, 2009, Popular's common stock fell again by 11%, and that the price of Series B

18  preferred stock fell by 43% in one day. They further alleged contemporaneous statements made by

19  outside analysts to the effect that one of the biggest factors contributing to the large loss was the

20  large valuation adjustment for the Popular's U.S. operations DTA. The court understands that these

21  allegations sufficiently provide Defendants with "some indication of the loss and the causal

22  connection that the plaintiff has in mind." Dura, 544 U.S. at 347.[12]

23  _____

24          [12] The court notes the defendants' argument that Popular disclosed other information in its

25  January 22, 2009 announcement that it would take a full valuation allowance, such as information
    about the Company's large losses, increases in its loan loss allowances, and that Popular faced a

26  weakening credit environment. However, as defendants themselves argue in other sections of their

27  motion to dismiss, these were facts that had been previously included by the Company in its
    financial statements (see Docket No. 117 at 24) and that, compared to the announcement of a

28  theretofore unheard-of valuation allowance of over $460 million, seems to the court unlikely to have

Defendants' argument for dismissal on this ground is also **DENIED**.

### 4. PSLRA's Safe Harbor for Forward-Looking Statements

"[C]ourts in the First Circuit generally have declined to impose liability for so called 'forward looking statements'– that is, broad statements that express optimism about a company's future because these courts regard such statements as unlikely, as a matter of law, to be material to a reasonable investor." Carney v. Cambridge Technology Partners, Inc., 135 F. Supp. 2d 235, 245 (D.Mass. 2001). Forward-looking statements are subject to a lighter scrutiny. In re Stone & Webster, 253 F. Supp. 2d at 117. They include (1) statements containing projections of revenue, income, earnings per share, capital expenditures, or other financial items; (2) statements of the plans and objectives of management for future operations; (3) statements of future economic performance; and (4) any statements of the assumptions underlying or relating to the preceding statements. See 15 U.S.C. § 78u-5(i)(1)(A)-(D). However, the PSLRA creates two specific "safe harbors." "[T]he first shelters forward looking statements that are accompanied by meaningful cautionary statements. . . [and the second] precludes liability for a forward looking statement unless the maker of the statement had actual knowledge it was false or misleading." Greebel, 194 F.3d at 201 (citing 15 U.S.C. § 78u 5(c)(1)(A)(i) & (B)).

Here, defendants contend that the statements relied upon by Plaintiffs for their allegations of securities fraud constitute forward-looking statements that are protected by either or both of the PSLRA's safe harbor provisions. The court understands, however, that neither of the PSLRA's two

---

had as large an impact on stock prices as the corrective disclosures that Plaintiffs point to. The court agrees with Plaintiffs' assessment that those factors that the defendants reference as "far more fundamental indicators of business problems than the DTA allowance" (Docket no. 117 at 31) go to the question of whether the defendants should have recorded a valuation allowance in the first place, i.e., material falsity, rather than loss causation.

Further, the court notes the defendants' argument that the drop in stock price was most likely caused by changing economic conditions and the general decline in stock prices of the period in question. The court finds it sufficient, however, that Plaintiffs allegations as to the January 22, 2009 disclosures reflect a stock price drop of 50% from one day to the next, following the disclosure of the valuation adjustment. The court finds this to be sufficient, at the motion to dismiss stage, to establish the plausibility of Plaintiffs' allegations as to loss causation.

1

2   "safe harbors" are applicable to the case at hand.  First, all of the cautionary language that the

3   defendants cite to in order to convince the court that their statements fall within the PSLRA's first

4   category of safe harbor cannot be said to constitute "meaningful" cautionary language.  The court

5   has reviewed all of the documents referenced in the complaint, and cited to by the defendants, and

6   has found that each and every one of the financial statements at issue merely contain boilerplate

7   warnings.[13]  Second, based on the court's discussion *supra* regarding material falsity and scienter,

8   the statements at issue fall outside of the second category of safe harbor, since according to

9   Plaintiffs' well-pled allegations "the maker of the statement had actual knowledge it was false or

10   misleading." Id.

11        The court, therefore, **DENIES** the defendants' motion to dismiss on this ground as well.

12              ***B.      Claim under Section 20(a) of the Exchange Act***

13        Plaintiffs allege that Defendants Carrion and Junquera were controlling persons of Popular

14   during the class period and, as such, are liable pursuant to Section 20(a) of the Exchange Act for

15   Popular's primary violation of  Section 10(b) and Rule 10b-5.  Section 20(a) creates derivative

16   liability for persons who "control" others who are primarily liable under the Exchange Act.  The

17   statute reads as follows:

18              Every person who, directly or indirectly, controls any person liable under any
19              provision of this chapter or of any rule or regulation thereunder shall also be liable
                jointly and severally with and to the same extent as such controlled person ... unless
20              the controlling person acted in good faith and did not directly or indirectly induce the
                act or acts constituting the violation or cause of action.

21

22   _____

23

24        [13] (See Jan. 24, 2008 Press Release, Docket No. 117-9 at 8-9; see also Popular's 2007 Form
     10-K, Docket No. 117-6 at 4; Apr. 18, 2008 Press Release, Docket No. 117-10 at 7; Popular's Form
25   10-Q for period ended Mar. 31, 2008, Docket No. 117-7 at 5; Jul. 17, 2008 Press Release, Docket
     No. 117-11 at 7; Popular's Form 10-Q for period ended June 30, 2008, Docket No. 117-6 at 4; Aug.
26   28, 2008 Press Release, Docket No.  117-12 at 2; Oct. 22, 2008 Press Release, Docket No. 117-13
     at 9; Popular's Form 10-Q for period ended Sept. 30, 2008, Docket No. 117-14 at 5; Popular's Form
27   8-K containing copy of B. Riley Investor Presentation, dated Nov. 18, 2008, Docket No. 117-15 at
     5.)

28

15 U.S.C. § 78t(a).  Thus, in order for their Section 20(a) claim to survive a motion to dismiss, plaintiffs must have sufficiently pleaded primary violations of Section 10(b) and Rule 10b-5.

Given the court's finding that Plaintiffs have sufficiently pleaded a Section 10(b) and Rule 10b-5 claim under the Exchange Act, it must **DENY** the defendants' motion to dismiss on this ground.[14]

### C.  Claims under the Securities Act

As to the Securities Act claims, Popular and the individual defendants aver that Plaintiffs' Section 11 and 12(a)(2) claims are insufficient because they have not pled any untrue statements, actionable omissions, or loss causation.  They also argue that these claims are precluded by the statutory safe harbor for forward-looking statements.  Finally, the defendants contend that their Section 11 claim fails against all of the individual defendants because it is barred by the statute of limitations; that the Section 12(a)(2) claim fails against Popular because it is not a statutory seller; and that Plaintiffs' claim under Section 15 fails because it requires an underlying violation of Section 11 or 12(a)(2), and none has been properly pled.

Pricewaterhouse's memorandum of law in support of its motion to dismiss elaborates the statute of limitations argument advanced by Popular and the individual defendants, incorporates by

_____

[14]  The court notes the defendants' argument in a footnote to their motion to dismiss, that Plaintiffs' claims should fail as to the Officer Defendants because they do not plead "culpable participation" on the part of Carrion and Junquera.  The court's review of the case law reveals that, as pointed out by the defendants, the First Circuit has not taken a position on whether a plaintiff must prove this element in order to adequately state a claim under Section 20(a). See In re Stone & Webster, 414 F. Supp. 2d at 339.  Here, the Plaintiffs have pled that the Officer Defendants signed false and misleading financial statements, which supports an inference that defendants were culpable participants in the alleged fraud.  See Fox, 2006 WL 4128534, at *10 and *8 (citing In re Stone & Webster, 253 F. Supp. 2d at 135 (finding that if culpable participation is a required element for control person liability, a claim is sufficiently pled by alleging that defendants reviewed account payable reports containing material misrepresentations) (affirmed in part, vacated in part on other grounds, 414 F.3d 187 (1st Cir. 2005)).  Though defendants contend that more is needed in order to adequately plead this element, in an exercise of caution, the court will allow Plaintiffs' claims to go forward at this stage as adequately pled, based on its previous analysis regarding material falsity and scienter under the Exchange Act, which also suggest culpable participation.

1

2   reference their arguments as to loss causation, and expounds upon the argument that Plaintiffs' claim

3   under Section 11 fails the Iqbal plausibility standard.  The Underwriter Defendants join the previous

4   two motions to dismiss and, *inter alia*, incorporate their arguments by reference.[15]

5           **1.      Timeliness of Section 11 Claim Against Director Defendants,**
                      **Pricewaterhouse & the Underwriter Defendants**
6

7           The Securities Act states that Section 11 and 12(a)(2) claims must be "brought within one year

8   after the discovery of the untrue statements or the omission, or after such discovery should have been

9   made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  In the context of securities fraud

10  claims, the First Circuit has set forth a two-step analysis to determine when a plaintiff should have

11  discovered his or her fraud claim.  The first step looks at whether, and when, there existed "storm

12  warnings" of the "possibility" of fraud.  If storm warnings existed, the second step of the analysis

13  looks at when an investor exercising reasonable diligence to investigate those storm warnings should

14  have discovered the fraud claim.  See, e.g., Young v. Lepone, 305 F.3d 1, 8-9 (1st Cir. 2002).  Both

15  parts of this test require fact-intensive inquiries generally reserved for the factfinder.  See, e.g., In

16  re TyCom Ltd. Sec. Litig., 2005 WL 2127674, at *18 (D.N.H. 2005) ("Because the multifaceted

17  question of whether storm warnings were apparent involves issues of fact, and the circumstances of

18  each case must be explored independently, in certain cases it may not be appropriate to resolve this

19  issue on a motion to dismiss.") (internal quotation marks omitted).

20          Plaintiffs filed the original complaint in this matter on May 14, 2009, against Popular, Carrion

21  and Junquera.  (See Docket No. 1.)  The complaint that added the Director Defendants,

22  Pricewaterhouse and the Underwriter Defendants was filed on October 19, 2009.  (See Docket No.

23

24  _____

25          [15] In addition to the grounds previously mentioned, the Underwriter defendants argue that
    they are protected from liability by the "reliance defense" as to the Section 11 and 12(a)(2) claims,
26  since these claims rely on an alleged misrepresentation contained in a section of the offering
    documents that was reviewed and approved by Popular's expert accountants and auditors,
27  constituting "expertised" content for which underwriters cannot be held responsible in the absence
    of "reg flags."  Given the court's ultimate disposition of Plaintiff's Section 11 and 12(a)(2) claims
28  against the Underwriter Defendants, it need not discuss these arguments further.

91.)[16]  Pricewaterhouse argues that Plaintiffs were on inquiry notice of sufficient storm warnings at least by May 2008, when they relied on the offering documents, and the financial statements incorporated therein, to purchase the Series B preferred stock.  These documents were public disclosures of Popular US's precarious financial position and, as alleged by the Plaintiffs in their complaint, contained material misstatements regarding the need to record a valuation allowance against Popular US's DTA.  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325-27 (3d Cir. 2002) (imputing knowledge to plaintiffs when defendant's public filings and press releases had made it clear that a certain segment of the company was in deep trouble).

"[B]ecause the storm warnings must be 'directly' related to the alleged fraud, publicized financial pitfalls, on their own, are insufficient to put a reasonable investor on inquiry notice."  In re Polaroid Corp. Sec. Litig., 465 F. Supp. 2d 232, 242 (S.D.N.Y. 2006) (internal citations omitted).  "Whether financial woes are sufficient to put an investor on inquiry notice depends on the nexus between those woes and the alleged fraud."  Id.  In this case, a decision whether or not to take a valuation allowance for DTAs is dependent on a company's prospects for profitability.  Thus, a company's financial struggles are directly related to that decision.  Plaintiffs in this case claim that the company had been reporting cumulative losses for three consecutive years and that, under SFAS No. 109, this was strong negative evidence in favor of reporting a valuation allowance.  As in In re Polaroid Corp. Sec. Litig., the alleged misstatements in this case involve Popular's "intentional ignorance of this evidence strongly suggestive of the need to take a valuation allowance," which means "[P]laintiffs were on notice of [those misstatements or fraud] as soon as the relevant

---

[16]  The defendants point out that Plaintiffs' claim against the Director Defendants under Section 11 of the Securities Act does not "relate back" to the filing of the initial complaint because the outside directors and Pricewaterhouse are new parties, and Plaintiffs' failure to sue these defendants in the initial complaint was not the result of a mistake of identity.  See Fed. R. Civ. P. 15(c)(1)(C)(ii) (an amended complaint adding a new defendant relates back only where, among other criteria, the failure to sue the defendant in the initial pleading was a result of "a mistake concerning the other party's identity"); see also Krupski v. Costa Corciere S. p. A., -- U.S. ---, 130 S. Ct. 2485 (2010).  The court notes that no such mistake has been argued here by Plaintiffs.

statements were published because that evidence was publicly available in the statements of recent past." 465 F. Supp. 2d at 242.  Because Plaintiffs' allegations are to the effect that Popular's recent cumulative losses militated against forming a conclusion that a valuation allowance was not needed, "[P]laintiffs were on inquiry notice that something was amiss as soon as that conclusion was formed and made public."  Id.

Plaintiffs' only argument in opposition to Pricewaterhouse's contention of untimeliness is the unsupported contention that "[o]n its face, . . . this information alone gave no indication to investors that the Company's finances were materially misstated by the Company and its auditor in the Offering," because "investors who lacked the privileged access to information of these Defendants had no reason to suspect at the time of the Offering that the Company's financial statements were materially misstated."  (Docket No. 146 at 81.)  The court understands this argument to be entirely self-serving, as in every other instance the Plaintiffs have argued that the same public disclosures contained sufficient negative evidence to put Popular and the rest of the defendants on notice that the Popular US DTA was not realizable in full.  The court, thus, disregards Plaintiffs' contention of supposed "privileged access to information."

Further, the court notes that allegations in the complaint reflect the Plaintiffs' access to reports by analyst Sterne Agee warning that "Popular['s] U.S. mainland deferred tax assets were likely overstated" (Docket No. 91, ¶ 128) on five different occasions between the preferred stock offering and October 19, 2008, the cut-off date for the Section 11 statute of limitations.  See In re Global Crossing, Ltd. Sec. Lit., 313 F. Supp. 2d 189, 202 (S.D.N.Y. 2003) (inquiry notice arises "where the publicly available information is sufficiently suggestive of the probability of fraud that a reasonable investor would commence investigation").  Finally, as pointed out by Pricewaterhouse, Plaintiffs were able to bring their securities fraud claim under the Exchange Act within one year of publication. As Plaintiff's Securities Act claims are based on the same information, Plaintiffs necessarily had knowledge of their Section 11 claim when they filed their Exchange Act claims in May 2009.  See In re Tyco Int'l Sec. Litig., 185 F. Supp. 2d 102, 116 (D.N.H. 2002) (Plaintiff's ability to bring

1

2   securities fraud claims within a year of publication of information supported argument that the same

3   information provided notice of Section 11 claims).

4         For the foregoing reasons, the court **GRANTS** all of the moving defendants' motions to

5   dismiss the Section 11 and 12(a)(2) claims for untimeliness.  Accordingly, the court finds that

6   Plaintiffs' Section 11 claims against the Director Defendants, Pricewaterhouse and the Underwriter

7   Defendants were brought past the one-year statute of limitations and, thus, must be **DISMISSED**

8   as untimely.  Likewise, Plaintiffs' Section 12(a)(2) claim against the Underwriter Defendants is

9   **DISMISSED** as untimely.

### 1.   Section 12(a)(2) Claim Against Popular

11        Popular and the individual defendants argue that Plaintiffs lack standing to bring their Section

12  12(a)(2) against Popular.  A plaintiff has standing to bring a Section 12(a)(2) claim only against the

13  person or entity from whom he directly purchased the security.  See Fox, 2006 WL 4128534 at *5

14  (citing Shaw v. Digital, 82 F.3d 1194, 1215 (1st Cir. 1996)).  As discussed in Shaw, in a firm

15  commitment offering, "the issuer of the securities sells all the shares to be offered to one or more

16  underwriters, at some discount from the offering price."  Shaw, 82 F.3d at 1215.  When title passes

17  in this way, "[the company] and its officers cannot be held liable as seller under [Section 12(a)(2)]

18  unless they actively 'solicited' the plaintiffs' purchase of securities to further their own financial

19  motives, in the manner of a broker or vendor's agent."  Fox, 2006 WL 4128534 at *5 (citations

20  omitted).

21        According to Plaintiffs' complaint, the Underwriter Defendants committed to and purchased

22  the Series B preferred shares from Popular and sold those shares to the class members.  The sale of

23  Series B shares pursuant to an underwriting agreement means that Popular was not a statutory seller.

24  See Fox, 2006 WL 4128534, at *6 (citing Shaw, 82 F.3d at 1215).  Nevertheless, Popular can still

25  be held liable if under Section 12(a)(2) it actively solicited plaintiffs to purchase the Series B shares.

26  In this vein, the complaint alleges that Popular priced the offering; announced that it was "planning

27  to commence a public offering" of preferred stock; increased the offering size by $50 million to $400

28

million; sold approximately $16 million in shares; raised over $380 million from those sales; and prepared, filed and signed a registration statement, preliminary prospectus and prospectus supplement. (See Docket No. 91, ¶¶ 280-83.) However, "neither the involvement in preparation of a registration statement or prospectus, nor participation in 'activities' relating to the sale of securities, standing alone, demonstrates the kind of *relationship between defendant and plaintiff* that could establish statutory seller status." Shaw, 82 F.3d at 1216 (emphasis in original) (citing Pinter v. Dahl, 486 U.S. 622, 650-51 (1988)). Moreover, "[t]o impose liability on defendants, plaintiffs must plead and demonstrate that defendants acted as something more than simply a 'seller's seller.'" Lalor v. Omtool, Ltd., 2000 WL 1843247, at *8 (D.N.H. 2000) (citing Shaw, 82 F.3d at 1215). In other words, "[P]laintiffs must demonstrate that there was some sort of relationship between plaintiffs and defendants and that defendants 'actively solicited' plaintiffs' purchases." Id. The complaint in this case fails to allege such "active solicitation." See id. (noting that there were no allegations that plaintiffs had any contact whatsoever with any of the defendants, or received any "solicitations" from them apart from the prospectus). Consequently, Plaintiffs' have failed to state a viable claim against Popular under Section 12(a)(2) of the Securities Act.

Thus, the court **GRANTS** Popular and the individual defendants' motion to dismiss the Section 12(a)(2) claim against Popular for lack of standing.

### 2.   Remaining Section 11 Claims

Section 11 of the Securities Act imposes liability on signers of a registration statement and on underwriters, among others, if the registration statement, at the time it became effective, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). In turn, Section 12(a)(2) of the Securities Act imposes liability on sellers of a security who have imparted material misstatements or failed to disclose material facts concerning the security by means of a prospectus or oral communication. See 15 U.S.C. § 771(a)(2).

Popular and the individual defendants aver that Plaintiff's Section 11 and 12(a)(2) claims are

insufficient because they have not pled any untrue statements, actionable omissions, or loss

causation.  They also contend that these claims are precluded by the PSLRA's safe harbor provisions

for forward-looking statements.

Though Plaintiffs specifically disclaim any allegations of fraud in connection with their

Securities Act claims, they rely on the same theory of falsity to support these claims as they did for

their Exchange Act claims.  Plaintiffs allege that the offering documents and the financial statements

included or incorporated by reference therein were materially misstated because they were

purportedly prepared in accordance with GAAP, when in fact they contained an overstated overall

DTA that required a valuation allowance against Popular's U.S. mainland DTA under SFAS No.

109.  Per the court's discussion *supra* regarding the sufficiency of Plaintiffs' allegations of material

misrepresentations or omissions and loss causation under Section 10(b) and Rule 10b-a of the

Exchange Act, the court finds that Plaintiffs' allegations are also sufficient to state a claim under

both Sections 11 and 12(a)(2) of the Securities Act.[17]  The court also finds that the same analysis as

to the PSLRA's safe harbor provisions made under the Exchange Act applies to Plaintiffs'

allegations under the Securities Act.  Therefore, the court **DENIES** Popular and the individual

---

[17] It is apparent, after reviewing the cited caselaw and the court's independent research, that
First Circuit precedent preceding the passage of PSLRA by Congress, dictates that despite the
minimal requirements of Sections 11 and 12(2), Securities Act claims that "sound in fraud" trigger
the pleading requirements of rule 9(b).  See, e.g., Shaw v. Digital Equipment Corp., 82 F.3d 1194,
1223 (1st Cir. 1996) and Cooperman v. Individual, Inc., 171 F.3d 43, 47 n.6 (1st Cir. 1999); see also
In re Sonus Networks, Inc. Securities Litigation, 2006 WL 1308165, at * 5-8 (D. Mass. 2006)
(discussing caselaw).  However, the First Circuit has yet to revisit this issue in light of Congress'
subsequent adoption of the PSLRA, which requires particularized allegations for private actions
under the Exchange Act (15 U.S.C. § 78u-5(b)), but not the Securities Act (15 U.S.C. § 77z-1(b)).

Nevertheless, the court need not decide whether it would follow its previous determination
in Fox, 2006 WL 4128534, at *4, 6 (holding that the mere disclaimer of fraud-type allegations
prevented the complaint from sounding in fraud as to Securities Act claims) (citing In re Number
Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1, 12 (D. Mass. 1999), or the First Circuit's pre-
PSLRA precedent requiring the application of Rule 9(b) to the Plaintiffs' Securities Act claims, as
the court finds that it would reach the same conclusion in this case as to the sufficiency of Plaintiffs'
allegations regarding material misstatements, whether or not it were to apply the heightened pleading
requirements of Rule 9(b) to the Securities Act claims.

defendants' motion to dismiss on the aforementioned grounds.

### 3.  Section 15 Claim Against the Officer Defendants

Finally, Section 15 of the Securities Act imposes derivative liability upon persons who control those liable under Sections 11 and 12.  See 15 U.S.C. § 77o.  As the court has concluded that Plaintiffs have sufficiently pled a cause of action under both Section 11 and 12(a)(2) of the Securities Act, it must **DENY** Popular and the individual defendants' motion to dismiss the Section 15 claim on this ground.

## IV.   Conclusion

For the reasons set forth above, the court **GRANTS in part and DENIES in part** Popular and the individual defendants' motion to dismiss (Docket No. 116), **GRANTS** Pricewaterhouse's motion to dismiss (Docket No. 119), and **GRANTS** the Underwriter Defendants' motion to dismiss (Docket No. 124).  Accordingly, the court **DISMISSES** Plaintiffs' claims brought pursuant to Section 11 of the Securities Act against the Director Defendants, Pricewaterhouse and the Underwriter Defendants.  The court also **DISMISSES** Plaintiffs' claims against Popular and the Underwriter Defendants under Section 12(a)(2) of the Securities Act.  Remaining before the court are Plaintiffs' claims under Section 10(b) and Rule 10b-5 of the Exchange Act against the Exchange Act Defendants (Popular and the Officer Defendants); their claims under Section 20(a) of the Exchange Act against the Officer Defendants (Carrion and Junquera); their claims under Section 11 of the Securities Act against Popular and the Officer Defendants; and their claims under Section 15 of the Securities Act against the Officer Defendants.

**SO ORDERED**.

In San Juan, Puerto Rico this 2nd day of August, 2010.


                              S/ Gustavo A. Gelpí
                              GUSTAVO A. GELPÍ
                              United States District Judge